```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3   UNITED STATES OF AMERICA    .
                                 .  H-09-CR-336
 4         vs.                   .  HOUSTON, TEXAS
                                 .  APRIL 28, 2010
 5                               .  8:09 A.M.
     BRENT A. CARTER and         .
 6   MICHAEL N. SWETNAM, JR.     .
     . . . . . . . . . . . . . . .
 7

 8                   TRANSCRIPT OF JURY TRIAL
               BEFORE THE HONORABLE KEITH P. ELLISON
 9                 UNITED STATES DISTRICT JUDGE

10          TESTIMONY OF BRENT CARTER, VOL. 2 OF 2
                 EXCERPTED FROM TRIAL DAY 7 OF 9
11

12   A P P E A R A N C E S:

13   FOR THE GOVERNMENT:

14        Gregg Costa
          Ryan McConnell
15        Assistant US Attorney
          PO Box 61129
16        Houston, Texas   77208-1129

17   FOR THE DEFENDANT BRENT A. CARTER:

18        Edmund K. Cyganiewicz
          Attorney at Law
19        1000 East Madison Street
          Brownsville, Texas 78520
20
          Norton A. Colvin, Jr.
21        Mitchell Chaney
          Colvin Chaney Saenz & Rodriguez
22        1201 East Van Buren Street
          Brownsville, Texas 78520
23

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
25                          - - - - -
```

```
 1  A P P E A R A N C E S:  (Continued)

 2  FOR THE DEFENDANT MICHAEL N. SWETNAM, JR.:

 3       Irvin Sheldon Weisfeld
         Attorney at Law
 4       855 East Harrison Street
         Brownsville, Texas 78520
 5
         Michael E. Clark
 6       Duane Morris, LLP
         3200 Southwest Freeway
 7       Suite 3150
         Houston, Texas 77027-7540
 8

 9  OFFICIAL COURT REPORTER:

10       Cheryll K. Barron, CSR, CM, FCRR
         U.S. District Court
11       515 Rusk Street
         Houston, Texas  77002
12
    ALSO PRESENT:
13
         Steve Goehring
14       Matthew Boyden
                              - - - - -
15

16

17

18

19

20

21

22

23

24

25
```

1                               INDEX

2                                                      PAGE

3   DEFENDANT CARTER'S WITNESS

4   Brent Carter

5       Direct Examination by Mr. Colvin                5

6       Cross-Examination by Mr. McConnell              78

7       Cross-Examination by Mr. Clark                  204

8       Recross-Examination by McConnell                243

9                           - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

*(Jury present)*

THE COURT:  Thank you.  Please be seated.  Ladies and
gentlemen, welcome.  Good morning, and thank you so much for
your continued punctuality throughout this trial.

Let me tell you what is in store.  We are going
to finish with testimony today.  And we may very well at that
point give you a break and let you go home early.  You'll get
paid for the full amount, of course.  We may then just adjourn
early.

We'll ask you to be back tomorrow morning at the
usual time.  Tomorrow morning, first I'll give my instructions,
kind of like the instructions I gave you at the beginning.  And
then we'll hear arguments of counsel, and then you begin your
deliberations.

As I always tell jurors when they ask about how
long deliberations will take, they'll take as long as they need
to.  I just don't know.  I've had cases where I thought the
jury would be back in 30 minutes and they took a day and a
half.  I've had cases just the opposite, where I thought it
would take a day and a half and they came back in an hour.  I
mean, I just don't know.

You may not even know.  If you followed our
instructions about not discussing the case among yourselves,
you don't even know what your colleagues are thinking.

*Colvin Direct of Carter*

08:10 1    But once we do give it to you, I promise I'll

2    ride with you for as long and in whatever way you want.  If you

3    want to continue the usual schedule of 8:00 to 4:00, that's

4    fine.  If you want to stay late and get it done tomorrow,

08:10 5    that's fine, too. I'll do whatever you want me to do.

6    Okay.  With that, why don't we proceed with the

7    rest of Mr. Carter's testimony?

8    **BRENT CARTER, DULY SWORN, TESTIFIED:**

9    **DIRECT EXAMINATION**

08:11 10   BY MR. COLVIN:

11   Q.  Good morning, Mr. Carter.

12   A.  Good morning, sir.

13   Q.  I believe we left off -- I know I kind of jumped around

14   yesterday a little bit, but I believe we left off on or about

08:11 15   September 5, 2007.  Do you remember that?

16   A.  It was 2006.

17   Q.  2006?

18   A.  Yes, sir.

19   Q.  I'm sorry.  I apologize.  September 7 -- September 5, 2006.

08:11 20   And that was when you heard for the first time from Mr. Swetnam

21   that there was a problem with the windstorm coverage?

22   A.  Yes, sir.

23   Q.  Did you keep any kind of record of what you were doing

24   during this time period, this September time period, of 2006?

08:11 25   A.  Yes, sir.  I was keeping a journal.

*Colvin Direct of Carter*

08:11    1    Q.  And what was the purpose of that?  Why were you doing it?

2    A.  Well, two reasons really.  I'd been getting some pressure

3    from Mr. Reagan at Smith-Reagan regarding new business

4    production.  And he was pretty adamant that I needed to produce

08:12    5    more small commercial accounts, and he was kind of wanting to

6    chronicle my time a little bit just mentally between he and I.

7    And the other reason was there was some criticism

8    within the agency that -- you know, little stinging remarks

9    that, you know, "Carter is making so much money but all he does

08:12   10    is play golf with the CEO"; and I was kind of getting beat up a

11    little bit by my colleagues.  So, I made a journal.

12    Q.  And what were you trying to demonstrate in the journal?

13    A.  Well, I ended up just keeping it for myself; but I was

14    marking all the time that it really took to -- the trips to and

08:12   15    from the hospital, the time that I was there.

16    You've been to a hospital.  You park 4 miles

17    away.  By the time you get to where you're going, you would

18    walk -- it took a half hour to go into the building.

19    So, I was just keeping up with that mostly for

08:12   20    myself; but over time I kept it for a record in case I was

21    asked.

22    Q.  Okay.  Was there any criticism about the time you were

23    actually working on the Valley Baptist account or whether you

24    were really working on the Valley Baptist account?

08:13   25    A.  No, sir.

*Colvin Direct of Carter*

08:13    1    Q.   Substantive work, I mean.

2    A.   Well, yes, sir.  In that regard, it was -- like I said, it

3    was reduced to I'm just doing the social stuff, you know,

4    "Carter is just doing the social stuff," and, you know, "Why is

08:13    5    he making so much money," was kind of the deal.

6    Q.   And where was this criticism coming from specifically?

7    Everybody or --

8    A.   Mostly Joe Reagan, yes, sir, Joe Reagan.

9         MR. COLVIN:  Your Honor, let the record reflect I'm

08:13   10    showing the exhibit to Mr. McConnell.

11         THE COURT:  Very well.  The record will so reflect.

12         MR. McCONNELL:  Your Honor, this is the first time

13    we've seen this journal.  I would like some time to study it.

14         MR. COLVIN:  That's fine, your Honor.  I was just

08:14   15    going to let him identify it.  I'm not offering it -- I don't

16    have to offer it at this point.  I just --

17         THE COURT:  Well, it looks like it's of some length;

18    and it does seem substantive.  Was there a reason it wasn't

19    produced before?

08:14   20         MR. COLVIN:  I don't believe -- I don't believe it was

21    ever requested of us before.  We did not really have it marked

22    as an exhibit or intend to offer it.

23         MR. McCONNELL:  It's marked as an exhibit, your Honor.

24         MR. COLVIN:  We marked it this morning.

08:14   25         MR. McCONNELL:  I think the Court asked we disclose

*Colvin Direct of Carter*

08:14  1    all exhibits --

    2              MR. COLVIN:  I didn't intend to use it as an exhibit,

    3    your Honor, but --

    4              THE COURT:  What's it being used for, then?  To

08:14  5    refresh his recollection?

    6              MR. COLVIN:  Yes, your Honor.

    7              MR. McCONNELL:  I don't have an objection to using it

    8    for that purpose.

    9              THE COURT:  Okay.  It's not going to be admitted,

08:14 10    though.

   11    BY MR. COLVIN:

   12    Q.  I just show this -- what's that marked as, Mr. Carter?

   13    A.  Exhibit 131.

   14    Q.  Carter Exhibit 131.  And is that, in fact, the journal that

08:15 15    you were keeping during that time?

   16    A.  Yes, sir.

   17    Q.  Now, is it -- can you tell the jury whether or not there's

   18    any detail to it?

   19    A.  It's mostly just scribbled notes, and I kept just marks of

08:15 20    the time that I was spending in and at the facility.  That's

   21    really what it is.  It's just a time clock, but I made little

   22    notes of why I was at the hospital.

   23    Q.  Now, using this journal to refresh your recollection, was

   24    there another conversation with Mr. Swetnam about the windstorm

08:15 25    coverage for '06-'07?

*Colvin Direct of Carter*

08:15　1　A.　Yes, sir.　I have a note on 9-7.　There's several pieces to
　　　2　it, but down here it says --
　　　3　　　　MR. McCONNELL:　Objection, your Honor.　You can use it
　　　4　to refresh your recollection --
08:15　5　　　　MR. COLVIN:　Yeah.
　　　6　　　　THE WITNESS:　Okay.　Yes.
　　　7　BY MR. COLVIN:
　　　8　Q.　I'm not asking you to read from it.
　　　9　A.　There are some notes.
08:15　10　Q.　And generally what was that conversation?
　　　11　A.　Well, it really -- it wasn't a conversation.　I just made a
　　　12　note that I -- that I took a letter to Mr. Springfield's
　　　13　office, and I just reference.
　　　14　Q.　Had Mr. Swetnam said something, though, about the '06-'07
08:16　15　coverage?
　　　16　A.　Yes.　He said he was experiencing a meltdown and asked me
　　　17　to deliver a letter.
　　　18　Q.　Okay.　Did you -- was the letter -- were you able to read
　　　19　the letter?
08:16　20　A.　No, sir.
　　　21　Q.　Was it in an envelope?
　　　22　A.　Yes, sir.
　　　23　Q.　Was the envelope sealed?
　　　24　A.　Yes, sir.
08:16　25　Q.　And were you told anything else about this coverage after

*Colvin Direct of Carter*

08:16  1  this second mention of the problem with it on the 7th?

2  A.  Well, in conversation a couple of days later, I just said,

3  "Did you get your problem solved?"

4  And, you know, he said, "Yes.  It's covered.

08:16  5  It's handled."

6  Q.  And did you take that to mean that there was coverage on

7  the '06-'07 cover notes?

8  A.  Yes, sir.  I never assumed there wasn't coverage in the

9  interim either.

08:16  10  Q.  Okay.  You just thought it was a problem that needed to be

11  taken care of?

12  A.  Yes, sir.

13  Q.  All right.  I want to talk to you about Exhibit 3A,

14  Mr. Carter.  Let me see if I can get this -- this is Government

08:17  15  Exhibit 3A.

16  *(Discussion off the record)*

17  BY MR. COLVIN:

18  Q.  And this is what?

19  A.  This is an e-mail that I sent to Joe Reagan, David Smith

08:17  20  and Mike Swetnam, with an attachment.

21  Q.  And what's the date?

22  A.  October the 10th of 2006.

23  Q.  And this is the "truth as I see it" e-mail?

24  A.  Yes, sir.

08:18  25  Q.  Are you upset at the time you send this?

*Colvin Direct of Carter*

08:18  1    A.  Yes, sir.

2    Q.  Had something happened -- had the principals of

3    Smith-Reagan been somewhere that prompted this e-mail?

4    A.  Yes, sir.  The three principals, Mr. Swetnam, Mr. Reagan

08:18  5    and Mr. Smith, had gone to an end-of-week and, I believe, part

6    of a weekend, like, management counseling seminar for the three

7    of them.  And I got the results in our Monday morning meeting.

8    Q.  And what were you -- were you criticized or --

9    A.  I think they all learned some new management techniques and

08:19  10   then they all wanted to employ them on me.

11   Q.  So, were you upset about this?

12   A.  Yes, sir.

13   Q.  Have you ever said anything you regretted?

14   A.  Yes, sir.

08:19  15   Q.  Ever written anything you regretted?

16   A.  Yes, sir.

17   Q.  Ever punch sand and wish you could take it back?

18   A.  Yes, sir.

19   Q.  Is this one of those things?

08:19  20   A.  Absolutely.

21   Q.  All right.  We're going to have to look at this.  And let

22   me show you what has been marked as Government's Exhibit 11-4.

23   This is the "painful truth" -- I'm sorry.  I've got the wrong

24   one.

08:19  25              This is the "painful truth."  Did you write this

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Colvin Direct of Carter*

08:19  1    immediate -- how do you know -- do you remember how soon after

       2    the meeting that you -- the Monday morning meeting you wrote

       3    this?

       4    A.  Well, I felt kind of blasted in the meeting; and I waited

08:20  5    until that afternoon, basically just stewed on it all day and

       6    sat down Monday evening after work and just started ranting.

       7    Q.  You remember the government's testimony, Mr. Boyden's

       8    testimony, about the -- this first paragraph, "After the

       9    painful truth from BC"?  Read that paragraph, if you can, to

08:20  10   the jury.

       11   A.  "My last note of this tone fell on mostly deaf ears.

       12   Remember me asking to be set free and allowed to use my endless

       13   contacts?  Well, somewhere around 1.85 million of income over

       14   two years later, I have found my tongue and here I am."

08:20  15   Q.  And do you remember Mr. Boyden's testimony about what the

       16   significance of the million and eight-fifty was?

       17   A.  Yes, sir.

       18   Q.  That it was a million dollars from a million three policy

       19   and $800,000 from a $936,000 policy, somehow, and they were

08:21  20   added together and that showed you knew something?

       21   A.  Yes, sir.

       22   Q.  Where did this number come from?

       23   A.  I was walking out of the office that afternoon; and I

       24   leaned in and just asked Mike, "How much income does this

08:21  25   account do over the last couple of years?"

*Colvin Direct of Carter*

08:21  1           He said, "I don't know.  A little under

2  2 million.  A million eight, a million nine."

3           I just literally interpolated, just made up a

4  random number that I thought would be close.

08:21  5  Q.  Is that why you said "over two years" in this e-mail?

6  A.  Yes, sir.

7  Q.  Because that's what he had said?

8  A.  Yes, sir.

9  Q.  Were you thinking about any specific policies or premiums

08:21  10  or coverages or commissions or anything else?

11  A.  No, sir.

12  Q.  Did it have anything to do with that?

13  A.  Absolutely not.

14  Q.  You know, we -- I want to respect everybody's time.  And,

08:21  15  you know, we could go through this line by line by line.

16           You're basically -- on this paragraph about

17  "without pointing fingers," and then you point fingers, right?

18  A.  Yes, sir.

19  Q.  I mean, that's really what you're doing?

08:22  20  A.  Yes, sir.

21  Q.  You basically talk about what's wrong with everybody?

22  A.  Yes, sir.

23  Q.  And basically you're talking -- you're probably talking

24  about what's wrong with them.  Is that fair to say?

08:22  25  A.  Yes, sir.

*Colvin Direct of Carter*

| | | |
|---|---|---|
| 08:22 | 1 | Q. And let me -- let's turn to the next page. It's 11-4A, I |
| | 2 | believe. Let's go to the second paragraph, where it says, "For |
| | 3 | example, as we ramble about." Could you read that to the jury? |
| | 4 | A. Yes, sir. "For example, as we ramble about running |
| 08:23 | 5 | Smith-Reagan as a corporation, I have to ask myself" -- |
| | 6 | THE COURT: Slowly, now, slowly. |
| | 7 | THE WITNESS: I'm sorry. |
| | 8 | THE COURT: "How many producers." |
| | 9 | A. -- "how many producers, anywhere, with a $250,000 gross |
| 08:23 | 10 | revenue book, not counting house business that was bought or |
| | 11 | walked in, collected a check for $250,000 off one account? Can |
| | 12 | you really afford to be accountable as your staff lives |
| | 13 | paycheck to paycheck?" |
| | 14 | BY MR. COLVIN: |
| 08:23 | 15 | Q. Now, I want to ask you two or three things about this. Who |
| | 16 | are you talking about? |
| | 17 | A. I'm talking about Mr. Reagan. |
| | 18 | Q. Why are you saying that? |
| | 19 | A. Well, being the youngest -- |
| 08:23 | 20 | Q. Let me ask just -- let me be more specific. |
| | 21 | What are you talking about on this $250,000? |
| | 22 | A. Oh, that's the income that I knew he made off of the Zurich |
| | 23 | policy. |
| | 24 | Q. And -- okay. So, go ahead and tell the jury what you're |
| 08:24 | 25 | talking about regarding Mr. Reagan and his commission on that. |

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

*Colvin Direct of Carter*

08:24  1   A.  Well, I think -- for me, I had never made the kind of money

2   that I was blessed to be making at that time.  And we had a

3   number of people in the agency that were -- there were ladies

4   that worked there for nine or ten dollars an hour, that had

08:24  5   forgotten more about insurance than I knew.

6          And I just felt like -- we always talked about

7   them being our biggest resources at the agency; and, yet, it

8   was just -- they didn't get their checks until the end of the

9   day on payday.  They would go to me at lunch time and go, "Hey,

08:24  10  Brent, can you help us get our checks?  We need to put them in

11  the bank."

12         I just wanted the agency to be accountable on

13  things that really mattered as opposed to talking about

14  accountability among producers.

08:24  15  Q.  Okay.  What about the next paragraph?

16  A.  Would you like me to read it?

17  Q.  Can you -- if you need to, to just tell the jury generally

18  what you're talking about, would it be easier if you read it?

19  A.  Well, one sentence says, "I was offended last year when I

08:25  20  asked David for a detail of the expenses on the account kept by

21  Valley Baptist and was questioned about my motives.  I simply

22  wanted to know where all the money went that I was supposedly a

23  partner in."

24         I didn't understand some of the income that was

08:25  25  earned and was never given an accounting of how much money was

*Colvin Direct of Carter*

08:25 1   actually earned from the account.  And it frustrated me

2   because, you know, in the meetings it would be, "You know,

3   Brent, you're our partner on this.  Thanks for your help.  And,

4   you know, you're really helping the agency with your contacts,"

08:25 5   but I was still kept in the dark about the majority of the

6   account.

7   Q.   And how long were you asking for an accounting of how much

8   was being made, what the commissions were, what the income was

9   to the agency, where the money went, where it came from; how

08:26 10  long was this an issue for you at Smith-Reagan?

11  A.   From a little bit before this time in '06 until after my

12  departure in December of '07.

13  Q.   In fact, you're still writing e-mails in January of '08,

14  aren't you --

08:26 15  A.   Yes, sir.

16  Q.   -- about this being an issue; you want to know what's

17  really going on with the money and the income and the

18  commissions and the division?

19  A.   Yes, sir.

08:26 20  Q.   Was this one of the major causes of friction between you

21  and the principals, the owners of the company?

22  A.   Absolutely.

23  Q.   Was your desire to have an accounting just to find out

24  whether you should be making more money or did you have another

08:26 25  interest in knowing what was going on with the --

*Colvin Direct of Carter*

08:26  1  A.  No.  I just wanted to understand -- we would hear about
2  expenses; the agency had E & O insurance, the agency had
3  directors and officers insurance.  And I would be kind of told,
4  "Well, don't worry about that.  Some of it is being accounted
08:27  5  for this way, and some is being allocated to this or that."
6      And it's just -- I think the issue for me was I
7  was making more money than I had ever made in my life and at
8  the account, at the client's, I felt more important than I had
9  ever felt in my life but amongst the people that in theory were
08:27  10  my peers I felt kind of -- it's hard to make that much money
11  and feel unappreciated.  Don't get me wrong.  But I just felt
12  kind of disrespected and unappreciated.  And I just wanted --
13  it just became, I guess, the burr in my saddle.
14  Q.  You know, it's a -- do you think that you were thinking too
08:27  15  much of yourself because of your relationship with
16  Mr. Springfield and your importance to them -- to them keeping
17  this account?
18  A.  Absolutely.  You can read this -- I can read it to you now,
19  and it's still embarrassing.  I mean, the whole thing is
08:28  20  written in the tone of, "It's my ball.  And if you don't want
21  to play with me, then I'll just go home."  And it's
22  inappropriate.
23      I had forgotten about it because years ago I had
24  tearful apologies to all three men regarding this and we put it
08:28  25  behind us.  But the issue still lingered, but this stupid act

08:28  1    on my part was put to rest.

2    Q.  Okay.  And the last paragraph, where you're talking about

3    you're servicing all the prominent accounts and you were "the"

4    agent in Harlingen, do you have anything you want to say about

08:28  5    that or add about that, that --

6    A.  Well, I mean, I did handle a lot of the prominent folks;

7    but it's just the wrong attitude.  I mean, there's no doubt I

8    was clearly insubordinate.  I -- sometimes, being a

9    salesperson, I just always had the ability to say things that

08:29  10   other people were thinking; and I -- clearly, I just went too

11   far.

12   Q.  Let me show you what has been marked as Exhibit 4 --

13   Government Exhibit 11-4B.  And let me just direct your

14   attention to the second paragraph, where it talks about,

08:29  15   "One million plus in income is hard to replace, and I do

16   control it."

17   A.  Yes, sir.

18   Q.  "So, let's try to find a way to get along."

19              What are you talking about there?  When you say,

08:29  20   "a million dollars in income, and I do control it," what are

21   you talking about there?

22   A.  On that particular statement, I'm talking about the Valley

23   Baptist account.

24   Q.  Okay.

08:29  25   A.  And, I mean, I know it's over a million dollars.  I don't

*Colvin Direct of Carter*

08:29  1   know how much income is in it, but I know it's over a million.

       2   And I say I control it because I had the relationship with the

       3   decision-maker.

       4   Q.  Okay.  All right.  And you say that you did -- there did

08:30  5   come a time where you were able to apologize to the people over

       6   at -- apologize to the principals of the agency over --

       7   A.  Absolutely.

       8   Q.  -- this tirade?

       9   A.  I went to each one of them individually and collectively in

08:30  10  another Monday morning meeting and told them, "Look, I was out

       11  of line.  You know, I'm volatile and passionate; and I was

       12  wrong."

       13  Q.  Let me show you Government's Exhibit 4H.

       14          Well, let me just ask you.  Do you remember the

08:31  15  government's exhibit where Mr. Swetnam was disclosing the

       16  commissions to the hospital?

       17  A.  Yes, sir.

       18  Q.  Had you ever seen that before?

       19  A.  No, sir.

08:31  20  Q.  When did you first see that document?

       21  A.  When it was produced in the civil lawsuit.

       22  Q.  And you did know that there was an issue about disclosure

       23  on the commissions, right?

       24  A.  Yes, sir.

08:31  25  Q.  And how did you come to find out that there was an issue

*Colvin Direct of Carter*

08:31   1   about that, I mean, an issue as far as the hospital was
        2   concerned?
        3   A.  Well, I was with Mike at the hospital the day that Manny
        4   brought it up.  Mr. Vela brought up that he wanted some
08:31   5   information on the account, and they discussed it.
        6   Q.  And what was said?
        7   A.  Well, I remember -- I mean, I was -- I was listening to the
        8   conversation and, at the same time, I knew that I had been told
        9   that you didn't -- you didn't have to disclose commissions in
08:32  10   the State of Texas and I knew that it wasn't the agency's
       11   policy to do so with any customer.
       12           And Manny was kind of adamant, "I want this
       13   information."
       14           And Mike was kind of, "Well, why do you want it?
08:32  15   Who are you going to give it to?  We don't like to give that
       16   out."
       17   Q.  Now, were you really part of that particular conversation?
       18   I mean, were you participating in that particular conversation?
       19   A.  I'm certain I would have said something, but it was -- Mike
08:32  20   is the principal in the agency, and Mike was definitely
       21   handling the conversation with Manny.
       22   Q.  Now, did you have reservations about disclosing the
       23   commissions?
       24   A.  Yes, sir.
08:32  25   Q.  And what were your reservations?

*Colvin Direct of Carter*

08:32 1  A.  Well, I knew that Mr. Springfield would take that and say,
2  "Well, if you guys made a million dollars last year, I want you
3  to handle the account this year but I'm going to put you on a
4  fee of 850 or 700 thousand" or he would have used it to drive
08:33 5  down our income.
6  Q.  Was there -- did you have any issue about personally
7  disclosing what the commissions were?
8  A.  I would -- I wouldn't -- I mean, personally I don't think
9  it would have bothered me; but professionally, I thought it
08:33 10  would have been, you know, suicide.
11  Q.  With -- but explain what you mean by "suicide."  Do you
12  mean that it would have cost money on how much you guys were
13  making or it would have caused you problems with the agency?
14  Or both?
08:33 15  A.  Well, it wouldn't have caused me problems with the agency.
16  When I say "suicide," if I would have said anything at all --
17  number one, I didn't have the information.  I mean, we just
18  discussed that.  I didn't have the information.
19       But had I had it, I would have been fired on the
08:33 20  spot for discussing -- I mean, it was -- you just did not do
21  it.  Outside of the agency, you didn't talk about the income on
22  any account.
23  Q.  Now, could you tell the ladies and gentlemen of the jury --
24  tell all of us.  You heard Mr. Vela's testimony about the
08:34 25  heated exchange between the two of you?

*Colvin Direct of Carter*

08:34  1    A.  Yes, sir.

2    Q.  Where did the heated exchange take place?

3    A.  We were fishing out on the bay, on a boat.

4    Q.  And do you remember that as a heated exchange?

08:34  5    A.  No, sir.  I mean, Manny and I were very close friends and I

6    believe, at the core, are still friends.  And, you know, we're

7    both animated people; but I don't recall it being like an

8    argument or anything animated.

9    Q.  Did anybody ask to be taken to the dock and dropped off?

08:34  10   A.  No, sir.  No.

11   Q.  Anybody jump off the boat?

12   A.  He did not walk off the boat.

13   Q.  Did you spend the rest of the day together?

14   A.  Yes, sir.

08:34  15   Q.  Was it brought up again?

16   A.  It was never brought up again, that day or after.

17   Q.  Now, on the subject of how much you knew anyway at the

18   time -- I'm going to -- let me -- I'm going to show you.

19          Let me hand these exhibits to counsel for the

08:35  20   government.  It's Carter Exhibits 128, 129, and 130.

21          MR. COLVIN:  These are just more e-mails.

22          Your Honor, I don't believe there's any objection

23   to Carter Exhibits 128, 129 and 130.  I would offer them at

24   this time.

08:36  25          MR. McCONNELL:  No objection, your Honor.

*Colvin Direct of Carter*

08:36  1          THE COURT:  Admitted without objection.

2   BY MR. COLVIN:

3   Q.  Let me put one of these on the overhead, Mr. Carter.

4              What is that e-mail?

08:36  5   A.  It's an e-mail from me to David Smith, Joe Reagan and Mike

6   Swetnam.

7   Q.  And what is the date on that e-mail?

8   A.  November the 5th of '07.

9   Q.  Now, this is after your what I'm going to call your

08:36  10  "rant" --

11  A.  Yes, sir.

12  Q.  -- "the truth as you saw it."  Considerably after, right?

13  A.  Oh, yes, sir.  Almost -- over a year.

14  Q.  But in the rant, you're wanting an accounting is one of the

08:36  15  things you were ranting about?

16  A.  Yes, sir.

17  Q.  So, a year later -- read this paragraph that begins, "The

18  problem lies."

19  A.  "The problem lies in the fact that a producer, viewed at

08:37  20  least previously as an integral part of the agency's future,

21  has a legitimate concern, poses it to the correct forum of

22  management and gets no response at all."

23  Q.  What are you talking about there?

24  A.  Well, this is an e-mail that's a follow-up to an earlier

08:37  25  e-mail.  There had been a -- what I am talking about there is I

08:37  1   had asked for some accounting on the account.

2   Q.  Okay.  Read the next paragraph.

3   A.  "Anything would be better for morale than totally ignoring

4   my e-mail.  If there's something going on more important than

08:37  5   my concerns, please tell me so.  David stresses communication,

6   openness and being in the loop; but it seems to be a one way

7   street."

8   Q.  What are you talking about there?

9   A.  Well, anything that I do, David wants a report on; but then

08:37  10   David's -- you know, it's a one-way funnel of communication.

11   Q.  You wanted disclosure on what was being paid and what the

12   agency --

13   A.  Yes, sir.

14   Q.  -- was doing with it?

08:38  15   A.  That's correct.

16   Q.  And what about the next paragraph?

17   A.  "Once again, Mike is the only one who shoots me straight

18   saying, 'Cut me a check.'  My accounting is separate from SRA.

19   I have ordered funds to be remitted to SIS and should have them

08:38  20   tomorrow.  All I wanted was the facts."

21   Q.  Okay.

22   A.  Can I tell you what that was?

23   Q.  Yes.

24   A.  There was a workers comp policy that I found -- I got a

08:38  25   note from Mr. Smith saying, "You need to bring a check in for

08:38  1   $12,500."

       2               And I said, "Okay.  Sure.  But what's the deal?"

       3   You know, because, I mean, he just wanted me to write him a

       4   check for $12,500.  It was there -- apparently the hospital,

08:38  5   like, either canceled or restructured a workers comp program;

       6   and the agency owed commission back -- $50,000 commission, I

       7   guess, needed to go back.

       8               So, each one of the four of us had to write a

       9   check for 12,500.  At the end of the day, I was the only one

08:39 10   who had already given Mike the check.  Mr. Smith hadn't and

      11   neither had Mr. Reagan.  And, you know, I -- it just struck me

      12   wrong.

      13               "You know, you guys call me, tell me to bring you

      14   12,500 bucks, I get very little explanation about it, and, then

08:39 15   again, I'm the only one gets it done during that business day

      16   and I'm just emphasizing again these are the problems I have

      17   with you guys."

      18   Q.  All right.  This is Exhibit -- Carter Exhibit 129 you've

      19   been reading from, correct?

08:39 20   A.  Yes, sir.

      21   Q.  Okay.  Let me show you what has been marked as Carter

      22   Exhibit 128.  Can you tell us what that is?

      23   A.  This is the e-mail that I sent earlier in the day, that I'm

      24   responding to that -- or that I'm adding on to that night.

08:39 25   Q.  I may have put that in the wrong order.

08:39    1  A.  Yes, sir.  This is the original e-mail.

        2  Q.  Okay.  Read that second paragraph.

        3  A.  "The act of my writing a check brought back to mind my

        4  request of five weeks ago that we go over the

08:40    5  income/expenses/accounting of the account."

        6  Q.  What about the following paragraph?

        7  A.  "It is with some intimidation that I approach you on this

        8  matter since, A, I upset David three years ago with this

        9  question and, B, my request of same this year has not been

08:40   10  addressed for five weeks."

       11  Q.  And what are you talking about here?  The same thing?

       12  A.  Yes, sir.

       13  Q.  Wanting to know what's going on with this account, where

       14  the money is coming from, where it's going to?

08:40   15  A.  Yes, sir.

       16  Q.  Let me show you what has been marked as Exhibit -- Carter

       17  Exhibit 130.

       18          Now, that last e-mail you just read from, one of

       19  the things you say is you've been asking about this for how

08:41   20  long?  Do you remember?

       21  A.  Well, really since '05 and then -- so, '5, '6, '7 and now

       22  we're in January of 2008.

       23  Q.  Okay.  This was one of the major issues that you had, one

       24  of the major issues you had with Smith-Reagan, that caused the

08:41   25  divisiveness and your attitude to change, the lack of

08:41    1    accounting on this --

2    A.   Oh, yes, sir, that absolutely was the problem.

3    Q.   All right.   Showing you Exhibit -- Carter Exhibit 130.   Who

4    is this from?

08:41    5    A.   It's from me to Mr. Smith.

6    Q.   And can you see the date on it?

7    A.   January the 16th.

8    Q.   Of what year?

9    A.   2008.

08:41    10    Q.   Okay.   And who are you writing to?

11    A.   I'm writing to David Smith.

12    Q.   Go down to the third paragraph, and read that to the jury.

13    A.   "My asking for what I have revolves around the amount of

14    time it took to get paid, the lack of proper accounting and my

08:42    15    being made to feel ungrateful for asking about it.   If that

16    needs to be discussed with Jim, sobeit.   I can't believe that

17    revelation will be more beneficial than agreeing to what I want

18    in order to continue the status quo.   Do you want to tell Jim

19    it is your account?   Okay.   It is your account.   How are you

08:42    20    going to renew it?"

21    Q.   All right.   Now, what are you -- you're threatening -- why

22    are you threatening meeting with Springfield?

23    A.   Well, by January the 16th of '08 Mr. Smith has expressed

24    that he needs help renewing the account for the '08-'09 year

08:42    25    and he wants to work desperately with Mike.   And I'm telling

Colvin Direct of Carter

08:43  1   him that I can help him work with Mike but that I want the

2   information that I've asked for in the past.  I'm just --

3   Q.  And the information you've asked for in the past is the

4   accounting on what Smith-Reagan is doing with the money --

08:43  5   A.  Absolutely.

6   Q.  -- where the money is coming from and what policy it's

7   attributable to, right?

8   A.  Yes, sir.

9   Q.  So, are there other e-mails about this division that occurs

08:43  10   between Mr. Swetnam and Mr. Smith?

11   A.  Oh, yes, sir.

12   Q.  And is -- are they -- is there a point where they're not

13   even speaking to one another?

14   A.  Yes, sir.  For -- actually, for several months.  I'm not

08:43  15   positive, but I don't believe that -- I know I never saw them

16   speak to each other from November through -- November of '07

17   through April of '08.

18   Q.  And were you being used as a mediator or go-between or

19   conduit once again --

08:44  20   A.  Yes, sir.

21   Q.  Were messages being passed back and forth between the two

22   of them through you?

23   A.  Yes, sir, both ways.  Predominantly from Mr. Smith, but

24   both directions.

08:44  25   Q.  Did -- do you think from -- just from your grassroots sort

*Colvin Direct of Carter*

08:44 1 of level, do you think Mr. Smith could have renewed all this
2 coverage without some technical help from Mr. Swetnam?
3 A.  I don't believe so, no, sir.
4 Q.  Do you really know from --
08:44 5 A.  I don't know.
6 Q.  Okay.
7 A.  They both knew more than I did from a technical side, but
8 Mr. Smith didn't believe that he could do so because he was
9 wanting Mike.
08:44 10 Q.  All right.  Read this next paragraph, that begins, "Let me
11 know.  I will set up a meeting if you desire."
12 A.  "Let me know.  I will set up any meeting you desire.  They
13 know of no conflict on our parts, and we have none if you do
14 what makes sense and let me handle the account as I have for
08:45 15 three years.  Otherwise, it may become more trouble than it is
16 worth.  I can't fight them and you, too."
17 Q.  What are you talking about there?
18 A.  Well, at this point I'm still running around with
19 Mr. Springfield all the time but I haven't told him that I --
08:45 20 he knows that I have left and I'm no longer at Smith-Reagan but
21 I haven't bad mouthed them to the client.  And I'm willing to
22 work with them and then share the income on the account with
23 them.  Let Smith-Reagan handle it, let Mr. Swetnam be the
24 wholesaler, if you will, and we would split the income.
08:45 25 Q.  Now, just -- I mean, your interest in trying to help with

*Colvin Direct of Carter*

08:45  1    the account, you were interested in making money off of helping

2    with the account, right?

3    A.  Absolutely, I was interested in the income.

4    Q.  There was a monetary motive on your part for wanting to

08:45  5    continue to help?

6    A.  Well, yes, sir.  I mean, absolutely.  I -- that's why I

7    worked, was to make the income.

8    Q.  The last paragraph there is, "If you try and do it all,"

9    would you read that for the jury, please?

08:46  10   A.  "If you try and do it all, you will lose it all.  The door

11   will open for others and, without Mike and me, you will lose,

12   just as we would lose without you."

13   Q.  Now, tell the jury what is going on.  How has it become

14   Mike and me and Smith and Reagan and there's this division?

08:46  15   What's going on in January of '08 that's caused this?

16   A.  Well, on January the 1st of '08 -- Mr. Swetnam had left the

17   agency back in November, and Mr. Swetnam was the person who

18   helped me place all of my commercial business.  Mr. Smith,

19   Mr. Reagan and I, as agents, had very similar roles.  I mean,

08:46  20   we were producers; whereas Mr. Swetnam was the guy that put the

21   account together.

22           When he left, my production -- my conduit to the

23   carriers basically dried up.  And Mr. Swetnam had orchestrated

24   a new agency through Lone Star National Bank.  It was a large

08:47  25   bank in the McAllen area.  And we went to work for the bank on

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:47  1    January the 1st.

2    Q.  Why did you go with Mr. Swetnam on this new venture rather

3    than stay with Smith-Reagan?

4    A.  Well, I've given the jury a little bit of background.

08:47  5    Mr. Smith at this point is about 63 and was looking to retire,

6    Mr. Swetnam is gone, and that would leave me with Mr. Reagan.

7    So, I -- you know, I decided it was a good time to move on.

8    Q.  Okay.

9    A.  And, Mr. Colvin, also I had insight that Smith-Reagan was

08:47  10    going to lose the business.  The business was earmarked to go

11    to Alliant.  And if that would have happened, my income would

12    have gone to nothing.  So, we -- we took a new opportunity with

13    the bank.

14    Q.  And what was the new opportunity at the bank?  What were

08:48  15    you -- what had Mr. Swetnam started with Lone Star -- is it

16    Lone Star National Bank?

17    A.  Yes, sir.

18    Q.  What did he propose to them, what was he doing that you

19    wanted to join?

08:48  20    A.  It was a retail agency, but it also -- the bank had become

21    very interested in setting up captives and offshore products

22    for some of their -- they had a lot of doctors that banked --

23    like, 300 doctors that banked at this bank.  And the doctors

24    were interested in working on a medical malpractice program.

08:48  25            And the bank basically hired Mike for his

*Colvin Direct of Carter*

08:48  1    expertise in that area.  And through his contacts, we had

2    retail -- you know, Nationwide, people like that -- that we

3    could write insurance through.  And I went to work over there

4    to sell what I had always sold.

08:49  5    Q.  And was that program going to be a captive or not?

6    A.  I mean, I believe that the program was -- Mike was going to

7    set up a captive for them.

8    Q.  Okay.  Are you sure about that or --

9    A.  I'm not positive, no.

08:49  10   Q.  Okay.

11   A.  I would have been calling on the doctors to encourage them

12   to buy the med mal insurance.

13   Q.  But would you have had anything to do with the captive or

14   with placing the coverage?

08:49  15   A.  No, sir.

16   Q.  Did you ever have anything to do with that, other than on

17   standard lines admitted carriers --

18   A.  I don't know a thing about captives.

19   Q.  What about this paragraph down towards the bottom, "I think

08:49  20   that a meeting with you, me" --

21   A.  Can you slide that up?

22            Yeah.

23   Q.  Can you see that on there?

24   A.  No, sir.

08:49  25            It's from David.

*Colvin Direct of Carter*

08:49   1    Q.  What about that paragraph?

2    A.  Let's see.  David says to me, "I think that a meeting with

3    you, me, Jim and Manny or a combination thereof is important at

4    this time.  It is foolish to think that VB will put up with a

08:50   5    bunch of conflict between the four of us.  You by this e-mail

6    and the mandates have created a conflict with me.  I have been

7    compliant, worked with you and Mike in any way possible in the

8    past."

9    Q.  Okay.  Now, what is the source of the conflict that you've

08:50  10    created with you and him?

11    A.  Well, I guess I've offended him by asking for the

12    accounting.

13    Q.  Okay.  In other words, for asking for disclosures --

14    A.  Yes, sir.

08:50  15    Q.  -- on the commissions?

16              I believe it's marked as Government Exhibit 4.  I

17    want to -- let me just ask this without showing you the other

18    policy.

19              You've seen in evidence the government exhibit of

08:50  20    the original insurance policy or binder sent from Zurich,

21    right?

22    A.  Yes, sir.

23    Q.  On the '06-'07?  Do you recall that?

24    A.  Yes, sir.

08:51  25    Q.  And you saw the premium amount of one point -- whatever it

*Colvin Direct of Carter*

08:51 1  was?

2  A.  Three or four.  Yes, sir.

3  Q.  And had you seen that at any time when you were working at

4  Smith-Reagan?

08:51 5  A.  No, sir.

6  Q.  Had you seen a binder or an invoice from Zurich to the

7  company, that showed that premium amount on it?

8  A.  No, sir.

9  Q.  I'm going to show you what has been marked as Government

08:51 10  Exhibit 4 and ask you if you have seen it.  First of all, what

11  is this?

12  A.  This is the Zurich, or Steadfast, declarations page for the

13  '06-'07 umbrella policy.

14  Q.  And what does it show -- and I'm not -- I'm not going to

08:52 15  ask you to be super specific or break it down, but what does it

16  show the Zurich premium to be?

17  A.  It shows the premium to be --

18  Q.  The total premium.

19  A.  Oh, the total, 2.38 -- $2,380,638.

08:52 20  Q.  Let me try to adjust this where everybody can see it.

21          Can you see that better?

22  A.  Yes, sir.

23  Q.  So, the -- this premium showing the two million three

24  hundred and eighty thousand dollars six hundred and

08:52 25  thirty-eight dollars and forty-two cents [sic], Government

*Colvin Direct of Carter*

08:52  1  Exhibit 4, you had seen this?

2  A.  Yes, sir.

3  Q.  Is this the only thing -- or this premium amount, the only

4  thing you saw on this policy or related to this policy

08:53  5  regarding this coverage?

6          I don't mean that you -- I mean, this premium

7  amount, not necessarily just this document.

8  A.  Yes, sir.  This premium amount matched the invoice and the

9  binder.  So, the policy, the invoice, and the binder all had

08:53  10  the same premium on them.

11  Q.  Did you ever -- did you have any reason to believe that

12  this was not signed by the representative of Zurich?

13  A.  No, sir.

14  Q.  Did you have any reason to believe that the commission was

08:53  15  included in the original premium from Zurich?  The 10 percent

16  commission.

17  A.  No, sir.

18  Q.  Did you know about a 10 percent embedded commission?

19  A.  I did not.

08:53  20  Q.  In fact, what had you been told about the commission and

21  the rate on this policy?

22  A.  I had been told by Mr. Smith that this policy was ordered

23  from Zurich.  He called it "flat," sometimes he called it

24  "net," sometimes he said "without commission."  And that -- and

08:54  25  that -- because I had inquired about the income.  And he said,

*Colvin Direct of Carter*

08:54    1    "Well, if we don't add commission to it, we don't make any

2    money."

3    Q.  All right.  Let me turn to Government Exhibit 11-7, just

4    moving through these e-mails.

08:55    5                 Is that legible?

6    A.  Yes, sir.

7    Q.  This is the "four horsemen" e-mail.

8    A.  Yes, sir.

9    Q.  And who is it from?

08:55    10    A.  It's from David Smith.

11    Q.  And when was it -- when does it seem to be sent?

12    A.  April the 30th of '07.

13    Q.  And who is it sent to?

14    A.  Sherri is Sherri Garcia in our office, Mr. Swetnam, myself

08:55    15    and Joe Reagan.

16    Q.  And go to the "four horsemen" paragraph and read that to

17    the jury.

18    A.  "The four horsemen, Smith, Swetnam, Reagan and Carter, have

19    met on this several times and I thank you for pushing the item

08:55    20    to the forefront.  Mike is the commanding officer on this

21    renewal process and will delegate work to each of us as he

22    determines prudent.  Mike and you certainly should always be in

23    communication on what needs to be done and what the status of

24    the project is.  The rest of us are assets which can and

08:55    25    probably should be used on a delegation from Mike basis."

08:56  1    Q.  Okay.  What prompted this e-mail?

    2    A.  Sherri was about to quit.  She --

    3    Q.  Who is Sherri?

    4    A.  Sherri is the customer service representative assigned to

08:56  5    the Valley Baptist account.

    6    Q.  Okay.

    7        THE COURT:  Why was she going to quit?

    8        THE WITNESS:  She had gotten upset.  She felt like she

    9    was getting instructions from three or four people and -- are

08:56  10   you familiar with the phrase "seagull management"?

    11       THE COURT:  I don't think so.  At least I'm not

    12   willing to assume the jury is.  That's more important than

    13   whether I understand it.

    14       THE WITNESS:  Well, I'm not being glib; but she

08:56  15   referred to Mr. Smith as a "seagull manager" and said that he

    16   would fly in once in awhile, squawk a lot, poop on everything

    17   and leave.  And she was very upset.

    18           And I'm not trying to be funny.  She was going to

    19   quit.  And Mr. Smith -- we had a meeting -- see, this is a

08:57  20   Monday e-mail, 11:42 a.m.  We had a meeting on that Monday

    21   morning at 7:30 and raised this concern to Mr. Smith that that

    22   was the problem.  And that's why -- he's writing this in

    23   response.  So, then -- he writes it to Sherri.  He's trying to

    24   calm her down.

08:57  25   BY MR. COLVIN:

08:57 1   Q.  Okay.  And he says that, "Mike and Brent will meet with the

2   decision-makers at Valley Baptist next Wednesday."  Do you see

3   that sentence?

4   A.  Yes, sir.  It says, "Wednesday, the 9th, at 1:00 to discuss

08:57 5   the renewal and other items."

6   Q.  And what -- do you remember what renewal -- what policy

7   that was?

8   A.  I'm certain Mike was going to give them an update on the

9   windstorm and the overall program.  I think he had a Power

08:57 10  Point for them.

11  Q.  Okay.  Would you have been -- there are several

12  presentations made to Valley Baptist Hospital at different

13  times on different proposals, right?

14  A.  Yes, sir.

08:58 15  Q.  By Smith-Reagan?

16  A.  Yes, sir.

17  Q.  And you were normally one of the people who speaks, are you

18  not?

19  A.  Yes, sir.

08:58 20  Q.  What would your part be?

21  A.  Well, I would make the introductory remarks; and I would --

22  I would get up and say, you know, "On behalf of Smith-Reagan,

23  Mr. Springfield, thanks for having us.  Board members" -- maybe

24  say something nice about the folks that I worked with at the

08:58 25  hospital; and then I would turn the floor over to Mr. Smith,

08:58  1    who would make the presentations.

    2    Q.   Okay.  Was it always Mr. Smith or was it sometimes

    3    Mr. Reagan or --

    4    A.   No, not Mr. Reagan at the hospital.  It was -- that was --

08:58  5    it was Mr. Smith's -- that was his baby.

    6    Q.   And what about Mr. Swetnam; was he normally one of the

    7    people who was actually talking about the technical aspects of

    8    the policy?

    9    A.   Yes, sir.  Mr. Smith would give the general overview and go

08:59 10    through the Power Point.  And if any questions arose, Mr. Smith

   11    would turn to Mike for clarification.

   12    Q.   Okay.  Let me direct your attention -- I put up on the

   13    screen Government Exhibit 11-8.  Can you identify that from

   14    what I've got up there?

08:59 15    A.   Yes, sir.  That's an e-mail from me to Mr. Smith,

   16    Mr. Swetnam and Mr. Reagan.

   17    Q.   And this is the "fancy themselves businessmen" e-mail?

   18    A.   Yes, sir.

   19    Q.   Okay.  What's the date on there?

08:59 20    A.   May the 9th of '07.

   21    Q.   Read to the jury that first paragraph.

   22    A.   "As we capitalize on the most recent opportunity to be of

   23    service to VBHS, let's concentrate on a solid, extremely

   24    succinct dissemination of information to their highest levels."

08:59 25    Q.   What are you saying and why are you saying it?

*Colvin Direct of Carter*

08:59  1    A.  I'm saying that we don't need a lot of small talk among a

2    lot of people.  We need to get the right information to the

3    decision-makers at the hospital: Mr. Springfield, Mr. Eastham,

4    Mr. Vela, Mr. Cook.

09:00  5    Q.  Okay.  Now, the truth, the whole truth and nothing but the

6    truth, were Mr. Cook and Mr. Eastham or anybody else, were they

7    decision-makers?

8    A.  No.  Mr. Springfield made the call.

9    Q.  Okay.  So, is that who you're really talking about?

09:00  10   A.  Well, yes, sir.  But this -- yes, sir.  This was going to

11   be a group meeting; but, yes, sir.

12   Q.  And the second paragraph that -- beginning with "Mike."

13   A.  I said, "Mike, we must focus on a layman's mentality as we

14   gather information regarding Marsh and make certain that our

09:00  15   presentation is easily understood.  These folks fancy

16   themselves as businessmen.  Manny is the only one who admits

17   any semblance of ignorance and is the only one who defers to

18   our knowledge.  Don't tell them anything about TDI, taxes or

19   anything negative about Marsh at this first meeting.  Trust me,

09:01  20   they all believe they got objective counseling from the big

21   broker.  Any challenge will make them timid about letting us in

22   front of their finance committee, and we have to get there."

23   Q.  Now, what are you talking about "focus on a layman's

24   mentality"?  What are you trying to communicate?

09:01  25   A.  Well, Mike was very technical and Jim was very --

*Colvin Direct of Carter*

09:01  1   Q.  Jim who?

2   A.  Mr. Springfield was very reluctant to admit he didn't know

3   something.  So, he would ask Mike a very technical question and

4   Mr. Swetnam would answer it in a technical manner and then

09:01  5   Mr. Springfield, later on, would yell at me, "He's talking over

6   my head, in my board room, trying to make me look bad."

7          And I'm telling Mike, "Just be calm.  Talk in a

8   layman's mentality.  Don't upset him."

9          And Mike had uncovered some issues with Marsh's

09:02  10  philosophical program that centered around the TDI, taxes and

11  other things.  And I said, "Let's don't talk bad about Marsh,

12  because they like Marsh.  Let's just wait until we get in front

13  of the finance committee and we can explain our own program."

14  Q.  You were just trying to get an opportunity to make your own

09:02  15  presentation to the --

16  A.  Yes, sir, absolutely.

17  Q.  -- to the committee?

18         Now, why do you say "they fancy themselves

19  businessmen"?

09:02  20         And let me just ask you this.  They're running a

21  multi, multi million-dollar operation, right?

22  A.  Yes, sir.

23  Q.  They just bought a hospital in Brownsville for millions and

24  millions of dollars, right?

09:02  25  A.  Yes, sir.

09:02  1   Q.  They are running this stuff?

2   A.  Yes, sir.

3   Q.  They are businessmen?

4   A.  Yes, sir.

09:02  5   Q.  They don't just fancy themselves businessmen, right?

6   A.  A better word might have been they fancy themselves

7   insurance aficionados.

8   Q.  Well, let me ask you this, then.  Did you hear Mr. Beck on

9   the witness stand?

09:02  10  A.  Yes, sir.

11  Q.  Did you hear them talk about having their own in-house risk

12  manager?

13  A.  Yes, sir.

14  Q.  Is that a normal insured?

09:03  15  A.  No, sir.

16  Q.  Did you hear him talk about them having their own general

17  counsel?

18  A.  Yes, sir.

19  Q.  Manny Vela, in-house lawyer in charge of legal?

09:03  20  A.  Yes, sir.

21  Q.  Is that a normal insured?

22  A.  No, sir.

23  Q.  So, they're not just fancying themselves as sophisticated

24  businessmen; they are sophisticated businessmen?

09:03  25  A.  Yes, sir.

09:03 1  Q.  So, do you feel like you were smarting off here a little

2  bit?  Or were you trying to make some other point that's just

3  lost on me?

4  A.  Well, it was three years ago; but I'm a little bit, I

09:03 5  think, acquiescing to Mike that he is very technical and, you

6  know -- but, yes, I'm being a smart aleck.

7  Q.  Okay.  Well, in other words, you're saying that Mike is the

8  expert on this --

9  A.  Yes, sir.

09:03 10  Q.  -- and to not talk over their heads?

11  A.  Yes, sir.

12  Q.  Okay.  What about the next paragraph that begins "David"?

13  I guess, do you have instructions for everybody, as the lowest

14  man on the totem pole?

09:03 15  A.  Yes, sir.

16          I did say, "David, we must focus on staying in

17  the here and now and avoid at all costs giving JGS a feeling of

18  condescension.  He is keenly aware that he lacks technical

19  expertise but does not want that fact disclosed.  We must

09:04 20  protect him at all costs.  We learned some lessons from Randy

21  McLelland and must remember how insecure the king is on these

22  matters."

23  Q.  All right.  Now, tell -- I know the jury has heard this,

24  and I don't want to just go over every little thing that

09:04 25  they've had to listen to.  But just remind the jury what the

09:04  1  situation was with Randy McLelland that you're referencing.

2  A.  This is the story I told you about the welding goggles

3  yesterday; and I've told you that Mr. Springfield got highly

4  offended when Mr. Smith presented welding goggles and said,

09:04  5  "Watch out for the flash of Marsh."  That's what I was

6  referring to.

7  Q.  Now, do you think Randy McLelland was offended?

8  A.  No, sir.  I think he and Mr. Smith were very close friends.

9  Q.  But you were just trying to keep another problem from

09:05  10  occurring.  Is that right?

11  A.  David spoke in metaphor all the time: the four horsemen,

12  commanding officers.  He was a little odd.

13  Q.  The next paragraph begins, "The best formula is the one

14  that has guided us the past three renewals,"" would you read

09:05  15  that?

16  A.  Yes, sir.

17        "The best formula is the one that has guided the

18  past three renewals.  Give me the info, let me explain it to

19  them.  They trust me completely, as evidenced by their

09:05  20  encouragement of this process; and we will handle this program

21  unless we do something stupid."

22  Q.  Okay.  When you say, "Give me the info," are you talking

23  about the technical information on --

24  A.  No, sir.

09:05  25  Q.  What are you talking about?

*Colvin Direct of Carter*

09:05  1    A.  I'm talking about the renewal -- the renewal numbers, "Give

2    me the information that you want them to have.  Give me -- just

3    give me the information."  They were basically renewing an

4    existing program.

09:06  5    Q.  Okay.  All right.  And what about the next paragraph; would

6    you read that to the jury?

7    A.  "If there is a message here that you need to heed, grab it

8    and hold onto it.  I will not be able to bail you out if you

9    play into JGS stereotypes of our team."

09:06  10   Q.  Let me stop you there and just ask you what you are talking

11   about.

12   A.  Well --

13   Q.  What are the stereotypes that you thought JGS -- and "JGS"

14   is Mr. Springfield, right?

09:06  15   A.  Yes, sir.

16           He thought that Mike intentionally talked over

17   his head technically, and he thought that Mr. Smith was always

18   trying to sell him insurance instead of provide him solutions.

19   Q.  Read the rest of that paragraph.

09:06  20   A.  "Do not sell, justify, explain, teach or exert metaphors in

21   his direction in his board room.  We will do just fine in the

22   first meeting by listening to what he wants to accomplish, with

23   no editorial or advisory comments, and then refining and making

24   suggestions that make it work."

09:07  25   Q.  That's pretty good advice, don't you think?  I mean, you

09:07 1  were just trying to give him some insight into Mr. Springfield

2  and --

3  A.  Yes.

4  Q.  -- what was working and what was not working.  Is that fair

09:07 5  to say?

6  A.  Yes, sir.  I think further down in that e-mail there's even

7  something about that.

8  Q.  Okay.  Go ahead.

9  A.  I can't see it.

09:07 10  Q.  Oh, I'm sorry.

11  A.  Oh, yes, sir.

12           "I know the above to be accurate because it came

13  from Jim himself today.  Drop all egos at the door and help me

14  do what I do best."

09:07 15  Q.  All right.  Go ahead and read that last sentence.

16  A.  "Relax.  I can handle this one.  BC."

17  Q.  What are you saying?

18  A.  I've given them the instructions that will allow them to

19  get in front of the finance committee, and I'm saying just

09:07 20  don't do anything crazy, don't whip out any, you know, props,

21  don't talk over anybody's head, don't put down Marsh and we'll

22  handle the account, we will handle the renewal.

23  Q.  Okay.  When you're saying, "I can handle this one," are you

24  talking about you handling Springfield -- what are you talking

09:08 25  about?

09:08  1   A.  I'm just talking about -- I'm just saying, "Heed the

2   advice.  You know, I'm giving you -- I'm giving you the key to

3   the account."

4   Q.  Okay.

09:08  5   A.  I'm not a -- I'm certainly not handling anything technical.

6   Q.  Did you feel like -- what's -- the date on that e-mail is

7   May of 2007.  Did you feel like at that point that the business

8   was moving no matter what?  Or had that -- had that not

9   really -- that decision not really been made yet?

09:08  10  A.  There were parts of the business I had been assured were

11  going to move as soon as it was feasible to do so, but I had

12  basically been advised that the plan was to renew the account

13  with Smith-Reagan for this year even though there was outside

14  competition.

09:09  15  Q.  And what part of the account were you talking -- were you

16  pretty sure you could get if everybody did what they should do

17  as far as Mr. Springfield was concerned?  What policies, you

18  know, what types of coverage were you --

19  A.  Well, the property and the windstorm and the umbrella and

09:09  20  the auto and -- the entire account.

21  Q.  Okay.  All right.  Now, let me show you what has been

22  marked as Government's Exhibit 11-9.  And can you see that?

23  A.  Yes, sir.  I think I've memorized this one.

24  Q.  I think I've memorized all of them.

09:10  25          Who is that from?

*Colvin Direct of Carter*

09:10   1    A.   It's from -- it's actually from Mike Swetnam, and this copy

        2    has been moved around from David Smith to Joe Reagan.

        3    Q.   Okay.   Now, this e-mail, were you copied on it?

        4    A.   No, sir.   It's addressed to my two partners, which would be

09:10   5    David and Joe.

        6    Q.   What has happened here?

        7    A.   I've been fired from the account.

        8    Q.   So, is it fair to say that on May 25th -- or May --

        9    A.   Or the 6th.

09:10  10    Q.   -- May 9th you were saying, "Relax and I'll handle it"?

       11    A.   Yes, sir.

       12    Q.   And less than a month later, you were fired?

       13    A.   Yes, sir.

       14    Q.   So, it didn't work out quite like you thought?

09:11  15    A.   No, sir, it did not.

       16    Q.   Okay.   Tell the jury how you went from, "Relax, I can

       17    handle this" to fired off the account?

       18         THE COURT:   Now, did you get fired by virtue of this

       19    memorandum?

09:11  20         MR. COLVIN:   No, your Honor.   This memorandum -- this

       21    e-mail was sent to correct -- let everybody know --

       22         MR. McCONNELL:   Objection.   Your Honor, I object to

       23    Mr. Colvin testifying.

       24         MR. COLVIN:   I'm sorry.

09:11  25         THE WITNESS:   I can -- this e-mail was actually sent

09:11   1   by Mr. Swetnam to his partners in response -- I had been asked
        2   a question by a board member.  It's a small community.
        3            And you've heard me mention Mr. Elliff.
        4   Mr. Elliff is a dear friend and a neighbor.  And he had asked
09:11   5   me a question about the viability of this VAC program that the
        6   hospital was looking at.  And it was -- you know, he was in my
        7   living room and I answered his questions and I told him some of
        8   the concerns that I had heard at Smith-Reagan.
        9            Well, when he left the house, he was concerned
09:12  10   and he was troubled and spoke with Mr. Springfield.  And
       11   Mr. Springfield, probably justifiably so, was livid with me
       12   for, in his opinion, going behind his back and talking to a
       13   board member.  And he saw it as self serving.  It actually
       14   wasn't, but that's neither here nor there.
09:12  15            He fired me.  He called David Smith and Joe
       16   Reagan.
       17   BY MR. COLVIN:
       18   Q.  What specifically did you say you had heard from the
       19   principals at Smith-Reagan about this VAC captive?
09:12  20   A.  Well, Mike had been doing some work with Mr. Springfield to
       21   give him some information and so had Marsh.  And Marsh had
       22   promised Mr. Springfield, "We're going to have a company up and
       23   running for you by September."
       24            And Mike had said, "You know, there's just no
09:13  25   way.  It just can't get done."

09:13   1          And Mr. Springfield was upset with Mike; and he

2      said, "You know, you're just a naysayer.  You're just trying to

3      keep the business for yourself."

4          And Mr. Springfield had wanted to write business

09:13   5      in the Valley, that included workers comp, some expensive home

6      owners policies, he wanted to write some medical malpractice

7      and he wanted to insure the hospital in a company that the

8      hospital owned.  And apparently there's some laws -- or there's

9      some regulation in Texas that only so-much of your business in

09:13  10      a company you own can be your own business.  And that hospital

11      was so big that they would have had to write three times as

12      much outside business just to make it legal.  And there was no

13      way to do it.

14          And that's about the conversation I had with

09:14  15      Mr. Elliff, that, "This is what I heard, and you guys need to

16      look into this."  And Mr. Springfield was very upset.

17      Q.   Did Mr. Springfield think you were going around his back

18      and talking to his board members to kill a project he believed

19      in?

09:14  20      A.   Yes, sir.

21      Q.   And did he think that you had had a motive for that in

22      trying to get the business some other way to Smith-Reagan?

23      A.   Yes, sir.

24      Q.   And did it damage your personal relationship with him for a

09:14  25      time?

*Colvin Direct of Carter*

09:14 1  A.  For a period of time, yes, sir.

2  Q.  All right.  Now, back to this e-mail that's marked as

3  Government Exhibit 11-9, read this first paragraph to us if you

4  would.

09:14 5  A.  "My two partners, lessons learned are sometimes painful;

6  but the long and short of it go this way.  If a board member of

7  any corporation asks us a question, we must answer it

8  truthfully and then promptly advise the CEO of that corporation

9  of the board member contact and the topic of discussion with

09:14 10  that board member."

11  Q.  Okay.  The second paragraph -- or Number 2?

12  A.  "If a corporate officer asks us a question, we should

13  answer it truthfully and then keep silent unless we are asked

14  to share the information with someone else by the corporate

09:15 15  officer."

16  Q.  Just go ahead and read the rest of -- through 5 for us.

17  A.  Yes, sir.

18       "Number 3, When we have differing opinions, we

19  need to come to a resolution about our opinions and respond

09:15 20  with the consensus, even if the consensus opinion is different

21  from our own personal opinion.

22       "Number 4, We must keep the insurance business of

23  any client confidential from insiders and outsiders of that

24  particular client.

09:15 25       "Number 5, Personal relationships must be kept

*Colvin Direct of Carter*

09:15  1   apart from business relationships.  Easy to say but hard to

2   do."

3   Q.  The things that he's talking about, do you really feel

4   like -- well, do you really feel like you -- I mean, were you

09:16  5   pretty much complying with the things that he's instructing or

6   reminding his other partners to do?

7   A.  Well, in that one instance, I would say no; but for the

8   most part, yes, sir.

9   Q.  Okay.  And then, after that, he says what?

09:16  10  A.  Can you slide it up?

11  Q.  I'm sorry.

12  A.  It ends at --

13  Q.  I apologize.

14  A.  It says, "I am surprised that we weren't fired today.  By

09:16  15  all reasonable standards, we should have been fired on the

16  spot."

17  Q.  And he's talking about you having, as far as

18  Mr. Springfield was concerned, gone around him and talking to a

19  board member?

09:16  20  A.  Yes, sir.

21  Q.  And but is it fair to say, is it the truth that what you

22  really did was just answer a board member's question?

23  A.  Yes, sir.

24  Q.  And was it a specific question?

09:16  25  A.  It was.

*Colvin Direct of Carter*

09:16   1    Q.  And was it about what your principal's thought at

2    Smith-Reagan about the VAC proposal?

3    A.  Yes, sir.

4    Q.  And this board member was also a friend of yours, right?

09:17   5    A.  A dear friend of mine and Mr. Springfield's.

6    Q.  And a neighbor?

7    A.  Yes, sir.

8    Q.  All right.  Now, the June '07-'08 windstorm coverage that

9    was placed --

09:17   10   A.  Yes, sir.

11   Q.  -- do you recall that?

12   A.  Yes, sir.

13   Q.  Who placed that?  As far as you knew, who at Smith-Reagan

14   placed that?

09:17   15   A.  Be Mr. Swetnam.

16   Q.  Was anybody else involved?

17   A.  Not that I know of.

18   Q.  Did you do any work on the placement of that coverage?

19   A.  No, sir.

09:17   20   Q.  On this coverage did you ever have any reason to believe

21   there was any issue about the coverage?

22   A.  No, sir.

23   Q.  Do you remember what you saw, as far as documentation, on

24   the windstorm coverage for '07-'08?

09:18   25   A.  I mean, nothing jumps to -- I don't recall seeing anything

09:18  1    on it.

2    Q.  And I can't remember right now, but at some point you do

3    deliver a binder of different coverages and different policies

4    to the hospital?

09:18  5    A.  Yes, sir, to Mr. Cook.

6    Q.  Would that have been on the '07-'08 policies or on the

7    '06-'07?

8    A.  No, sir.  That was '06.  I wasn't -- I didn't go to the

9    hospital during that period of time in '07, at

09:18  10   Mr. Springfield's request.

11   Q.  So, you were not even at the agency when this policy was

12   quoted, bound, issued or the cover notes written?

13   A.  Well, I still worked at Smith-Reagan; but, no, I was not at

14   the hospital at any point during --

09:18  15   Q.  Or working on any hospital business?

16   A.  No.  No, sir, no hospital business.

17   Q.  Okay.  You were paid a commission?

18   A.  Yes, sir.

19   Q.  A percentage of a commission, right?

09:19  20   A.  Yes, sir.

21   Q.  Had you at this point gotten any kind of accounting from

22   Smith-Reagan about what money came in and what money --

23   A.  No, sir.

24   Q.  -- was being paid?

09:19  25   A.  No, sir.

09:19  1    Q.   Okay.  And was this still a source of friction between you

2    and them?

3    A.   Yes.  Yes, sir.

4    Q.   Was the friction between you and them aggravated by virtue

09:19  5    of you having damaged your relationship with Mr. Springfield?

6    A.   Yes, sir.  The perception was, you know, "You were in

7    charge of the social stuff, and now you can't do that.  So, you

8    know, really what good are you to us on this account?"

9    Q.   And how much were you paid on that policy?  I mean, your

09:19  10   part -- your commission on that policy?

11   A.   On the wind?

12   Q.   On the wind.  Do you remember?

13   A.   I'm going from remembering through the trial.  I think

14   two -- 274, two -- something like that.

09:20  15   Q.   Okay.

16   A.   $274,000.

17   Q.   Okay.  Now, let me show you what has been marked as

18   Government's Exhibit 11-10.  Can you see that?

19   A.   Yes, sir.

09:20  20   Q.   Who is that from?

21   A.   It's from me.

22   Q.   And what's the date on that?

23   A.   July the 28th of '07.

24   Q.   And who are you writing to?

09:20  25   A.   Mr. Reagan, Mr. Smith and Mr. Swetnam.

09:20  1   Q.  Read that first sentence, and then I'm going to ask you
       2   about it.
       3   A.  "I am leaving Sunday with Mr. Springfield, Dr. McKenna and
       4   our kids for California.  I will be out next week.  It won't be
09:20  5   relaxing."
       6   Q.  Where were you going?
       7   A.  We went to the Monterey Peninsula.  We went out to the West
       8   Coast and played golf.
       9   Q.  What had caused your relationship with Springfield to be
09:21 10   good enough -- he was going on this trip?
      11   A.  Yes, sir.
      12   Q.  Were you invited to go?
      13   A.  Yes, sir.
      14   Q.  How did that happen?
09:21 15   A.  Well, I answer that in the third paragraph.  But he -- we
      16   had made up, for lack of some technical jargon.  We had
      17   reconciled.
      18   Q.  Okay.  Read that next paragraph, beginning with "David
      19   mentioned."
09:21 20   A.  "David mentioned that I should handle all the social stuff
      21   for the agency while I am gone.  My inference is that he will
      22   continue to handle the actual important work of the account.  I
      23   appreciate that and will do my part to contribute.
      24           "The social stuff is the reason we kept the
09:21 25   account three years ago, have it today, and the reason

*Colvin Direct of Carter*

09:22 1    Mr. Springfield didn't throw us out two months ago.  The social

2    stuff is the reason it will move someday.

3              "No one questions our ability to buy insurance

4    for the facility.  Hey, we are in a social business; and I am

09:22 5    Jim Springfield's best friend.  This fact could matter later."

6    Q.  Were you upset again?

7    A.  Yes, sir.

8    Q.  Were you perhaps overreacting again?

9    A.  Yes, sir.

09:22 10   Q.  The -- did you feel like the social stuff was work?

11   A.  It was with Mr. Springfield, yes, sir.

12   Q.  Okay.  You did enjoy the relationship?

13   A.  I did.

14   Q.  He truly was a friend?

09:22 15   A.  Yes, sir.

16   Q.  But he can be work?

17   A.  It's -- if you've ever done corporate entertaining, it's a

18   full-time -- you've got to watch what you say early in the

19   morning, late at night, on the golf course.  It can all come

09:23 20   back around.

21   Q.  In fact, if you don't watch what you say, you can get fired

22   off the account?

23   A.  I've heard that it's happened.

24   Q.  Within 24 hours?

09:23 25   A.  Yes, sir.

09:23  1   Q.  Read that next paragraph.

2   A.  "When you have volatile personalities like Jim's and mine,

3   flare-ups occur, people get yelled at and feelings get hurt.  I

4   have taken volumes of grief over the past three years and

09:23  5   protected you from it all.  The welding goggles jump to mind,

6   followed closely by the accidental implications they sought to

7   commit a crime over their trusts.  I get paid handsomely to

8   take it.  Right?  So, do you.  Welcome to my world."

9   Q.  What are you talking about there?

09:23  10          We know what you're talking about on the goggles,

11   and you don't need to repeat it.  What are you talking about on

12   the "crime on the trust"?  Is that the excess loss program we

13   heard about?

14   A.  They had closed down a trust and had planned to -- it was

09:24  15   near the end of the calendar -- or the fiscal year for them,

16   and they wanted to close this trust down and take out about --

17   I think it was a little over $2 million.  And they were just

18   going to roll it into their bottom line as if it was.

19          Income.  And Mr. Smith drew a couple of T

09:24  20   accounts and said, "You know, it's really not income."  And --

21   and they were offended.

22          You know, they said, "You sell insurance.  We'll

23   do our own accounting."

24   Q.  And, then, the next paragraph is, "My relationship with

09:24  25   JGS."  Would you read that paragraph?

*Colvin Direct of Carter*

09:24    1    A. "My relationship with JGS" -- Mr. Springfield -- "is fine

2    and back to normal. Yet I am still catching little

3    irresponsible stinging remarks from my own team. The time

4    spent obsessing on this account needs to be directed towards

09:24    5    streamlining production to replace the income loss when it

6    moves. The financial reckoning cometh."

7    Q. Now, in July of 2007, is there any doubt that this account

8    is going to move?

9    A. Not to me, no, sir.

09:25    10    Q. And do you have an opinion at that time about what you

11    should be doing as far as pricing the account -- or how you

12    treat the account as far as pricing goes?

13    A. From my perspective, my attitude was, "This is -- this is

14    the last time you're going to renew it. It doesn't make any

09:25    15    sense to try to sell it super cheap to keep the business,

16    because I know you're not going to keep it." And they didn't.

17    Q. Okay. So, were you trying to keep it within the market --

18    the price within the market?

19    A. Oh, yes, sir.

09:25    20    Q. But you weren't trying to save any money --

21    A. No, sir.

22    Q. -- off of this account?

23    A. No, sir.

24    Q. That's a pretty mercenary attitude about it, isn't it?

09:26    25    A. Smith-Reagan was not a not-for-profit organization.

09:26  1   Q.  All right.  Go down this last paragraph -- the paragraph
       2   that begins, "I am doing my best to let things roll off my
       3   back."
       4              Have I even got that up yet?
09:26  5   A.  "I am doing my best to let things roll off my back.  Mike
       6   can clarify anxieties if they matter to any of you.  I am just
       7   an employee and will contribute as you see fit.  However, you
       8   only need -- you need only to look back three years.  Remember
       9   Bob Shepard breathing down your necks and all of your fears of
09:26 10   that and acknowledge I made him irrelevant with all that social
      11   stuff.  I know they're just words, but they matter.  Fix it,
      12   drive on, and avoid the ego traps laying everywhere.  See, I
      13   listen and learn."
      14   Q.  Okay.  Who is Bob Shepard?
09:27 15   A.  Mr. Shepard is a competing agent in the Valley, that was
      16   also a friend of Mr. Springfield's.
      17   Q.  And Shepard Walton King would have been a major competitor
      18   of Smith-Reagan?
      19   A.  Yes, sir.
09:27 20   Q.  I mean, a serious competitor?
      21   A.  They're a larger agency, yes, sir.
      22   Q.  And they're not the only one in the Valley, right?
      23   A.  No, sir.
      24   Q.  There were several others?
09:27 25   A.  Yes, sir.

*Colvin Direct of Carter*

09:27 1    Q.  But just based on this e-mail, you're still having issues

2    with the principals of Smith-Reagan?

3    A.  Yes, sir.

4    Q.  And you still got your feelings hurt about not being able

09:27 5    to get an accounting and not being told what's going on with

6    the --

7    A.  Yes, sir.

8    Q.  Okay.  Let me show you what has been marked as Government

9    Exhibit 11-11.  Can you see that?

09:28 10    A.  Yes, sir.

11    Q.  Who is that from?

12    A.  It's from me to David Smith.

13    Q.  Okay.  And what's the date?

14    A.  August the 28th of '07.

09:28 15    Q.  This was an e-mail that the government talked about,

16    correct?

17    A.  Yes, sir.

18    Q.  Okay.  Read that first paragraph.

19    A.  "Be that as it may, we did a good job pricing it last year

09:28 20    at a level I suspect was higher than you would have placed it.

21    The concept of pricing it down has no logic since it will not

22    lead to any consideration in the future.  As soon as VAC is

23    capable, it will write the excess if for no other reason than

24    to justify its existence."

09:28 25    Q.  Okay.  Go ahead and read that next sentence.

*Colvin Direct of Carter*

09:28    1    A.   "Trust me on matters of cash and be more profitable. You

2    can always give it back via Children's Gala, etcetera. I am

3    really serious here."

4    Q.   All right. Now, what are you saying?

09:29    5    A.   Well, the year before, I had input from Mr. Vela that --

6    kind of through conversation and through time together, that

7    allowed me to -- I forwarded to Mr. Smith where the market was,

8    based on their consultant. And it allowed Smith-Reagan to make

9    more income and still be cheaper than the competition.

09:29    10    He, Mr. Smith, was kind of guessing where the

11    market was and Mike had some indications but, at the end of the

12    day, Valley Baptist basically priced the product for us.

13    Mr. Vela said, "You need to get it done cheaper than X" and I

14    told that to Mr. Smith and then Mr. Smith ended up choosing a

09:29    15    higher income than he would have without that information.

16    Q.   You're responding to something from Mr. Smith. Mr. Smith

17    is obviously thinking about trying to price it down.

18    A.   Yes. He had asked me, actually. He said, "Do you think we

19    would get any long-term consideration if we just drop the

09:30    20    bottom out of it and just didn't make much profit at all this

21    year?"

22    And I told him what I knew to be true, which

23    ended up occurring. I said, "You're going to lose this

24    business after this year."

09:30    25    THE COURT: I'm sorry. Tell me why you were so

09:30  1   confident of that.

2           THE WITNESS:  Well, by this time, your Honor,

3   Mr. Springfield was encouraging me to interview with and try to

4   go to work for Alliant --

09:30  5           THE COURT:  Okay.

6           THE WITNESS:  -- who was going to take the business.

7   BY MR. COLVIN:

8   Q.  And he encouraged you pretty strongly to go to work for

9   Alliant, didn't he?

09:30  10  A.  Yes.

11  Q.  Do you have any regrets today you didn't do that?

12  A.  Ultimately, no.

13  Q.  Can you see the bottom part of that page, where the e-mail

14  is to you?

09:30  15  A.  Yes, sir.  If you'll raise up where it starts --

16  Q.  I'm just asking you to see that first few lines.

17  A.  Yes, sir.

18  Q.  Do you see it says, "Brent, I will talk to Mike"?

19  A.  Oh, yes, sir.

09:31  20  Q.  "I suspect your mortgage is about paid off"?

21  A.  "But I understand your concept and thinking," yes, sir.

22  Q.  What -- why is he saying that?

23  A.  Well, I was -- I was being flip with him in an earlier

24  e-mail.  I don't know where it is, but I had sent Mr. Smith an

09:31  25  e-mail and it was -- it was in conversation regarding this

*Colvin Direct of Carter*

09:31   1   "should we drop the bottom out of the pricing."

2           And he -- I had told Mr. Smith -- I said, "Don't

3   be thinking about your legacy over there."  I said, "Be

4   thinking about my mortgage."  And I was the guy in the agency

09:31   5   with the young kids and the house that wasn't paid for.  So, I

6   was just being a smart aleck.  But it wasn't mean spirited.  We

7   were just talking.

8   Q.  Okay.  Now, I just -- let me go back up to that first -- I

9   guess it's the first paragraph.  In that first paragraph, you

09:32   10   say, "Be that as it may, we did a good job pricing it last year

11   at a level" -- do you see that sentence?

12   A.  Yes, sir.

13   Q.  What do you mean by that, when you say you did a good job

14   pricing it last year?

09:32   15   A.  Well, I was referring to the fact that the information I

16   received from Valley Baptist allowed Smith-Reagan to make more

17   money than they would have if they would have been guessing at

18   what the market was.

19   Q.  Okay.

09:32   20   A.  I received market information from Valley Baptist.

21   Q.  Did -- were you told by them where -- what the source was

22   of this other quote that you had to beat?

23   A.  On several occasions.

24   Q.  Okay.  And what were you -- who were you told they were

09:33   25   getting this information from?

09:33  1   A.  In this particular year, it was definitely Alliant.

2   Q.  Okay.  Was Marsh out of the picture at this stage?

3   A.  I'm not positive because some of that happened while I was

4   off the account.  I wasn't in tune with what was going on.

09:33  5   Q.  All right.  I'm going to show you what has been marked as

6   Government Exhibit 11-11A.  Can you see that?

7   A.  Yes, sir.

8   Q.  Who is that e-mail from?

9   A.  It's from me.

09:33  10   Q.  And what's the date on it?

11   A.  August the 28th, '07.

12   Q.  Okay.  And what's -- read this first -- these first two

13   sentences to the jury -- or to all of us.

14   A.  "Just got back from a meeting with Ward Cook and David

09:34  15   Smith.  Sounds like VBHS will be a player at 30 excess 10."

16   Q.  Okay.  And the next sentence?

17   A.  "Ward also requested a look at 30 excess 15.  The big guy

18   will probably sleep better excess of 10.  Twenty is too high."

19   Q.  What are you talking about there?

09:34  20   A.  I'm quoting Ward Cook as saying, "The big guy" -- that

21   would be Jim Springfield -- "would probably like to just have a

22   $10 million deductible instead of a 15 million or a 20 million

23   dollar deductible."

24   Q.  Okay.  Can you see where -- the paragraph that starts,

09:34  25   "Here is the deal"?

*Colvin Direct of Carter*

09:34  1  A.  Yes, sir.

    2  Q.  Read that paragraph to us.

    3  A.  "Here is the deal.  By giving them credit for good losses,

    4  HB4 and renewal credit, we can offset the natural increase

09:35  5  caused by a third year claims made.  That means 30 excess 20

    6  should come in around last year's premium.  Therefore, it

    7  should cost about 2.3 million."

    8  Q.  Now, what are you talking about -- I think it may be self

    9  explanatory, but just briefly tell us what you're talking about

09:35  10  by "giving them credit for good losses."

    11  A.  Well, I mean, I really don't know.  This is an assemblage

    12  of information.  I mean, I kind of know what this is talking

    13  about.  This is talking about that they had good losses and --

    14  "HB4" is House Bill 4, which kind of modified medical

09:35  15  malpractice legality, I guess.

    16          What -- if you look at it the way it is in form,

    17  the -- one, two, three -- the first four sentences are my notes

    18  from the meeting with Ward and David Smith.

    19  Q.  All right.  So, it's natural that Ward Cook would have told

09:36  20  you what their loss record was for the last year, right?

    21  A.  Yes, sir.  I believe Mike handled the trust.

    22  Q.  Because he's the risk manager?

    23  A.  Yes.

    24  Q.  And he's very involved in all the claims?

09:36  25  A.  Yes, sir.

09:36  1   Q.   And, so, really, you're just passing on information to the

2   agency?

3   A.   Yes, sir.  The second part is from Mike.

4   Q.   Okay.  And beginning with, "I spoke with Manny," could you

09:36  5   read that?

6   A.   "I spoke with Manny after the meeting and agreed -- and he

7   agreed that the rationale is good.  Let us see how much is in

8   the trust, and let's talk again tomorrow.  He understands that

9   the additional premium is simply the cost of funds for not

09:36  10   funding the trust.  He further understood and appreciated that

11   the trust amount did not affect our quote.  For example,

12   whether he's got eight and a half or nine in there, we attach

13   at 10."

14   Q.   Okay.  And read the paragraph that begins, "In summary."

09:37  15   A.   "In summary, this business is leaving as soon as they can

16   move it.  I suggest all commissions and fees be fully earned

17   and we plan on losing it next renewal.  That does two things:

18   allows us to plan for the future and removes any guilt about

19   this year's income."

09:37  20   Q.   What -- so, can you just sort of summarize for us --

21   because I don't want to go through a lot of detail on this.

22   But your mind-set at this time is what regarding pricing this

23   policy?

24   A.   That is the last renewal.  You know, there's -- you might

09:37  25   as well sell it at retail.

*Colvin Direct of Carter*

09:37  1    Q.  Okay.  And the sentence -- the next sentence that follows,

2    "Don't focus on legacy issues.  Focus on my mortgage," is

3    that --

4    A.  Yes, sir.  That's the one I referred to earlier.  I'm

09:38  5    encouraging Mr. Smith to maximize the agency's income.

6    Q.  Did he think if he tried to really deeply discount the

7    policy -- the coverage for the next year that there was some

8    chance you might keep it, the business?

9    A.  Initially.  But he continued to ask me to follow and make

09:38  10   certain that I was correct.  And eventually I told him that I

11   was correct.

12   Q.  Okay.  Let me get another exhibit here.

13           Mr. Carter, let me show you what has been marked

14   as Government Exhibit 8.  And can you see that well enough?

09:39  15   A.  Yes, sir.

16   Q.  What is that?

17   A.  That's the '07-'08 Zurich umbrella policy dec page.

18   Q.  And if I -- can you see the premium on there?

19   A.  Yes, sir.

09:39  20   Q.  Is this the one that you would have seen?

21   A.  This is the final one that I would have seen, yes, sir.

22   Q.  Okay.  And the original one from Zurich, did you ever see

23   that?

24   A.  No, sir.

09:39  25   Q.  Did you know it had been changed?

*Colvin Direct of Carter*

09:39  1    A.  No, sir.

2    Q.  I want to show you what has been marked as Government

3    Exhibit 8A.  Do you see the premium on there?

4    A.  Yes, sir.

09:40  5    Q.  The premiums are significantly different, right?

6    A.  Yes, sir.

7    Q.  Now, you knew about the difference in the -- did you

8    believe that there was a 10 percent in commission embedded in

9    the Zurich premium?

09:40 10    A.  No, sir.

11    Q.  Did you know about the -- I'm going to call it "excess

12    commission" for lack of a better way to put it.  That may not

13    be the correct term.  But you did know what the commission was?

14    A.  Yes, sir, I knew commission was added to the policy.

09:40 15    Q.  Who was that determined by, what the amount of the

16    commission was going to be?

17    A.  That was always determined by Mr. Smith.

18    Q.  Okay.  And you knew it was about a million dollars?

19    A.  Yes, sir.

09:40 20    Q.  But did you ever see anything from Zurich that had their

21    premium number on it before the commission -- the commission

22    was added?

23    A.  No, sir.

24    Q.  Did you have any reason to believe any of their

09:41 25    documentation was changed?

*Colvin Direct of Carter*

09:41  1    A.  No, sir.

2    Q.  Did you see any of these documents that were -- that

3    they're saying were modified, their original Zurich documents;

4    did you see any of those before the lawsuit?

09:41  5    A.  No, sir.

6    Q.  You received a part of this commission?

7    A.  Yes, sir.

8    Q.  Do you remember how much?

9    A.  Not exactly.  My guess would be 250,000; but I don't

09:41  10   remember the exact.

11   Q.  Okay.  Let me show you what has been marked Government

12   Exhibit 8E.  Do you see that?

13   A.  Yes, sir.

14   Q.  Is that the -- is that the check that was made out to you

09:41  15   for that commission?

16        Don't let me confuse you on the exhibit.

17   A.  No.  That's fine.

18        I believe that that's the total commission on the

19   entire -- I don't think that's just on the windstorm.

09:42  20   Q.  Would it have included your part of the commission -- well,

21   this is the Zurich policy, not the windstorm --

22   A.  Oh.

23   Q.  -- that we're talking about.

24   A.  I mean, again, that's why I was always trying to figure out

09:42  25   what was going on.  I can't tell you exactly what policy this

09:42   1    check would have been attributed to.

2    Q.   This is -- you were paid this money?

3    A.   Yes.

4    Q.   And you did disclose this money on your taxes?

09:42   5    A.   Yes, sir.

6    Q.   Okay.  All right.  Back to the e-mails.

7              And we're about done.

8              I'm going to put up what's been marked as

9    Government's Exhibit 11-13 and ask you if you can identify

09:43  10    that.

11    A.   Yes, sir.

12    Q.   What -- who is that from?

13    A.   It's from me.

14    Q.   And who is that to?

09:43  15    A.   To David Smith.

16    Q.   Now, you heard the testimony in this courtroom about there

17    being e-mails, in the government documents, where you are

18    evidently responding to you?

19    A.   Yes, sir.

09:43  20    Q.   Is that, in fact, the case, that there were a lot of

21    e-mails in these documents that have been clearly redacted,

22    from your own personal knowledge?

23    A.   Absolutely.

24    Q.   Is this a response to an e-mail from someone else?

09:43  25    A.   Yes, sir.

*Colvin Direct of Carter*

09:43  1    Q.  Do you have the e-mail -- were we able to find the e-mail
       2    you're responding to?
       3    A.  No, sir.
       4    Q.  Do you remember what the e-mail said?
09:43  5    A.  Yes, sir.
       6    Q.  What did it say?
       7    A.  Mike and David were not talking by this point.  This is in
       8    January of '08.  And David had sent me an e-mail, basically
       9    whining that Mike wouldn't return his calls, Mike wouldn't
09:44 10    agree to a meeting with him, Mike was being childish and,
      11    "Brent, I need Mike to work on the renewal for '08."
      12              His last line in the e-mail before this one said,
      13    "At the end of the day, I just want to do whatever I can to
      14    help the hospital."
09:44 15              And I replied, "Don't give me any of that good
      16    old boy rhetoric about just trying to help.  You're culpable in
      17    this one as well," meaning he's culpable in the fact Mike won't
      18    even take his calls, they weren't even talking.
      19              "You're just lucky I'm as greedy as you."  I'm
09:44 20    saying, "You know what, David?  I'll get with Mike, and I'll
      21    try to get Mike to work with you because I would like to renew
      22    the account, too."  It was as simple as that.
      23    Q.  So, when you're talking about "culpability," you're not
      24    even talking anything about the account?
09:45 25    A.  No.

*Colvin Direct of Carter*

09:45  1    Q.  Or your performance?

       2    A.  I'm not calling Mr. Smith a criminal, no, sir.

       3    Q.  Or yourself?

       4    A.  Certainly not.

09:45  5    Q.  It's about his relationship with Mr. Swetnam?

       6    A.  Absolutely.

       7    Q.  Do you have any idea who would have redacted all these

       8    e-mails the government has drawn their inference from?

       9                MR. McCONNELL:  Objection to speculation.

09:45  10               MR. COLVIN:  I'll withdraw it.

       11               THE COURT:  Okay.

       12   BY MR. COLVIN:

       13   Q.  Do you have any idea who might have redacted those e-mails?

       14               MR. McCONNELL:  Same objection, your Honor.

09:45  15               THE COURT:  Well, I'm going to allow that.

       16                    Do you have any idea?  If you don't, don't guess.

       17   A.  Well, can I state that it would -- it would probably be

       18   somebody who had an interest in the other half of the e-mails

       19   not getting in.

09:45  20               THE COURT:  Okay.

       21               MR. COLVIN:  Okay.

       22   BY MR. COLVIN:

       23   Q.  Let me show you what has been marked as Government Exhibit

       24   11-18.

09:46  25               THE COURT:  Anybody need a break?

09:46    1          Okay.  Would all please rise for the jury?

         2     (Recess was taken from 9:45 to 9:57 a.m.)

         3     (Jury present)

         4          THE COURT:  Members of the jury, please be seated.

09:57    5              Okay.  Why don't we resume your inquiry?

         6          MR. COLVIN:  Yes, your Honor.

         7     BY MR. COLVIN:

         8     Q.  Mr. Carter, I've only got a couple of more documents I want

         9     to show you.  And the next one is Government Exhibit 11-18.

09:58   10     Can you see who that's from?

        11     A.  Well, there's several there.  There's one from David with

        12     nothing.  Then there's me -- that one is from me.

        13     Q.  Okay.  This is the one I think that really we need to look

        14     at.  What's the date on the portion of that e-mail that's from

09:58   15     you?

        16     A.  January 17th, '08.

        17     Q.  And it begins "David," and then skip -- I think skip the

        18     first paragraph and read to us that second paragraph.

        19     A.  "I have never gotten over the disrespect I felt when I

09:58   20     asked for an accounting of the income and simply where it went.

        21     I am truly sorry I am so weak minded that it still bugs me.  It

        22     led directly to my cutting a deal with Lone Star and leaving

        23     your firm.  Don't ever get between me and the money.  It's how

        24     I keep score in this game I play."

09:59   25     Q.  All right.  Now, what are you talking about there?

*Colvin Direct of Carter*

09:59  1   A.  Well, by this time I'm already away from Lone Star [sic].

2   And I'm just talking about, "Don't lie to me about the money,

3   don't get between me and the accounting.  I want to know -- I

4   want transparency."

09:59  5   Q.  When you're talking about keeping score, are you

6   referencing again this disrespect issue within the agency and

7   who is doing the real work and who really should be getting the

8   credit?

9   A.  Yes, sir.

09:59  10  Q.  You know, is that what this is about or is it about

11  something else?

12  A.  No.  That's basically it.  I mean, it was just an abyss

13  that he and I have not gotten past.

14          THE COURT:  "He and I" meaning?

09:59  15          THE WITNESS:  Mr. Smith and I.

16  BY MR. COLVIN:

17  Q.  And the next paragraph?

18  A.  "Also, I saw how quickly you correctly rationalized cutting

19  Joe out of the spread last year.  Sure, he had it coming; but

10:00  20  Mike and I negotiated that spread and I sold it to them.  You,

21  on the other hand, simply felt entitled to it, in my view.

22  That makes me want to watch every dime, because a rationalizing

23  mind is a dangerous mind."

24  Q.  What are you talking about there?  Reagan didn't get a

10:00  25  portion of --

*Colvin Direct of Carter*

10:00    1    A.  One of the policies that renewed '07, I overheard a

2    conversation where Joe was not going to get an equal share.  I

3    don't know how much he got, but it wasn't an equal share.

4    Q.  Were you one of the decision-makers on that?

10:00    5    A.  No, sir.

6    Q.  And when you sold it to them, are you talking about your

7    relationship with Springfield?

8    A.  Absolutely.  I don't think there were any presentations on

9    that.

10:01    10    Q.  Let me direct your attention to one more -- one more

11    e-mail -- or maybe it's a text.  It's Government Exhibit 11-25.

12    I guess this is the text that you sent to Mr. Vela.  Do you

13    recall that?

14    A.  The -- yes, sir.

10:01    15    Q.  And it's got Chris Hanslik's name there because Mr. Vela,

16    your friend, forwarded it over to the attorney for the

17    hospital, right?

18    A.  Yes, sir, and Mr. Eastham and Mr. Lieberenz.

19    Q.  What is the date on this text?

10:01    20    A.  December the 8th of '08.

21    Q.  What time of year is that?

22    A.  It's around Christmastime.

23    Q.  What were you feeling that caused you to send this text?

24    A.  Just somewhat abandoned by somebody that I really had a

10:02    25    kindred heart with.

*Colvin Direct of Carter*

10:02   1   Q. Were you threatened with a criminal indictment?

2   A. I knew there was an investigation. I had very few details.

3   And Mr. Vela was, like, absent. We weren't communicating.

4   Q. Who had initiated stopping communicating?

10:02   5   A. Mr. Vela.

6   Q. Did you consider him one of your best friends?

7   A. Yes, sir, without a doubt.

8   Q. Before all this started?

9   A. Yes, sir.

10:02   10   Q. Now, as we sit here today, Mr. Carter, do you have a job?

11   A. No, sir.

12   Q. Do you have a 401(k) left?

13   A. No, sir.

14   Q. What happened to it?

10:02   15   A. It was seized by Mr. Boyden's office.

16   Q. Do you have anything except the house you live in?

17   A. Nothing but my family.

18       MR. COLVIN: I'll pass the witness.

19       THE COURT: Thank you very much.

10:03   20       All right. Who's got the inquiry? Or do you

21   have questions?

22       MR. CLARK: I will. I thought the government was

23   going to go first.

24       THE COURT: I thought so, too.

10:03   25       MR. CLARK: I just want to defer to the Court's --

10:03    1        THE COURT:  I thought it would be the government's

2   turn next and you'll get your turn at bat after that.

3        MR. CLARK:  Thank you, your Honor.

4        MR. McCONNELL:  We do have some questions, your Honor.

10:03    5        THE COURT:  Thought you might.

6               **CROSS-EXAMINATION**

7   BY MR. McCONNELL:

8   Q.  Good morning, Mr. Carter.

9   A.  Good morning, sir.

10:03   10   Q.  Now, I'm going to start, if it's okay, with some of the

11   things you talked about yesterday and go kind of

12   chronologically like Mr. Chaney did.  Is that all right?

13   A.  Yes, sir.  Sure.

14   Q.  So, you joined Smith-Reagan in 2004, right?

10:04   15   A.  Yes, sir.

16   Q.  Okay.  And at that time, you moved to Harlingen.  Am I

17   right about that, that area?

18   A.  Yes, sir.

19   Q.  And where did you move from?

10:04   20   A.  I moved from the -- Conroe, North Houston.

21   Q.  And you had been working in the insurance industry for

22   quite a period of time?

23   A.  Not at that time, no, sir.

24   Q.  Oh, not before 2004?  You didn't have any insurance

10:04   25   experience?

*McConnell Cross of Carter*

10:04    1    A.  I did from '86 until about '95 off and on.  But from

        2    '95 forward, none.

        3    Q.  So, what's that?  About nine years?  '86 to '95?

        4    A.  It ended up being about seven and a half because there were

10:04    5    some gaps.

        6    Q.  Had you taken any sort of license to sell insurance?  Is

        7    there a licensing requirement?

        8    A.  Yes, sir.  I took a test that allowed me to have what they

        9    called a "solicitor's license" at that time.

10:05    10    Q.  What is a "solicitor's license"?

       11    A.  It's what now is -- I think it's a little broader now, but

       12    it's roughly what they call a "general agent's license" that

       13    allows you to sell the types of insurance I told you I sold:

       14    small commercial, home owners, auto.

10:05    15    Q.  What kind of test is there to do that?

       16    A.  It's a computerized test.  You go and you can take a class

       17    and then you go and take a test on a computer and you get

       18    fingerprinted now and they take your photo and send you a

       19    license.

10:05    20    Q.  How long is the test?

       21    A.  A hundred questions.

       22    Q.  What sort of subject matter does it cover?

       23    A.  They may -- you have to figure deductibles.  It's just a

       24    general knowledge of the insurance industry.

10:05    25    Q.  You said you could take a class before you took the test.

10:05   1   What type of information is covered in the class?

2   A.   Just general insurance information, I mean, you know,

3   what -- what's a deductible, what kind of policy -- you know,

4   what does a home owners cover, that kind of stuff.

10:06   5   Q.   Do they tell you what a "premium" is?

6   A.   In general, yes, sir.

7   Q.   Do they tell you what "commissions" are?

8   A.   Yes, sir.

9   Q.   So, you moved to Harlingen in 2004; and you worked with

10:06   10   Smith-Reagan, right?

11   A.   Yes, sir.

12   Q.   And pretty quickly, I guess, after moving -- or was it

13   before moving that you became friends with Jim Springfield?

14   A.   It was after moving.

10:06   15   Q.   And how did you and Mr. Springfield come to be friends,

16   again?

17   A.   We had -- well, we shared a love of golf and ended up in

18   the same golf group; and that's really where the friendship

19   developed.

10:07   20   Q.   Did you socialize with one another?

21   A.   Quite often.

22   Q.   Did you have dinner at each other's house?

23   A.   I think I've had dinner at Jim's house several times but

24   rarely at mine.

10:07   25   Q.   You went on at least one trip together?

10:07  1  A.  We went on several trips together.

2  Q.  I'm going to show you what Mr. Colvin showed you as

3  Government's Exhibit 11.  Do you remember talking about this

4  e-mail yesterday?

10:07  5  A.  Yes, sir.

6  Q.  And do you see here, in this third paragraph, where it

7  talks about Hurricane Katrina?

8  A.  Yes, sir.

9  Q.  And what are you saying about Hurricane Katrina?

10:08  10  A.  That -- I'm quoting -- "we don't expect any significant

11  savings in '06 due to Katrina and increasing reinsurance cost

12  to carriers."

13  Q.  Do you remember telling Mr. Colvin yesterday that after

14  you -- after you moved down to Harlingen that you became kind

10:08  15  of a point person with Mr. Springfield and the hospital?

16  A.  Yes, sir.

17  Q.  And when you read this e-mail and in your testimony, you

18  were kind of the one who would provide information to the

19  hospital in terms of what the market is like, you know, what

10:08  20  kind of prices they could expect and that sort of thing.  Do

21  you remember testifying to that?

22  A.  Yes, sir, in very general -- I mean, in very general ways,

23  yes, I would give them this information right here.

24  Q.  Is it fair to say that you have some knowledge of the

10:08  25  insurance market down in Harlingen?

10:09    1    A.  On smaller risks, yes, sir.

         2    Q.  Do you remember telling the jury yesterday about TWIA?

         3    A.  Yes, sir.

         4    Q.  What is "TWIA"?

10:09    5    A.  It's the Texas Windstorm Insurance Association.

         6    Q.  And do you remember the context of you telling the jury

         7    about TWIA yesterday?

         8    A.  Yes.  We were talking about Mr. Buentello looking at a

         9    spreadsheet, I believe.

10:09   10    Q.  And, so, you're familiar with TWIA and windstorm coverage?

        11    A.  I'm very familiar with TWIA, yes, sir, and its role in

        12    windstorm coverage, yes.

        13    Q.  And is it fair to say that you're also friends with

        14    Mr. Vela?

10:09   15    A.  Yes, sir.

        16    Q.  You talked about that, and what was the nature of your

        17    friendship with Mr. Vela?

        18    A.  Mutual admiration.

        19    Q.  And you and Mr. Vela also had a relationship outside of

10:10   20    your business relationship, correct?

        21    A.  Yes, sir.

        22    Q.  Did you go golfing together?

        23    A.  Some, yes, sir.

        24    Q.  What about social outings?

10:10   25    A.  Some, yes, sir.

10:10   1   Q.  Did you run in the same social circles?

        2   A.  Some, yes, sir.

        3   Q.  Do you remember talking yesterday about how you and

        4   Mr. Springfield had a friendship?

10:10   5   A.  Yes, sir.

        6   Q.  And it was a friendship where you trusted one another.  Do

        7   you remember telling the jury that?

        8   A.  Yes, sir.

        9   Q.  What about you and Mr. Vela, did you trust one another?

10:10  10   A.  I believe so, yes, sir.  I know I did.

       11   Q.  You trusted him?

       12   A.  Yes, sir.  I hope he trusted me.

       13   Q.  You trusted him?

       14   A.  Yes.

10:10  15   Q.  And yesterday, at the beginning of your testimony, you

       16   talked about how -- when you were talking about this e-mail,

       17   about this meeting that occurred in December of 2005?

       18   A.  Yes, sir.

       19   Q.  Do you remember how you became the point person for kind of

10:11  20   the account, the hospital account?

       21   A.  I remember, yes, sir.

       22   Q.  And you felt a little bit embarrassed to be there, kind of,

       23   being the new guy?

       24   A.  Yes, sir.

10:11  25   Q.  Why did you feel embarrassed?

*McConnell Cross of Carter*

10:11 1    A.  Because the transition needed to happen.  It was at

2    Mr. Springfield's request; but it's a little embarrassing when

3    you're in a room and your bosses are being told, "I like you

4    guys; but from now on, Mr. Springfield wants to hear from

10:11 5    Brent."

6    Q.  Sure.  So, you were the new guy?

7    A.  So, I was the new guy.

8    Q.  But now you're the point person on the account?

9    A.  Okay.  Yes, sir.

10:11 10   Q.  And all of these problems that the jury is hearing about

11   with these policies started after you became the point person

12   on the account.  Is that fair?

13   A.  Not any more fair than they started after Hurricanes

14   Katrina and Rita.

10:12 15   Q.  So, you're saying the problems with --

16        THE COURT:  Well, I think -- before we talk about

17   cause at all, was that the timing of it?

18        THE WITNESS:  Oh, yes, the problem started around or

19   after the time -- or around the time that I became the point

10:12 20   person, yes, there were problems.

21   BY MR. McCONNELL:

22   Q.  That was my question.

23   A.  I'm sorry.  There were problems.

24   Q.  And if you don't understand my question, just tell me --

10:12 25   A.  I apologize.

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

10:12  1    Q.  -- you don't understand and I'll try to rephrase it.

2    A.  Yes, sir.

3    Q.  So, yesterday, the first real substantive area that you

4    talked about and the first area that I'll talk about is the

10:12  5    meeting down in Mexico and these first windstorm policies.  Do

6    you remember talking about that yesterday?

7    A.  Yes, sir.

8    Q.  So, from what I understood yesterday, you got a call to go

9    to this meeting at some point before August 29th, 2006?

10:13  10   A.  I believe it was on August 29th.

11   Q.  On August 29th, 2006?

12   A.  Yes, sir.

13   Q.  And you were asked to go to dinner.  Is that right?

14   A.  Yes, sir.

10:13  15   Q.  And you were asked to go in Mr. Smith's place?

16   A.  Yes, sir.

17   Q.  I guess Mr. Smith had planned on going to this dinner, but

18   you went instead?

19   A.  Yes, sir.

10:13  20   Q.  And you drove down with Mr. Vela, Mr. Cook and who was the

21   other one?

22   A.  Lesley Freeberg.

23   Q.  Lesley Freeberg.  And she also works for the hospital?

24   A.  Yes, sir.

10:13  25   Q.  And, so, three hospital folks, you and Mr. Swetnam?

10:13   1    A.   Yes.

        2    Q.   And you drove down to Mexico in Mr. Swetnam's truck?

        3    A.   Yes, sir.

        4    Q.   And you had dinner?

10:13   5    A.   That's correct.

        6    Q.   Do you remember where you ate?

        7    A.   I remember it was a place that Mr. Cook knew of that was

        8    kind of in a back area down in Nuevo Progresso.

        9    Q.   So, at the point when you guys are going down to dinner,

10:14  10    you had been the point person on the Springfield -- or I'm

       11    sorry -- you were the point person on the hospital's account

       12    for roughly eight months, nine months?

       13    A.   That's -- yes, that's right.

       14    Q.   Is that fair?

10:14  15    A.   I'm sorry.  I was doing some -- yes, that's fair.

       16         THE COURT:  Why don't you move that microphone a

       17    little nearer your mouth?

       18         MR. McCONNELL:  Sure.

       19         THE COURT:  Okay.  Thank you.

10:14  20    BY MR. McCONNELL:

       21    Q.   Can you tell us about your relationship with Ward Cook?  Is

       22    he -- do you have the same relationship with him as you do with

       23    Mr. Springfield and Mr. Vela?

       24    A.   No, sir.  It was a little more distant.  I mean, I saw Ward

10:14  25    professionally.

10:14    1    Q.  Are you golfing buddies?

         2    A.  No, sir.

         3    Q.  You ever had dinner at Ward Cook's house?

         4    A.  No, sir.

10:14    5    Q.  Did you go out to dinner with Ward Cook on a regular basis?

         6    A.  No, sir.

         7    Q.  Have you ever gone to dinner in Mexico with Ward Cook?

         8    A.  Yes, sir.

         9    Q.  Other than the time August the 29th, 2006?

10:15   10    A.  No.  Just that time.

        11    Q.  And you testified yesterday that you didn't really know

        12    what the meeting was about, other than it was a dinner?

        13    A.  Did I?  I mean, I knew that Mike needed to go down to do

        14    the transaction for the windstorm.

10:15   15    Q.  Oh, so, you knew --

        16    A.  I didn't think it was just a social dinner.

        17    Q.  Okay.

        18    A.  I was asked to go to a business meeting.

        19    Q.  Okay.  And did you ask Mr. Swetnam any questions about what

10:15   20    was going to happen at the dinner?

        21    A.  No, sir.  Like I said, I got the call at the last minute to

        22    go.

        23    Q.  Did you ask Mr. Smith why he couldn't go?

        24    A.  I testified yesterday that Mr. Smith told me he didn't feel

10:15   25    well and asked me to go in his place.

10:15   1   Q.  Did you ask Mr. Swetnam why he needed you to go down there
        2   with him?
        3   A.  I don't believe he needed me to go at all.
        4   Q.  But did you ask him?
10:15   5   A.  Oh, no, sir.  I'm sorry.
        6   Q.  Did you ask Mr. Vela about the meeting?
        7   A.  I may have actually called Mr. Vela to set the meeting up,
        8   initially; but I -- no, I didn't ask Mr. Vela anything about
        9   it.
10:16  10   Q.  Well, if you would have called him and asked him to set the
       11   meeting up, what would you tell him was the purpose of the
       12   meeting?
       13   A.  That Mike would have said, you know, "I need to go down and
       14   do the captive transaction."
10:16  15   Q.  Were you aware that the captive transaction needed to occur
       16   in Mexico?
       17   A.  Yes, sir.
       18   Q.  You were aware that there was a reason that Mr. Swetnam
       19   believed that transaction could not occur in Texas?
10:16  20   A.  Yes, sir.
       21   Q.  And what was your understanding of why that transaction,
       22   that deal, couldn't occur in Texas?
       23   A.  Well, everything that had been testified to here, that
       24   there was -- TDI didn't regulate that type of activity and
10:16  25   therefore it couldn't be transacted in either -- I don't know

10:16   1   if it was in the State of Texas or in the United States.

2   Either way, Mexico was the closest.

3   Q. Were you aware that Mr. Swetnam had been in communications

4   with anyone from the BVI?

10:17   5   A. Not at that time, no, sir.

6   Q. Do you remember the e-mail we looked at that talked about

7   Bermuda and the BVI?

8   A. Oh, yeah. Well, he was -- when he was getting quotes, I

9   mean, I knew that he was going to go get a quote for excess

10:17   10   wind from either Bermuda or the Caymans or somewhere.

11   Q. Were you aware how much the premium was going to be, the

12   general ballpark?

13   A. Not of that specific piece of -- that layer, no, sir.

14   Q. So, you go down to dinner in Mexico; you get to the

10:17   15   restaurant; and you testified yesterday that you didn't see

16   Mr. Swetnam and Mr. Cook exchange any documents.

17   A. That's correct, I didn't.

18   Q. But you're aware now that the document -- the documents,

19   plural, given to Mr. Swetnam at this meeting include -- given

10:18   20   from Mr. Swetnam to Mr. Cook at this meeting include this cover

21   note?

22   A. Yes, sir.

23   Q. Do you remember hearing Mr. Cook testify about this cover

24   note?

10:18   25   A. Yes, sir.

*McConnell Cross of Carter*

10:18  1  Q.  And you're not saying that didn't happen; you just didn't

2  see it happen?

3  A.  No, I -- I'm not saying it didn't happen.

4  Q.  Were you at, like, a large table at the restaurant?

10:18  5  A.  A little bit bigger than this.  It was me, Mr. Swetnam,

6  Mr. Cook was at the end, Mr. Vela was across from Mr. Swetnam

7  and Lesley Freeberg sat right across from me.

8  Q.  Do you remember it pretty clearly, the dinner?

9  A.  I was there, yes, sir.

10:18  10  Q.  When you rode down to Mexico with Mr. Swetnam, Mr. Vela,

11  Ms. Freeberg and Mr. Cook, where were folks situated in

12  Mr. Swetnam's truck?

13  A.  Mike and I drove up from the agency, and they just got in

14  the back.  We picked them up at the hospital.

10:19  15  Q.  Did you see any documents exchanged in the car?

16  A.  No, sir.

17  Q.  And you didn't see Mr. Swetnam pass Mr. Cook these

18  documents during dinner?

19  A.  Not that I -- no, sir, I didn't.

10:19  20  Q.  Okay.  I mean, did you see them leave and go to the

21  bathroom together?

22  A.  No, sir.

23  Q.  You didn't notice anything suspicious about Mr. Swetnam

24  giving Mr. Cook any documents at dinner?

10:19  25  A.  No, sir.

*McConnell Cross of Carter*

10:19  1    THE COURT:  I believe your testimony is you didn't see

2    it happen.

3    THE WITNESS:  I mean, yes, sir.  I think it's been

4    testified that Mr. Swetnam just gave the documents to Mr. Cook.

10:19  5    I didn't -- I mean, I knew at some point he was bound to do

6    something with some documents; but I didn't --

7    THE COURT:  You didn't see it.

8    THE WITNESS:  I just didn't see it.

9    THE COURT:  All right.  All right.

10:19  10   BY MR. McCONNELL:

11   Q.  Did you ever ask Mr. Swetnam about who he ended up getting

12   coverage from?

13   A.  No, sir.

14   Q.  Because you knew that he was trying to set up these

10:20  15   captives, right?

16   A.  Well, I thought originally he was trying to set up a

17   captive.

18   Q.  Okay.

19   A.  And, yes, I knew that.

10:20  20   Q.  You knew he was trying to get some windstorm coverage for

21   the hospital?

22   A.  Absolutely.

23   Q.  And you knew at this meeting in Mexico that the reason you

24   were going down there is because Texas law precluded you from

10:20  25   doing this deal in Texas?

10:20    1    A.   Yes, sir.

2    Q.   So, you knew that was going to happen?

3    A.   Yes, sir.

4    Q.   Did you ever ask Mr. Swetnam, before that meeting, about

10:20    5    whether he was successful in setting up the captive?

6    A.   No, sir.

7    Q.   Did you ask him what the premium would be to the hospital?

8    A.   No, sir, I didn't.

9    Q.   Weren't you concerned that Mr. -- what would you say if

10:21   10    Mr. Springfield had asked you about this policy?  Isn't that

11    something that you would want to be aware of to tell him?

12    A.   Well, there's two parts to that.  Number one,

13    Mr. Springfield knew I didn't deal with the technical side of

14    the account; and, number two, if he would have asked me for

10:21   15    that premium, I would have said, "I'll find out from Mike, and

16    I'll give you a call."

17    Q.   So, if he would have asked you a question, then you would

18    have called Mr. Swetnam and asked him?

19    A.   I would have gone to the only person I know that could have

10:21   20    answered the question, yes, sir.

21    Q.   But you didn't ask Mr. Swetnam any questions about these

22    policies before you went down to Mexico?

23    A.   No, sir.

24    Q.   Okay.  So, you have dinner; and you didn't see Mr. Swetnam

10:21   25    give Mr. Cook these policies.  And then you go back to Texas.

10:21  1   A.  Yes, sir.

       2   Q.  Is that right?

       3           Okay.  And then you testified -- you know, the

       4   next thing that Mr. Colvin asked you about was that $425,000

10:21  5   check?

       6   A.  Okay.  Yes, sir.

       7   Q.  Do you remember talking about that?

       8   A.  Yes, sir.

       9   Q.  And do you remember telling the jury yesterday that

10:22 10   Mr. Swetnam gave you this $425,000 check while you were having

      11   lunch with a friend in Harlingen?

      12   A.  No, sir.  With Jamie Whittemore in McAllen.

      13   Q.  In McAllen?

      14   A.  That's correct.

10:22 15   Q.  Okay.  I apologize.

      16           And you testified this was a social lunch?

      17   A.  He's a friend of both of ours, yes, sir.

      18   Q.  And that Mr. Swetnam gave you this check for $425,000 and

      19   told you he needed you to deposit it in an account -- or open

10:22 20   an account for him because he had too much money in his

      21   account?

      22   A.  Yes, sir, that's correct.

      23   Q.  And do you remember how much you told the jury yesterday

      24   that he said he had in his account?

10:22 25   A.  It was a little over $1.8 million.

| | | |
|---|---|---|
| 10:22 | 1 | Q. And you've been sitting here this entire trial, right? |
| | 2 | A. Yes, sir. |
| | 3 | Q. Under the screen over there? |
| | 4 | A. Yes, sir. |
| 10:23 | 5 | Q. And you saw Mr. Boyden talk about all of these bank records |
| | 6 | as we went through the case? |
| | 7 | A. Yes, sir. |
| | 8 | Q. Do you remember talking about -- do you remember Mr. Boyden |
| | 9 | talking about Government's Exhibit 1G? |
| 10:23 | 10 | A. No. But I'll sure look at it. |
| | 11 | Q. Government's Exhibit 1G is Mr. Swetnam's bank records -- do |
| | 12 | you remember that -- for the Swetnam Insurance Agency account? |
| | 13 | A. Yes, sir. |
| | 14 | Q. And, so, this lunch was September 5th. And can you tell |
| 10:23 | 15 | the jury what it says the balance on that account was |
| | 16 | September 5th? |
| | 17 | A. It says "$942,000." |
| | 18 | Q. And do you see the withdrawal on the check that you |
| | 19 | received, $425,000 taken out 9-6? |
| 10:23 | 20 | A. Yes, sir. |
| | 21 | Q. See that on that account? |
| | 22 | So, you testified that you got this check and |
| | 23 | you're having lunch with your banker friend, correct, in |
| | 24 | McAllen? |
| 10:24 | 25 | A. Yes, sir. |

10:24  1    Q.   And he's a banker at what bank?

2    A.   At the time, it was McAllen National Bank; and now it's

3    called Border Capital Bank.

4    Q.   Did you have an account at that bank?

10:24  5    A.   I did later.  I didn't then.

6    Q.   In fact, you opened an account later with some of the

7    proceeds from some of these policies.  Is that right?

8    A.   Yes.

9    Q.   And that happened, you remember, in October or September?

10:24  10   A.   No.  It was in September, the 13th, 14th, somewhere in

11   there.

12   Q.   Why would Mr. Swetnam give you a check for $425,000 to

13   deposit into one of his own accounts or to open an account for

14   him?

10:24  15   A.   All Mike said was, "I've got too much money in this

16   account, and I want you to go and open an account for me, for

17   Swetnam Insurance Services" and --

18   Q.   And were you able to do that?

19   A.   No, sir.

10:25  20   Q.   And you said you weren't able to do that because -- you

21   know, you drove around to different banks?

22   A.   No, sir.

23   Q.   No?  That's not what happened?

24   A.   I didn't drive around to different banks, no, sir.

10:25  25   Q.   Okay.  You went to one bank?

10:25    1    A.  Yes, sir.

2    Q.  But you couldn't open an account for him because you

3    weren't on the signature card?

4    A.  That's correct.  The banker told me, "I can't open an

10:25    5    account for Swetnam Insurance Services from you because you're

6    not a signatory on his account."

7    Q.  Wouldn't it have been easier for Mr. Swetnam just to give

8    the check to your friend at lunch, the banker, and have him

9    deposit it into a different account for him?

10:25    10    A.  I don't -- I don't know, and it really wasn't my concern.

11    I just do what my employer asks me to do.

12    Q.  Did you ask him?

13    A.  No.

14    Q.  Did you ask him any questions, "Hey, hey, Mike, why are you

10:25    15    giving me this $425,000?"

16    A.  Well, number one, Mike wasn't giving me $425,000.  Mike

17    wrote a check for $425,000 and instructed me to go open an

18    account for Swetnam Insurance Services.

19    Q.  But the check was written to you?

10:26    20    A.  Well, somebody had to endorse it and put it in the bank.

21    Q.  Why wouldn't he just write it to himself, Michael Swetnam

22    to Michael Swetnam, so you could go deposit it in one of his

23    accounts?

24    A.  I have no idea.  It happened --

10:26    25    Q.  Wouldn't that have been easier?

10:26  1    A.  -- in the banker's office.

     2    Q.  And you didn't ask, did you?

     3    A.  No, sir.

     4    Q.  Didn't you think that was an unusual request from

10:26  5    Mr. Swetnam, to give you that?

     6    A.  You would have to know Mr. Swetnam; but, no, sir, it was

     7    not an unusual request.

     8    Q.  But you didn't ask him any questions about it?

     9    A.  No, sir.

10:26  10   Q.  And you weren't able to open a different account -- what

    11   did you say about the tax ID?  I was a little bit unclear on

    12   that.

    13   A.  Okay.  I tried to open an account for Swetnam Insurance

    14   Services and was told I couldn't because I didn't sign on any

10:26  15   of his accounts.  He did not want it just to go into one of --

    16   by the way, they had -- Mr. Smith, Mr. Reagan, Mr. Swetnam,

    17   Smith-Reagan Agency and Swetnam Insurance Services all had

    18   accounts at Frost Bank, which is the primary reason I went to

    19   Frost Bank.

10:27  20             I said, "Well, can I open a commercial account?"

    21             And the lady said, "Sure.  Do you have a tax ID

    22   number?"

    23             And I said, "No, ma'am."

    24             And her name is Karen Adams.

10:27  25             And she said -- I said, "Well, what can I do?

10:27    1    This isn't my money.  It belongs to Swetnam Insurance Services.

2    He doesn't want it in one of the Swetnam accounts here.  He

3    wants a new bank account.  What can I do?"

4          She said, "How about if I set up a d/b/a account

10:27    5    like I've done for Mike?"

6          I said, "That's fine for me.  It's not going to

7    be here very long, I don't think.  So, you can have it."

8    Q.  So, you couldn't open an account for Mr. Swetnam; so, you

9    opened an account in "Brent Carter Insurance Services"?

10:27    10    A.  I opened it as "Brent A. Carter d/b/a Carter Insurance

11    Services."

12    Q.  And had you filed any d/b/a with the State of Texas?

13    A.  No, sir.  That's the point.  I didn't have to.  She said

14    she could open it as if it was a sole proprietorship and I

10:28    15    didn't need a tax ID number.

16    Q.  Was there any company called --

17    A.  No, of course, not.

18    Q.  -- Brent Carter -- so, you just made that up?

19    A.  I just did -- it was actually Ms. Adams' suggestion.  That

10:28    20    was a way to open an account.

21    Q.  Oh, she told you to make it up?

22    A.  No.  I didn't make it up, sir.  I mean, it was -- it was

23    her suggestion.  She said, "I could open an account for you

24    like I've done for Swetnam."

10:28    25          I said, "Then, let's do it."

*McConnell Cross of Carter*

10:28   1   Q. You said it's not a real company?

2   A. No, it was never intended to be a company.

3   Q. So, she told you to make up a fake company; and that's what

4   you did?

10:28   5   A. In order to get it into an account, yes, sir. I didn't

6   want it in my name individually.

7   Q. Why didn't you just give it back to Mr. Swetnam?

8   A. That's not what he asked me to do, sir.

9   Q. Did Swetnam tell you that he had just gotten paid on a

10:29   10   hurricane policy?

11   A. No, sir.

12   Q. He didn't mention any -- anything about where this money

13   came from?

14   A. No, sir.

10:29   15   Q. He just said that he had too much money in his account?

16   A. That is what he told me, sir.

17   Q. He told you $1.8 million, but we see -- on Exhibit 1G we

18   have $942,000?

19   A. Okay.

10:29   20   Q. And, so, ultimately, you deposit this money, the $425,000

21   that the hospital paid to purchase insurance, into your own

22   account which you opened in the name of Brent Carter Insurance

23   doing business as -- what is it? D/b/a --

24   A. -- Carter Insurance Services.

10:29   25   Q. A fake company.

10:29    1    A.   No, sir, it was not a fake company.  It wasn't a company.

         2                 And I had no idea where this $425,000 came from.

         3    This was just money that was in an account in McAllen when we

         4    went to lunch.

10:30    5                 THE COURT:  Did he, Mr. Swetnam, ask you to do

         6    anything comparable before or after that?

         7                 THE WITNESS:  No, sir.

         8    BY MR. McCONNELL:

         9    Q.   Why would you put so much money into your own account?

10:30   10    A.   Well, I think I've stated I tried several other options.  I

        11    tried to open an account for Swetnam Insurance Services.  I

        12    tried to open a commercial account.

        13                 As I stated yesterday, I did not want to be

        14    associated with the money.  And Ms. Adams said, "Well, I can

10:30   15    set up a d/b/a."

        16    Q.   Why not -- why wouldn't you want to be associated with the

        17    money?

        18    A.   Because, sir, it was not my money.

        19    Q.   It had -- the check has your name on it?

10:30   20    A.   Well, I -- I've explained, I believe --

        21    Q.   You opened an account.  Isn't that being associated with

        22    the money?

        23    A.   Yes, sir.

        24    Q.   So, you made up Brent Carter Insurance Services.  And

10:31   25    you're aware that these policies, these hurricane policies,

10:31 1  that these companies didn't exist either, are you not?

2  A.  I am -- I am now under the impression that they don't

3  exist, yes, sir.

4  Q.  Somebody made up those companies, too.

10:31 5  A.  Okay.

6  Q.  Is that right?

7  A.  (No response).

8  Q.  Do you know that now?

9  A.  I -- I can't believe --

10:31 10  Q.  Are you telling the jury these are really companies?

11  A.  No, sir.  I'm not telling the jury anything about these

12  companies.

13  Q.  So, after -- after you deposited this check into Brent

14  Carter Insurance Agency, what -- and that's a Frost Bank

10:31 15  account?

16  A.  Yes, sir.

17  Q.  Frost Bank account.  A short period after that, Mr. Swetnam

18  tells you there's a problem with the captives?

19  A.  Yes, sir.

10:32 20  Q.  And did you ask him what the problem was?

21  A.  I was -- no.  I really didn't deal with the technical side

22  of the account.  I mean --

23  Q.  So -- so, you knew that you went down to Mexico for a

24  captive -- a meeting on captives because you couldn't do that

10:32 25  in Texas?

10:32  1    A.  Yes, sir.

2    Q.  Four days later you get a check for 425 -- you didn't see

3    any policies exchanged, cover notes?

4    A.  No, sir.

10:32  5    Q.  Okay.  Four days later you get a check for $425,000, which

6    happens to be just about half the premium that the hospital

7    paid on the cover notes but you didn't know that and then

8    Mr. Swetnam gives you the check for $425,000, right?

9    A.  Yes, sir.

10:32  10   Q.  And tells you he has too much money in his account and he

11   needs to get rid of this money.

12            You didn't want to be associated with it, right?

13   A.  I just knew it wasn't my money.

14   Q.  And you didn't ask him where the money came from, right?

10:33  15   A.  No, sir.

16   Q.  Okay.  And you went and opened up -- because you couldn't

17   put it in Swetnam's -- one of Swetnam's accounts because you

18   weren't on the account; you couldn't open up a new account

19   because you didn't have a tax ID number, correct?

10:33  20   A.  Correct, sir.

21   Q.  And then you opened your own account and made up a d/b/a

22   and deposited the $425,000 in that account?

23   A.  Yes, sir.

24   Q.  Okay.  Then you find out that there's a problem with the

10:33  25   captives, but you don't ask him what the problem is.  Weren't

10:33    1    you concerned for your friend Mr. Springfield and your friend

2    Mr. Vela?

3           I mean, if there was a problem with the captives

4    and they didn't have hurricane insurance, wouldn't you want to

10:33    5    tell your friends, "Look, I mean, there may be an issue here"?

6    A. Well, "there may be an issue here" is an opportunity for an

7    agency to be of service. If there was an issue there, I

8    believe Mike would have let them know. I mean, I'm not trying

9    to --

10:34    10    Q. Did you ask him? Did you ask him if he let them know?

11    A. No, sir. As far as I know, there was never a lack of

12    coverage.

13    Q. As far as you know, there was never a lack of coverage?

14    A. I had no reason to believe there wasn't coverage.

10:34    15    Q. But you testified you gave the letter in the envelope

16    addressed to Mr. Springfield saying that the hospital had no

17    coverage under those policies?

18    A. I didn't read the letter, sir. I just took an envelope

19    that was sealed from the basket on the end of the desk.

10:34    20    Q. Just a delivery man?

21    A. Yes, sir.

22    Q. That pays pretty well, $425,000 for the one policy and all

23    you had to do was take the letter to the hospital, telling them

24    that that policy didn't exist and they didn't have any

10:34    25    insurance. Is that right?

10:34  1   A.  I don't -- I don't know what was in the letter and -- I

2   mean, I --

3   Q.  What else did you do to earn --

4        THE COURT:  Just a second.  Let him finish his answer.

10:35  5   A.  Well, what else I did -- I mean, I'm in a relationship

6   business.  There are people that make lots more money in

7   Houston introducing people to the right people and being the

8   right person, being the person that is the contact on accounts.

9   Law firms have people that -- that find clients.  They get paid

10:35  10  well.

11  BY MR. McCONNELL:

12  Q.  But they aren't selling fake insurance.

13  A.  Neither was I, sir.

14  Q.  Have you read Mr. Swetnam's deposition?

10:35  15  A.  Yes, sir.

16  Q.  How many times?

17  A.  I don't know.  I've seen it several times since the civil

18  suit.

19  Q.  Have you read it in anticipation of your testimony here

10:35  20  today?

21  A.  Not recently.  I've read it.

22  Q.  Did you sit down and go over your testimony today with your

23  attorneys?

24  A.  Of course.

10:35  25  Q.  And they didn't show you the civil deposition?

10:36  1   A.  No, sir.

     2   Q.  I'm showing you Page 230, what's been admitted as

     3   Government's Exhibit 12.  Can you start reading at the top of

     4   the page there?

10:36  5   A.  Yes, sir.

     6            "Who told you that there was a problem with the

     7   cover notes?"

     8            And the answer:  "I determined that about the --

     9   I determined that about the 5th or the 6th.  Joe told me that

10:36 10   he couldn't get the deal together.  I knew I had a melted down

    11   deal.  So, I called -- I believe I called Brent, because him

    12   and Jim were out playing golf.  I asked him to put Brent on his

    13   phone, and he did.  I told him, 'I've got a problem.'"

    14            Okay.  You want me to keep going, sir?

10:36 15   Q.  Please.

    16   A.  "So, the first time you informed Mr. Springfield about

    17   this, about the 5th, about the 6th -- 5th or 6th probably was

    18   via phone?"

    19            "The only time I informed him about it, yeah."

10:36 20            "And he -- you called Mr. Carter and said, 'Hand

    21   the phone to Mr. Springfield'?"

    22            "They were golfing, I believe, that day."

    23            Can you move it up?

    24            "They were golfing that day, I believe.  Yeah."

10:37 25            "And that would be about the 6th or 7th of

10:37  1    September?"

2                "Somewhere in there."

3    Q.  So, is that right?  Is that when you found out there was a

4    problem with the captives, when you were out on the links with

10:37  5    your buddy Mr. Springfield?

6    A.  I didn't hear anything about a captive on the golf course,

7    no, I did not.

8    Q.  Where did you hear there was a problem with the captive?

9    A.  In the office.

10:37  10   Q.  In the office?  And what did Mr. Swetnam say to you, if you

11   remember?

12   A.  He said he was having trouble getting the coverage down.

13   Q.  Did you call your friend that we heard testify, Mr. Beck,

14   and say, "You know, there may be an issue here.  What should I

10:37  15   do?"

16   A.  No, sir.

17   Q.  Did you go ask Mr. Reagan?

18   A.  No, sir.

19   Q.  Did you go ask Mr. Smith?

10:37  20   A.  No, sir.

21   Q.  Didn't you think Mr. Reagan would probably want to know

22   since he was supposed to go to that meeting in Mexico and you

23   went in his stead?

24   A.  Actually --

10:38  25   Q.  I'm sorry.  Mr. Smith.

10:38   1   A.  Mr. Smith.  That's okay.

2   Mr. Smith was supposed to go and -- I mean, I

3   officed in Harlingen -- if you'll let me explain for you, I

4   officed in Harlingen.  So, I would come out to San Benito and

10:38   5   come in.  I would stop by and see -- if I was working on a home

6   owners, I would go by and see the lady that did that.  If I was

7   working on a commercial account, I would go see the person that

8   handled that.

9   And, then, on the way out, I would stick my head

10:38  10   in and say, "You got anything that needs to go?"  And I would

11   do that for Mr. Smith, Mr. Reagan and Mr. Swetnam.

12   And Mike said, "Yeah, yeah.  Here, take this

13   stuff and" -- on a normal basis.  I'm not talking about a

14   specific event.  He would say, "Here, take this stuff."  And it

10:38  15   was in his basket.

16   If there was a problem with the windstorm at the

17   agency, people would have been very busy.  And Mr. Smith was

18   the agent on the account, and they would have handled the

19   technical side of that account.

10:39  20   Q.  But I thought you said you were the point person on the

21   hospital account.

22   A.  I was the point person on contact with the hospital and on

23   taking and gathering information.

24   Q.  I'm showing you Page 228 from the same deposition.

10:39  25   A.  Okay.

10:39   1    Q.  Can you read this bottom part, where my finger is?

        2    A.  Yes, sir.

        3              "Did they know that when you gave this to the

        4    hospital, that that insurance wasn't actually in place?"

10:39   5              And he answers, "No."

        6              Oh, then, it says, "Just you and Mr. Carter knew

        7    that?"

        8    Q.  Can you keep reading, this next page?

        9    A.  "Just me at the time that I gave it to the hospital.

10:39  10    Okay."

       11              "And then, when you gave Carter the check, you

       12    told him?"

       13              "Told him it was falling apart, I think I'm

       14    trying to get it back together, yeah."

10:40  15    Q.  Did you ever tell Ward Cook there was a problem with the

       16    captives?

       17    A.  No, sir.  I didn't talk to Ward Cook about coverage.

       18    Q.  What about Manny Vela, did you ever tell him there was a

       19    problem about the captives?

10:40  20    A.  No, sir.

       21    Q.  After -- in this letter -- and you heard testimony that the

       22    hospital doesn't have any record of this letter?

       23    A.  Yes, sir.

       24    Q.  This letter that was given -- so, you get the -- you get

10:40  25    the check on 9-5-2006, right?

10:40  1          It's dated 9-5-2006; do you remember that?

       2  A.  Yes, sir.

       3  Q.  And then, a couple of days later, September 7, we have this

       4  letter.  And this is the letter that you -- you remember taking

10:41  5  something to the hospital around this period of time?

       6  A.  In all fairness, I don't remember taking something known as

       7  this letter.

       8  Q.  That's not what I asked.  I asked do you remember taking

       9  something to the hospital around this time.

10:41 10  A.  Well, if that's --

      11  Q.  You were looking in your diary or whatever.

      12  A.  -- what you're thinking, that's -- absolutely, yes, sir.

      13  Q.  Okay.  And, so, this letter tells Mr. Springfield that the

      14  hospital insurance -- the hospital isn't covered under these

10:41 15  cover notes.  Is that a fair statement?

      16  A.  Okay.  Yes, sir.

      17  Q.  And, so, what -- what is -- what is the only option for the

      18  hospital, under this letter?

      19  A.  The only other option that may be possible for us to offer

10:41 20  the hospital is a loss guaranty for the same monies.

      21  Q.  And this is Government's 13.  And can you read down there

      22  at the bottom?

      23          It says, "If you have any questions, please do

      24  not" --

10:42 25  A.  -- "hesitate to contact Brent or me."

*McConnell Cross of Carter*

10:42  1    Q.  And you said that -- yesterday you testified you don't know

2    why you would be in there because, if there was a problem and

3    they did contact you, you would just go ask Swetnam?

4    A.  Well, you know, you've stated that I was the front man on

10:42  5    the account.  Mr. Swetnam and Mr. Springfield didn't talk very

6    often.  I mean, it wasn't a real common occurrence --

7    Q.  I didn't state that.  You stated that.  I was stating what

8    you said, that you were the front man on the account.

9    A.  Okay.  Well, then you stated it correctly.

10:42  10              And -- and if Mr. Springfield would have called

11   me and said, "Hey, I need to talk to Mike about something.  Get

12   him to give me a call," I would have done so.

13   Q.  And did he ever call you after he received this supposed

14   letter --

10:42  15   A.  No, sir.

16   Q.  -- and say, "Brent what's going on here?  We don't have any

17   hurricane coverage?"

18   A.  He never called me.

19              THE COURT:  Mr. McConnell, you might want to look for

10:42  20   a break point.  I need to take up a couple of other matters.

21              MR. McCONNELL:  This is a good break point.

22              THE COURT:  Ladies and gentlemen, I apologize.  I know

23   you're not ready for another break.  If you want to, you can

24   remain in the courtroom.  I have a criminal matter and a civil

10:43  25   matter.  We'll get back to you as soon as we can.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*McConnell Cross of Carter*

10:43   1          Would all rise for the jury?

        2          *(Other matters were heard before the Court from 10:42 to*

        3   *11:18 a.m.)*

        4              A MARSHAL:  All rise for the jury.

11:18   5      *(Jury present)*

        6              THE COURT:  Members of the jury, please be seated.

        7                  All right.  You may resume.

        8   BY MR. McCONNELL:

        9   Q.  Mr. Carter, before we broke, we were talking about the

11:19  10   $425,000 check.  So, we kind of talked about, chronology wise,

       11   when you got the check and how it got into the your Frost Bank

       12   account.

       13   A.  Yes, sir.

       14   Q.  Do you recall that?

11:19  15              So, at some point after that deposit -- we saw

       16   the deposit, saw the checks dated 9-5 of '06; and it was

       17   deposited around the same time period, maybe the next day?

       18   A.  I think it was -- I think it was deposited that day.

       19   Q.  That day.

11:19  20              It's written out to you.  Is that -- you endorsed

       21   the back of it there?

       22   A.  Yes, sir.

       23   Q.  It's from Swetnam Insurance Service.

       24              And then we talked about this letter two days

11:19  25   later, addressed to Mr. Springfield, and how it says,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:19   1    September 7th, 2006, "contact Brent or me." Do you remember

        2    talking about all that?

        3    A.  Yes, sir.

        4    Q.  And you said that you don't recall whether you delivered

11:20   5    this letter, you just took something over there?

        6    A.  Yes, sir.

        7    Q.  Just making sure we're on the same page.

        8            At some point in September of 2006 Mr. Swetnam

        9    told you you could keep this money.

11:20  10    A.  Yes, sir.  Okay.

       11    Q.  Do you -- I'm not trying to put words in your mouth.  Is

       12    that what he told you?

       13    A.  I mean, he said, "Congratulations.  That's your bonus for

       14    last year and your commission and bonus for this year," yes,

11:20  15    sir.

       16    Q.  So, your bonus for 2005 and 2006?

       17    A.  Yes, sir.

       18    Q.  So, you started in 2004, right?

       19    A.  Yes, sir.

11:20  20    Q.  And you became the point person on the account in

       21    December 2005.  Is that what you said?

       22    A.  I guess officially, yes, sir.  I was involved before that.

       23    Q.  So -- and the check was from Mr. Swetnam, right, Swetnam

       24    Insurance Services?

11:21  25    A.  From Swetnam Insurances Services, yes, sir.

11:21    1    Q.  And signed by Mr. Swetnam.  And Mr. Swetnam told you that

2    this was -- this was a bonus for work you had performed in the

3    past?

4    A.  Yes, sir.

11:21    5    Q.  Did you thank him?

6    A.  Absolutely.

7    Q.  I mean, that's -- 425,000, that's a lot of money?

8    A.  It absolutely is.  It was more money than I had ever made

9    in my life.

11:21    10    Q.  Because what did you say when Mr. Colvin was -- when you

11    were talking to Mr. Colvin?  Did you say the most you had made

12    was 80,000?

13    A.  In -- before I came to the Valley, that's probably

14    accurate.

11:21    15    Q.  Wow.  So, that's, like, five times more than you had ever

16    made in your life, the highest paying --

17          THE COURT:  Annual salary.

18    BY MR. McCONNELL:

19    Q.  -- annual salary?

11:21    20    A.  Well, this wasn't salary; but, I mean, yes, it was a lot of

21    money.

22    Q.  Did you go thank Mr. Smith?

23    A.  No.

24    Q.  Did you go thank Mr. Reagan?

11:22    25    A.  No, sir.

11:22  1  Q.  Did you ask them, "Wow.  I mean, this is such a generous

2  bonus"?  Did you go talk to them about the bonus?

3  A.  Not directly at that time.  Michael explained at the time

4  that -- he told me that the money was my income, that he was

11:22  5  making up for a discrepancy in the payment that I was supposed

6  to have received for '05.  And he told me at that time that

7  Mr. Smith had shorted me on income that they had agreed to pay

8  me in '05.

9  Q.  And that's how you keep score, right, is money?  Isn't that

11:22  10  what the e-mail says?

11  A.  Well --

12  Q.  Is that what the e-mail says?

13  A.  That is what the e-mail says.

14  Q.  So, 425,000.  And you get that six days after the

11:23  15  August 29th, 2006, meeting in Mexico with the --

16  A.  Yes, sir.

17  Q.  Did you tell Mr. Springfield, your good buddy, that you had

18  gotten a $425,000 bonus?

19  A.  No, sir.

11:23  20  Q.  Did you tell Mr. Cook?

21  A.  No, sir.

22  Q.  Mr. Vela?

23  A.  No, sir.

24  Q.  Did you tell anyone at Smith-Reagan, other than

11:23  25  Mr. Swetnam?

11:23   1    A.   I don't believe so.

2    Q.   Do you remember yesterday, when Mr. Colvin was asking about

3    the $425,000, you said that you thought it was "curious"?

4                    And I thought that was an interesting choice of

11:23   5    words.   Do you remember that?

6    A.   I -- yes, sir.

7    Q.   Had you ever received a $425,000 check before in your life?

8    A.   No, sir.

9    Q.   It was curious --

11:23  10    A.   Yes, sir.

11    Q.   -- but you didn't ask any questions about it.

12    A.   I asked questions about -- about the accounting of it.   I

13    wanted to know where it came from.   I had no reason to doubt

14    that people in the agency didn't make huge incomes, sir.   We --

11:24  15    Q.   When did you ask questions about the accounting?

16    A.   Subsequent to this check, after that.

17    Q.   When?

18    A.   I don't recall exactly.   I talked to Mr. Smith about it.

19    Q.   Oh, you did talk -- I thought you just said you didn't talk

11:24  20    to Mr. Smith about the check.

21    A.   I talked to Mr. Smith about the accounting on the account.

22    I didn't talk to him specifically about this check.   He signed

23    on this account, to my understanding.   I assumed he knew about

24    it.

11:24  25    Q.   Wouldn't you ask him -- if you're asking about the

11:24  1    accounting for the account, wouldn't you ask him about a

2    $425,000 check?

3    A.  No, sir.  I wanted to go over the entire account.

4    Q.  If -- well, you testified on direct that when you asked

11:24  5    Mr. Swetnam about, you know, what the account's worth and he

6    said 1.8 million -- remember you were talking about the letter

7    that you were --

8    A.  Yes, sir.

9    Q.  I mean, $425,000, that's a substantial part of 1.8 million.

11:25  10   Wouldn't you agree?

11   A.  It's actually a little bit less than a fourth over two

12   years.  Yes, sir, it is.

13   Q.  So, if you're talking about the accounting to Mr. Smith,

14   you wouldn't mention that you received a check which is equal

11:25  15   to almost a fourth of what you believed you told Mr. Colvin was

16   the income on the account?

17   A.  Well, I believed that the account is generated -- this

18   is -- we're way further down the road now.  We're in, like --

19   whenever that other e-mail was -- it was in, like, October or

11:25  20   November.

21             But I -- 425,000 is -- is not a fourth of

22   1.85 million.  And, in theory, I was due a fourth.  So, it

23   didn't seem out of the ordinary, if the account did 1.8 million

24   over two years, for me to receive a fourth.  That was what they

11:25  25   told me they were going to do.

*McConnell Cross of Carter*

11:26   1   Q.  How much work did you do on that hurricane policy?

2             Because I remember -- we went through all these

3   e-mails.  They were all with Mr. Thompson and Mr. Swetnam.  I

4   mean, what did you do?

11:26   5             Did you make this document --

6   A.  No.

7   Q.  -- this Exhibit 1A?

8   A.  No, sir.  I did no work on the procurement of the lines of

9   coverage at all.

11:26   10  Q.  Nothing?

11  A.  No, sir.  And -- and neither did Mr. Reagan, for that

12  matter.

13  Q.  But he didn't get any money, did he, off of these policies,

14  Mr. Reagan?

11:26   15  A.  I can't tell you, sir.  I never saw the accounting.

16  Q.  You can't tell me -- you sat through over a week of this

17  trial.  You don't remember if Mr. Reagan got any money off of

18  this first policy?

19  A.  You have to realize that when you look at the --

11:26   20  Q.  The answer -- when Mr. Colvin is talking, you can answer

21  the question that you want to --

22            THE COURT:  Is what you want to explain responsive to

23  the question?

24            THE WITNESS:  Yes, sir, ultimately.

11:26   25            THE COURT:  Okay.  Go ahead.

11:26   1          THE WITNESS:  In short order.

        2   A.   When you look at -- whether it be the proposal that was

        3   given, the Power Point, or you look at any information that was

        4   given to the hospital, none of which I generated -- I didn't do

11:27   5   the Power Point or anything -- you would see, in this case, for

        6   example the TWIA, the -- whoever it was, CNA or Zurich or

        7   whoever it was and then there's layers and yada, yada, yada,

        8   and then at the bottom there's a total that says, you know,

        9   whatever -- whatever the total was, 2.563 million.  It did not

11:27  10   say, to my recollection, anywhere in there what any one section

       11   of that cost.  I mean, do see what I am saying?

       12          And I'm not trying to skirt your question -- your

       13   question at all.

       14   BY MR. McCONNELL:

11:27  15   Q.   Not really, but let me ask you a different question.

       16   A.   Yes, sir.

       17   Q.   So, we talked about the 1.8 million in the e-mail which was

       18   sent -- which I don't characterize as a "long way down the

       19   road."  It was sent the next month.

11:27  20   A.   Okay.

       21   Q.   You mentioned that you were due a fourth, right?

       22   A.   That's what I was told.

       23   Q.   That's what you thought --

       24   A.   Yes, sir.

11:28  25   Q.   -- a fourth?

11:28    1              Okay.  So, you got -- in September, you got
         2    $425,000 off of this policy.  Then you got another $250,000
         3    from the Zurich policy around the same time period, just a
         4    little while later.  Am I right?
11:28    5    A.  Yes, sir.
         6    Q.  And I'm not great at math, which we saw earlier in the
         7    trial; but I added that up to 675,000, which would be roughly a
         8    third of 1.8 million.
         9    A.  Okay.
11:28   10    Q.  Is that -- I mean, is that right?
        11    A.  That sounds accurate.
        12    Q.  Not a fourth.  I'm just --
        13    A.  You're on the exact reason that I asked for some
        14    understanding of the accounting.
11:28   15    Q.  And 1.8 was over two years, was it not?
        16    A.  Yes, sir, that's what I was told.
        17    Q.  Okay.  So, you get this bonus and -- curious bonus; and
        18    were you excited?
        19    A.  Absolutely.
11:28   20    Q.  You had already deposited the bonus into the Frost account,
        21    right?
        22    A.  Yes, sir.
        23    Q.  Doing business as Brent Carter.
        24              And, then, two weeks -- you deposited on
11:29   25    September 5th, 2006, you said, the same day, right?

11:29   1   A.  Yes, sir.

2   Q.  And, then, two weeks later, do you recall transferring

3   $275,000 in opening up another account?

4   A.  Yes, sir.

11:29   5   Q.  And that account -- your wife is on that account, right?

6   A.  Yes.

7   Q.  And that was at McAllen Bank, but I think it's now

8   Border --

9   A.  Border Capital.

11:29   10   Q.  -- Border Capital?

11   A.  McAllen Bank at that time.

12   Q.  And then, the next day, you transferred a hundred thousand

13   dollars out of that Brent Carter Insurance Services account --

14   A.  Yes, sir.

11:29   15   Q.  -- into a Wells Fargo account?

16   A.  Yes, sir.

17   Q.  Do you remember doing that?

18   A.  Was it Wells Fargo or was it First Community Bank?

19   Q.  I believe it was Wells Fargo.

11:30   20   A.  I'll take your word for it.

21   Q.  It was another bank, a different account, other than the

22   two --

23   A.  Sure.

24   Q.  -- that we just talked about.

11:30   25   A.  Sure.

11:30    1    Q.  Okay.  And you deposited the $250,000 Zurich check for

         2    the -- for those first umbrella policies that I just alluded

         3    to, that went into the same Brent Carter Insurance account.  Is

         4    that right?

11:30    5    A.  Yes, sir.

         6    Q.  Okay.  And, then, that was done on September 20th, 2006.

         7    That's when you got the 250,000, right?

         8    A.  Okay.

         9    Q.  Okay.  And then, the next day, you got a $75,000 cashier's

11:30   10    check and a $25,000  cashier's check, within two days, out of

        11    that account.  Do you remember doing that?

        12    A.  No.  But I know what the $75,000 check was for.  Yes, sir,

        13    I remember doing that.

        14    Q.  Okay.  So, that was deposited on 9-20.  And then we have

11:30   15    the -- the account -- the first deposit on 9-5-06.  And do you

        16    remember what you did with some of that money?

        17    A.  Yes, sir.

        18    Q.  Did -- in fact, did you have a pretty sizeable tax bill due

        19    from 2005?

11:31   20    A.  Yes, sir.

        21    Q.  Do you remember how much it was?

        22    A.  I do not.

        23    Q.  Thirty-five thousand sound familiar?

        24    A.  I wouldn't doubt that a bit.

11:31   25    Q.  Okay.  So, October 12th, 2006, you paid the IRS $35,000

11:31  1   that you owed from the tax bill -- you owed the tax man from
       2   your taxes the previous year?
       3   A.  Yes, sir.  We filed extensions -- it seems that everyone at
       4   the agency filed extensions.  And when I got down there, I did,
11:31  5   too, and started paying my -- actually paying my taxes in
       6   October.
       7   Q.  Did you have the money before you got the money from the
       8   fake hurricane policy?
       9   A.  (No response).
11:31 10   Q.  Thirty-five thousand, did you have that in your account
      11   when you got -- before you got the money from the hurricane
      12   policy and the Zurich policies?
      13   A.  I'm not certain.  I doubt it.
      14   Q.  It was pretty helpful, wasn't it, to get $425,000 to pay
11:32 15   off the tax man?
      16   A.  Yes, sir.  I mean, it's -- it's always good to have money
      17   to pay your taxes.
      18   Q.  Then you paid off a boat loan for Bobby?
      19   A.  (No response).
11:32 20   Q.  Thirteen thousand dollars?
      21   A.  Yes, sir.  I bought a small used boat.
      22   Q.  And, then, on September 25th, you spent $26,000 at the
      23   Jewelry Connection.  Do you remember that?
      24   A.  Yes, sir.
11:32 25   Q.  What did you buy at the Jewelry Connection for $26,000?

*McConnell Cross of Carter*

11:32   1   A.  My wife had lost her wedding ring when we moved to

2   Harlingen, and it had actually been an insurance claim.  And we

3   had taken some of the money and set it aside to replace her

4   ring.  And I took some of the money that I earned and I bought

11:32   5   her another ring.

6   Q.  So, you took money that you previously had gotten from

7   insurance and the hospital's money and you bought your wife a

8   wedding ring?

9   A.  Well, I actually took money that was my income and money

11:33  10   from insurance proceeds and bought my wife -- bought my wife a

11   wedding --

12   Q.  Do you understand, sitting here today, that insurance was

13   never purchased with this $425,000?

14   A.  I understand, sitting here today, that I never associated

11:33  15   that $425,000 with --

16   Q.  That's not my question.

17   A.  -- with any one policy.

18   Q.  Do I understand --

19        MR. COLVIN:  Your Honor, I object.  I ask he be

11:33  20   allowed to answer the question.

21        THE COURT:  Yeah, go ahead.  The answer I see on the

22   transcript, "I understand, sitting here today, that I never

23   associated that 425,000 with" --

24   A.  -- with any one insurance policy.  That money -- you know,

11:33  25   we've talked about bank accounts.  And Mr. Swetnam and Swetnam

11:33    1    Insurance Services had bank accounts in several banks that I

2    know of. I signed on none of them. It doesn't surprise me a

3    bit --

4    BY MR. McCONNELL:

11:34    5    Q. I know you want to tell your sorry.

6             THE COURT: No. Let him finish his answer.

7             MR. McCONNELL: It's not responsive to my question.

8             THE COURT: Then move to strike after he's finished,

9    but let him finish.

11:34    10    A. But the point is, for him to tell me on one day that, "I

11    want you to open an account for Swetnam Insurance Services --

12    I've got to go back and do some work -- and handle this for

13    me," to go actually do that did not trigger to me a couple of

14    days later that he's got trouble on a two and a half million

11:34    15    dollar property section of the hospital's business, that that

16    425 was somehow involved, at all.

17    BY MR. McCONNELL:

18    Q. You thought it was just bonus money?

19    A. No. At that time I thought it was Swetnam Insurance

11:34    20    Services' money, sir.

21    Q. Just the timing is -- is curious?

22    A. There's absolutely no doubt the timing is curious.

23    Q. So, $26,000 at the Jewelry Connection. And, then, did you

24    also use $40,000 of that money to pay off an MBNA credit card,

11:35    25    two cards, ending in 0724 and 2647?

*McConnell Cross of Carter*

11:35    1    A.  I don't have the numbers memorized; but like a lot of young

2    couples with young kids, I was in the Valley originally at

3    $4,000 a month and we had racked up a lot of credit card debt.

4    I don't think it's uncommon.

11:35    5    I'm not trying to make excuses.  Yes, I had the

6    money.  I set aside money for taxes and I paid off my debts,

7    yes, sir.

8    Q.  And you used the $425,000 that the hospital had given

9    Mr. Swetnam to purchase insurance?

11:35    10    A.  I used the money that Mr. Swetnam and Swetnam Insurance

11    Services bonus'ed to me and called my income.

12    Q.  So, let me ask you again my question that you didn't answer

13    few minutes ago.

14    A.  Okay.

11:35    15    Q.  Sitting here today -- and try to answer it.  Sitting here

16    today, do you understand that the hospital never received any

17    insurance from that $425,000?

18    A.  I understand that that money is absolutely in dispute and

19    that is the absolute reason for the civil suit that I'm in the

11:36    20    middle of today.

21    Q.  Do you understand that this policy that the hospital

22    purchased for $936,000, they never got any insurance from that?

23    A.  I don't understand that either, because I'm not an expert

24    regarding that guaranty that was supposedly delivered.  I

11:36    25    don't -- I don't know, sir.

11:36    1    Q.  Also, the guaranty protected the hospital?

2    A.  I don't know the ramifications -- my gut feeling is that

3    there was no coverage on that -- on that property at that

4    point.  But I didn't have anything to do with that.

11:36    5    Q.  Do you care?

6    A.  Absolutely, I care.

7    Q.  The cash continued to flow.

8    A.  It's semantics.

9    Q.  Is it?

11:37   10            So, $40,000 for MBNA.  Do you also remember

11    purchasing $6,000 worth of furniture?

12    A.  Yes, sir.  We had -- we bought a dining room set.

13    Q.  And then $1,800 for the Harlingen Country Club; $3,000 to

14    Chase; and 2800 to American Express, all out of that account,

11:37   15    using the hospital's money?

16            MR. COLVIN:  Your Honor, I object to the

17    characterization of it being the hospital's money.  And I

18    object to this line of questioning, because it's really not

19    relevant to any issue in this case.

11:37   20            THE COURT:  Well, the line of questioning, I think, is

21    relevant.

22            I will ask you to rephrase the last question.

23    BY MR. McCONNELL:

24    Q.  These purchases, all using the $425,000 which was part of

11:37   25    the $936,000 that the hospital had given to Mr. Swetnam to

11:37  1  purchase insurance --

2       MR. COLVIN:  Your Honor, I renew my objection.  I

3  don't believe that that's what -- what he's testified to, that

4  it was part of the $936,000; and I don't believe that's what

11:38  5  the record necessarily reflects.

6       MR. McCONNELL:  It's in the bank record, your Honor.

7       THE COURT:  I'm going to allow the question.

8            If you disagree with his premise, then feel free

9  to say so.

11:38  10  A.  Well, I mean, as long as I properly explained it, yes, I

11  did receive as income $425,000 from Swetnam Insurance Services.

12  And -- and if -- and at some point the hospital had at least

13  $936,000 in Mr. Swetnam's and Swetnam Insurance Services'

14  account, that was commingled with other funds in Mr. Swetnam's

11:38  15  account, I assume -- or I was told.

16            And at some point -- I mean, ultimately, I don't

17  know where that dollar originated; but I have no doubt that I

18  was being compensated on the hospital account.  I wasn't

19  being -- I mean, I was being compensated on the hospital's

11:38  20  account.  There's no doubt about it.

21  BY MR. McCONNELL:

22  Q.  This check was pretty tough to get rid of, wasn't it,

23  $425,000?

24  A.  Tough to -- I'm sorry.  I don't understand the question.

11:39  25  Q.  Well, you couldn't deposit it into an account for

*McConnell Cross of Carter*

| | | |
|---|---|---|
| 11:39 | 1 | Mr. Swetnam; you couldn't open up an account for Mr. Swetnam; |
| | 2 | and you had, as a last resort, to open up your own account for |
| | 3 | Brent Carter Insurance Agency. |
| | 4 | A.  Yes, sir.  And just -- if I can explain a little bit for |
| 11:39 | 5 | you -- |
| | 6 | Q.  You'll get your chance. |
| | 7 | A.  Okay.  No.  That's fine.  I'm sorry. |
| | 8 | Q.  Your attorney is asking -- |
| | 9 | A.  This is my first time in court, sir.  I apologize. |
| 11:39 | 10 | Q.  I know you want to give a speech, but you can do it with |
| | 11 | your attorney. |
| | 12 | MR. CLARK:  Judge, I'm going to object to sidebar. |
| | 13 | THE COURT:  Yeah, we'll strike that.  We'll strike |
| | 14 | that. |
| 11:39 | 15 | BY MR. McCONNELL: |
| | 16 | Q.  So, as I understand your testimony, you did not draft this |
| | 17 | document? |
| | 18 | MR. McCONNELL:  Ms. Loewe, can you put this on? |
| | 19 | A.  No, sir.  I never saw that document until it was produced |
| 11:40 | 20 | in the civil suit. |
| | 21 | BY MR. McCONNELL: |
| | 22 | Q.  And you didn't draft the other documents that were given to |
| | 23 | Mr. Cook in Mexico? |
| | 24 | A.  Absolutely not. |
| 11:40 | 25 | Q.  And you don't dispute that that happened; you just didn't |

11:40   1   see it?

2   A.   That's correct.

3   Q.   Did you do any work on these insurance policies?

4   A.   On -- in what way?

11:40   5   Q.   Well, you didn't draft the document. Did you communicate

6   with Harry Thompson at all?

7   A.   No, sir.

8   Q.   Did you go to the British Virgin Islands?

9   A.   No, sir.

11:40   10   Q.   But you got $425,000 from this first policy.

11   A.   Okay.

12   Q.   How long would it take you -- you just testified that you

13   made $4,000 a month. How long would it take you to make

14   $700,000, which was -- which would be the $425,000 plus the

11:41   15   $250,000 that you received from the Zurich policy?

16           THE COURT: How much -- how long would it take in

17   terms of 4,000 a month?

18           MR. McCONNELL: Yes, your Honor.

19   A.   Let's see. Four thousand -- forty-eight -- roughly 15 --

11:41   20   14 years, 13 and a half years, something like that.

21   BY MR. McCONNELL:

22   Q.   And then, in September, you made $700,000 in one month. Is

23   that fair?

24   A.   Yes, sir. That was the month that the biggest account of

11:41   25   the agency renewed, yes, sir.

11:41    1    Q.  In fact, you made $1.2 million a year to the day, isn't

         2    that right?

         3    A.  I've never -- I don't know.

         4    Q.  You never -- you never thought about it?

11:41    5    A.  No, sir.  I -- it always renewed on September the 1st.

         6    So --

         7    Q.  Okay.  You got the first check from the hospital, the

         8    $425,000 that we looked at, on September 5th, 2006 --

         9    A.  Okay.

11:41   10    Q.  -- right?

        11                 Then you get another check in September from the

        12    Zurich policy, $250,000, right?

        13    A.  Okay.

        14    Q.  And then the -- you get the check from the other windstorm

11:42   15    policy in June of 2007.  Do you remember how much that check

        16    was for?

        17    A.  Is that the one that was 274?

        18    Q.  I don't know.  Is it 274, 294?

        19    A.  I don't know.  I don't remember.  I'm not -- I'm not -- I

11:42   20    just don't remember.

        21    Q.  You don't recall?  You get a 200-something-thousand-dollar

        22    check, and you don't recall how much it's for?

        23    A.  No, sir, I don't recall the exact amount.

        24    Q.  Okay.  Then you get the last Zurich check 9-5 of 2007.  Do

11:42   25    you recall that?

*McConnell Cross of Carter*

11:42　1　A.　Okay.　Yes, sir.

2　Q.　So, you earned over $1.2 million in the course of one year.

3　A.　Okay.　Two policy years.　They're big policies; they're big

4　expenditures.

11:42　5　Q.　That's not my question.

6　　　　Okay.　From August -- from September 5th, 2006,

7　to September 5th, 2007, did you earn $1.2 million?

8　A.　Okay.　Yes, I'll take your word for it.

9　Q.　Did you ever ask Mr. Swetnam why he was paying bonuses

11:43　10　instead of the Smith-Reagan Agency?

11　A.　No, sir, because I got 1099's from both and because some of

12　the policies, due to my surplus lines relationships, they

13　renewed through Swetnam Insurance Services and some of the

14　policies were through Smith-Reagan.　And, so, it was very

11:43　15　normal -- I mean, all four individuals got money from both

16　companies.

17　Q.　Isn't it curious, though, that you never received a

18　sizeable bonus from -- like this, from Smith-Reagan?

19　A.　I think -- well, I didn't receive one that big, no, sir.

11:43　20　　　　Well, the biggest policies renewed through

21　Swetnam Insurance Services.　I didn't think it was odd.

22　Q.　So, let's go back to September of '06.　We talked about

23　425,000 and where that money went.　But you deposited the

24　money; and then, at some point, Mr. Swetnam tells you, "Good

11:44　25　job, Brent, a $425,000 bonus for this year and last year"?

*Cheryll K. Barron, CSR, CM, FCRR*　　　　　*713.250.5585*

11:44    1    A.  Yes, sir.

         2    Q.  Okay.  But he also told you around the same period that

         3    there was a problem with the hurricane policy.

         4    A.  Yes, sir.

11:44    5    Q.  Do you recall that?

         6    A.  Yes, sir.

         7    Q.  And if you go to Mr. Swetnam's deposition, do you remember

         8    the -- do you remember giving a binder to Mr. Ward Cook, an

         9    insurance binder?

11:44   10    A.  You're talking about the binder, the book?

        11    Q.  Yes, sir.

        12    A.  Yes, sir.

        13    Q.  You heard Mr. Ward Cook talk about it and you heard

        14    Inspector Boyden talk about it, the binder that had the policy

11:44   15    letter on it?

        16    A.  Yes, sir.

        17    Q.  The letter signed by you.  And then --

        18    A.  Yes, sir.

        19    Q.  -- threes pages into it, it had something about captives.

11:45   20    Do you remember that?

        21    A.  Okay.  I didn't look at it.

        22    Q.  You didn't look at it in preparation for your testimony?

        23    A.  No.  Mr. Smith had talked -- oh, no.  I've never really

        24    looked at that binder.  Mr. Smith talked to Mr. Cook and asked

11:45   25    me to draft a letter that said, "Here, these policies are in

11:45 1  this binder."

2      I wrote the letter, "Per your conversation with

3  David Smith," went by, got the ladies to put the letter in the

4  big book.  I took it to Mr. Cook.

11:45 5      And the reason I remember is I thought it was

6  very funny that the minute I sat down, he said, "Thanks," and

7  he pops open the binder, takes everything out, starts putting

8  it in files.  They did all this work to compile the book for

9  him, and he took it all apart.

11:45 10  Q.  But that information was important to Mr. Cook.  He wanted

11  to save it.  He was placing all those documents in each file to

12  go with the policies.

13  A.  Yes, sir.

14  Q.  Mr. Cook wanted to make sure that the hospital was

11:45 15  protected on all those policies?

16  A.  Absolutely.

17  Q.  Do you remember him testifying to that?

18  A.  Absolutely.

19  Q.  If you look at this deposition --

11:46 20      MR. CLARK:  Which reference, please?

21      MR. McCONNELL:  Page reference is 249, here at the

22  top, on the overhead.

23      MR. CLARK:  Thank you.

24  BY MR. McCONNELL:

11:46 25  Q.  If you -- can you start reading where it says, "And it

11:46  1  shows"?

2  A.  Yes, sir.

3         "And it shows -- is purporting to show the layers

4  of windstorm coverage, right?"

11:46  5         "Yes, sir."

6         "And on the top of the layers it says,

7  '75 million captive insurers,' doesn't it?"

8         "Yes, sir."

9         "If the jury believes your testimony about the

11:46  10 guaranty, then this document is in error, right?"

11        "Yes, sir."

12        "And it was provided to Valley Baptist on

13 September 25th, 2006, right?

14        You believe --"

11:46  15       "Right."

16        I'm sorry.

17        "You believe that is in error?"

18        "Absolutely."

19        "And it should say, 'Mike Swetnam guaranty,

11:46  20 $100 million.'"

21 Q.  Keep going.

22 A.  Could you move it a little bit?

23 Q.  Yes.

24 A.  "If you want them to reflect that, yes.  This was taken

11:47  25 from a proposal and put in.  And the proposal was done -- was

11:47　　1　　probably done, I would say, maybe in May."

　　　　2　　　　　　　　　"But you said Mr. Carter knew that the captives

　　　　3　　had fallen through earlier, in September, right?"

　　　　4　　　　　　　　　And he answered, "Yes, sir."

11:47　　5　　Q.　And September 25th, 2006, do you remember that day?

　　　　6　　A.　Yes, sir.

　　　　7　　Q.　Okay.　And do you remember the binders that we were talking

　　　　8　　about?

　　　　9　　A.　Yes, sir.

11:47　　10　　Q.　September 25th, 2006?

　　　　11　　A.　Yes, sir.

　　　　12　　Q.　And you saw Mr. Cook flip through this binder.　And he

　　　　13　　talked about how you had signed it and it was cc'd to Manny

　　　　14　　Vela, your friend, and he talked about this third page.　Do you

11:47　　15　　remember that?

　　　　16　　A.　(No response).

　　　　17　　Q.　Do you remember him talking about the third page?

　　　　18　　A.　Okay.　Yes, sir.

　　　　19　　Q.　Okay.　And it discusses on this third page the captive's

11:47　　20　　reinsurers mentioned $900,000 and the $75 million worth of

　　　　21　　coverage.

　　　　22　　A.　Yes, sir.

　　　　23　　Q.　Do you remember Mr. Cook talking about that?

　　　　24　　A.　Yes.

11:48　　25　　Q.　And, so, your testimony is that when you gave this policy,

11:48  1    this binder set, to Mr. Cook -- that you did give it to

2    Mr. Cook and, when you did that, he took these pages and put

3    them in folders associated with the particular policies?

4    A.  Yes, sir.

11:48  5    Q.  And that's what he testified that he did because he was

6    concerned and wanted to make sure that the hospital was covered

7    on these policies.  Do you remember that?

8    A.  Yes, sir.

9    Q.  Did you tell him when you gave him the policies, "Hey,

11:48  10   Ward, there's a problem with this windstorm coverage.  You

11   should look into it"?

12   A.  No, sir.

13   Q.  Did you -- did Ward seem upset, when you gave him this --

14   gave him these binders, that the hospital didn't have any

11:48  15   hurricane insurance?

16   A.  No, sir.  We both believed that they did.

17   Q.  And you testified that Ward Cook was in poor health.

18   A.  Yes, sir.

19   Q.  Do you remember that?

11:49  20        Did you tell Mr. Springfield at the time when you

21   dropped off the binders, "Hey, Jim, man, I got to be honest

22   with you.  The hospital may not be protected under these

23   hurricane policies.  There's an issue with this coverage"?

24   A.  No, sir.  I had no reason to believe that the hospital

11:49  25   didn't have coverage.

*McConnell Cross of Carter*

11:49  1   Q.  So, you think Mr. Swetnam was incorrect in his statements
       2   in this deposition?
       3   A.  Well, obviously, at this time I didn't have access to his
       4   deposition.  He hadn't been sued.
11:49  5          And he did tell me in September at some point
       6   that I think is probably noted somewhere, that, you know, "Hey,
       7   I've got some problems with this coverage and I've got to get
       8   it replaced."
       9          But, I mean, he got it replaced.  Later on he
11:49 10   told me that he had gotten it -- he had gotten it taken care of
      11   and gotten it replaced.
      12          THE COURT:  Once again, Mr. McConnell, I'm sorry to
      13   interrupt; but at a convenient time we need to break for lunch.
      14          MR. McCONNELL:  Can I go through just five more
11:50 15   minutes, your Honor?
      16          THE COURT:  You may.  You may.
      17   BY MR. McCONNELL:
      18   Q.  And, so, you didn't tell Ward Cook that Mr. Swetnam had
      19   told you that there was a problem with these captives?
11:50 20   A.  No, sir.  Because as Mr. Cook testified, he talked to Mike
      21   about the technical side of the account.
      22   Q.  You knew you could slip it by him because he was in poor
      23   health, didn't you?
      24   A.  No, sir.  He was a very good friend of mine.  That's not
11:50 25   the case at all.

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

| | | |
|---|---|---|
| 11:50 | 1 | Q.  And you sent him an e-mail the next day, didn't you? |
| | 2 | A.  It's possible. |
| | 3 | Q.  You don't recall? |
| | 4 | A.  Can you show me? |
| 11:50 | 5 | Q.  I thought you told Mr. Colvin that you had pretty much |
| | 6 | memorized these e-mails. |
| | 7 | A.  I think -- I mean, I'll be familiar with it if it's been |
| | 8 | produced, yes, sir. |
| | 9 | Q.  Well, it's been produced.  It's been turned over. |
| 11:50 | 10 | A.  I'm not trying to be a smart aleck.  I'm just saying I |
| | 11 | don't -- |
| | 12 | Q.  (Indicating) |
| | 13 | A.  Right.  Yes. |
| | 14 | Q.  Do you remember this? |
| 11:50 | 15 | A.  Yes, sir, absolutely. |
| | 16 | Q.  And what day was this e-mail sent? |
| | 17 | A.  September the 24th. |
| | 18 | Q.  So, this would be what day in relation to these binders? |
| | 19 | A.  Well, you know -- oh, it would have been on the Sunday |
| 11:51 | 20 | before I took them over there on Monday. |
| | 21 | Q.  Yeah.  So, the -- I was incorrect.  So, the day before, |
| | 22 | right? |
| | 23 | A.  Yes, sir. |
| | 24 | Q.  And -- |
| 11:51 | 25 | A.  Although -- |

11:51  1   Q.  Mr. Colvin had you read some of this e-mail yesterday, but

2   he didn't have you read this bottom paragraph.  Will you read

3   that for the jury so they hear the whole e-mail?

4   A.  Yes, sir.

11:51  5          "We don't need anyone stirring up an already

6   overworked Ward with stuff that isn't of the utmost.  Trust me,

7   and the cash will continue to flow.  I never create doubt; so,

8   let's just stick to the plan.  Thanks to all."

9   Q.  What does it say after that?

11:51  10  A.  "Thanks to all.  And this is not a problem and requires no

11  explanation or reply."

12  Q.  You dealt with Ward, didn't you?

13  A.  I dealt with Ward.  This e-mail was to David Smith.  I'm

14  basically telling David I don't need him to send me a reply.  I

11:52  15  just don't want him over there getting Ward all upset again.

16  Q.  Do you think Ward would be upset if Mr. Smith came and told

17  him the hospital didn't have any hurricane coverage?

18  A.  I think if Mr. Smith thought for a minute the hospital

19  didn't have coverage he would have gone to Mr. Cook.

11:52  20  Q.  So, Mr. Smith didn't know; just you and Mr. Swetnam knew?

21  A.  That's not what I am saying at all.

22  Q.  You said if Mr. --

23  A.  If I had known, I would have gone to Ward Cook.  If I had

24  known, I would have gone to Mike.

11:52  25  Q.  Did you ever ask Mike?

11:52  1  A.  Sir, these people -- Mr. Reagan and Mr. Swetnam and

2  Mr. Smith had so much more infinite insurance knowledge than

3  me, I did not -- I did not ask them how they put the program

4  together on the technical side at all.

11:52  5  Q.  But you had the relationship with the hospital, and they

6  trusted you?

7  A.  That's correct.

8  Q.  They trusted you, and you dealt with Ward.  You didn't tell

9  him, and you knew there was a problem.  Isn't that right?

11:53  10  A.  No, sir.  I did not know there was a problem.

11  Q.  You just testified that Mr. Swetnam told you there was a

12  problem with the captives.  Why --

13  A.  But I didn't think there was a problem, ultimately, with

14  the coverage being in place.

11:53  15  Q.  Why didn't you tell them?  They trusted you.

16  A.  That's not right, sir.

17  Q.  What do you mean it's not right?

18  You testified that they trusted you.  Why didn't

19  you tell them they purchased nothing with this $936,000?

11:53  20  A.  I did not know that they had purchased nothing.

21  Q.  You knew there was a problem, and you didn't tell him.

22  MR. COLVIN:  Your Honor, I object to that.  It's just

23  argumentative.  He's just arguing with the witness.

24  THE COURT:  I'm going to allow the question, but let

11:53  25  him finish his answer.

McConnell Cross of Carter

11:53  1      Go ahead please, Mr. Carter.

2      A.  If I had known there was something wrong with the coverage,

3      that hadn't been corrected by Mr. Swetnam, I would have talked

4      to someone about it.  I certainly did not know that there was

11:53  5      a -- you know, someone purported there was coverage when there

6      was none.

7      BY MR. McCONNELL:

8      Q.  The cash continued to flow, though, didn't it?

9      A.  (Indicating).

11:53  10     Q.  You got paid?

11     A.  I did get paid, yes, sir.

12     Q.  You testified yesterday that Mr. Swetnam told you that

13     there was a meltdown.  Do you recall that?

14     A.  Yes, sir.

11:54  15     Q.  Why didn't you tell Mr. Cook there was a meltdown?

16     A.  When you have an account that is that complex and that

17     technical and when I don't know how to explain anything about

18     it, the bottom line is a guy like -- a guy with Mr. Swetnam's

19     qualifications goes in and his job is to fix that problem.

11:54  20     Things -- problems happen with accounts all the time, and the

21     technical side of the agency solves the problem.

22     Q.  So, the bottom line, you -- what you are telling the jury

23     is you got $1.2 million for just taking over some documents to

24     the hospital and playing golf with Mr. Springfield.  You were

11:54  25     the relationship guy, and you didn't -- you know, if there was

*McConnell Cross of Carter*

11:54    1    a problem, if there was an issue, you left it to others to deal

2    with and you didn't ask any questions.  Is that right?

3    A.  You know that's not -- that's really not a bad

4    interpretation for a lot of what I did on that account that

11:55    5    they had had for 40 years, the agency had when I got there,

6    that Smith-Reagan had handled for over 20 years when I got

7    there.

8          And based on their reputations in the

9    community -- I absolutely did -- I completely deferred to them

11:55    10    on the technical side of that account and made no bones about

11    the fact that my relationship with the new, younger CEO allowed

12    Smith-Reagan to continue to handle the insurance for their

13    agency.  I don't make any excuse about that.

14          I didn't determine what I was paid.  I didn't

11:55    15    sign on any of their bank accounts, sir.  And what they chose

16    to pay me, I took graciously and was proud to earn.

17    Q.  You did sign the back of all those checks, didn't you?

18    A.  Absolutely.  That's how you put them in the bank.

19    Q.  So, you did get paid for your work.

11:55    20    A.  Yes, sir.

21          MR. McCONNELL:  Your Honor, I think this is a good

22    place to stop.

23          THE COURT:  All right.  Ladies and gentlemen, just

24    come back whenever you wish.  Enjoy your lunch.

11:56    25      *(Jury not present)*

*Cheryll K. Barron, CSR, CM, FCRR*         *713.250.5585*

| | | |
|---|---|---|
| 11:56 | 1 | THE COURT:  Anything we need to take up? |
| | 2 | MR. McCONNELL:  No, your Honor. |
| | 3 | THE COURT:  Okay. |
| | 4 | MR. McCONNELL:  Your Honor, when would you like us to |
| 11:56 | 5 | be back? |
| | 6 | THE COURT:  I doubt they'll be back before 1:15.  So |
| | 7 | if you're back before then, that's time enough. |
| | 8 | MR. McCONNELL:  Thank you, your Honor. |
| | 9 | *(Recess was taken from 11:56 a.m. to 1:44 p.m.)* |
| 01:44 | 10 | *(Jury present)* |
| | 11 | THE COURT:  Members of the jury, please be seated. |
| | 12 | Do you want to resume your inquiry, |
| | 13 | Mr. McConnell? |
| | 14 | MR. McCONNELL:  Yes, your Honor. |
| 01:44 | 15 | BY MR. McCONNELL: |
| | 16 | Q.  Mr. Carter, before lunch, we were talking about the curious |
| | 17 | check and the hurricane policy.  I'd like to talk now about the |
| | 18 | Zurich policies. |
| | 19 | A.  Okay. |
| 01:45 | 20 | Q.  You testified on direct that you tried to get the hospital |
| | 21 | a good deal on insurance.  Do you remember that? |
| | 22 | A.  That was the agency's role, yes, sir. |
| | 23 | Q.  So, did you feel like it was your job to get the best price |
| | 24 | for the hospital? |
| 01:45 | 25 | A.  As an agency, possibly, but not me individually. |

*McConnell Cross of Carter*

01:45    1    Q.  That was the agency's job, but you didn't feel that was

2    your job?

3    A.  Well, it wasn't my role.  I mean -- and I'm not being a

4    smart aleck.  But our receptionist would want our agency to do

01:45    5    the best job, too; but she didn't deal with procurement of

6    coverage.

7    Q.  Right.  Your role was just dealing with Mr. Springfield?

8    A.  And the day-to-day -- you heard Mr. Cook testify that

9    hundreds of documents and hundreds of other things were taken

01:46    10    over there.  That's what I did on that particular account, yes,

11    sir.

12    Q.  You were -- on the Zurich account, you were managing the --

13    kind of the flow of information?

14    A.  Often, yes, sir.

01:46    15    Q.  And you've seen the -- you also testified that you're aware

16    on the 2006 and 2007 policy and the 2007 and the 2008 policy,

17    the two policies that are at issue in this trial, that you were

18    aware that both of them had approximately a million dollar

19    markup?

01:46    20    A.  Yes, sir.

21    Q.  And you were aware that -- well, I shouldn't say you were

22    "aware."

23          And you received an equal share of that

24    million-dollar markup.  Is that right?

01:46    25    A.  As far as I know, yes, sir.

01:46    1    Q.  Well, I mean, you've seen all the cashier's checks; and

2    they all look pretty much the same?

3    A.  Yes.

4    Q.  And, so, the 2006-2007 policy, the one that came from

01:46    5    Zurich and -- and we've seen this a lot during the trial.

6            I'm going to show you Exhibit 2.  You see this

7    $1.4 million --

8    A.  Premium.

9    Q.  -- premium?  And you never saw this document?

01:47   10    A.  I did not, sir.

11    Q.  And this one, also in 2006, listing the total premium of

12    $2.3 million, also dated November 30th, 2006, you've never seen

13    that document?

14    A.  No, sir.  That's the document -- is this -- is this the

01:47   15    declarations page or the binder?

16    Q.  This is the declarations page.

17    A.  Yes, sir.  I -- chances are -- this is for '06-'07?

18    Q.  Yes.

19    A.  Chances are I delivered that policy.  I probably did see

01:47   20    it.  That's certainly the premium I remember.

21    Q.  Okay.  So, you delivered this -- and I apologize for

22    mistaking your testimony.

23            So, you delivered this declaration page to the

24    hospital?

01:47   25    A.  Yes, sir.  I would have probably delivered the entire

01:47  1  policy that would have been behind this, as well.

2  Q.  Okay.  And you knew when you delivered this that this

3  policy had been marked up by a million dollars?

4  A.  I knew the commission had been added to it of a million

01:48  5  dollars, yes, sir.

6  Q.  Is that -- and I'm going to ask you kind of an obvious

7  question; but is that disclosed at all here, where it says

8  "Annual Premium Policy Fee, Surplus Line Tax and Stamping Fee"?

9  A.  No, sir.

01:48  10  Q.  Because your understanding was that that did not have to be

11  disclosed, the commission?

12  A.  Yes, sir, and because the premium includes the commission

13  in this scenario.

14  Q.  Okay.  And you say it includes the premium from Zurich or

01:48  15  the premium as -- as, I guess, inserted by Smith-Reagan

16  includes that premium?

17  A.  Well, the -- the total premium of $2,380,638.42, part of

18  that -- in this case I happen to know it's roughly a million

19  dollars -- part of that 2 million and change is commission.

01:49  20  Q.  And you testified on direct, I believe, that there were

21  discussions at Smith-Reagan about this million-dollar markup?

22  A.  Yes, sir.

23  Q.  Were you involved in these discussions at all?

24  A.  Yes, sir.

01:49  25  Q.  And -- because you were aware, in general, of kind of the

01:49　1　pricing information and what the prices are in the area.  Is

2　that right?

3　A.  Well, not in the area.  But, I mean, as I testified, I

4　often would receive information.  It might be something as

01:49　5　subtle as, from Mr. Springfield, you know, "Hey, Carter, your

6　boys better sharpen their pencil," or it might be something

7　more direct from Manny Vela that actually involved a number

8　that said, "You need to make sure your guys get it done for

9　less than X."

01:49　10　Q.  You were actually able to get kind of inside information

11　from the hospital on what everyone else's bids are and take

12　that back to Smith-Reagan and tell them, "Look, you know, we're

13　close to the market," "We're outside the market," so that they

14　knew what the pricing should be.  Is that fair?

01:50　15　A.  Yes, sir, at times and --

16　Q.  Okay.  And, then, this Exhibit 2A, now, this is a

17　document -- and we've seen this before, and we know that's Ward

18　Cook's initials.

19　A.  Yes, sir.

01:50　20　Q.  And it's got the $2.3 million premium here that we just saw

21　on Exhibit 4, and it's signed by Mr. Swetnam.  Would you have

22　been the one to take this interim insurance binder to the

23　hospital?

24　A.  I certainly may have, yes, sir.

01:50　25　Q.  Okay.  And it basically has the same information that --

01:50    1    A.   I believe so.

         2    Q.   -- that's listed on this Exhibit 4.

         3                 And, so, your relationship in that sense kind of

         4    paid off because -- or was valuable, I should say, because

01:50    5    Smith-Reagan was sort of able to adjust their pricing based on,

         6    you know, what your competitors might be pricing their policies

         7    at?

         8    A.   Yes, sir.

         9    Q.   And, so, we had 1.4 million for Exhibit 2 and then 2.3 for

01:51   10    Exhibit 4.

        11                 And then, if we go to Exhibit 8, this is the next

        12    year, right?

        13    A.   Yes, sir.

        14    Q.   2006-2007.

01:51   15                 Well, the first page is not here.

        16                 But 8A, this is, again, a document you would not

        17    have seen, correct?

        18    A.   That is correct.

        19    Q.   And -- because this is the original.  And this lists the

01:51   20    $1.2 million; and it's signed by Mr. Hamlin, Gregory Hamlin,

        21    November 28, 2007.

        22    A.   And that is -- that's the dec page, is it?  I just can't

        23    see the top of it.

        24    Q.   Yes, it is.

01:51   25    A.   Yes, sir.  You know, I saw that when it was produced in the

01:51   1    civil lawsuit.

        2    Q.  So, were the folks at Smith-Reagan, Mr. Smith and

        3    Mr. Reagan, I mean, were they generally happy that you were

        4    able to get this information?

01:52   5    A.  I believe so.  They paid me handsomely.

        6    Q.  Wasn't that information critical to figuring out how much

        7    you could change this premium and how much you could charge the

        8    hospital?

        9    A.  I mean, there's no doubt it was valuable.  I was -- yes.  I

01:52  10    mean, it was valuable.  They wanted to know -- and, again, to

       11    put it into a simpler term, if -- if I can, if I'm looking to

       12    buy a Buick and I come to you and say, "I've got a quote on a

       13    Buick.  It's $30,000.  I'll buy it from you if you can get it

       14    for less," then you know if you can afford to get it for less

01:52  15    or not.

       16          If I say, "Okay.  I -- you know, I'll buy it for

       17    28 from you," I still save $2,000 versus the other guy, no

       18    matter what the guy that sold it for 28 sold it for [sic].

       19    That's --

01:53  20    Q.  Now, in your hypothetical, you would agree, however, that

       21    it's a little bit different if you're selling, let's say -- go

       22    back to your hypothetical -- if you're selling a car to someone

       23    and you lie to the person about the price they're paying.

       24    Would you agree that's different?

01:53  25    A.  Well, no.  If I lied about the price I paid for it to sell

01:53 1    it to you?

2    Q.  No.  No.  Not -- irrespective of what you paid, would you

3    agree that it's different -- based on your hypothetical that

4    you just gave this jury, it's different when you lie about the

01:53 5    price that the customer is paying, regardless of what you paid?

6    A.  I guess any time you lie about the price the customer

7    pays -- but I just give you a hypothetical -- two options, one

8    is 30 and one is 28.  You buy the one that's 28, that -- that

9    was the price, 28.

01:53 10   Q.  I know.  I changed it up a little bit.  I'm asking you if

11   it's just a little different.

12   A.  I'm just trying to clarify.  I'm sorry.  I don't understand

13   the question.

14   Q.  The question is, is that different.  Is changing the price

01:54 15   that the customer is paying, is that different than not telling

16   the customer what you're paying?

17   A.  I'm sorry.  I just don't understand.  Is that different --

18   Q.  Well, how is that confusing?

19   A.  If I change the price that I'm paying --

01:54 20   Q.  Let's say you go up -- you're signing a document to buy a

21   Buick, under your scenario, and the customer thinks the price

22   is $10 -- or let's -- in your scenario, $20,000 and let's say

23   you change it to $30,000.  Is that the same as not telling the

24   customer what you paid for the car?

01:54 25   A.  Well, I can see that being different; but that's not in any

01:54  1    way indicative of the scenario that I gave.  So --

2    Q.   I'm just expanding on your hypothetical.

3    A.   I'm just not really certain how to answer.

4    Q.   Is that the same thing as doctoring up the sticker price?

01:55  5    Your hypothetical?  Is that different from your hypothetical?

6    A.   (No response).

7    Q.   Let's say you go up to -- you know, someone goes -- you

8    know, all cars have a window sticker on the car, right?

9    A.   Right.

01:55  10   Q.   And it lists out, you know, what you are paying for the

11   car.  And, you know, sometimes customers have, you know, what

12   the dealer paid for the car; but that's not usually on the

13   sticker price, right?

14   A.   Okay.

01:55  15   Q.   Is that your understanding?

16   A.   Yes, sir.

17   Q.   So, is it different for someone to change the numbers on

18   the sticker price, is that different than just not telling them

19   what the dealer paid for the car?

01:55  20   A.   Not as -- in my opinion, no, not as long as I show you --

21   well, let's say the car was 30 and I mark it to 32.5 and I tell

22   you that I'll sell it to you for 32.5, as long as your

23   independent research tells you that 32.5 is still a good deal,

24   I don't see the problem.

01:56  25   Q.   But if you're changing a sticker price, you're changing a

01:56  1  document, a manufacturer document.  That's not your document.

2  A.  Mr. McConnell, that -- unfortunately, for our scenario,

3  that happens all the time, sir.  On cars, absolutely.

4  Q.  The car dealers alter documents?

01:56  5  A.  Car dealers often sell a car for more than the sticker

6  price, depending on supply and demand.

7  Q.  Sure, they do; but they don't alter documents, do they?

8  A.  I don't know, sir.  I'm not a car --

9  Q.  Do they lie to their customers?

01:56  10  A.  I think a lot of us would probably think car dealers lie.

11  Car dealers might, yes, sir.

12  But -- and I'm sorry.  I wasn't trying to be

13  smart.  I was just -- I shouldn't have brought up the analogy,

14  and I apologize.

01:56  15  Q.  Right.  Okay.  So, going back to your analogy -- or do you

16  not want to talk about the analogy anymore?

17  A.  Talk about anything you would like to, sir.

18  Q.  Okay.  What I was trying to distinguish was between

19  disclosing what you paid for an item, whether it's a car,

01:57  20  whether it's a chair, whether it's a computer, versus

21  affirmatively changing something that you're -- a

22  representation you're making to a customer.  Do you understand

23  the difference between that?

24  A.  (No response).

01:57  25  Q.  Do you understand the difference between me not telling you

01:57   1    something and me telling you something that's false?

2    A.   Oh, okay.  Yes, sir.  You can bring that back to Zurich if

3    you like.

4    Q.   That's what I am trying to get at.

01:57   5    A.   I can follow you on that.

6    Q.   That's what I am trying to get at.

7    A.   Sure.

8    Q.   Okay.  That was my point.

9              Okay.  So, in Exhibit 7A -- 7A, this is the

01:58  10    2.5 million.  And this is -- if we had the first page of

11    Exhibit 8 -- is that accurate -- this would be what the premium

12    is on Exhibit 8.

13    A.   And that's the binder?

14    Q.   This is the -- yes, this is the document that went to the

01:58  15    hospital.

16    A.   And you say the dec page matches that?

17    Q.   Right.

18    A.   Okay.  Yes, sir.  I'm fine with that.

19    Q.   Would this be a document that you would have taken to the

01:58  20    hospital?

21    A.   I don't -- it is the type of document I would have taken.

22    I do not believe I took this document in '07.

23    Q.   Okay.  But the one in '06, are you sure you took this one?

24    A.   Yes, sir, I'm fairly well sure I did take that one.  I'm

01:58  25    certainly not denying I took that one.

01:58  1    Q.  Why would you think you didn't take the one in

      2    October 2007?

      3    A.  After I was relieved of my duties in the middle of '07, I

      4    didn't spend a whole lot of time at the facility.  I did repair

01:58  5    my relationship with Mr. Springfield.  I did, you know, do a

      6    lot of things for the individuals that I worked with at the

      7    hospital, but I didn't spend a lot of time on the account.

      8    Q.  So, the premium -- according to these documents we looked

      9    at, the premium for Zurich from 2006 to 2007 was $1.4 million;

01:59 10    and 2007 to 2008 -- we had a first page of Exhibit 8 -- you'll

      11   see it's $1.2 million.  That's a savings of $200,000.

      12   A.  Are you talking about the originals that --

      13   Q.  Yes, the originals, the unaltered.

      14   A.  Okay.  That's --

01:59 15   Q.  Okay.  And, then, the documents that we saw were presented

      16   to the hospital, for Exhibit 4 it's $2.3 million; and, then,

      17   Exhibit 8B we looked at, that's $2.5 million, right?

      18   A.  I'll take your word for that.

      19   Q.  So, the original document, the original -- according to the

01:59 20   original Zurich policies, the hospital would have saved

      21   $200,000 between 2006-2007, 2007-2008.  But with the documents

      22   that included the commission, they actually paid what?

      23   $200,000 more between years and I guess the spread would have

      24   been 400,000.  Do you follow me?

02:00 25   A.  I guess.  Except -- I mean, I do follow the math you just

*McConnell Cross of Carter*

02:00   1    used.  But I never saw the original; so, I had no idea of

       2    the -- I mean, I didn't have -- I guess the bigger point is

       3    there was more spread in '07-'08 than there was in '06-'07

       4    and --

02:00   5    Q.  And who got the savings on those policies?

       6    A.  I mean, I would have to compare it to the market, as it was

       7    advised to me, for each year, from the competition.

       8    Q.  Well, the hospital -- the original policy in '06 and '07

       9    was $200,000 less than '07 and '08.

02:00  10    A.  Yes, sir.

      11    Q.  And, then, the hospital was charged $200,000 more those

      12    years.  We said the spread is $400,000.  Where did that go?

      13    A.  Well, it would have -- I mean --

      14    Q.  It went to Smith-Reagan, wouldn't it?

02:01  15    A.  It would have gone to the agency, yes, sir.

      16    Q.  Okay.  And do you recall Mr. Swetnam's deposition, where he

      17    talked about changes in these policies and managing general

      18    agent?  Do you recall how he described these changes to the

      19    policies?

02:01  20    A.  He described it as "correcting" the policy.

      21    Q.  "Correcting."  But you described it a little differently.

      22    Do you remember that?  Yesterday.

      23    A.  I don't.

      24    Q.  You used the term "manuscripting"?

02:01  25    A.  Oh, no.  I was talking about something different.  But it's

02:01 1    okay.  If you want to explore it, I'll talk to you about it.

2    Q.  What is "manuscripting"?

3    A.  "Manuscripting," as I understand it, is you got -- this

4    particular hospital, they had a number of underlying

02:01 5    liabilities, like -- and I'm not going to be specific because I

6    actually don't know specifically.

7         But let's say their auto policy that covered the

8    automobiles the hospital had, let's say they had a $5 million

9    limit of liability on their auto policy.  And maybe they had

02:02 10   a -- on their med mal they had a $5 million trust and another

11   15 on top of that; and on general liability, they had the same.

12   But they also had, like, a hired/not owned aircraft policy.

13   And it, I believe, only had, like, a $5 million limit.

14        The policy that Mike manuscripted, as I

02:02 15   understand, and the reason that he went directly from the

16   office in San Benito to New York is so that Zurich would --

17   their umbrella would drop down to each attachment point.

18   Instead of everything having to be a million dollars and the

19   umbrella was excess of a million, it might literally be

02:02 20   30 million excess of 5 on auto, 30 million excess of one on

21   general liability, 30 million excess of 15 on a trust.  It kind

22   of dropped down to where it needed to be.

23        And as I understand it, that's -- that was one of

24   the advantages that Swetnam Insurance Services could provide,

02:03 25   is attachment points that met all their underlying coverage.

02:03  1   And that was, in theory, one of the reasons they were more

2   competitive.  But I --

3   Q.  You did a very good job explaining that.

4   A.  Well, I -- you know, I listened to it; but I don't -- I

02:03  5   don't know that I'm correct.  I'm glad you understood it, but

6   I'm not sure I'm correct.  That's as I understand it.

7   Q.  I mean, is that -- "manuscripting" is that -- is that an

8   insurance term?

9   A.  It's -- that's how Mr. Smith explained it to me.

02:03  10  Q.  Mr. Smith explained "manuscripting"?

11  A.  Yes, sir.

12  Q.  I mean, is it a real word or --

13  A.  I really don't know.  I mean, you -- I don't know.  That's

14  what it was described to -- to me.

02:03  15  Q.  When you're doing that kind of changing to a policy, do you

16  use a program like Adobe Acrobat so you can go in and make

17  changes to the document?

18  A.  I don't know how to do that.

19  Q.  Do you know if you can do that with Adobe Acrobat?

02:04  20  A.  I have no idea.

21  Q.  Have you ever used Adobe Acrobat?

22  A.  I don't know.

23  Q.  You don't -- like, you've never used an Adobe Acrobat file?

24  A.  Well, I --

02:04  25  Q.  A .pdf?

02:04  1  A.  Yes, I --

2  Q.  You open up a .pdf, Adobe Acrobat is the program that opens

3  that.

4  A.  Okay.

02:04  5  Q.  You weren't aware that you could go in and change .pdf's

6  with the editing equipment?

7  A.  I'm sure I had it; but, I mean, as pertains to these

8  policies, I didn't have anything to do with that.

9  Q.  You weren't aware that you could do that?

02:04  10  A.  No, sir.

11  Q.  And if it was done, you didn't have anything to do with it?

12  A.  No, sir.

13  Q.  Okay.  And we talked about, at the beginning of your

14  testimony, the insurance test that you took.  Do you remember

02:04  15  that?

16  A.  Yes, sir.

17  Q.  And you said that you had roughly nine years of experience

18  in the insurance field before 2004, before you went to work for

19  Smith-Reagan?

02:05  20  A.  Yes, sir.

21  Q.  Do you remember testifying to that?

22      Do these tests teach you anything in terms of --

23  do they teach you anything about omissions and

24  misrepresentations?

02:05  25  A.  I mean, not -- I don't recall any specific question.  I'm

02:05  1   certain that there's ethics type questions on the exam.

2   Q.  What sorts of ethics type questions?

3   A.  I couldn't tell you.  It was years ago and it -- I remember

4   it wasn't very in-depth.

02:05  5   Q.  Do those tests tell you that it's okay to change a document

6   just because you don't have to disclose something?

7   A.  Sir, I took the general agent's test.  I didn't take an MGA

8   test or a surplus lines test, and I didn't have to deal with

9   any of those issues.

02:05  10  Q.  I'm just asking as a general matter.

11  A.  No, as a general agent, there was nothing on there that

12  explained to me anything about altering or changing and

13  correcting policies.

14  Q.  Do they teach you generally, as insurance agents, that

02:06  15  you're not supposed to alter documents presented to your

16  customers?

17  A.  Yes, sir.

18  Q.  And you know that as an insurance agent that you're not

19  supposed to do that?

02:06  20  A.  Not only that, but I know that I never did.

21  Q.  Well, I'm not -- that's not my question.

22  A.  Okay.

23  Q.  Thank you for the answer.

24  A.  I'm sorry.

02:06  25  Q.  You know that that's unlawful, that it's illegal to do

*McConnell Cross of Carter*

02:06 1   that?

2   A.  I can't speak to that.

3   Q.  You can't speak to whether it's illegal?

4   A.  No, sir.

02:06 5   Q.  But the test that you took for insurance and the knowledge

6   you have as an insurance agent tells you that you're not

7   supposed to do that?

8   A.  Yes, sir.

9   Q.  What about selling insurance that doesn't exist; what does

02:06 10   the test tell you about that?

11   A.  Well, the test didn't address it; but I'm certain that's

12   not legal.

13   Q.  Does the insurance code make it okay to lie to clients?

14   A.  I've never read the insurance code, but I'm certain it does

02:07 15   not.

16   Q.  Does it teach you that a misrepresentation is a lie?

17   A.  The insurance code?

18   Q.  The training that you had and your experience as an

19   insurance agent, do you know that making a misrepresentation to

02:07 20   someone is lying to them?

21   A.  No, sir.  I think common sense does that.

22   Q.  So, common sense -- so, you wouldn't even need your

23   experience to know you can't just change a document and have it

24   be something that's truthful?

02:07 25   A.  No, sir.  I said that -- that misrepresenting something to

*McConnell Cross of Carter*

02:07    1    someone is a lie.

2    Q. Is changing a document making a misrepresentation?

3    A. It depends on what your qualifications are to change that

4    document or alter it or correct it or whatever the proper term

02:07    5    for the event is.

6    Q. So you can get a license to steal. Is that what you are

7    saying?

8          THE COURT: Okay. All right. Let's move on.

9    BY MR. McCONNELL:

02:08    10    Q. And you didn't go to New York with Mr. Swetnam?

11    A. No, sir.

12    Q. Do you know how much time was spent altering these

13    policies?

14    A. No, sir. In fact, I -- I always -- the documents that I

02:08    15    saw, again, as I testified, the binder matched the invoice,

16    which matched the policy that I delivered. I understood that

17    they came from Zurich that way. I was under the impression

18    that Zurich knew everything that was happening on the account.

19    Q. Did you ever tell Mr. Springfield about these undisclosed

02:08    20    commissions?

21    A. No, sir.

22    Q. He was your friend. Never talked about that sort of thing?

23    A. No, sir.

24    Q. Do you ever tell Mr. Vela about the undisclosed

02:08    25    commissions?

02:08  1    A.  No, sir.  I would have been fired for that.

2    Q.  Who would have fired you?

3    A.  Mr. Smith.

4    Q.  Earlier today, before we broke for lunch, you said that you

02:09  5    couldn't tie particular policies to particular checks.  Do you

6    remember testifying to that?

7    A.  To a degree, that's true.  I mean, there's -- when you get

8    a $250,000 check on an account that you know had a million

9    dollars' worth of commission in it, I mean, you -- it doesn't

02:09  10   take, you know, a lot of thought to know that.  But there -- as

11   Mr. Cook testified, there's 10, 15 -- all these policies that

12   Smith-Reagan wrote.  And there were some random checks I got

13   that I have no idea what policy or group of policies they were

14   attached to.

02:09  15   Q.  I haven't seen any other $250,000 checks.  Was there

16   another $250,000 check --

17   A.  Not to my knowledge.

18   Q.  -- that we haven't talked about in the trial?

19   A.  No.

02:09  20   Q.  But with the Swetnam checks, with the checks that you got

21   from Mr. Swetnam, from Swetnam Insurance, you at least knew

22   that they had something to do with the types of policies that

23   he dealt with, correct?

24   A.  Yes, sir.

02:09  25   Q.  Okay.  Thank you for that clarification.

02:10  1          And you said that you discussed commissions on

2     the Zurich policies at Smith-Reagan?

3     A.   Yes, sir.

4     Q.   And did you say they were discussed in the kitchen or

02:10  5     something, at the office?

6     A.   Well, there was a -- it was a small office, and there was

7     a -- like, a kitchenette thing and a refrigerator and a

8     conference table and a, you know, white grease board, if you're

9     referring to my conversation with Mr. Smith.

02:10  10    Q.   How were they discussed in this kitchen?  I mean, was it

11    kind of -- did you say, "Hey, look, you know, this is how much

12    I think we can charge," and, you know, they figured out how

13    much they could add onto the policy?

14         What was the context of the conversation?

02:10  15    A.   Well, they would -- we had a Monday morning meeting every

16    Monday; and we traded, you know, information, ideas.  That's

17    where conversations were held that said, you know, "Our

18    official word should be the market is tight.  Don't go talk

19    about the coverage.  By the way, these are the quotes that I've

02:11  20    been getting.  I'm going to be out of town next week.  I'm

21    going to New York," or whatever about that specific account.

22         But we also talked about all the other agency

23    business that we were involved in.  So, it wasn't a -- it

24    wasn't just a Valley Baptist Medical Center agency.

02:11  25    Q.   Okay.  And you testified that you were trying to get the

02:11  1    best deal -- well, the Smith-Reagan agency was trying to get

2    the best deal for Valley Baptist?

3    A.   Yes, sir.

4    Q.   And you helped them do that by telling them, you know, what

02:11  5    kind of the market was and what other folks were submitting

6    bids for?

7    A.   Any -- any information that I could get through my

8    relationships, I forwarded on to the principals at

9    Smith-Reagan, yes, sir.

02:11  10   Q.   Why would you hide commissions and be secretive if you're

11   trying to get the best deal?

12   A.   I didn't hide anything, and I don't think I was secretive.

13   I mean, it's a retail business and --

14   Q.   You didn't hide anything?

02:12  15          MR. CLARK:   Excuse me.   I object.

16          THE COURT:   Yeah.   Let's let him finish.

17          MR. CLARK:   Interrupting the witness.

18   A.   I'm just -- I'll just avoid an analogy.   I don't think it's

19   secretive or hiding anything.   If -- if this price is presented

02:12  20   and was approved by Zurich and it's the best deal according to

21   Valley Baptist at the time they make the purchase, how much --

22   whether one -- if the other policy was a higher premium,

23   then -- then this is the best deal for the hospital.

24   BY MR. McCONNELL:

02:12  25   Q.   How is this not hiding the commission?   Where is it listed

02:12   1   in this document that went to the hospital?

2   A.   Well, there is -- there's no mention of commission there.

3   There's a fee that I don't know where it went, and I don't know

4   where -- well, the taxes went to Texas; and the stamping office

02:12   5   fee went to Texas.

6              Like I said, this is the only document I ever

7   saw.  So --

8   Q.   And this fee here, this $81,000, this would be an

9   additional fee that Smith-Reagan got?

02:13   10   A.   I have no idea what that -- I know it was something that

11   was on about every surplus lines policy I ever saw.

12   Q.   Were you aware in Mr. Swetnam's deposition he talked about

13   this fee, you know, paying office expenses, overhead, omissions

14   and liability insurance?

02:13   15   A.   It may have.  It wasn't something that was ever accounted

16   for to me; and as far as I know, I never got a dime of it.

17   Q.   All you got was your $250,000?

18   A.   Yes, sir.

19   Q.   And what exactly did you do to earn that $250,000?

02:13   20   A.   Well, one thing, besides having the relationship that

21   allowed the agency to continue pulling in the business, one

22   thing to think of is that, you know, in our business you can

23   transfer an account from one agent to another with an agent of

24   record letter.  You heard Ms. Lewis talking about coming in and

02:13   25   receiving an agent of record letter to move the business to

02:13  1   Alliant.

       2           In practical application, I could have gone to

       3   work for Bob Shepard at Shepard Walton King and, with the

       4   simple agent of record letter that is about two lines long, I

02:14  5   could have moved this business to Shepard Walton King.

       6   Q.  Why would it move with you?  Why wouldn't it stay with

       7   Smith-Reagan?

       8   A.  Because I was the one with the relationship, and that's

       9   part of what Smith-Reagan paid for.

02:14 10   Q.  Wasn't that relationship built on lies?

      11   A.  No, sir, not at all.  My friendship with Mr. Springfield

      12   was absolutely genuine, and I truly believed he was getting the

      13   best deal on his coverage right there.

      14   Q.  You believe that the Smith-Reagan agency getting more than

02:14 15   Zurich was the best deal for the hospital?

      16   A.  I believe it was a better deal than they were getting from

      17   any of their competitors.

      18   Q.  How were they supposed to know what the best deal is if

      19   you're not telling them all the -- all the money that you're

02:14 20   receiving in this deal?

      21   A.  I -- number one, it wasn't my role to do so; number two, I

      22   don't believe that a retail agent has that obligation in the

      23   State of Texas.

      24   Q.  How do they know it's the best deal if they think their

02:15 25   premium is $2.1 million when it's actually a million dollars

*McConnell Cross of Carter*

02:15  1   less?

2   A.  I mean, I think I've answered your question.  I don't

3   really know how to continue to belabor it.

4   Q.  I don't think you have answered my question.  How does the

02:15  5   hospital --

6           MR. COLVIN:  Your Honor, I'm going to object.  The

7   question has been asked and answered four or five times.  He

8   just didn't like the answer.

9           THE COURT:  There's nothing in the Rules of Evidence

02:15  10  that prevent the question being asked more than once.  We're on

11  the verge of being cumulative under Rule 611, but I'll allow a

12  little bit more inquiry.

13          MR. CLARK:  Judge, I'm going to object.  This line is

14  cumulative.  It's been three or four times now; and just for

02:15  15  the record, it's cumulative.

16          THE COURT:  Your objection is noted for the record.

17  It is overruled for now, but we're not going to linger on this

18  point much longer.

19  BY MR. McCONNELL:

02:15  20  Q.  Wouldn't that $1.2 million policy have been the best deal

21  for the hospital?

22  A.  Well, if an agency can stay in business selling everything

23  at cost, then absolutely I agree that would be --

24  Q.  Cost?  You were getting 10 percent.

02:15  25  A.  Well, number one, I didn't know anything about the

02:15    1    10 percent; and the 10 percent went to Swetnam Insurance

       2    Services, not to me, sir.

       3    Q. Well, that wasn't my question. You said, "If the agency

       4    was selling something at cost, I don't know how they could stay

02:16    5    in business."

       6            And I said, you know, the $1.2 million, the --

       7    Smith-Reagan was still getting 10 percent out of that policy --

       8    A. Technically Swetnam Insurance Services got the 10 percent.

       9    Q. Okay. They were getting 10 percent?

02:16   10    A. Right.

     11    Q. Wouldn't that have been the best deal, for the hospital to

     12    just pay the 10 percent as opposed to a hundred and ten

     13    percent?

     14    A. Using that logic, they could have received the 10 percent

02:16   15    commission and donated it back to the hospital and made it an

     16    even better deal; but they can't pay the bills that way.

     17           THE COURT: Okay. All right. Well, that's fine.

     18    Let's move on.

     19    BY MR. McCONNELL:

02:16   20    Q. Do you remember Mr. Colvin going over your tax returns?

     21    A. Yes, sir.

     22    Q. And he talked about for 2005 your total income was 193,000?

     23    A. Okay. Yes, sir.

     24    Q. And, then, for '06, the total income was 745,000?

02:17   25    A. Yes, sir.

02:17  1  Q.  And, then, in '07, 665,000?

2  A.  Yes, sir.

3  Q.  And in '08, 75,000?

4  A.  Okay.

02:17  5  Q.  And, so, all you had to do -- and we talked about before

6  lunch that you got $1.2 million from September 2006 to

7  September of 2007.  So, all you had to do to get this

8  $1.2 million was have this relationship with Mr. Springfield

9  and give this information about, you know, what the market was

02:17  10  and what everyone else was bidding on back to Smith-Reagan.

11  A.  And service the account and do the delivery work that I did

12  and -- and -- I mean, it is -- you've simplified it greatly;

13  but, for the most part, my relationship is what I was paid for,

14  yes, sir.

02:18  15  Q.  I would like to go through some of the e-mails that

16  Mr. Colvin showed you.  And he showed you this e-mail, which is

17  Government's 11-11A, August 28th, 2007.  Do you remember this

18  e-mail?

19  A.  Yes, sir.

02:18  20  Q.  So, at the time this e-mail was sent, you would have

21  received the $425,000 for the first windstorm policy Ariel RE,

22  right?  You got that money in '06?

23  A.  In '06, yes, sir.

24  Q.  Then you got $250,000 for the first Zurich policy, right?

02:18  25  A.  Yes, sir.

02:18   1    Q.   274 for the second one.   Is that right?

        2    A.   Oh, in June?

        3    Q.   Yeah.

        4    A.   Okay.

02:18   5    Q.   For the second windstorm policy?

        6    A.   Yes, sir.

        7    Q.   It was 274, 294, somewhere around there?

        8    A.   One of those.

        9    Q.   So, close to a million dollars.

02:19  10              Okay.   Is that -- is that fair?

       11    A.   Fair enough.

       12    Q.   And then you were discussing -- you told Mr. Colvin that --

       13    you know, what you were discussing in this e-mail.   And what

       14    did you say it was, in general?

02:19  15    A.   (No response).

       16    Q.   That the e-mail -- that the discussion above -- I guess

       17    below "gents."   You talked about how you met with Ward Cook and

       18    David Smith --

       19    A.   Right.

02:19  20    Q.   -- and you -- and I guess Mr. Springfield, who was "the big

       21    guy," wanted to get a better deal.   Is that the gist of what

       22    this is saying?

       23    A.   No, sir.   This is talking about the limit of insurance, I

       24    believe.   These are notes that I -- this is -- the notes here

02:19  25    are for Mr. Smith, and I put those into one side of this e-mail

McConnell Cross of Carter

02:19   1   and for Mr. Swetnam into the other.

        2           They're talking about the limit of the umbrella

        3   coverage over the trust, is it going to be a $10 million trust,

        4   a $15 million trust.  And Mr. Cook said 20 million in the trust

02:20   5   is too high.

        6   Q.  And, then, what do you say here in the bottom?  "In

        7   summary"?

        8   A.  "In summary, this business is leaving as soon as they can

        9   move it.  I suggest all commissions and fees be fully earned

02:20  10   and we plan on losing it next renewal.  That does two things.

       11   It allows us to plan for the future and removes any guilt about

       12   this year's income."

       13   Q.  And, so, you had one more check to go to hit that

       14   1.2 million bucks in September, right?

02:20  15   A.  Are you assuming that was a goal or --

       16   Q.  No.  I'm asking you.  One more check to go until you hit

       17   $1.2 million?

       18   A.  I received one more large check on this account, yes, sir.

       19   Q.  Okay.  And that was in September.

02:20  20   A.  Okay.

       21   Q.  What does it say about "legacy issues"?

       22   A.  Oh, that's -- I said, "Don't focus on any legacy issues.

       23   Focus on" --

       24           THE COURT:  No.  You're going too fast.

02:20  25           THE WITNESS:  Oh, I'm sorry, sir.

*McConnell Cross of Carter*

02:20   1   A.   "Don't focus on any legacy issues.  Focus on my mortgage."

        2                  That was in reference to Mr. Smith talking about,

        3   you know, "What if we drop the bottom out of it; you know,

        4   would we be able to keep the business?"

02:21   5                  And I advised him no, and history shows that I

        6   was correct.

        7   BY MR. McCONNELL:

        8   Q.   What does "drop the bottom out of it" mean?

        9   A.   If he were to drop the spread significantly and sell it for

02:21  10   less money, would it allow them to have some type of a

       11   long-term relationship.  And I was telling him that, no, the

       12   pricing wasn't going to affect the relationship, that the

       13   business was going to move.

       14   Q.   Is that because you thought the hospital would find out

02:21  15   about these fake hurricane policies?

       16   A.   No, sir.  The contrary.  Mr. Springfield was encouraging me

       17   to go to work for Alliant at the time.

       18   Q.   Why would you have any guilt about that income?

       19   A.   I wouldn't have any guilt about it.  David was saying,

02:21  20   "Gee, that's a lot of spread."

       21                  I said, "It's still cheaper than what they're

       22   getting and" -- that was the indication I had from Alliant.

       23                  In fact, Mr. Vela testified that -- or Ms. Lewis

       24   testified that she told Mr. Vela, "I think they're about a

02:22  25   hundred thousand dollars high."

02:22  1    And as I recall, the premium was adjusted

2    downward, the deductible was lowered, and then we sponsored a

3    key event at the hospital.

4    Q.  I thought Mr. Smith said the spread was okay.

02:22  5    A.  What do you mean?

6    Q.  The spread -- you just said the spread -- Mr. Smith was

7    concerned about the spread?

8    A.  Well, Mr. Smith set the spread.

9    Q.  He set the spread?

02:22  10   A.  He's the decision-maker on the account.  I just gave him my

11   input.

12   Q.  And what was your input?

13   A.  My input was, "Sell it at sticker price because you're not

14   going to -- you know, you're not going to get their business

02:22  15   long term by dropping the price."

16   Q.  I notice you had a -- you found a pretty calm demeanor here

17   in court today.

18   A.  Yes, sir.  You've been very nice.

19   Q.  Some of these e-mails suggest you may have a different

02:23  20   demeanor at times.

21   A.  I like to think I've outgrown it, but I understand your

22   point.

23   Q.  And you weren't under indictment when you wrote those

24   e-mails, were you?

02:23  25   A.  No, sir.

02:23  1   Q.  You weren't on trial.

       2   A.  I was -- I was a little more prideful.

       3   Q.  In this -- in the e-mail that we've seen, talking about the

       4   golden goose --

02:23  5   A.  Yes, sir.

       6   Q.  -- do you remember that one?

       7   A.  Yes, sir.

       8   Q.  Who's the golden goose?  Is that you or the hospital?

       9   A.  I was the golden goose.

02:24 10   Q.  You were the golden goose?

      11   A.  Yes, sir.  That's in response to a comment from the Monday

      12   morning meeting.

      13   Q.  Do you remember your attorneys getting up here and asking

      14   each witness whether your name was in certain documents?

02:24 15   A.  Yes, sir.

      16   Q.  Your name is on all those checks that you got, isn't it?

      17   A.  Yes, sir.

      18   Q.  Do you remember what Mr. Vela said his salary was?

      19   A.  I think he said 300,000 and the most he made was four.

02:24 20   Q.  And, so -- and he's a lawyer, the head of the hospital's

      21   legal department, correct?

      22              So, in one year, you made four times his salary.

      23   A.  That's -- I mean, by your logic, Mr. Vela would have made

      24   six or eight hundred thousand.

02:24 25              You've added two years of my income that you

02:24   1   grouped into one calendar year -- or one fiscal year.

2   Q.   Really?

3   A.   Yes.

4   Q.   I don't think so.  How does that math work?

02:25   5   A.   If I made $475,000 in --

6   Q.   No.  I'm talking about from September 2006 to September of

7   2007.

8   A.   Well, he was on salary and I was on commission.  I mean,

9   it's -- when you get paid is the difference.  He made -- I got

02:25   10   paid that amount in two years --

11   Q.   Let's talk about those commissions.

12          THE COURT:  Just a second.  Let him --

13             Go ahead and finish your answer.

14   A.   He would have gotten his salary for two years, '06 and '07.

02:25   15   I got the commissions for '06 and '07.

16             And, Mr. McConnell, I mean, I'm not an attorney.

17   It's, like, I don't compare my salary to a car dealer.  I never

18   knew what Mr. Vela made.  I had no input in his income, and I

19   have no idea what he earned or how it relates to the insurance

02:25   20   business at the hospital.

21   BY MR. McCONNELL:

22   Q.   And at what point did you realize during the course of

23   Mr. Boyden's investigation in the civil case and this criminal

24   trial that those hurricane policies, that money was never

02:26   25   purchased with that -- insurance was never purchased with that

02:26    1    money?

         2    A.   I guess I knew insurance was never purchased when I saw the

         3    guaranty in the civil suit.

         4    Q.   In the civil suit?

02:26    5    A.   Yes, sir.

         6    Q.   Did you ever try to pay back the money you got from the

         7    hospital, from those hurricane policies?

         8    A.   No, sir.  And I've explained this to Mr. Hanslik in the

         9    civil suit, as well.  The income I received, I received from

02:26   10    the agency that I worked for.  And I told them specifically, it

        11    may be that Smith-Reagan made decisions that affected you as a

        12    hospital and, even though you've already accepted monies back

        13    from Smith-Reagan, they may actually owe you more.  But I said,

        14    "I never took a dime from Valley Baptist.  I took my income

02:27   15    from Smith-Reagan and Swetnam Insurance Services."

        16    Q.   Why did Mr. Smith pay his money back?

        17    A.   I can't speak for Mr. Smith, sir.

        18    Q.   What about Mr. Reagan?

        19    A.   I wouldn't try to speak for Mr. Reagan.

02:27   20    Q.   Did you ever apologize to Mr. Springfield?

        21    A.   No, sir.

        22    Q.   What about Mr. Cook?

        23    A.   No, sir.

        24    Q.   The hospital?

02:27   25    A.   No, sir.

*McConnell Cross of Carter*

02:27  1    Q.  Knowing right now, today, if you knew what you know right
       2    now, today, at the time these policies were passed to Mr. Cook,
       3    would you have gone through with taking this money?
       4    A.  Knowing what I know today?
02:27  5    Q.  Yes.
       6    A.  I don't believe so.
       7    Q.  Do you remember your attorneys during the trial asking
       8    about the e-mails?
       9    A.  Yes, sir.
02:27 10    Q.  And those e-mails were all to your e-mail address, the
      11    e-mails in Government's Exhibit 11, that you said you had gone
      12    through several times?
      13    A.  I don't know.  I mean, I -- I think they were from my
      14    e-mail address.  I don't know if they were -- you know, I mean,
02:28 15    like I sent them?
      16    Q.  No, no, no.  Is that your e-mail address that's listed on
      17    those e-mails?
      18    A.  There's -- yes, sir.  I mean, I think.
      19    Q.  Do you think it's possible to reply to an e-mail twice?
02:28 20    A.  I guess -- I guess it could be possible.  I don't --
      21    Q.  Is it -- is it possible, when you reply to e-mails more
      22    than once, that the signature block will appear at the bottom
      23    of an e-mail more than once?  Have you ever seen that happen?
      24    A.  Not without something being redacted.  I mean, I don't -- I
02:28 25    don't believe -- something had to be missing somewhere for that

02:28    1    to happen.

         2    Q.  That signature block at the bottom of your e-mail, does

         3    that come up when you hit "Compose New Message," when you write

         4    an e-mail -- e-mail, automatically?

02:28    5    A.  (Indicating).

         6    Q.  So, each time, you sit there and type out "Brent A.

         7    Carter," your address, your phone number --

         8    A.  Oh, yeah.  I don't type it out, no, sir.

         9    Q.  That's something that automatically pops on there?

02:29   10    A.  Sure.

        11    Q.  So, it's possible, with Government's Exhibit 11, that the

        12    three blocks where e-mail appears three times, that's just

        13    because you were replying to e-mails or an e-mail was

        14    forwarded; that doesn't necessarily mean that the document was

02:29   15    tampered with, correct?

        16    A.  I'll even -- I don't believe necessarily the documents were

        17    tampered with, and I've certainly never -- I never suggested

        18    they were done so by your office.

        19             But it is worth noting that those documents went

02:29   20    from Smith-Reagan to someone, to a TDI guy, to a -- to

        21    Mr. Boyden's office.  And somewhere along the way, significant

        22    pieces of a lot of them were left out, many of the gaps of

        23    which I've filled in and --

        24    Q.  With your testimony here today?

02:29   25    A.  Well, and yesterday.  I mean, I know what I was responding

02:29    1    to in some cases.

         2    Q.   Do you recognize this defense exhibit, 130?

         3    A.   It's marked as one of mine.  So, I'm sure.

         4    Q.   And if you look at the last page of this exhibit --

02:30    5    A.   Right.

         6    Q.   -- that's your e-mail three times?

         7    A.   Yes.  And something -- something has been removed from

         8    there.  I didn't produce this document.

         9    Q.   That's a document you offered into evidence in this trial,

02:30   10    though.

        11    A.   But it was taken from the production in the civil suit,

        12    sir.  It's not an e-mail that I produced from my attorneys.

        13    Q.   Did someone deposit money in your bank accounts during the

        14    course of this deal you had going on with the hospital?

02:30   15    A.   On occasion, yes, sir.

        16    Q.   Those checks, do you think Mr. Smith put those in your

        17    account or did you put those in your account?

        18    A.   No.  Wait.  I thought you were talking about did my parents

        19    give me some money to survive while I'm going through this.

02:30   20    Q.   No.

        21    A.   Clarify your question, please.

        22    Q.   When you had -- when this case was going on, questions in

        23    the case --

        24    A.   Okay.  I'm sorry.

02:30   25    Q.   -- when the policies were being sold to the hospital, and

02:31    1    the coverage, did Mr. Smith or anyone else put any of that

         2    money into your bank account?

         3    A.   No.   I mean, they would have written me a check and I would

         4    have endorsed it, put it in the bank like anybody else would do

02:31    5    with their income or payroll check.

         6    Q.   You put it in the account?

         7    A.   Yes, sir.

         8    Q.   Did somebody spend your money at the jewelry store?

         9    A.   I spent my money at the jewelry store.

02:31   10    Q.   And you're the one who opened up that account, the Carter

        11    Insurance Services account?

        12    A.   Yes, sir, as -- as we have detailed.

        13    Q.   Did you -- you knew that Zurich was mailing policies to

        14    Swetnam Insurance and Smith-Reagan, did you not?

02:31   15    A.   I assumed they were mailed to them.

        16    Q.   And you knew that documents associated with this case were

        17    being mailed to the hospital?

        18    A.   I'm sorry.   Like, what type of document?

        19    Q.   Invoices?

02:31   20    A.   If -- if I didn't deliver them, they were mailed.

        21    Q.   And you knew that e-mails were being sent?

        22    A.   On?

        23    Q.   On -- during the course of your dealings with the hospital,

        24    from Mr. Swetnam to Mr. Thompson and --

02:32   25    A.   Oh, yes, sir.   Yes.

*McConnell Cross of Carter*

02:32  1    Q.  And you knew that money was being wired back to Zurich to

2    pay for these policies?

3    A.  I've never dealt with that; but I'm familiar that that's

4    how the money is paid to the carriers, through electronic wire,

02:32  5    yes, sir.

6    Q.  That's the ordinary course of business?

7    A.  I believe, for just about every agency.

8    Q.  Do you remember we've talked about this letter to

9    Mr. Springfield?

02:32  10   A.  Yes, sir.

11   Q.  And you've seen and folks have talked about your name being

12   in this letter as a contact person, "contact Brent or me"?

13   A.  Yes, sir.

14   Q.  Why is your name in this letter?

02:33  15   A.  Well, can you slide it down a little bit?

16   Q.  Sure.

17   A.  By September the 7th of '06, I was the main contact with

18   the hospital.  And of the three people other than myself,

19   whether it be Mr. Swetnam, Mr. Smith or Mr. Reagan,

02:33  20   Mr. Springfield would be most liable to call me.

21        MR. McCONNELL:  Your Honor, I'd ask Mr. Chaney refrain

22   from making comments -- or somebody at this table.

23        MR. CHANEY:  I didn't say a thing, your Honor; and

24   that's offensive for him to suggest it.

02:33  25        MR. McCONNELL:  There's comments coming from this

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

02:33    1    table, your Honor; and it's distracting.

         2         MR. CLARK:  As an officer of the Court, I haven't

         3    heard anything.

         4         THE COURT:  Let's all be reminded there will be no

02:33    5    stage whispering and also no affirmative signals that are

         6    non-verbal, by way of nodding in agreement or rolling one's

         7    eyes in disagreement.  We have tolerance for none of that.

         8    BY MR. McCONNELL:

         9    Q.  And just to go -- I'm sorry, Mr. Carter, about that.  What

02:34   10    did you say your response was?  I didn't hear you.

        11    A.  The -- in September of '06, I was the contact person.  And

        12    although I don't recall delivering this letter or -- or

        13    seeing -- I know I didn't see it until the civil discovery --

        14    it doesn't surprise me at all that my name would be on it as

02:34   15    someone to contact with a question.

        16    Q.  Why not?

        17    A.  Why would I be surprised --

        18    Q.  Because you're the contact person for the hospital?

        19    A.  Yes, sir.

02:34   20    Q.  And here's some discussion in Mr. Swetnam's deposition,

        21    Page 166, about the calculation in one of those Zurich

        22    policies.  Can you start reading where it says, "Question:

        23    How --"?

        24    A.  Yes, sir.

02:35   25              "How was the $2,185,000 figure calculated?"

02:35  1        THE COURT:  You're going too fast.

     2              "How was the $2,185,000 figure calculated?"

     3   A.  "David, Joe, Brent, myself sat down, talked about it; and

     4   they decided that we needed to add excess commission on the

02:35  5   policy to get it up into the market."

     6              Continue?

     7   BY MR. McCONNELL:

     8   Q.  Yes, please.

     9   A.  "And what other market indicators were you comparing it

02:35 10   against to suggest that this was an appropriate excess

    11   commission?"

    12              Can you slide it up?

    13              "The one that we placed the most reliance upon

    14   was Lorraine -- was Lorraine Lewis, because she had been

02:35 15   talking to Manny and Ward and Brent had been getting from Manny

    16   and Ward that we were within the market -- within the market at

    17   that level."

    18   BY MR. McCONNELL:

    19   Q.  That's good.

02:36 20              How was the information translated back -- or

    21   transferred back to Zurich on this price?

    22   A.  I mean, as I've stated, I would be at the hospital,

    23   involved in my normal conversations or maybe a specific

    24   conversation about, "Hey, how are we looking?  What's the

02:36 25   consultant telling you?  Are we in the market?"

02:36  1        And, typically, we had the advantage of being the

2    local agent as opposed to someone like Alliant, who was from

3    Houston.

4        The servicing of this account was somewhat labor

02:36  5    intensive in that there were lots of dinners and lots of golf

6    and lots of things to do with and for Mr. Springfield.

7        And Manny and Ward, without ever saying, "It

8    needs to be X-number of dollars," would say, "Yeah, you're

9    close" or, you know, "You need to get it down a little bit.

02:37 10    Jim wants it down a little bit."

11        I just got feedback.  I mean, I'm a salesman.  I

12    would see where I needed to be in order to get the business.

13    Q.  Do you remember talking about -- did you ever ask any

14    questions of Mr. Springfield or Mr. Swetnam on how Zurich would

02:37 15    ultimately figure out the price, the price that was ultimately

16    charged on the policy?

17    A.  No, sir.

18    Q.  Did you ever ask, you know, how you were going to get your

19    million dollars out of the premium presented to the hospital?

02:37 20    A.  No, sir.

21    Q.  Because you're aware -- I mean, if you looked at the

22    document -- if you look at Exhibit 4, it indicates the premium

23    is for the entire Zurich policy, correct?

24    A.  If I can see it?

02:38 25    Q.  Is there any breakout in there for Smith-Reagan?

*McConnell Cross of Carter*

02:38  1   A.  No, sir.  As I stated, the annual premium, if you look in

2   the middle of the page, is $2,185,325.

3           Some large percentage of that is going to go to

4   Zurich; and the rest would remain with the agent as commission,

02:38  5   as it does in just about every insurance transaction I've ever

6   seen.  That's -- you get the commission by paying the balance

7   due Zurich.

8   Q.  So, you would pay -- the hospital would pay the

9   $2.3 million to Smith-Reagan?

02:39  10  A.  Okay.  Yes, sir.

11  Q.  And then what would happen with the money?

12  A.  It looks here like a stamping fee of $2268.35 would go

13  wherever stamping fees go.  The surplus lines tax would be

14  remitted, I believe, to the State of Texas for $110,015.21.

02:39  15          The policy fee of eighty-three thousand oh

16  twenty-nine eighty-five, I don't know why or even if it has to

17  be disclosed, but it is.  That would go wherever Swetnam

18  Insurance Services put it.  I don't know where that went.

19          And, then, the actual balance due Zurich of

02:39  20  whatever it was, if it was 1.4 or 1.2, would be deducted out of

21  this two million one hundred eighty-five thousand three hundred

22  twenty-five thousand dollars and that one-point-something or

23  whatever would be wired to New York and the balance would be

24  the commission for the agency.

02:40  25  Q.  Where is the document that shows that?

02:40  1    A.   I mean, I've given you the only explanation I know; and I

2    don't believe there is a document that shows that, nor have I

3    ever heard any evidence that one is required.

4    Q.   Because it -- I mean, this is a Zurich document.  It says

02:40  5    the premium is 2.3 -- $2.3 million.  So, where does it say, you

6    know -- where does it break out you getting -- where does it

7    break out how you're going to get the million dollars out of

8    this policy?

9    A.   Numerous people sat up here and testified you don't have to

02:40  10   disclose your commission in the State of Texas.  And,

11   Mr. McConnell, I have to tell --

12   Q.   Are you -- are you aware --

13   A.   -- you I'm not the guy to teach you this.

14            THE COURT:  No, no.  There you go again.  Let him

02:40  15   finish his answer.

16   A.   I'm just not -- I'm not the guy to teach you this.  I don't

17   know.

18   BY MR. McCONNELL:

19   Q.   Are you aware of the difference between a "commission" and

02:40  20   a "premium"?

21   A.   Yes, sir.

22   Q.   And what does this say on this document?

23   A.   It says "Total Premium."

24            "And a -- are you aware of a sales price versus a

02:41  25   profit?"

02:41  1        The profit is included in the sales price.

2   That's how I understand it.  The commission is included in the

3   premium.  It's not a separate line item.  It's what's left

4   over.

02:41  5   Q.  I guess I just don't understand under that logic how you

6   get your money -- your million dollars out -- out of the

7   $2.3 million going to Zurich.

8   A.  And maybe you and I can take the surplus lines class

9   together, sir, because I don't know either.

02:41  10  Q.  Do you remember the "four horsemen" e-mail that Mr. Colvin

11  showed you?

12  A.  Yes, sir.

13  Q.  And what was the context of that e-mail, you said?

14  A.  One of the ladies in the office was upset with Mr. Smith.

02:41  15  Q.  Why was she upset with Mr. Smith?

16  A.  Mr. Smith had gone through some emotional ups and downs.

17  He had some health issues, as well.  And he would come into the

18  office somewhat sporadically and usually with lots of

19  directives.

02:42  20       And Ms. Garcia worked in the commercial lines

21  area.  She traditionally responded and reported to Mike

22  Swetnam.  And she brought it to Mike's attention that she was

23  about to quit.  She said, "I'm tired of David coming in and

24  raising Cain, and I'm ready to -- I'm just going -- I'm going

02:42  25  to quit."

02:42  1        And in the Monday morning meeting that we have,

2    it was brought to David's attention that he was causing a

3    problem.  So, he wrote that e-mail detailing everybody's

4    duties.

02:42  5    Q.  And what was your thinking about that e-mail?

6    A.  It was fine.  I didn't want Sherri to quit.

7    Q.  You didn't care about Sherri, did you?

8    A.  Yes, sir, I did, very much.

9    Q.  Showing you Government's Exhibit 11-4A.  Can you read this,

02:43  10   starting right here, after "'06"?

11   A.  Yes, sir.

12        "I don't care what you allocate to Sherri, fax

13   paper and Kent.  I changed your lives and demand a voice in

14   your operation.  I am unreceptive to the concept of a principal

02:43  15   making calls with me when I can make things happen you can't

16   imagine."

17   Q.  And in this -- I guess "the truth according to Brent" memo,

18   I mean, you're asking for an accounting, you said, right?

19   A.  Yes, sir.

02:43  20   Q.  Aren't you really just asking for more money?

21   A.  No, sir, not at all.

22   Q.  You're the golden goose, you're "the" agent in Harlingen; I

23   mean, you're bad, you're the man.

24   A.  No, sir.

02:43  25   Q.  You want more money.

*McConnell Cross of Carter*

02:43　1　　　　THE COURT:  Okay.  All right.  All right.

2　A.  In fact, when we did the '06 renewal, I actually paid

3　Sherri a cash bonus out of my pocket because I appreciated all

4　the work she had done for me.

02:44　5　BY MR. McCONNELL:

6　Q.  And what was your explanation of this $1.8 million?

7　A.  I was told by Mr. Swetnam that's how much income had come

8　in off the hospital roughly over two years.

9　　　　　I later, in the same document, referred to the

02:44　10　hospital as a "million-dollar account"; and I refer to it as a

11　"$1.25 million account" in the same document.  I have no idea

12　what the total income was on that account, sir.

13　Q.  You did know about this $850,000 premium, though, didn't

14　you?

02:45　15　A.  No, sir.  In fact, if you -- if you have a chance in a

16　minute, if you'll drag out one of your documents that you put

17　up a few minutes ago, that was the -- part of the binder for

18　Mr. Cook, I'll show you what I saw on that.  You had the binder

19　from Mr. Cook --

02:45　20　Q.  Well, it says "somewhere around," right?

21　A.  Right.  But you're trying to tie it to exactly.  And,

22　number one, I never even saw the 936,000-dollar figure until

23　this was produced for the civil suit.

24　Q.  You just got half of it.

02:45　25　A.  I got 425,000 out of a million eight is what I was told.

*McConnell Cross of Carter*

02:45  1  And I don't know where 936 and 425 line up as a percentage.  I

2  never saw any part of that policy processing fee, to my

3  knowledge; and I don't know anything about where the Federal

4  excise tax went on that particular cover note.

02:46  5  Q.  I guess it's just curious that this is $850,000 listed here

6  as the premium and that --

7  A.  Right.

8  Q.  -- you had made a million dollars -- or I guess $850,000 is

9  the premium here --

02:46  10  A.  Right.

11  Q.  -- and that Smith-Reagan had made a million dollars off of

12  the first Zurich policy and that you sent this e-mail in

13  October, shortly after Smith-Reagan made those monies.

14  A.  I don't see where that relates to the fact that there were

02:46  15  two years I was referring to and -- and no -- I mean, I -- I

16  appreciate you connecting those things together, but they

17  weren't connected in any way in what I am writing right there.

18  Q.  Would you agree that it's curious?

19  A.  It might be to you, sir.  I had no idea that that 936 even

02:46  20  existed.

21  Q.  You never saw Mr. Swetnam give this document to Mr. Cook?

22  A.  No, sir.  Still I did not see that.

23          And, by the way, sir, Mr. Vela testified that he

24  never saw Mr. Swetnam give that document to Mr. Cook.

02:47  25  Q.  He didn't get $425,000, though, did he?

*McConnell Cross of Carter*

02:47 1     A.   That -- that would not have helped my eyesight, sir.

2     Q.   I'm showing you -- let me zoom out here -- Government's

3     Exhibit 11-8.  Do you recognize this e-mail?

4     A.   Yes, sir.

02:48 5     Q.   And as Mr. Colvin indicated, you appear to be giving some

6     instructions to folks?

7     A.   Yes, sir.  I'm relaying some information that was given to

8     me, point blank, from Jim Springfield and using examples to

9     make it pertinent.

02:49 10    Q.   What are you instructing Mike to do?

11    A.   I'm --

12    Q.   Can you read that passage?

13    A.   Sure.

14             "We must focus on a layman's mentality as we

02:49 15    gather information regarding Marsh and make certain that our

16    presentation is easily understood.  These folks fancy

17    themselves as businessmen.  Manny is the only one who admits

18    any semblance of ignorance and is the only one who defers to

19    our knowledge."

02:49 20             THE COURT:  Slowly, slowly.

21    A.   "Don't tell them anything about TDI, taxes or anything

22    negative about Marsh at this first meeting.  Trust me.  They

23    all believe they got objective counseling from the big broker.

24    Any challenge will make them timid about letting us in front of

02:49 25    their finance committee, and we have to get there."

02:49  1   BY MR. McCONNELL:

       2   Q.   And your attorney also showed you Government's Exhibit

       3   11-1?

       4   A.   Yes, sir.

02:49  5   Q.   Do you recall this e-mail?

       6   A.   Certainly.

       7   Q.   Do you recall telling the accounting manager,

       8   Mr. Buentello, that he needs to count the beans and not try to

       9   figure out how they're spent?

02:50  10  A.   No, sir, I did not tell Mr. Buentello that.

       11  Q.   Who were you telling that to?

       12  A.   I told that to the gentlemen, JR, at the top and the

       13  addressee, Mr. Joe Reagan.

       14  Q.   You weren't referring to Mr. Buentello?

02:50  15  A.   I was referring to Mr. Buentello, yes, sir; but I did not

       16  tell Mr. Buentello to count the beans.

       17  Q.   Oh, I appreciate the clarification.

       18       So, what -- can you read this paragraph from

       19  Mr. Buentello?

02:50  20  A.   Certainly.

       21       "I wanted to touch base with you on the current

       22  insurance policy for Brownsville.  I looked at the figures

       23  provided in the worksheet by Brent, and I started doing some

       24  calculations on my own; and some of the figures are either

02:50  25  overstated by several millions or understated in other

02:50 1    buildings.

2              "I was wondering, if I prepare an updated

3    insurance worksheet and the total insurable value is down, can

4    we get a refund on the remaining premium?  Please let me know

02:51 5    what you think or give me options."

6    Q.   And what was your response?

7    A.   My response was, to Joe Reagan, "We need to find a way to

8    advise Carlos to work with and through Ward and to quit trying

9    to make a name for himself saving $50 on insurance.  We can

02:51 10   sure dig ourselves a hole by e-mailing this guy about premiums,

11   charges, etcetera.  He needs to count the beans, not try to

12   figure out how they are spent."

13   Q.   And, so, this was in March 2006.  And then we have the

14   other e-mail exchanges, the policies; and then you told

02:51 15   Mr. Colvin that you were, I guess -- there was some issue with

16   talking to your neighbor about the VAC or something?

17   A.   It --

18   Q.   It's not relevant to this but --

19   A.   Okay.

02:52 20   Q.   -- I'm just saying later --

21   A.   Right.

22   Q.   -- in the summer of 2007, do you remember talking about

23   that?

24   A.   Yes, sir.

02:52 25   Q.   And you said that -- I guess you had a -- I guess

02:52  1   out-of-school talk with your -- is that how you characterize

2   it?  Talking shop outside of Smith-Reagan?

3   A.   Mr. Elliff was not only the vice chairman of the board, he

4   was also one of Mr. Springfield's best friends.  And he was

02:52  5   concerned that the hospital was getting ready to put a whole

6   bunch of money into an insurance concept that might not work.

7   And he simply walked across the street and said, "What are you

8   hearing in your office?  What are your guys saying?  Is this a

9   pipe dream or will it work?"

02:52  10        And I relayed what I had been -- what I had

11   literally overheard in our office was Mr. Smith and Mr. Swetnam

12   realistically evaluated this program and said, "It won't work.

13   They're not going to make any money doing this.  They're just

14   going to waste a bunch of money."

02:53  15        And I passed that on to Mr. Elliff, who I

16   believed was not asking so much as a board member, although he

17   was; he was asking as someone that didn't want to see

18   Mr. Springfield make an expensive mistake.

19   Q.   And because of that conversation, you were fired from that

02:53  20   account?

21   A.   Yes, sir.

22   Q.   Were you rehired on the account later on?

23   A.   Never formally.

24   Q.   Well, but after that conversation -- you said that happened

02:53  25   in May 2007, right?

02:53  1    A.  Yes.

       2    Q.  That's what I wrote down, May 27, 2007.

       3    A.  Okay.

       4    Q.  After you were fired from the account, you still received

02:53  5    the money for the second windstorm policy, the RAC RE policy,

       6    $294,000, and then you received the money from the second

       7    Zurich policy.

       8    A.  Yes, sir.

       9    Q.  Isn't that right?

02:53 10             So, about a half million dollars, right?

      11    A.  Okay.

      12    Q.  After you were fired from the account.  Is that correct?

      13    A.  Yes, sir.

      14    Q.  During that conversation -- and this guy, I guess he's your

02:54 15    neighbor or lives close to you or something?

      16    A.  Mr. Elliff?

      17    Q.  Yes.

      18    A.  Yes, sir.

      19    Q.  Did you tell him that there was an issue with this

02:54 20    windstorm coverage from the previous year?

      21    A.  What issue?

      22    Q.  That Mr. Swetnam had said that there was a meltdown, that

      23    Mr. Swetnam had said there were problems --

      24    A.  No, sir.

02:54 25    Q.  -- with the coverage?

02:54  1    A.  No, sir.  Because within a week of the meltdown,

2    Mr. Swetnam confirmed for me that the coverage had been taken

3    care of and that everything was fine on the account.

4    Q.  How did he do that?

02:54  5    A.  I literally said, you know, "Did you get your problem taken

6    care of?"

7              And he said, "Yeah.  Everything is fine."

8    Q.  So, you asked him how it was taken care of and he said it

9    was fine?

02:54  10   A.  I didn't ask him how it was taken care of.  I just asked

11   him if he got it taken care of.

12   Q.  Why didn't you ask him how it was taken care of?

13   A.  Didn't concern me.

14   Q.  Is that because you already had your money?

02:55  15   A.  No, sir.

16   Q.  Is that because you already spent your money on your taxes?

17   A.  No, sir, Mr. McConnell.  Because that was his job, was to

18   get the coverage handled.

19              And this e-mail that you have on the screen is

02:55  20   still referencing the TWIA policies that were down at the

21   lowest levels, and I do understand those policies if you want

22   to discuss them.

23   Q.  I know you want to talk about the e-mail, but let's talk

24   about the questions.

02:55  25   A.  Yes, sir.  I apologize.

*McConnell Cross of Carter*

02:55 1   Q.  The -- I want to talk about the RAC RE policy.  You weren't

2   involved in the second hurricane policy at all?

3   A.  No, sir.

4   Q.  Did you ever have discussions with Mr. Swetnam about RAC

02:55 5   RE?

6   A.  I was familiar with the term.  It was -- it was "RAC" stood

7   for "rent a captive," and it was a concept that had been

8   explored more than once.

9   Q.  Did you ever have discussions with Mr. Smith about RAC RE?

02:55 10  A.  I believe he was probably in the same meetings, yes, sir.

11  Q.  What were the discussions that you had with Mr. Swetnam and

12  Mr. Smith about RAC RE?

13  A.  Conceptual, about -- about a cell type captive.  It's very

14  technical, and I'm not by any means qualified to discuss it.

02:56 15  But I remember the concept of RAC RE.

16  Q.  And what was your memory of the concept?

17  A.  That -- that it allowed different companies to participate

18  at a -- I guess at a smaller amount in a captive and -- and

19  it -- somehow it helped limit their liability.

02:56 20  Q.  Did you understand that it was supposed to provide

21  hurricane insurance for the hospital?

22  A.  No, sir.  In fact, as I understand, the captive, by its

23  nature, did not provide any insurance.  It was just a vehicle

24  to access surplus lines or offshore insurance that you can't

02:56 25  get to traditionally.

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

02:56  1    Q.  But you understood that the discussion of the captive was

2    in the context of some insurance policy for the hospital?

3    A.  I think that's fair, yes, sir.

4    Q.  I mean, you guys weren't just talking about setting up a

02:57  5    captive for Smith-Reagan?

6    A.  No.  Certainly not, no.

7    Q.  I would like you to look at Page 256 of Mr. Swetnam's

8    deposition.

9    A.  Okay.

02:57  10   Q.  Can you read where it starts, "Answer:  No"?

11   A.  "No, that was RAC" -- I call it "RE" -- "RAC RE.  We were

12   attempting to set up RAC RE -- we were in a captive RE through

13   Harry Thompson.  But that did not materialize, and we attempted

14   to re-issue the binder through GTC RE and then found out that

02:57  15   GTC -- Harry Thompson didn't get GTC set up either and it was a

16   hundred percent passthrough to Lantana -- or Landmark

17   American."

18           Excuse me.

19           "So, we just let Landmark American take it

02:58  20   straight.  There was no captive.  The hospital didn't go over

21   to Mexico to do a captive deal.  No captive involved in the

22   transaction."

23   Q.  Will you keep reading, please?

24   A.  Can you raise it a little?

02:58  25   Q.  Yes.

02:58  1    A.   Thank you.

       2             "Okay.  You, I think, gave some words to what the

       3    'RAC' of 'RAC RE' stand for.  What was that?"

       4             "Rent captive."

02:58  5             "Rent captive?"

       6             "Yes, sir."

       7             "And who was going to be a part of that entity?"

       8         THE COURT:  Hold on just a second.

       9             Is it true somebody on the jury needs a break?

02:58 10             All right.  Sorry.  I thought somebody did.

      11             Okay.

      12    BY MR. McCONNELL:

      13    Q.   Will you please continue on the next page?

      14    A.   Sure.

02:58 15             "Brent Carter and myself."

      16             "So, RAC RE was going to be an entity owned by

      17    you and Mr. Carter?"

      18             "Yes, sir."

      19             "And the idea was you'd provide insurance through

02:58 20    that entity, right?"

      21             "Pass through insurance, yes, sir."

      22             Do you want me to keep going?

      23    Q.   No.  That's fine.  Thank you.

      24    A.   Okay.

02:59 25    Q.   Were you going to own RAC RE with Mr. Swetnam?

02:59    1    A.   I mean, it looks like I might have had an opportunity to

         2    have some equity in it.  I don't recall ever discussing owning

         3    any of it.

         4    Q.   And Mr. -- you're aware that Mr. Smith also received

02:59    5    $290,000 from the RAC RE policy?  You've seen that check?

         6    A.   Yes, sir.  Whatever the amount was.

         7    Q.   Was Mr. -- so, it was you and Mr. Smith and Mr. Swetnam

         8    that were in this meeting where RAC RE was discussed?

         9    A.   I believe Mr. Reagan was there, as well.

02:59   10    Q.   And Mr. Reagan.  But did Mr. Reagan get any money off of

        11    that policy?

        12    A.   I found out later he did not.

        13    Q.   Okay.

        14    A.   Or that he didn't get an equal share.  Put it that way.

02:59   15    Q.   Okay.  We haven't seen a big cashier's check for that

        16    policy, for Mr. Reagan?

        17    A.   I don't even know where that -- where that came from.  I

        18    didn't pull the records.  So, no, sir.

        19              And I'm not being smart.  I don't recall seeing a

03:00   20    check for Mr. Reagan, no, sir.

        21    Q.   If you add the three checks that we've seen, they add up to

        22    the price of the policy.  I mean, we can do it here if you want

        23    to.

        24    A.   They add up to the price of the policy?

03:00   25    Q.   Right, the RAC RE policy that was split three ways between

03:00  1   you and Mr. Carter and --

      2   A.  Okay.

      3   Q.  Okay.  I want to show you -- and Mr. Colvin also showed you

      4   Government's Exhibit 11-11.  Can you read this e-mail for the

03:00  5   jury?  And it's August 28, 2007.

      6   A.  Yes, sir.

      7           "Be that as it may, we did a good job pricing it

      8   last year at a level I suspect was higher than you would have

      9   placed it.  The concept of pricing it down has no logic since

03:00 10   it will not lead to any consideration in the future.  As soon

     11   as VAC is capable, it will write the excess, if for no other

     12   reason than to justify its existence."

     13   Q.  Weren't you off the account at this point?

     14   A.  Formally, yes.  But by this time in August, Jim --

03:01 15   Mr. Springfield and I had gone to -- we had certainly made

     16   amends and gone to California and he was talking to me again

     17   about things as they would come up.  I just wasn't spending

     18   hardly any time at all at the hospital.

     19   Q.  So, were you on or were you off?

03:01 20   A.  Overall, I was probably off.  Formally, I was off.

     21   Mr. Smith was the contact person, if you will.  But in reality,

     22   I mean, I was -- I was still in the loop as to what was going

     23   on, by Mr. Springfield's design.

     24   Q.  Why did Mr. Springfield want to keep you in the loop?

03:01 25   A.  We were -- we were friends.  I was still the person that --

03:02   1    of the four people at the agency, the three principals and

2    myself, I was the one that he wanted to spend time with.

3    Q.  And what does it say there?  "Trust me"?

4    A.  "Trust me on matters of cash and be more profitable.  You

03:02   5    can always give it back via the Children's Gala, etcetera.  I'm

6    really serious here."

7                I was telling him, "You might as well make as

8    much money as you can and still be within the market, as you've

9    done in the past," as explained to me is perfectly acceptable.

03:02  10                And then I said, "You know, we can always give it

11   back via the Children's Gala," which was a hospital event that

12   two years in a row we were the title sponsor of, as an agency.

13   Q.  So, were you telling Mr. Smith that if he felt guilty about

14   it somehow that he could give it back to the hospital?

03:02  15   A.  I don't say that there at all.

16   Q.  I'm asking if that's what you're saying in your testimony.

17   A.  No, sir.  And I'm the one that can testify to that.  No,

18   sir, that's not what I am saying at all.

19   Q.  Okay.  So -- okay.

03:03  20                And Mr. Colvin asked you about your 401(k).  He

21   was kind of asking you, I guess, about the consequences of this

22   house?

23                Or -- I'm sorry.  The consequences of this

24   indictment.

03:03  25   A.  Yes, sir.

03:03   1   Q.  Why did the government -- and I believe you said Inspector
        2   Boyden took your 401(k)?
        3   A.  Well, I mean, yes, sir.
        4   Q.  Why did Inspector Boyden take your 401(k)?
03:04   5   A.  I guess because he could.
        6   Q.  Because he could or because it had a bunch of the
        7   hospital's money in there?
        8   A.  It didn't have any hospital money in it.  One year, I
        9   believe it was 2006, I probably actually paid in 2007 my taxes.
03:04  10   I think that year I paid something like $183,000 in taxes and
       11   my accountant said, "You owe, like" -- I'm doing easy math --
       12   "like, 237,000 or 227,000 dollars in taxes.  But you can pay
       13   183 and put the other 44,000 into a 401(k) and, you know, you
       14   can't touch it until you're 55 and all that."
03:04  15          So, I said, "Well, that's -- you know, I'll do it
       16   tax deferred."  So, I took his advice and put it into a 401(k).
       17          And then, when this investigation started -- or I
       18   guess when the indictment -- I don't know when Mr. Boyden did
       19   it, but I understand --
03:05  20   Q.  You realize that that's not Mr. Boyden's call.  A Federal
       21   Judge --
       22          THE COURT:  All right.  All right.  We're not going
       23   to -- we're not going to --
       24          THE WITNESS:  Yes, sir.
03:05  25   A.  And I wasn't trying to insinuate anything about Mr. Boyden

03:05  1   either.  I'm just saying the government seized that account
       2   and -- which was -- I mean, they just seized it until this is
       3   over.
       4            MR. McCONNELL:  Your Honor, I pass the witness.
03:05  5            THE COURT:  Okay.
       6        *(Discussion off the record)*
       7            MR. McCONNELL:  Actually, I have one more question if
       8   I may.
       9            THE COURT:  All right.
03:05 10   BY MR. McCONNELL:
      11   Q.  This is my last question, I promise.
      12   A.  It's okay.
      13   Q.  Mr. Carter, I'm showing you Government's Exhibit 11-15.
      14   Can you read this sentence?
03:06 15   A.  Yes, sir.
      16            "There is always a reckoning.  Wise old insurance
      17   guy."
      18   Q.  Thanks.
      19            MR. McCONNELL:  No further questions, your Honor.
03:06 20            THE COURT:  Okay.  Mr. Clark?
      21            MR. CLARK:  May I proceed?
      22            THE COURT:  You may.
      23            MR. CLARK:  Thank you.
      24                    **CROSS-EXAMINATION**
03:06 25   BY MR. CLARK:

*Clark Cross of Carter*

1    Q.  I think in evidence, already marked as Carter Exhibit

2    Number 1, is the plaintiff's original petition in the civil

3    suit.  I would like to show that to you.

4         THE COURT:  I'm sorry?

5         A JUROR:  I'm sorry, your Honor.

6         THE COURT:  I'm sorry.  Sorry.

7         A JUROR:  Could we take a break before they start?

8         THE COURT:  Let's take a break.  All right.  Try to

9    keep it to 10 minutes.

10        MR. CLARK:  Withdraw the question.  I'm sorry.

11     *(Jury not present)*

12        THE COURT:  All right.  I don't know if the jury is

13   willing to stay any later tonight.  I would really like to

14   conclude the testimony before we break.  Whether we do or not,

15   we ought to everyone plan to stay a little bit later to work on

16   the jury charge.

17        I can tell you in advance some of my questions.

18   You can be thinking about them.

19        On the "knowingly" instruction, Instruction 21,

20   defendants had the second paragraph of that instruction in

21   brackets.  We didn't know what that meant.  So, let us know

22   whether you're objecting to it or not.

23        On Instruction Number 22, only the defendants

24   asked for it; but they didn't give us any content.  They

25   just -- it's blank.  So, we need to know what you're asking us

03:08    1    to do.

         2              You don't have anything on the verdict form.  We

         3    need to -- we need to work that out, unless you're just going

         4    to go with, as to Count 1, for each defendant, as to Count 2,

03:08    5    guilt or innocence -- guilty or not guilty.

         6              There are minor wording differences throughout

         7    these instructions.  The default option is always going to be

         8    the pattern.  Defendants are slightly closer to the pattern

         9    than the plaintiffs.

03:09   10              And on some of these instructions where one side

        11    asks for them, we need to know whether the other side opposes

        12    or not.  Like in Section 24, only defendants wanted the foreign

        13    commerce instruction.

        14              Okay.  Thank you very much.

03:09   15              MR. CLARK:  Thank you, your Honor.

        16         *(Recess was taken from 3:09 to 3:20 p.m.)*

        17         *(Jury not present)*

        18              THE COURT:  By the way, the jury says they'll work

        19    till 5:00 tonight; but that's not an invitation.

03:20   20              MR. CHANEY:  I think that makes a lot of sense, your

        21    Honor.

        22              MR. CLARK:  I do understand.

        23         *(Jury present)*

        24              THE COURT:  Members of the jury, please be seated.

03:23   25              MR. CLARK:  Your Honor, may I proceed?

03:23  1          THE COURT:  You may proceed, yes.

       2          MR. CLARK:  Thank you very much.

       3   BY MR. CLARK:

       4   Q.  I'm going to put up my copy of what's in evidence as

03:23  5   Carter's Exhibit Number 1.  Okay?

       6              It says "Cook," but it's actually Carter's 1.

       7   Okay?

       8   A.  Okay.

       9          THE COURT:  Let's call it Carter 1, and we'll --

03:24 10              It's been marked in another lawsuit.  That's what

      11   the confusion is, ladies and gentlemen.

      12   BY MR. CLARK:

      13   Q.  And just for your reference, this is the civil suit that

      14   was filed in Cameron County.  You're familiar with that, aren't

03:24 15   you?

      16   A.  Yes, sir.

      17   Q.  I imagine you've taken a look at this lawsuit before, have

      18   you not?

      19   A.  Yes, sir.  I'm actually a party to that lawsuit now.

03:24 20   Q.  I would like to call your attention to the upper right-hand

      21   corner.

      22   A.  Yes, sir.

      23   Q.  What's the date that this lawsuit was filed?

      24   A.  April the 30th, 2008.

03:24 25   Q.  Do you remember that day?

03:24  1    A.  Yes, sir.

       2    Q.  How so?

       3    A.  Well, by that time Mr. Swetnam and I were working in

       4    another office in Harlingen, for the bank, the new agency that

03:24  5    was begun.  And I walked in right after he had been served.

       6    Q.  By the way, you and I haven't gotten together to talk about

       7    your testimony, have we?

       8    A.  No, sir.

       9    Q.  I'm going to show you what's in evidence now as Defendants'

03:25 10    Trial Exhibit Number 7.

      11    A.  Okay.

      12    Q.  This is the $263,000 check that there's been some testimony

      13    about.

      14    A.  Yes, sir.

03:25 15    Q.  You with me?

      16              This was actually -- it looks like a signature

      17    from David Smith.  Do you recognize Mr. Smith's signature?

      18    A.  Yes, sir.

      19    Q.  It purportedly was created on January the 8th of 2008,

03:25 20    right?

      21    A.  Yes, sir.

      22    Q.  But as we've seen previously -- and I'll call your

      23    attention from the bank's processing stamp, right here -- the

      24    date that it was actually deposited was what?

03:26 25    A.  It says 2008-04-30.

03:26    1    Q.   Okay.   That would be?

          2    A.   4-30-08.

          3    Q.   Same date that the lawsuit was filed?

          4    A.   Yes, sir.

03:26    5    Q.   Were you privy to a discussion between Michael Swetnam, my

          6    client, and David Smith about, "Why am I getting this check

          7    that's dated in January, David, when it's April the 30th right

          8    now?"

          9    A.   Yes, sir.   Just for a moment but --

03:26   10    Q.   What do you recall about that situation?

         11    A.   Well, I walked into the office that morning and Mr. Swetnam

         12    had a lawsuit in his hands and he had been served about 9:15 in

         13    the morning.   And when I walked in, Mr. Smith was there, as

         14    well.

03:27   15               And he handed Mike that check and said, "Well, I

         16    want you to use this for your defense fund."

         17    Q.   Okay.

         18               MR. CLARK:   May I have permission to approach, your

         19    Honor?

03:27   20               THE COURT:   You may.

         21               MR. CLARK:   Thank you.

         22    BY MR. CLARK:

         23    Q.   I'm going to show you what has been marked as Exhibit 21,

         24    Swetnam 21.   Just briefly take a look at that.   And I'm going

03:27   25    to ask you, if you've seen that document, if you're familiar

03:27    1    with that document, whether you can authenticate that document,

         2    sir.

         3    A.  Yes, sir, I believe I've seen this.

         4    Q.  Does it appear to be a true and an accurate document, from

03:27    5    what your memory is?

         6    A.  Yes, sir.  It's a Power Point presentation.

         7         MR. CLARK:  Okay.  Move to introduce this exhibit into

         8    evidence at this time, your Honor.

         9         MR. McCONNELL:  No objection.

03:27    10         THE COURT:  Admitted without objection.

       11    BY MR. CLARK:

       12    Q.  Would from time to time Michael Swetnam create Power Point

       13    presentations to ostensibly help the hospital people understand

       14    the products and the issues?

03:28    15    A.  Yes, sir.

       16    Q.  Is that what this Defendants' Trial Exhibit 21 concerns?

       17    A.  Yes, sir.

       18    Q.  I'll look at it very quickly.  We're going to try to move

       19    fast.

03:28    20         This appears to be a presentation that was

       21    concerning the Texas Windstorm Insurance, primary windstorm

       22    proposal, renewal options.  Is that what you recall?

       23    A.  Yes, sir.

       24    Q.  And purportedly would cover the period of 2006 through

03:28    25    2007, correct?

03:28    1   A.  Yes, sir.

         2   Q.  Among other things -- how much do you recall about this

         3   presentation?  Let me ask you that instead.

         4   A.  If it's the one that I'm -- that I'm remembering, it was

03:29    5   what Mr. Eastham would call a "shirt sleeve meeting," just --

         6   he had a fairly large office and had a big round table we could

         7   all just kind of sit around and just go over stuff like this.

         8   It wasn't formal at all.

         9   Q.  Okay.  Would this have been a presentation that would have

03:29   10   been handed out -- and the reason I'm asking you this

        11   question -- let me turn to some of the back pages.

        12          I don't know how familiar you are with Power

        13   Points, but do you see that this is a smaller slide that

        14   appears to have some space for some people that would be the

03:29   15   recipients to make notes on each slide?

        16   A.  Yes, sir.

        17   Q.  And I guess my question to you is whether you have an

        18   independent recollection of whether or not this Power Point was

        19   reduced to a hard-copy form and handed out to Mr. Swetnam or

03:30   20   Mr. Eastham or others.

        21          If you don't know, you don't know.

        22   A.  I actually don't know.

        23   Q.  Okay.  Fair enough.

        24          You notice this is a presentation that was in a

03:30   25   folder apparently with the notation "2006."  Do you see that?

03:30   1    A.  Yes, sir.

        2    Q.  Which would be consistent, would it not, with the dates

        3    that are reflected herein: June 15th of 2006 through June 15th

        4    of 2007?

03:30   5    A.  Yes, sir.

        6    Q.  Now, you, obviously, have sat through the whole proceeding.

        7    And I want to ask you, do you recall the line of questions that

        8    I had previously of Mr. Vela about where are the 2006 finance

        9    committee minutes --

03:31  10    A.  Yes, sir.

       11    Q.  -- where are the 2006 board of directors minutes?

       12    A.  Yes, sir.

       13    Q.  More particularly, I would like to know whether you know if

       14    presentations were made by Mike Swetnam, David Smith, Joel

03:31  15    Reagan, yourself through the Swetnam Insurance Services or

       16    through the Smith-Reagan agency to either the board or the

       17    finance committee of the Valley Baptist Health System during

       18    this period of time.

       19    A.  I'm fairly certain -- I can't be exactly sure of the dates,

03:31  20    but I do remember going and making introductions and having

       21    Mr. Smith make a presentation of a Power Point to the finance

       22    committee.

       23    Q.  Okay.  In evidence as Government's Exhibit 1E is a document

       24    that was identified as a document created, I believe, by Ward

03:32  25    Cook.

03:32  1   A.   Yes, sir.  That looks like Mr. Cook's handwriting.

2   Q.   Okay.  If we go to the second page of this particular

3   document, does this look like Mr. Cook's handwriting here, sir?

4   A.   Yes, sir.

03:32  5   Q.   The handwriting is even worse than mine; but it appears to

6   say "windstorm," does it not?

7   A.   Yes, sir.  I think it's just been copied and the top is cut

8   off.

9   Q.   Okay.  Just kind of walking down through here, "captives,"

03:32 10   is that what it looks like to you?

11   A.   Certainly -- I mean, that would make sense.  Captive --

12   Q.   If you can decipher it, it might be helpful.  "Selling us

13   captives for" --

14   A.   Yeah, "Selling us captives for -- "W/S" would be "windstorm

03:32 15   insurance."

16   Q.   "Ariel RE Limited"?

17   A.   Yes, sir.  "Bermuda, non-admitted" -- that's the word

18   "captive," I assume.

19   Q.   Okay.

03:32 20   A.   "Mexico," asterisk.

21   Q.   Okay.  Now, down here at the very bottom is a mention of

22   TWIA, the Texas Wind Insurance -- I don't know the last letter.

23   A.   Association.

24   Q.   Association.

03:33 25        And it says, "3 million each building"?

*Clark Cross of Carter*

03:33   1   A.  Yes, sir.

2   Q.  Now, recall the testimony of Lorraine.  And I think when

3   she testified on direct she said that there was only $3 million

4   of coverage in that first layer that was put together by the

03:33   5   Smith-Reagan and Swetnam Insurance group for the Valley Baptist

6   Hospital System.

7             Was that your understanding, there was only a $3

8   million first layer?

9   A.  No, sir.  And that's a good example of some of the work I

03:33   10   did.  As I recall, Valley Baptist had, I think, 32 what you

11   would call "satellite buildings" around the main hospital

12   building.  And it was my job to work -- I think Mr. Reagan

13   actually worked on the spreadsheet, but I went out and measured

14   and took pictures of -- there's a -- the TWIA app required a

03:34   15   photo and square footage and a building value and -- and you

16   had to get the construction and when it was built and what kind

17   of wiring it had, all the pertinent information like you were

18   trying to insure your home.  And I did that for those, like, 32

19   or 33 buildings.

03:34   20             So, there was a -- I think I remember testimony

21   here there was $96 million worth of coverage.  So, that would

22   be 32 times, or 33.

23   Q.  Let's go now and take a look at -- I hate to be redundant,

24   but focus a little bit differently.

03:34   25             Government's Exhibit 13, which has had a fair

*Clark Cross of Carter*

1    amount of play, at least today, in front of the jury, September

2    the 7th, 2006, letter -- this is my copy -- to Jim Springfield?

3    A.   Yes, sir.

4    Q.   This is the same document.  It's a different copy than --

03:34    5    but it's the same document you've been shown, is it not?

6    A.   Yes, sir.

7    Q.   Now, in your direct examination with Mr. Colvin questioning

8    you, reference was made to a spiral notebook.

9         Is that what you would call this?

03:35   10    A.   Yes, sir.

11    Q.   This has been marked as Defendant Brent Carter's

12    Exhibit 131.  And it was provided to you to refresh your

13    memory.

14         MR. CLARK:  I would like to approach if I may, your

03:35   15    Honor?

16         THE COURT:  Yes you may.

17    BY MR. CLARK:

18    Q.   I would like to ask you just again, so that everybody is

19    clear about this particular document, how was it that this

03:35   20    document was created.  And go ahead and explain the process to

21    us, please.

22    A.   Well, as I testified, I was getting some pressure from

23    Mr. Reagan about new business production and kind of the -- you

24    know, "Carter, all you do is play golf with the boss.  What are

03:36   25    you doing with all your time?"

03:36　　1　　　　　And I think I pointed out to you that I took

　　　　2　　this -- I just started making notes that, you know, I went by

　　　　3　　to drop something off for a doctor and took 35 minutes; I

　　　　4　　delivered something to Ward Cook, it took 45 minutes.  And I

03:36　　5　　just kept up with this for a period of weeks following the

　　　　6　　renewal.  And it was mostly for my reference, but it was also a

　　　　7　　little bit of an --

　　　　8　　Q.  CYA?

　　　　9　　A.  -- insurance policy.  Yes, sir.

03:36　 10　　Q.  I notice that there's different ink in it.

　　　 11　　A.  It actually -- my truck was my office quite often, and it

　　　 12　　slid around in the floorboard of my truck most of the time.

　　　 13　　Q.  Are you a coffee drinker?

　　　 14　　A.  No, sir.  That would be Diet Coke.

03:36　 15　　Q.  This might have been a place holder, too, at some point in

　　　 16　　time?

　　　 17　　A.  Yes, sir.  Like I said, it was just for me.  It wasn't

　　　 18　　anything that I was asked to produce for anybody.

　　　 19　　　　　　MR. CLARK:  Judge, I would move at this time to

03:37　 20　　introduce what has been marked as Exhibit 131.

　　　 21　　　　　　MR. McCONNELL:  Same objection, your Honor.  We just

　　　 22　　received it today, and it's hearsay.

　　　 23　　　　　　MR. CLARK:  May I respond?

　　　 24　　　　　　THE COURT:  Yes, you may.

03:37　 25　　　　　　MR. CLARK:  We have heard the claim of recent

03:37 1  fabrication against Mr. Swetnam in connection with the

2  government's theory of the letter to Mr. Springfield.  This

3  document, which this is first time I've seen it, I think is

4  properly admissible to rebut the implication of recent

03:37 5  fabrication that the government has made over and over and over

6  again, your Honor.

7          THE COURT:  Well, I mean, it would come in under

8  801(d)(1).  I am concerned about the lack of production,

9  though.

03:37 10         MR. McCONNELL:  Your Honor, I think 801(d)(1), are you

11 talking about reason for a prior statement?

12         THE COURT:  Yeah.

13         MR. CLARK:  I would think it would go to the weight

14 and not to the admissibility, though, your Honor.

03:38 15         THE COURT:  It doesn't have to be under oath if it's

16 consistent with the declarant's testimony.  801(d)(1)(B).

17              That's not my concern.  My concern is we're just

18 now seeing it.  That's my concern.

19         MR. CLARK:  I do understand.

03:38 20        THE COURT:  I'm -- on balance, I'm going to allow it.

21 Your objection is noted.

22         MR. McCONNELL:  Your Honor, is it the entire journal

23 or just the page that's relevant?

24         THE COURT:  Are you offering the entire journal?

03:38 25        MR. CLARK:  The entire journal, yes, your Honor.  I

03:38    1    think that --

2            THE COURT:  How many pages have markings on them?

3            MR. CLARK:  Judge, it looks like, on balance, about --

4    about 10 in front, a couple on the back, and most --

03:39    5            THE COURT:  I'm going to allow it for now.  I may take

6    a --

7            MR. CLARK:  I understand.  I'm just going to focus in

8    on a page or two.

9            THE COURT:  Okay.  All right.

03:39   10            MR. McCONNELL:  Your Honor, may we look at it?

11            MR. CLARK:  Absolutely.  I thought you had.

12       *(Discussion off the record)*

13            MR. McCONNELL:  Thank you.

14            MR. CLARK:  May I then proceed, your Honor?

03:39   15            THE COURT:  You may.

16    BY MR. CLARK:

17    Q.  We're looking at -- for the record, this is Government's

18    13-2, which is that letter which is up -- it's -- actually,

19    this is not the letter that I wanted to show.  But this is

03:39   20    Government's 13 -- 13 straight up, September 7th of 2006 letter

21    to Jim Springfield -- or James, I guess, not to be too

22    informal.  Ostensibly, from Mr. Swetnam, correct?

23    A.  Yes, sir.

24    Q.  Now, Defendant Brent Carter's Exhibit 131 -- it's too

03:40   25    bright to show; but this is 131, for the record.

03:40  1          Here it is.

2          Down at the bottom appears to be an entry for

3     9-7.  Would you --

4          There appears to be a Diet Coke, by the way.

03:40  5          Would you go ahead and explain these -- I really

6     want to focus in on this entry down here at the bottom.

7     There's some shorthand, some acronyms, apparently; and I would

8     like you to translate it for us.  Just read it out loud; but,

9     you know, where you say "D & O" -- I'm sure that's "directors

03:41 10     and officers."

11     A.  Yes, sir.  The bottom part says, "Letter" -- it's my

12     handwriting so I can -- it says, "Letter to JGS office Re

13     meltdown," in quotes.  And I think that says, "A" -- I think

14     it's "ARE," and then I've got "Landsdow" and "London" and a

03:41 15     question mark and just says, "MNS to follow up."

16     Q.  Michael N. Swetnam?

17     A.  Yes, sir, that's how I refer to Michael.

18     Q.  Let me take you back.  And above the -- what we've now

19     discerned is Diet Coke and not coffee -- I don't mean to

03:41 20     suggest something that's not what the answer is, but could that

21     be "Ariel"?

22     A.  I mean, yes, I suppose it could be, sure.

23     Q.  You just don't know, quite candidly?

24     A.  I don't know what -- I mean, I believe it's probably

03:41 25     referring to Ariel, but I don't know what my handwriting is

03:41  1   doing there.  It was -- again, it was just a note to me,

       2   marking time.

       3   Q.  Yours is better than mine, I assure you.

       4           Similarly, on the next page, I'm assuming "9-8"

03:42  5   would be "September the 8th."  Is that true?

       6   A.  Yes, sir.

       7   Q.  You have an entry about what you did that day.  You got

       8   a -- "four hours" circled here; but would you read that out

       9   loud, please?

03:42  10  A.  It says, "Spent all afternoon with JGS" -- that's

       11  Mr. Springfield; "Manny" is Manny Vela -- "and Bill Boyer.  We

       12  flew to Houston and played golf at Lochinvar Golf Club up in

       13  North Houston.  I just wrote "good visit" out to the side.

       14  Q.  "Great"?

03:42  15  A.  "Great visit."

       16  Q.  "Great visit."  Okay.

       17          "Spoke," below, "with" --

       18  A.  "Spoke with somebody Re work comp Brownsville.  Are we

       19  double billed 7-1 to 9-1?"  That was just a question I ended up

03:43  20  taking back to Smith-Reagan.

       21  Q.  Okay.  And the entries that are in here are basically --

       22  were these made contemporaneously or as close in time as you

       23  could to the events, to keep track of them?

       24  A.  Yes, sir.  Typically, they were made in my truck.  I would

03:43  25  just write them -- I'm a lefty, and I wrote, across myself, on

03:43 1 my armrest; and then I would just throw it back on the floor.

2 Q.  I see there's a different ink in different entries.

3 A.  Yeah.  Whatever pen was in my pocket at the time is the pen

4 that I would use.

03:43 5 Q.  About --

6 A.  This is --

7 Q.  About eight pages in, it looks like kind of a to-do list.

8 Is that what that was?

9 A.  Yes.  It's predominantly just unrelated.  That's just notes

03:43 10 for me.  At that point I flipped way to the back.

11 Q.  Looks like you have a map here how to get somewhere?

12 A.  That's a map for somebody, yes, sir.

13 Q.  And then there's -- there's really just blank pages.

14 Sporadically there would be an entry.

03:43 15 A.  Right.

16 Q.  When did -- when did you get fired -- I think you've

17 already testified, but excuse me.

18       When did you get fired from the account

19 officially or, you know -- you say "fired."  You were kind of

03:44 20 taken off the account because of --

21 A.  Yes, sir.  "Reassigned" would be, I guess, a more

22 politically correct term.  It was in -- but it was "fired."

23       But it was in May of -- late May of '07.

24 Q.  All right.  And then there's really no entries until you

03:44 25 get to the very back.  And I'm just -- I'm guessing -- and you

03:44   1   correct me if I'm wrong, but it looks like somebody had died.

     2   And just from context, "Words are not enough. She is well and

     3   whole. She's in a better place"?

     4   A. Yes, sir. That was my pastor and child -- his wife had

03:44   5   passed away.

     6   Q. Now, was there, to your knowledge -- we talked a little bit

     7   about E & O coverage with other witnesses.

     8                Are you familiar with the concept of E & O

     9   coverage?

03:45  10   A. Yes.

   11   Q. Errors and omissions coverage?

   12   A. Yes, sir.

   13   Q. To your knowledge, did the Smith-Reagan agency carry errors

   14   and omissions coverage during this period of time?

03:45  15   A. Yes, sir.

   16   Q. Do you have any idea what the amount of the errors and

   17   omissions coverage was?

   18   A. No, sir, I don't.

   19   Q. Do you have an understanding of what the purpose of having

03:45  20   an errors and omissions coverage policy is?

   21   A. Well, if an agent makes a mistake -- I mean, it could be --

   22   I guess as simple as getting a policy issued for a hundred

   23   thousand dollars that ought to be a million dollars and there

   24   was -- I'm talking about the coverage limit -- and then there

03:45  25   was a loss and you didn't have enough insurance or something,

03:45  1   the insurance would kick in to cover the balance.

2   Q.  You had mentioned a little bit about Mr. Springfield's

3   personality, that he -- he was kind of in control, is the best

4   way I can shorthand it.

03:46  5   A.  Yes, sir.

6   Q.  I want to ask you a little bit about whether or not you

7   were aware of his financial compensation package at the

8   hospital system.

9   A.  Not -- not in any formal way.  I heard, you know, innuendo

03:46  10  and things.  He and I did not exchange that information with

11  each other.

12  Q.  Well, I don't want to go into gossip and innuendo.  Let's

13  speak from personal knowledge.  Okay?

14  A.  Yes, sir.

03:46  15  Q.  I'm pulling out an exhibit; so, if you'll just bear with me

16  for a second, I'll make it quick.  And, again, I'm sorry to be

17  redundant.  This is just kind of a follow-up to some questions

18  before.

19          This is Government's 11-10.  It's one of those

03:47  20  e-mails that has been covered perhaps ad nauseam, and I have a

21  couple of follow-up questions.

22  A.  Yes, sir.

23  Q.  You had described -- you had described in here -- and I

24  guess I need to zoom in so everybody can kind of see.  I don't

03:47  25  know if I can fit it on the page.  I'm going to try.

03:47    1              This paragraph right here caught my attention,

         2    and I wanted to follow up and make sure I understood.

         3              "After the welding goggles" -- it's kind of

         4    poetic.  "After the welding goggles jump to mind followed

03:47    5    closely by the" --

         6              THE COURT:  Too fast.  Start over.

         7              MR. CLARK:  I do apologize, Judge.

         8    BY MR. CLARK:

         9    Q.  -- "followed closely by the accidental implication they

03:47   10    sought to commit a crime over their trusts."

        11    A.  Yes, sir.

        12    Q.  And if I understood what you were saying, there had been

        13    some income that the hospital wanted to pull out of a trust.

        14    And to do what with?

03:48   15    A.  Well, as I understand -- I was in one of the meetings, and

        16    it certainly wasn't -- it was above my head but --

        17    Q.  Meetings with whom?

        18    A.  Mr. Smith, Mr. Springfield, Mr. Eastham.  And I believe

        19    Mike was there, but I can't -- I can't swear to it.  But I was

03:48   20    there, for sure.

        21    Q.  At one of the hospital facilities?

        22    A.  Yes, sir.

        23    Q.  Okay.  Go ahead.  I'm sorry.

        24    A.  They had a trust that at one point had covered something.

03:48   25    It was a balance in there that they used to pay, like, some

03:48  1    self-insured claims.  And as I recall, the balance was

2    somewhere around, I think, under two and a half million

3    dollars.  And it had been sitting there for several years.

4                 And apparently, everybody at the hospital, they

03:49  5    agreed that whatever it's covering is no longer an issue.  If

6    it was medical -- if it was doctors' claims or whatever,

7    there -- there aren't any more that we don't know about.  So,

8    this money is just sitting there.

9                 And they wanted -- "they" being Mr. Springfield

03:49 10    and the hospital.  They wanted to fold that trust down and then

11    bring that money, you know, back into where they could use it

12    for -- to run the hospital.

13    Q.  And the hospital had, I think we've heard earlier, a --

14    generally a non-profit purpose but they had some for-profit

03:49 15    parts, correct?

16    A.  Yes, sir.

17    Q.  And if I'm guessing correctly, was the discussion about

18    violating the tax laws by doing that or there had to be some

19    tax aspects to it because you were taking money that was put

03:50 20    into a non-profit designation and you can't just move it

21    without some tax implications?  If you know.

22    A.  I really don't know, no, sir.

23    Q.  What I was trying to figure out is who said that this would

24    be --

03:50 25    A.  To commit a crime?

03:50    1    Q.  Yeah.

2    A.  That was Mr. Smith.  He insinuated that there might be

3    something fraudulent with taking this money out of a trust and

4    putting it into your general operating budget and calling it --

03:50    5    they wanted -- they called it a nice little pickup.  They

6    wanted it to be profit on the bottom line.

7    Q.  Everybody wants to be profitable on the bottom line; but

8    that didn't happen, did it?

9    A.  I really don't know what -- I don't know if they took the

03:50   10    money or how they folded it up.

11    Q.  Fair enough.  That's fine.  And you don't know whether or

12    not Mr. Springfield's package was tied somehow to the profits

13    on the bottom line, with his bonuses and whatnot?

14    A.  That's what's been indicated to me by several folks.

03:51   15    Q.  Okay.  I gleaned from your testimony and from others that

16    he was an avid golfer?

17    A.  Yes, sir.  He's a good one.

18    Q.  He had his house, did he not, built right next to the golf

19    course that the hospital ended up buying?

03:51   20    A.  Yes, sir.

21    Q.  Right on the -- one of the fairways, I guess, right next to

22    it?

23    A.  I think he's on Number 12.

24    Q.  Did anybody ever discuss with you or around you this idea

03:51   25    of bond covenants and the hospital's need to be insured up to

03:51  1   certain levels so they don't violate their bond covenants?

2   A.  Yes, sir.

3   Q.  Did you have a feel for what that was all about?

4   A.  I was in a meeting that involved Mr. Eastham, where he

03:52  5   stated that they had to -- the comment was made that nothing

6   would ever happen at the hospital that was over a certain

7   limit, whatever it was.

8          And Mr. Eastham said, "But we still have the bond

9   covenant.  And in order to be in compliance, we've got to

03:52 10   carry" -- I think at the time it was 235 million in property

11   coverage.

12   Q.  And did you understand a bond covenant means that the --

13   effectively, the lender is trying to protect their investment

14   and they're requiring that the hospital keep the facilities

03:52 15   properly insured?

16   A.  That's the way I understood it, yes, sir.

17   Q.  And if you violate a bond covenant, bad things can happen,

18   right?

19   A.  Yes, sir.

03:52 20   Q.  You can perhaps have the bond accelerated and that type of

21   stuff?

22   A.  There could be -- I was told there could be penalties and

23   you could be what they called "forced placed."

24   Q.  Whatever it meant, it was not a good thing?

03:53 25   A.  No.  It would have been expensive.

03:53  1    Q.  Now, were you around at the time when there was this vote

2    of no confidence by the staff, about Mr. Springfield?

3    A.  Yes, sir.

4    Q.  And was that a small or a big thing?

03:53  5    A.  It was -- it was a big thing.

6    Q.  Kind of elaborate on that, if you don't mind.

7    A.  Well, there was -- any time there's unrest in an

8    organization like that, as you can imagine, in South Texas, for

9    example, the -- the unions came in and started talking to the

03:53  10   nurses and it was kind of a "If you don't think you're getting

11   treated good here, why don't you-all join our union?"  And it

12   made -- it made the board very nervous.

13            A lot of the doctors -- I shouldn't say "a lot."

14   I was told later it was about 150 doctors, you know, decided

03:53  15   they just didn't have confidence in management in general, the

16   way the hospital was being managed.  It wasn't specifically

17   Mr. Springfield, but he was the guy that ended up in the

18   newspaper.

19   Q.  And he was the guy that ended up leaving, resigning.  Isn't

03:54  20   that correct?

21   A.  Well, later, yes, sir.

22   Q.  And in connection with his resigning or being pushed out

23   the door or however to properly characterize it, were you still

24   talking to him by that point in time?

03:54  25   A.  Yes, sir.  I'm trying to remember the exact date.  And I

03:54  1   don't remember exactly when he left the hospital, but that --

       2   his situation at the hospital didn't have anything to do with

       3   our personal relationship.

       4   Q.  Okay.  So, you've maintained -- or you maintained at some

03:54  5   point, I guess, outside the lawsuit, some sort of relationship?

       6   A.  Yes, sir.  I don't recall exactly.  Either the civil

       7   lawsuit or his departure, whichever came first.  I mean, if I

       8   was in the civil suit, I wasn't talking to him much.

       9   Q.  I can certainly understand that.

03:55  10  A.  Yes, sir.

       11  Q.  Now, this is going to be just kind of the last part of my

       12  line of questioning, if you don't mind.  And I'm sure you don't

       13  mind but --

       14  A.  No, sir.  I'm fine.

03:55  15          THE COURT:  Carry on.

       16          MR. CLARK:  I strike my own sidebar.  I'm sorry.

       17  BY MR. CLARK:

       18  Q.  You were asked about my client's testimony in the civil

       19  suit?

03:55  20  A.  Yes, sir.

       21  Q.  And I kind of -- again, I apologize for being a bit

       22  redundant; but I'm going to give a bit more context to the

       23  question and answer here.

       24          Starting on Page 225, Line 2, and let's read it

03:55  25  on down to -- I believe Mr. McConnell started on 226.  Let's

03:55   1   read -- if you don't mind being the reader --

2   A.   I'll read it, yes, sir.

3   Q.   Would you read the question and answer pairs, starting with

4   Line 2?

03:56   5   A.   Yes, sir.

6              "And then you took the $936,000.  And on

7   September 5th you gave 425,000 to Brent Carter?"

8              "That's correct."

9              "Did you pay any portion of the 936,000 to

03:56   10  Mr. Thompson or Mr. Lord?"

11             "No."

12             "Did you pay any portion of the 936,000 to any

13  company that was affiliated with Mr. Lord or Mr. Thompson?"

14             "No."

03:56   15             "What did Brent Carter do" --

16  Q.   I'm sorry to do that to you.

17  A.   I'm sorry.  I'm going too fast.

18  Q.   I'm going to take it off the page.

19             Okay.  Go ahead.

03:56   20  A.   "What did Brent Carter do to earn 425,000 of the 936,000

21  that was paid pursuant to Exhibit 65?"

22  Q.   Okay.

23  A.   "Brent Carter received 425,000 basically to settle the 2005

24  Smith-Reagan accounting and because he was my partner.  He got

03:56   25  paid that money at that time, but it wasn't for that.  He got

03:57 1  paid that money on the 5th to hold."

2  Q.  "On the 5th" is referring to what date, please?

3  A.  September the 5th.

4  Q.  2000 and?

03:57 5  A.  '6.

6  Q.  Okay.

7  A.  "To hold for what?"

8       "To hold in a bank account."

9       "But why was he given it to hold?"

03:57 10      "Because I was up over 1.8 million in one bank

11  account at Border bank.  I told him to take this money and go

12  set up a bank account and hold the" --

13  Q.  To be continued.

14  A.  -- "money until we paid the company."

03:57 15      "So, he wasn't supposed to do anything with that

16  money?"

17       "No.  Not at that time, he wasn't."

18       "Well, when -- I don't understand that.  What --"

19       "Okay."

03:57 20      "You gave him the money and said to hold it?"

21       "Put the money in a bank account.  That's all you

22  have to do, is sit there with the money and hold onto the

23  money.  I'm having a problem getting my coverage down.  We may

24  have to give this money back."

03:58 25  Q.  Now, stop for just a second, if you don't mind.  I heard

03:58  1    your direct; I heard your cross-examination.  And it's not

2    quite the same characterization of what my client said and what

3    you said.

4                He's saying in his deposition that you were

03:58  5    pretty much told to just put this money -- hold it, it may have

6    to be given back?

7    A.  Yes, sir.

8    Q.  Thinking back, is that -- is that accurate with what you

9    recall or is it different?

03:58  10   A.  I don't remember Mr. Swetnam saying, "We may have to give

11   this money back."

12   Q.  Okay.

13   A.  But I remember the rest of it pretty much like that.

14   Q.  Okay.  Fair enough.

03:58  15               And picking up on Line 14, Mr. Carter, if you

16   would start there, please, sir?

17   A.  "And give it --"

18               "What would have been an event to cause you -- to

19   cause you to have to give the money back?"

03:58  20               "Not being able to get all the coverage down or

21   getting something placed."

22               "So, if the coverage had fallen through, you

23   would have to give the 936,000 back to the hospital?"

24   Q.  Right.

03:59  25   A.  "Yes, sir."

*Clark Cross of Carter*

03:59   1   Q.  Keep going, please.

  2   A.  "Okay.  And there comes a time when you gave Mr. Carter the

  3   green light, 'Okay.  You can keep the money.'"

  4           "Yes, sir."

03:59   5   Q.  Is it fair to ask whether you recall Michael at some point

  6   coming to you and saying -- Michael Swetnam -- excuse me --

  7   coming to you and saying, "It's taken care of" -- I think you

  8   said that in your dialogue with him that you understood he was

  9   going to try to fix this problem, right?

03:59   10   A.  Yes, sir.

  11   Q.  Whatever the problem was, he was going to fix it?

  12   A.  Certainly.

  13   Q.  You understood him to be a pretty good insurance expert,

  14   did you not?

03:59   15   A.  Yes, sir.

  16   Q.  And then, contemporaneous to these events, we have, I

  17   guess, 131.  And you have some note in here about a meltdown at

  18   the bottom here, "Letter to JGS regarding the meltdown."  This

  19   all happened at kind of the same period of time?

04:00   20   A.  This would have been two days later, yes, sir.

  21   Q.  Now, a "meltdown" is a kind of a pejorative word.  I mean,

  22   it's -- I think about Three Mile Island and that kind of stuff.

  23           Did he use the term "meltdown" or is that your

  24   characterization?

04:00   25   A.  Well, I put it in quotation marks.  It's very possible that

04:00  1   it's mine but --

   2   Q.  You just don't recall, do you?

   3   A.  It was just a note.  Yes, sir.

   4   Q.  Okay.  Now, just continuing -- and we're not going to have

04:00  5   that much more to read so just -- I apologize.

   6           At the top of 227, let's pick up on Line 1 and

   7   we'll take it down, if you don't mind, until -- really, where

   8   it ends right here on the screen, Line 17.  Could you read that

   9   into the record, please?

04:01 10   A.  Yes, sir.

   11           "When was that?"

   12           "Probably somewhere around the 13th of the

   13   month."

   14           "Of September?"

04:01 15           "Yes, sir."

   16           "And your recollection is Mr. Carter received a

   17   1099, specifically this amount?"

   18           "For the 425, yes, sir."

   19           "Why did you give Mr. Carter the green light on

04:01 20   September the 13th or thereabout to keep the money?"

   21           "Because I had entered into a personal guaranty

   22   on the 11th and the money was earned at that time."

   23           "Okay."

   24           "Although, technically, it hadn't been paid

04:01 25   because the checks were still bouncing.  Hospital wrote a hot

04:01   1   check."

2   Q.  Did you know at the time that Mr. Swetnam had resolved the

3   problem by issuing a personal guaranty?  Did he have any

4   discussions with you about that?

04:02   5   A.  No, sir.

6   Q.  Now, again, I don't mean to be disrespectful; but from your

7   testimony, it sounds like your knowledge of the insurance laws

8   are not quite the same as Dave Smith or perhaps even Mike

9   Swetnam, the level?

04:02   10   A.  No, sir, not even close.

11   Q.  Do you know or have you ever heard in discussions with

12   these gentlemen whether or not a guaranty is the same as a

13   contract?

14   A.  I don't know anything about the technical aspects of that.

04:02   15   Q.  And do you know whether or not a guaranty can be considered

16   as an insurance contract?

17   A.  No, sir, I do not.

18   Q.  That's a fair answer.

19        Later into the discussion about the 936, going

04:02   20   back to the bottom of 227, pick up, if you don't mind, and read

21   into the record Lines 22 through 25; and then I'm going to flip

22   the page.  Okay?

23   A.  Yes, sir.

24        "And, so, it is your testimony that -- did

04:03   25   Mr. Smith or Mr. Reagan share in any of the $936,000?"

04:03  1         And the answer is, "Yes."

2    Q.   Okay.   And then on the next page, on 228?

3    A.   "How much?"

4         "I believe 50,000."

04:03  5         "Each?"

6         "No.   Fifty thousand was what we had agreed that

7    we were going to pay the company, the agencies, 50,000."

8    Q.   Okay.   Not to be perhaps Clinton-esque --

9         THE COURT:   Just a second.

04:03  10        Ladies and gentlemen, do I understand you can

11   stay a little bit later tonight?

12        Okay.   We'll carry on.

13        MR. CLARK:   Thank you, your Honor.

14   BY MR. CLARK:

04:03  15   Q.   We'll go to Page 229 now.   229 picks up back again asking

16   my client, being questioned by Mr. Hanslik of Boyer and Miller,

17   about the check --

18   A.   Yes, sir.

19   Q.   -- the check that has been shown to the jury repeatedly.

04:04  20        Line 10, would you read that through to the end

21   of the page, please?

22   A.   Yes, sir.

23        "That's a copy of the check that you gave to

24   Mr. Carter, correct?"

04:04  25        "Yes, sir."

*Clark Cross of Carter*

04:04  1    "And it's been marked as Exhibit 66?"

2    "Yes, sir."

3    "And it was written on the 5th and posted on

4 the -- the next day, on the 6th, right?"

04:04  5    "Yes, sir."

6    "And your testimony is, by the time you gave

7 Mr. Carter this check, he knew there was a problem with the

8 cover notes that were Exhibit 65?"

9    "That's why he was holding the money."

04:04  10    "And then your testimony is that when you found

11 out there was a problem with the insurance, you contacted

12 Mr. Springfield at the hospital?"

13    "Yes, sir."

14 Q. Okay.  I'm sorry to do this to you, but just a -- just a

04:04  15 little bit more.  On top of 230, would you read -- let's just

16 read it through Line 22, sir.

17 A. Okay.

18    "Who told you that there was a problem with the

19 cover notes?"

04:05  20    "I determined that about the 5th or 6th.  Joe

21 told me that he couldn't get the deal together.  I knew that I

22 had a melted down deal, and so I called -- I believe I called

23 Brent.  Because him and Jim were out playing golf.  I asked him

24 to put Brent on his phone, and he did.  I told him, 'I've got a

04:05  25 problem.'"

*Cheryll K. Barron, CSR, CM, FCRR*      *713.250.5585*

*Clark Cross of Carter*

04:05  1          Looks like that should read, "I asked him to put
       2  Jim on his phone and he did," since he called me but --
       3  Q.  Okay.
       4  A.  "So, the first time you informed Mr. Springfield about
04:05  5  this --"
       6          "About the 6th -- 5th or 6th probably."
       7          "-- was via phone?"
       8          "The only time I informed him about it, yeah."
       9  Q.  Okay.  I'm sorry.  Just continue on down, please.
04:05 10  A.  Okay.  No problem.
      11          "And he -- you called Mr. Carter and said, 'Hand
      12  the phone to Mr. Springfield'?"
      13          "They were golfing, I believe, that day, yeah."
      14          "And that would have been about the 6th or 7th of
04:06 15  September?"
      16          "Somewhere in there."
      17          "5th or 6th?"
      18          "5th or 6th, 6th or 7th."
      19  Q.  Would you golf frequently or infrequently with
04:06 20  Mr. Springfield?
      21  A.  I would call it "frequently."
      22  Q.  Do you have a recollection of whether or not you and he
      23  were golfing in that period of time?
      24  A.  We certainly played probably a couple of times a week
04:06 25  during that period.  I don't know about on the 5th or 6th of

04:06  1    September.

2    Q.  Would you carry a cell phone out to the golf course with

3    you when you would go golfing?

4    A.  Always.

04:06  5    Q.  Now, kind of think back for a second.  Do you recall

6    Mr. Swetnam calling you on the golf course at any point in time

7    and saying, "I need to talk to Jim Springfield"?

8    A.  I don't know if I specifically remember him asking to speak

9    with Jim; but, I mean, the answer to the question would be he

04:07 10    called me pretty regularly on the golf course.

11    Q.  Okay.  And then my client goes on, on Page 231, in answer

12    to some questions about this conversation with Springfield.

13            Would you read, please, from Line 2 to the bottom

14    of the screen.

04:07 15            Let me see if I can get more of it here.

16            We can stop with, "Yes, sir."  Just read that

17    into the record.

18    A.  "So, you had that conversation with Mr. Springfield?"

19            "Yes, sir."

04:07 20            "Did you, during that phone call, negotiate the

21    terms of the guaranty to Mr. Springfield?"

22            "I gave Mr. Springfield three or four options

23    real quickly."

24            "And what were those options?"

04:07 25            "One, he could get another agent to go find the

04:07  1  coverage, which I didn't think there was anybody out there at

2  that time that could do it.  One option was to buy a vendor's

3  dual interest, which would have cost probably somewhere between

4  20 and 25 million, which really wasn't a doable option on the

04:08  5  deal.  Then, third option was do a guaranty; or fourth option,

6  you can have your money back."

7  Q.  Okay.

8  A.  "Those are the options you told him on the phone?"

9          "Yes, sir."

04:08  10  Q.  And then, finally, on Page 233, this is kind of at the end

11  of this same line of questioning.  You have, I guess, read the

12  deposition of my client at some point.  You've admitted on --

13  A.  Yes, sir.

14  Q.  And you know that he talked about the fact being that he

04:08  15  understood that the hospital had to have at least $225 million

16  of coverage to maintain the bond covenants, right?

17  A.  Yes, sir.

18  Q.  Okay.  And, then, take a look at 233 and be kind enough, if

19  you don't mind, to read from Line 4 through Line 18, please.

04:09  20  A.  "And you also told Mr. Springfield on the phone that he

21  could have the money back?"

22          "Yes, sir."

23          "Okay.  After the phone call with

24  Mr. Springfield -- strike that.

04:09  25          "Did Mr. Springfield take any one of your options

04:09   1   during that phone call?"

2   "He told me to fix this problem.  That's the only

3   one."

4   "He just said, 'Fix it'?"

04:09   5   "'Fix it.'"

6   "What did you do next?"

7   "I did the guaranty."

8   "You drafted it?"

9   And I can't read the answer.

04:09   10   Q.  Oh, I'm sorry.

11   A.  "Yes, sir."

12   Q.  Okay.  And it goes on to say that, "Did you do it on your

13   laptop?"

14   He said, "Probably, yes, sir"?

04:10   15   A.  Yes, sir, it says, "Were you at your rented office at

16   Smith-Reagan agency?"

17   "Probably, yes, sir."

18   Q.  Ask you a little bit more about Mr. Springfield and the

19   type of person he was.  Would it be consistent or -- excuse me.

04:10   20   Was he the kind of -- the kind of personality or

21   person, if you would, that would issue directives like that,

22   what we just saw, "Fix it"; would that be consistent or

23   inconsistent with your experience and knowledge of him?

24   A.  That would be very consistent.

04:11   25   Q.  I'm going to ask, I promise, one last line of questions

*Clark Cross of Carter*

04:11 1  here.

2  A.  Sure.

3  Q.  Page 234, this is referring to the cover letter that was

4  marked for the deposition.  And let me see just in particular

04:11 5  if I could --

6  A.  Okay.

7  Q.  The cover letter is the subject of this discussion on

8  Page 234.  I think we've seen that already.  My client is

9  asked, "Did you send this to Mr. Springfield?"

04:11 10      I would like you to read from Line 7, if you

11  will, down to -- let me see if I can get this situated here --

12  Line 7 on down to Line 20.

13  A.  Okay.

14      "Did you send this to Mr. Springfield?"

04:12 15      "No, sir.  I gave it to Carter, to Brent."

16      "And did you instruct him to give it to

17  Mr. Springfield?"

18      "Yes, sir."

19      "Did you ever sign a copy of this letter?"

04:12 20      "Yes, sir.  The original was signed."

21      "And this was after you'd already split the money

22  with Mr. Carter, right?"

23      "Mr. Carter had part of the money, yes, sir, on

24  the 5th.  He had part of the money, but he didn't have part of

04:12 25  the hospital's money.  He had my money from my banker."

04:12   1              "And in this letter you're informing

2    Mr. Springfield that the coverage that you thought was there is

3    gone?"

4              "Yes, sir."

04:12   5    Q.   That's fine.

6    A.   I'm sorry.  You said --

7    Q.   No, that's fine.

8              Mr. Carter, I thank you very much.

9              MR. CLARK:  I pass the witness at this time, your

04:12  10    Honor.

11              MR. COLVIN:  Nothing further, your Honor.

12              THE COURT:  Nothing further?

13              MR. McCONNELL:  Your Honor, I have four questions.

14              THE COURT:  All right.

04:13  15              MR. COLVIN:  Your Honor, I would object to them doing

16    recross when I didn't do a redirect.

17              MR. McCONNELL:  Your Honor, they introduced that

18    binder.

19              THE COURT:  Yeah, I'm going to allow him.

04:13  20                       **RECROSS-EXAMINATION**

21    BY MR. McCONNELL:

22    Q.   Mr. Carter, do you see here where it says, "No, 50,000 was

23    what we agreed that we were going to pay the company, the

24    agencies, 50,000"?

04:13  25              "Did both agencies get 50,000?"

04:13    1              "No.  Just Smith-Reagan."

         2              Do you see that?

         3    A.   Yes.

         4    Q.   Who is "we"?

04:13    5    A.   I guess Mr. Smith, Mr. Reagan and Mr. Swetnam.

         6    Q.   But not you?

         7    A.   No, sir.  I didn't make those decisions.

         8    Q.   Okay.  Do you see where it says, "Did they" -- well --

         9              Do you see where it says, "That was what --

04:14   10    that's why he was holding the money"?

        11              And then it's, "Your testimony is that when you

        12    found out that there was a problem with the insurance you

        13    contacted Mr. Springfield at the hospital?"

        14              "Yes, sir."

04:14   15    A.   Yes, sir.

        16    Q.   Do you see that?

        17              You deposited that check on September 5th or 6th,

        18    correct?

        19    A.   I believe it was the 5th.

04:14   20    Q.   The 5th.  Did Mr. Springfield ever ask you about the lack

        21    of insurance?

        22    A.   No, sir.

        23    Q.   Did he, Mr. Springfield, ever ask for the $936,000 back for

        24    that premium?

04:15   25              MR. COLVIN:  Your Honor --

04:15  1    A.  No, sir.

2          MR. COLVIN:  -- I've got to interpose an --

3          THE COURT:  Yes.  This is --

4          MR. COLVIN:  -- objection.  This isn't about the

04:15  5    binder or anything that was done --

6          THE COURT:  This seems outside the bounds of --

7          MR. McCONNELL:  Your Honor, it goes towards -- that

8    notebook says that that letter was delivered to Mr. Springfield

9    on that particular day, listing those policies: Ariel,

04:15 10    Landsdown --

11          THE COURT:  All right.  All right.  I think --

12          MR. McCONNELL:  So, that's --

13    A.  I think I said, "No, sir" to whatever your last question

14    was.

04:15 15          MR. McCONNELL:  Thank you.

16          THE COURT:  Is that it?

17          MR. McCONNELL:  That's it, your Honor.

18          THE COURT:  All right.  You may step down.

19          THE WITNESS:  Thank you, sir.

04:15 20          THE COURT:  Right?  Nobody had any more questions,

21    right?

22          MR. CLARK:  Certainly not.

23          THE COURT:  Okay.  All right.  Ladies and gentlemen,

24    thank you for your patience.  Thank you for staying late with

04:15 25    us.

04:15   1          This is what I would like to do to avoid

        2   unnecessary waste of your time.  I would like you to plan on

        3   being here by 10:00 o'clock tomorrow.  If your schedule is such

        4   you come in on the early bus, we'll be ready for you at 8:00.

04:16   5   We'll have food there; we'll have coffee there.

        6              But we're going to have some lawyer business to

        7   do, and I think 10:00 o'clock is a safer time than 8:00.

        8              Would all please rise for the jury?

        9       *(Jury not present)*

       10       *(End of requested proceedings)*

       11                        * * * * *

       12              COURT REPORTER'S CERTIFICATION

       13       I certify that the foregoing is a correct transcript from
                 the record of proceedings in the above-entitled cause.
       14

       15   Date:  June 8, 2010

       16

       17                      /s/   Cheryll K. Barron

       18                   Cheryll K. Barron, CSR, CMR, FCRR
                            Official Court Reporter
       19

       20

       21

       22

       23

       24

       25