1      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF TEXAS
2           HOUSTON DIVISION

3   UNITED STATES OF AMERICA    .
                                .  H-09-CR-336
4           vs.                 .  HOUSTON, TEXAS
                                .  APRIL 26, 2010
5                               .  2:47 P.M.
    BRENT A. CARTER and         .
6   MICHAEL N. SWETNAM, JR.     .
    . . . . . . . . . . . . . . .
7

8               TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE KEITH P. ELLISON
9            UNITED STATES DISTRICT JUDGE

10       TESTIMONY OF WARD COOK, VOL. 1 OF 2
           EXCERPTED FROM TRIAL DAY 5 OF 9
11

12  A P P E A R A N C E S:

    FOR THE GOVERNMENT:
13

14      Gregg Costa
        Ryan McConnell
        Assistant US Attorney
15      PO Box 61129
        Houston, Texas  77208-1129
16

17  FOR THE DEFENDANT BRENT A. CARTER:

18      Edmund K. Cyganiewicz
        Attorney at Law
        1000 East Madison Street
19      Brownsville, Texas 78520

20      Norton A. Colvin, Jr.
        Mitchell Chaney
21      Colvin Chaney Saenz & Rodriguez
        1201 East Van Buren Street
22      Brownsville, Texas 78520

23

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
25                      - - - - -

1   A P P E A R A N C E S:  (Continued)

2   FOR THE DEFENDANT MICHAEL N. SWETNAM, JR.:

3        Irvin Sheldon Weisfeld
         Attorney at Law
4        855 East Harrison Street
         Brownsville, Texas 78520
5
         Michael E. Clark
6        Duane Morris, LLP
         3200 Southwest Freeway
7        Suite 3150
         Houston, Texas 77027-7540
8

9   OFFICIAL COURT REPORTER:

10       Cheryll K. Barron, CSR, CM, FCRR
         U.S. District Court
11       515 Rusk Street
         Houston, Texas  77002
12
    ALSO PRESENT:
13
         Steve Goehring
14       Matthew Boyden
                              - - - - -
15

16

17

18

19

20

21

22

23

24

25

1 <u>INDEX</u>

2 <u>PAGE</u>

3 <u>GOVERNMENT'S WITNESS</u>

4 Ward Cook

5    Direct Examination by Mr. Costa    4

6    Cross-Examination by Mr. Cyganiewicz    41

7         - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Costa Direct of Cook*

1                    P R O C E E D I N G S

2        *(Jury present)*

3            THE COURT:  Members of the jury, please be seated.

4            MR. COSTA:  United States calls Ward Cook, your Honor.

02:47  5            THE COURT:  Mr. Cook, yes, sir.

6                This is going to be your seat.  Before you take

7        your seat, Mrs. Loewe will administer the oath.

8            THE CASE MANAGER:  Do you solemnly swear the testimony

9        you're about to give in the matter now before the Court will be

02:47 10        the truth, the whole truth, and nothing but the truth?

11            THE WITNESS:  I do.

12            THE COURT:  That will be your seat.  Try to adjust the

13        mic so you can speak directly into it.

14            **WARD COOK, DULY SWORN, TESTIFIED:**

15                    **DIRECT EXAMINATION**

16        BY MR. COSTA:

17        Q.  Good afternoon, Mr. Cook.

18        A.  Hi.

19        Q.  If you can just remember to try to speak slowly.  And

02:48 20        there's also some water there, in the pitcher, if that will

21        help.

22                Would you please introduce yourself to the jury?

23        A.  My name is Ward Cook.

24        Q.  And are you currently employed?

02:48 25        A.  No.  I'm retired.

Costa Direct of Cook

02:48   1    Q.  Enjoying retirement?

        2    A.  You bet.

        3    Q.  And where do you currently reside?

        4    A.  I live in San Benito.

02:48   5                 You want the address?

        6    Q.  That's good enough.

        7    A.  Okay.  San Benito, near Harlingen, Texas.

        8    Q.  Is that also near Brownsville?

        9    A.  Yes.

02:48  10    Q.  All in Cameron County?

       11    A.  Yes.

       12    Q.  And how long have you lived down in Cameron County?

       13    A.  All my life.

       14    Q.  Born and raised there?

02:48  15    A.  It's a long time.

       16    Q.  And you said you're retired now.  When did you retire?

       17    A.  Last October, '09.

       18    Q.  And were you working at Valley Baptist Health System before

       19    you retired?

02:48  20    A.  That's correct.

       21    Q.  And whose decision was it for you to stop working there?

       22    A.  Mine.  I actually -- they tried to get me to retire a year

       23    earlier -- I tried to retire a year earlier, and they made me

       24    stay an extra year.

02:49  25    Q.  And when did you first go to work for Valley Baptist?

*Costa Direct of Cook*

02:49  1  A. 1989.

2  Q. What were you doing before that?

3  A. I was a claims manager for Trinity Insurance Companies for

4  South Texas.

02:49  5  Q. What were you doing as a claims manager with Trinity, just

6  very generally?

7  A. I was responsible for handling all insurance claims for

8  Trinity Companies: automobile claims, property claims, that

9  kind of thing.

02:49  10  Q. Does that mean that when somebody had a claim with a

11  Trinity insurance policy you would review that claim and decide

12  whether and how it was going to be paid?

13  A. Yes. I had an office of adjustors who went out and handled

14  the claims.

02:49  15  Q. So, if there was a car wreck, they would go look into it,

16  decide how the claim should be handled?

17  A. Yes, sir.

18  Q. How did you go from that job to working at Valley Baptist

19  in 1989?

02:50  20  A. Well, Valley Baptist developed a self-insurance plan to

21  handle all their professional liability claims.

22        And, actually, Mike Swetnam introduced me to the

23  CEO at Valley Baptist and recommended that they -- Valley

24  Baptist hire me to handle all their claims.

02:50  25  Q. So, you knew Mr. Swetnam back in 1989?

02:50  1    A.  Yes, I did.

     2    Q.  When did you first meet Mr. Swetnam?

     3    A.  I would say probably 1984, '85.

     4    Q.  And how did you know him?

02:50  5    A.  Well, Mr. Swetnam was handling Trinity Insurance, among

     6    other companies; and whenever one of their Trinity clients had

     7    an accident or a claim, I would handle the claim for them.  And

     8    that's how I met Swetnam.

     9    Q.  So, he was already -- in the Eighties, he was an agent down

02:50  10   there in South Texas?

     11   A.  Yes.

     12   Q.  He's the one that introduced you to the folks at Valley

     13   Baptist?

     14   A.  Yes, that's correct.

02:51  15   Q.  And when you came on with Valley Baptist in 1989, what was

     16   your job title?

     17   A.  Claims manager.

     18   Q.  And that was -- when you talk about the self insurance,

     19   with the professional liability?

02:51  20   A.  Yes.  It was professional liability, medical malpractice

     21   cases, and general liability, among other things.

     22   Q.  And, so, what did you do in that position?

     23   A.  I handled all complaints and claims against the medical

     24   center, from very minor things to major med-mal cases.

02:51  25   Q.  And did you stay with that job title your whole time at

02:51 1 Valley Baptist or did it change?

2 A.   The risk manager retired in 1997, and I was promoted to

3 vice-president in charge of their risk management as well as

4 continued to handle the claims.

02:52 5 Q.   And as vice-president for risk management, did you have

6 some additional duties?

7 A.   I acquired quite -- several new responsibilities, yes.

8 Q.   And what -- did some of those responsibilities have to do

9 with the insurance that the hospital would purchase each year?

02:52 10 A.   Yes.  I began to oversee the entire insurance program for

11 the hospital.

12 Q.   And when you -- when did you become vice-president of risk

13 management?

14 A.   1997.

02:52 15 Q.   And when you took that position in 1997, was the hospital

16 already working with some agents who were helping provide the

17 insurance policies each year?

18 A.   Yes.

19 Q.   Who were those agents?

02:52 20 A.   Smith-Reagan Insurance Agency and Swetnam Insurance

21 Services.

22 Q.   And how would that process work each year, in terms of the

23 hospital deciding which policies it was going to purchase?

24 A.   Well, they would basically renew policies from the prior

02:53 25 year, simply a matter of renewal.  The hospital had been

*Costa Direct of Cook*

02:53  1   covered by Smith-Reagan for 30, 40 years; and it was just a
       2   continuing process.
       3   Q.  Did you trust the Smith-Reagan agency?
       4   A.  Yes, sir.
02:53  5   Q.  Did you trust Mr. Swetnam, who you had known since 1984?
       6   A.  Yes, sir.
       7   Q.  And do you see Mr. Swetnam in court here today?
       8   A.  Yes.
       9   Q.  Can you point out where he is and what he's wearing?
02:53  10  A.  He's right behind you, over there.  (Indicating).
       11  Q.  Is it difficult to be testifying in this case, given
       12  Mr. Swetnam -- you've known him since 1984?
       13  A.  It's not easy.
       14  Q.  You said a lot of times there were just renewals of the
02:53  15  prior year policies.  Is that right?
       16  A.  That's correct.
       17  Q.  What if there was some new area of insurance the hospital
       18  needed or the hospital wanted to change policies; who would go
       19  and look for those new policies?
02:54  20  A.  Well, I don't recall that we did that until around 2005.
       21  And at that point in time the responsibilities for exploring
       22  different insurance options was taken over by Mr. Springfield,
       23  the best I remember it.
       24          I was sort of taken out of the picture as to the
02:54  25  decisions concerning the insurance program.

02:54  1   Q.  And was Mr. Springfield the CEO at that time?

2   A.  That's correct.

3   Q.  Was Manny Vela also involved in some insurance policy

4   decisions around 2005?

02:55  5   A.  Yes.  Manny Vela is our corporate counsel, and I reported

6   to him.  And he was giving me instructions as to what decisions

7   were made on the major insurance policies.

8   Q.  And would you still, in your office, keep and retain the

9   actual policies each year, that the hospital believed it had

02:55  10  purchased?

11  A.  That's correct.

12  Q.  So, Mr. Springfield was involved in the decision-making;

13  but you still maintained the policies.  Is that fair?

14  A.  Yes.

02:55  15  Q.  During this time period, 2005-2006, how frequent was your

16  interaction with Mr. Swetnam?

17  A.  I talked to him on the phone several times a month.

18  Q.  And did you -- during this time period, did you come to

19  know an individual named Brent Carter?

02:55  20  A.  Yes.

21  Q.  Do you know about what year you might have met Brent

22  Carter?

23  A.  I think it was 2005.

24  Q.  And did you ever see him at the hospital?

02:56  25  A.  Yes.

02:56  1   Q.  Would he ever stop by and stop in your office and say
       2   hello?
       3   A.  Yes, sir.
       4   Q.  Was it usually just to visit you or would he be visiting
02:56  5   other people during those visits to the hospital?
       6   A.  I believe most of the time he was there to see someone else
       7   and would just stick his head in my office and say hello.
       8   Q.  Do you know who else at the hospital he had close
       9   relationships or frequent contact with?
02:56  10  A.  I think primarily Mr. Springfield.
       11  Q.  What about Mr. Vela and Mr. Carter?
       12  A.  (No response).
       13  Q.  Do you know anything about how often they saw each other or
       14  their relationship?
02:56  15  A.  No, I don't really.
       16  Q.  Okay.  Was there any talk -- again, on this 2005-2006 time
       17  period -- I think you've already said the hospital used
       18  Smith-Reagan maybe 30, 40 years -- was there any talk within
       19  the hospital of actually thinking about changing insurance
02:57  20  agents?
       21  A.  I didn't hear any discussions about it.
       22  Q.  Okay.  Did you ever have any discussions with Mr. Swetnam
       23  about his belief that there was interest, in the hospital, in
       24  looking at other agents?
02:57  25  A.  Yes.

02:57  1   Q.  What did he say about that?

2   A.  Well, he mentioned the fact that the hospital had retained

3   some consultants or experts to come in and assess the program.

4   Q.  What was his reaction to the hospital doing that?

02:57  5   A.  Well, he wasn't very happy about it.

6           THE COURT:  In your experience, is that an unusual

7   procedure or does that happen customarily within big

8   institutions every so often?

9           THE WITNESS:  I don't know why any institution

02:57  10  wouldn't do that.  But this is the only institution I've been

11  in, and I wasn't familiar with the consultants that were

12  brought in.

13          THE COURT:  So, it was the first time in your career?

14          THE WITNESS:  Yes, sir.

02:58  15  BY MR. COSTA:

16  Q.  And that had been since 1989, at Valley Baptist?

17  A.  That's correct.

18  Q.  And this time, around 2005, that was the first time you

19  have any information about outside consultants coming in to

02:58  20  review the insurance program?

21  A.  Yes, sir.

22  Q.  And that's what you said Mr. Swetnam was unhappy about?

23  A.  Yes, sir.

24  Q.  And you said you had this -- you talked about your

02:58  25  interaction with Mr. Swetnam.  Of the agents we've discussed --

02:58 1   Mr. Swetnam, Mr. Carter and Mr. Reagan -- was it Mr. Swetnam

2   who you typically had discussions --

3   A.  Yes, sir.

4   Q.  -- about substantive insurance policy issues with?

02:58 5   A.  Yes, sir.

6   Q.  I want to direct your attention to 2006.  Do you recall a

7   discussion with Mr. Swetnam about problems or difficulties in

8   the market, for hurricane coverage?

9   A.  Yes, sir.

02:59 10   Q.  What did Mr. Swetnam say was the issue with getting

11   hurricane coverage in 2006?

12   A.  Well, he told me that because of Hurricane Katrina and the

13   other hurricanes along about that time in Florida -- I think

14   there was three in one year over there -- that the major

02:59 15   property insurance companies were withdrawing placing coverage

16   for seacoast territories; they didn't want to write it anymore;

17   they only would write small layers of coverage for certain

18   commercial risks.  And he said that our costs for purchasing

19   property insurance were going to skyrocket.

02:59 20   Q.  And, so, had Hurricane Katrina just been the previous

21   hurricane season, as you can recall?

22   A.  I can't recall exactly when Katrina was.

23           THE COURT:  Why don't you assume it was late August,

24   early September of 2005?

03:00 25           THE WITNESS:  Okay.

03:00 1 BY MR. COSTA:

2 Q.  And you just said this discussion with Mr. Swetnam was

3 around 2006?

4 A.  Approaching the 2006-2007 policy period.

03:00 5 Q.  Okay.  And when he told you that hurricane insurance was

6 going to skyrocket because of Katrina, did he say where he was

7 going to be able to find any coverage for higher layers of

8 damage?

9 A.  I don't think we discussed layers or company -- companies.

03:00 10 I was relying on him to find the coverage that we needed.

11 Q.  Did he ever -- during 2006, did he ever have an unusual

12 request about where an insurance policy had to be consummated?

13 A.  Yes.

14 Q.  Tell the jury about that.

03:01 15 A.  Mr. Swetnam told me that he could save us money by

16 purchasing a layer of insurance through a non-admitted carrier.

17 That's a carrier -- insurance company that's not licensed to do

18 business in the State of Texas.

19 Q.  And was that going to be for hurricane coverage?

03:01 20 A.  Yes, windstorm.

21 Q.  And is -- "named windstorm," is that what coverage for

22 hurricanes is called?

23 A.  I believe it just covered named hurricanes.

24 Q.  And named tropical storms, as well?

03:01 25 A.  Yes, I think so.

Costa Direct of Cook

03:01  1  Q.  So, that's why it's called "named windstorm"?

2  A.  Uh-huh.

3  Q.  And this is around the same time period that he's talking

4  about the difficulties in the insurance market because of

03:01  5  Katrina?

6  A.  Yes, sir.

7  Q.  Was it your idea or his idea to get the windstorm coverage

8  offshore?

9  A.  It was his recommendation.

03:02  10  Q.  And, so, what did he say you were going to have to do to

11  make this policy effective?

12  A.  He told us that we would need to do the deal outside the

13  United States or outside the State of Texas and that he

14  recommended that we drive across the -- into Mexico and have

03:02  15  dinner and make the deal there.

16  Q.  Did you go to Mexico for dinner?

17  A.  Yes, we did.

18  Q.  Who attended?

19  A.  Mike and Mr. Carter and Manny Vela and Lesley Freeberg from

03:02  20  the hospital and myself.

21  Q.  Did Mr. Swetnam give you any documents that evening?

22  A.  Yes, sir.

23  Q.  Do you recall what type of documents those were?

24  A.  They looked sort of like insurance binders.

03:02  25  Q.  What is an "insurance binder"?

*Costa Direct of Cook*

03:02    1    A.   It's an interim or temporary certificate of insurance that

2    you hold.   It proves you've got insurance coverage until such

3    time as you receive the actual policies.

4    Q.   Mr. Cook, I'm going to hand you what are already in

03:03    5    evidence as Government Exhibits 1, 1A and 1B, ask you to look

6    at those and tell me if you recognize them.

7    A.   Yes.   Yes, I have.   I've seen these.

8    Q.   What are these documents I just showed you?

9    A.   Those are three documents that Mr. Swetnam gave me in

03:03    10    Mexico.

11    Q.   At this dinner we're talking about?

12    A.   Yes, sir.

13    Q.   And if you look in the top left corner, there's some

14    handwriting.   Whose handwriting is that?

03:04    15    A.   That's mine.

16    Q.   And what does it say?

17    A.   It says, "Received Nuevo Progresso, Tamaulipas, Mexico,

18    August 29th, 2006."   And it's my initials on there.

19    Q.   August 29th, 2006, is that when the dinner was in Mexico?

03:04    20    A.   Yes.

21    Q.   When did you write this on there?

22    A.   The following day, at my office.

23    Q.   And did you file these away in your office that next day?

24    A.   Yes.

03:04    25    Q.   And this shows a total premium of $936,000.   Does that

03:04  1  sound familiar?

2  A.  Yes.

3  Q.  It says here, the last sentence, "This document is intended

4  for use as evidence that insurance, described herein, has been

03:04  5  effected," and it goes on.

6         And is that sentence there, "This document is

7  evidence that insurance has been effected," is that what you

8  just described as your understanding of what a "binder" is?

9  A.  Yes.

03:05  10  Q.  So, when Mr. Swetnam handed you these documents at dinner

11  on August 29th, 2006, did you believe the hospital had

12  hurricane coverage, as stated?

13  A.  Yes, sir, effective on the effective date.  I think it was

14  September 1st.

03:05  15  Q.  Right.  And I'll show you that you're right.  "September 1,

16  2006," that was your understanding?

17  A.  Yes, sir.

18  Q.  Did Mr. Swetnam give you any indication when he handed you

19  those documents that this -- there might be some issues or this

03:05  20  wasn't a done deal yet?

21  A.  No, sir.

22  Q.  Did Mr. Carter raise any concerns at dinner that the

23  insurance was not yet a done deal?

24  A.  No, sir.

03:05  25  Q.  Was most of the discussion at dinner about business or just

03:05  1   personal stuff, once you got these documents handed to you?

2   A.   There was no discussion at all about insurance that night.

3   Q.   Basically, it was just where Mr. Swetnam handed you these

4   documents?

03:06  5   A.   That's all.

6   Q.   Would you pay for that -- have the hospital pay that

7   $936,000 just upon receipt of those cover notes?

8   A.   No.  I would have received an invoice.

9   Q.   And when the invoice is -- who were those invoices

03:06  10  typically from?

11  A.   Probably Swetnam Insurance Services.

12  Q.   And when you receive an invoice like that, what do you do?

13  A.   I send a request for payment down to the accounting

14  department, along with a copy of the invoice.

03:06  15  Q.   And then accounting issues the check?

16  A.   Yes, sir.

17  Q.   Do you recall when that 936 -- just generally how long

18  after the dinner in Mexico that $936,000 was paid?

19  A.   I can't remember, but I think it was just a few days at the

03:07  20  most.

21  Q.   I'll show you what is in evidence as Government's 1F.  Do

22  you recognize that as a Valley Baptist check, Mr. Cook?

23  A.   Yes.

24  Q.   And it's "Pay to the Order Of" Swetnam Insurance Services?

03:07  25  A.   Yes.

Costa Direct of Cook

03:07  1    Q.  For that $936,000 amount?

     2    A.  That's correct.

     3    Q.  And it's dated September 1st.  Do you see that?

     4    A.  Yes.

03:07  5    Q.  So, that would indicate it was issued very soon after the

     6    dinner on August 29th.  Is that right?

     7    A.  Yes, sir.

     8    Q.  And I want to show you what is in evidence as Government's

     9    13.

03:08 10            Are you able to see that on the screen, Mr. Cook?

    11    A.  Yes, sir.

    12    Q.  It's a letter supposedly dated September 7, 2006, to

    13    Mr. James Springfield.  Do you recognize that as Swetnam

    14    Insurance Services' letterhead?

03:08 15    A.  Yes, sir.

    16    Q.  And it says at the bottom, "Sincerely, Michael Swetnam,"

    17    with no signature.

    18            Do you recall seeing this in September of 2006?

    19    A.  No, sir.

03:08 20    Q.  Have you seen it before today, though?

    21    A.  Yes, sir.

    22    Q.  When did you first see it?

    23    A.  Sometime after the civil suit was filed in this case, I saw

    24    it in some discovery we received.

03:08 25    Q.  So, was this in your files there at the hospital?

03:08  1    A.  No, sir.

2    Q.  Would Mr. Swetnam -- did he correspond with the hospital on

3    occasion?

4    A.  Yes.

03:09  5    Q.  Would he typically sign documents that he sent to the

6    hospital?

7    A.  Yes, sir.

8    Q.  Have you, to this day, seen a signed copy of this letter?

9    A.  No, sir.

03:09  10   Q.  If you want to take a second to just skim over this -- look

11   over this letter; and if you can tell the jury, what is he

12   saying about the Ariel and Landsdow cover notes that he had

13   just given you on August 29th in Mexico?

14   A.  Said that, "They do not insure your risk at the hospital."

03:09  15   Q.  And this is September 7th, supposedly six days after that

16   check we just saw?

17   A.  Yes, sir.

18   Q.  Did anyone, in September, 2006, tell you that those Ariel

19   and Landsdow policies did not insure the hospital's risk?

03:10  20   A.  No, sir.

21   Q.  And was this during this time period when you said that you

22   would talk with Mr. Swetnam on the phone on a fairly regular

23   basis; is that right?

24   A.  Yes, sir.

03:10  25   Q.  Did he -- from September 2006 until the time that he

03:10   1   stopped being the hospital's agent, did he ever mention to you

2   a problem with those offshore hurricane policies?

3   A.   No, sir.

4   Q.   Did Mr. Springfield ever bring this to your attention and

03:10   5   say, "Oh, Mr. Swetnam told me there's a problem with the

6   offshore policies"?

7   A.   No.

8   Q.   Anybody else at the hospital bring that to your attention?

9   A.   No, sir.

03:10   10   Q.   In this letter, what does Mr. Swetnam say; since there's a

11   problem with the offshores, that they're not in effect, what's

12   his proposal for insuring the hospital in case of a

13   catastrophic hurricane?

14   A.   He offers the hospital a loss guaranty for the same amount

03:10   15   of money that the insurance policy was written for, which I

16   assume was $75 million.

17   Q.   Did Mr. Swetnam ever discuss during this time period, with

18   you, that he was going to personally guarantee the coverage?

19   A.   No, sir.

03:11   20   Q.   Anyone else at the hospital bring that to your attention

21   during 2006?

22   A.   No, sir.

23   Q.   What's your reaction to the proposal in this letter, that

24   Mr. Swetnam is going to insure the hospital?

03:11   25   A.   That's no insurance at all.

03:11  1    Q.  Why do you say that?

     2    A.  Well, I don't think Mr. Swetnam could pay a $75 million

     3    claim.

     4    Q.  Would you have ever --

03:11  5    A.  If we had the loss.

     6    Q.  Would you have ever agreed to Mr. Swetnam being the

     7    personal insurer for the hospital's hurricane coverage?

     8    A.  I wouldn't.

     9    Q.  Now, I want to show you, Mr. Cook, what is in evidence as

03:11 10    Government's 17.  And this is the -- the letter we just looked

    11    at was supposedly September 7th.  Did you see that, sir?

    12    A.  Yes.

    13    Q.  Exhibit 17, which I'm now showing you, is dated later that

    14    month, September 25th, 2006.  Do you see that?

03:12 15    A.  Yes, sir.

    16    Q.  It's addressed to you.  And if you look at the second page,

    17    who is writing this letter?

    18    A.  Mr. Carter, Brent Carter.

    19    Q.  It says, "Dear Ward, Pursuant to your conversation with

03:12 20    David Smith today, please accept the attached binder with the

    21    following information."

    22               And then does it list a number of different

    23    policies?

    24    A.  Yes, sir.

03:12 25    Q.  Do you remember receiving this set of documents?

03:12  1    A.   I vaguely remember.

     2    Q.   Do you remember this set of documents being in your office?

     3    A.   Yes.

     4    Q.   How was it -- do you know what form it was in, in your

03:13  5    office?

     6    A.   Pardon?

     7    Q.   Do you remember what was -- when it was in your office, was

     8    it just loose paper or what form was it in?

     9    A.   I kept separate folders on each policy, each type of

03:13  10   insurance.  And I would imagine -- I would guess that I filed

     11   each certificate in the property folder or liability folder or

     12   whatever coverage it was.

     13   Q.   And I'm just going to show you one of the documents in

     14   here, which is 117-04.  Is it fair to say -- I'll just

03:13  15   represent there's 105 pages in this exhibit.

     16           I want to look now at Page 4 in Government's 17.

     17   Here it's talking about premiums, and it says "TWIA."  What is

     18   "TWIA"?

     19   A.   Texas Windstorm Insurance Association.

03:14  20   Q.   And, then, later on, it's talking about captive reinsurers

     21   with a premium of about $900,000.  Given the mention of TWIA

     22   and the captive reinsurers at $900,000, which policy is this

     23   document referring to?  What kind of coverage is the TWIA

     24   referring to?

03:14  25   A.   That's windstorm coverage.  That's the State windstorm

03:14  1    pool.

2    Q.  Were there different layers of coverage that year?

3    A.  Yes.  The Texas Windstrom Pool insured, I believe,

4    $3 million on every building that we had listed.

03:14  5    Q.  And, then, were there higher layers, including the

6    offshore --

7    A.  Everything else was above the windstorm pool.

8    Q.  And when Mr. Carter -- it says here, "hand delivered."  Do

9    you see that?

03:14  10    A.  Yes, sir.

11    Q.  "9-26-2006."

12            When Mr. Carter delivered this to you, did he say

13    anything about there being a problem with the offshore

14    windstorm coverage from the British Virgin Islands?

03:15  15    A.  No, sir.

16    Q.  That entire -- say, 2006, 2007, 2008, on those occasions

17    when he would stop by and say hello after visiting with others

18    at the hospital, did he ever say anything about problems with

19    the offshore windstorm coverage?

03:15  20    A.  No, sir.

21    Q.  I think you already mentioned, when you first joined the

22    hospital in 1989, a lot of what you were dealing with was

23    medical malpractice claims.  Is that right?

24    A.  That's about all I did.

03:15  25    Q.  Is that a major part of a hospital's insurance program?

03:16  1  A.  Yes.

2  Q.  In 2006 and 2007, do you recall the company with which the

3  hospital had an excess liability policy for medical

4  malpractice?

03:16  5  A.  I believe it was Steadfast Insurance Company, which is

6  owned by Zurich.

7  Q.  I'm going to show you what is in evidence as Government's

8  Exhibit 2A, Mr. Cook.  And right there, where it says,

9  "Insurance Company," do you recognize that Steadfast Insurance

03:16  10  Company, what you just said?

11  A.  Yes.

12  Q.  And you said they're related to a company called Zurich?

13  A.  Yes, sir.

14  Q.  This says, "Interim Insurance Binder and Premium Billing."

03:16  15  What is an "interim" insurance binder?

16  A.  It would be a proof of insurance to keep until the actual

17  policy was issued.

18  Q.  And what is listed as the total premium for this policy?

19  A.  Two point three million.

03:17  20  Q.  And you see Mr. Swetnam signs it dated September 5th, '06?

21  A.  Yes, sir.

22  Q.  So, this was early September.  That's the same time period

23  we just saw when we were talking about the offshore windstorm.

24  Is that right?

03:17  25  A.  Yes, sir.

03:17  1    Q.  And there's a note here to the right, and what does that

      2    say?

      3    A.  My initials.

      4    Q.  "WC"?

03:17  5    A.  Yes, sir.

      6    Q.  And what's the date?

      7    A.  September 7, '06.

      8    Q.  Do you recall how you received this interim insurance

      9    binder?

03:17 10    A.  Well, I'm pretty sure it was in the mail.

      11   Q.  And what does the fact you received it -- you received it

      12   two days after Mr. Swetnam signed it.  Is that --

      13   A.  That's correct.

      14   Q.  -- what that notation indicates?

03:18 15    A.  Right.

      16   Q.  When you would be sent this interim insurance binder, would

      17   it be accompanied by another document from Swetnam Insurance?

      18   A.  Possibly an invoice.

      19   Q.  Now, I'm going to show you Government 3.  Is this the

03:18 20    invoice you're talking about, the type -- what an invoice looks

      21   like?

      22   A.  That's an invoice, but I can't see the amount on it there.

      23   Q.  Okay.  I'll let it focus for a second.

      24   A.  Yes.

03:18 25    Q.  Two point three million, is that for this --

03:18 1    A.   That's correct.

2    Q.   -- interim binder we were just looking at?

3    A.   Yes.

4    Q.   Okay.  And it's from Swetnam Insurance Services, correct?

03:18 5    A.   Yes, sir.

6    Q.   And it has the return address for Swetnam?

7    A.   Yes, sir.

8    Q.   And then it has the PO box for the healthcare system.  Is

9    that a PO box at which the hospital would receive mail?

03:19 10   A.   That's correct.

11   Q.   And what would you do after getting that invoice?

12   A.   I would have taken the invoice and written out a request

13   for payment and delivered the invoice and the request down to

14   our accounting department.

03:19 15   Q.   And would you often ask in those written requests to have

16   the accounting department just give the check to you?

17   A.   Yes.

18   Q.   Did they always follow that instruction?

19   A.   No, sir.

03:19 20   Q.   What would they do instead?

21   A.   Mail it to the payee.

22   Q.   And I want to show you what's in evidence as Government 4A.

23   A check here, if you look, a date of September 18th, '06?

24   A.   Yes, sir.

03:20 25   Q.   Is that that same amount of 2.3 million plus we've seen?

03:20 | 1 | A. Correct.

2 | Q. Made out to Swetnam Insurance Services?

3 | A. Yes, sir.

4 | Q. And do you remember anything that stands out about

03:20 | 5 | Mr. Swetnam, how he got this check?

6 | A. Well, we mailed this check -- the accounting department

7 | mailed it to him.

8 | Q. And did he have any reaction to the fact that the

9 | accounting department mailed it to him?

03:20 | 10 | A. Yes, sir. He asked me not to mail any more big checks, to

11 | deliver them or call him and he would come pick them up.

12 | Q. Did he give you any particular reason why?

13 | A. No, sir.

14 | Q. And is that what you tried to do moving forward after this

03:20 | 15 | point?

16 | A. Yes, sir.

17 | Q. But you said, even then, sometimes accounting would still

18 | mail the checks?

19 | A. Sometimes they did.

03:21 | 20 | Q. I want to move forward now to 2007. Did you -- again, did

21 | the hospital obtain a hurricane policy from offshore?

22 | A. Yes, sir.

23 | Q. Do you recall Mr. Swetnam telling you anything about that

24 | renewal?

03:21 | 25 | A. He said it was going to cost less than the one the prior

03:21    1    year.

2    Q.   And was he -- did it, in fact, cost less that second year?

3    A.   Yes, sir.  I remember it was $884,000.

4    Q.   So, when he's discussing this renewal with you, had you

03:21    5    been told that there was a problem with the prior year's

6    offshore hurricane coverage policies?

7    A.   No, sir.

8    Q.   Would you have done an offshore policy again if Mr. Swetnam

9    had told you that that coverage in fact wasn't in existence?

03:21   10    A.   No, sir.

11    Q.   Did you go to Mexico the second year?

12    A.   No, sir.

13    Q.   Did he mention anything about the Mexico issue, about

14    having to conduct it outside the country?

03:22   15    A.   Prior to the effective date of that policy, I asked Mike if

16    we had to go to Mexico again to make this deal; and he said,

17    "No.  It's not necessary this year."

18    Q.   I want to go back to Government 13.  Showing you the second

19    page in Government 13, Mr. Cook, is that again Swetnam

03:23   20    Insurance Services' letterhead?

21    A.   Yes, it is.

22    Q.   Dated or March 10th, 2008, addressed to James Springfield.

23    And what does it say this letter is regarding?

24    A.   Regarding 2007 into '8 RAC RE hurricane policy.

03:23   25    Q.   Is that -- in your recollection, is that the name of the

03:23  1  policy that second year the hospital went with the offshore

2  hurricane coverage?

3  A.  Yes, sir.

4  Q.  We met yesterday to talk about this case, correct?

03:23  5  A.  Yes, sir.

6  Q.  And I showed you this document --

7  A.  Yes, sir.

8  Q.  -- yesterday?

9          Before I showed this to you yesterday, had you

03:23  10  ever seen this document before?

11  A.  No, sir.

12  Q.  Do you have any recollection of it being in your files at

13  the hospital?

14  A.  No.  I've never seen it.

03:24  15  Q.  And again, looking down here, you see Mr. Swetnam's name

16  but no signature.  Is that correct?

17  A.  That's correct.

18  Q.  And in this one he's saying, "We recently found out that

19  RAC RE BVI SPC, Ltd., which was supposed to be set up and

03:24  20  authorized to do business, is still not licensed by the BVI

21  insurance department due to various pending items that have not

22  been provided."

23  Q.  Did Mr. Swetnam ever tell you that during 2007 or 2008?

24  A.  No, sir.

03:24  25  Q.  Did Mr. Carter ever tell you that?

03:24  1  A.  No, sir.

   2  Q.  Mr. Smith or Mr. Reagan?

   3  A.  No, sir.

   4  Q.  Did mr. Springfield bring this to your attention back in

03:24  5  '08?

   6  A.  No, sir.

   7  Q.  Did anyone at the hospital inform you in '08 that they had

   8  heard from Mr. Swetnam or anyone else that there was an issue

   9  with this hurricane policy?

03:25 10  A.  No.

  11  Q.  And here, in the second paragraph, it says, "While this was

  12  not good news, it will not affect the insurance coverage

  13  afforded to Valley Baptist, because the RAC RE insurance

  14  coverage was 100 percent reinsured by Landmark American

03:25 15  Insurance Company."

  16          Is it your understanding that the Landmark policy

  17  was going to already provide the same coverage as the offshore

  18  supposed RAC RE policy?

  19  A.  I can't remember that.

03:25 20  Q.  Would the hospital have paid over $800,000 for an offshore

  21  hurricane policy if a policy the hospital already had was going

  22  to provide the same coverage?

  23  A.  No, sir.

  24  Q.  And since I just showed you this yesterday, I take it you

03:25 25  haven't had a chance to go back and look at the Landmark policy

03:26　1　or talk to anyone from Landmark, to remember what the specifics

2　of their policy was at that time.  Is that fair?

3　A.  Yes, sir.

4　Q.  And did the hospital also renew the Zurich policy for the

03:26　5　2007-2008 time period, when Mr. Swetnam, Mr. Carter, Mr. Smith

6　and Reagan were still the agents?

7　A.  Yes, sir.

8　Q.  I want to show you Government 4.  Do you recognize this

9　document, Mr. Cook?

03:26　10　A.  It's a declarations page from an excess umbrella policy.

11　Q.  And does it list "Steadfast" right there?

12　A.  Yes, sir.

13　Q.  And, then, also "Zurich" up in the top right?

14　A.  Yes.

03:27　15　Q.  And we've already seen that interim insurance binder which

16　you get initially.  Do you then, eventually, get the Zurich

17　policy itself?

18　A.  Yes.

19　Q.  And what is the declarations page?

03:27　20　A.  Now, this is the '06-'07 policy.

21　Q.  Right, right.  Fair enough.  September '06 to September

22　'07?

23　A.  That's right.

24　Q.  I'm just showing this as an example, though.  You're right.

03:27　25　I'm just showing this as an example of the Zurich document.

*Costa Direct of Cook*

03:27    1    What is this declaration page?

2    A.  It's the first page of a policy.  It shows the policy

3    limits, policy number, policy period and, I think, the premium.

4    Maybe it's -- the premium may be down there.

03:27    5    Q.  Sure.  If you go down there --

6    A.  Yes, sir.

7    Q.  -- is there the premium?

8    A.  There it is.

9    Q.  And it has the signature of an authorized representative

03:27    10    there?

11    A.  Yes, sir.

12    Q.  Do you see that?

13    A.  Yes.

14    Q.  Is that Michael Swetnam's name listed there?

03:28    15    A.  No.

16    Q.  Is that, in your understanding, a representative of

17    Zurich's signature?

18    A.  That's the way it's supposed to be.  I don't recognize the

19    signature.

03:28    20    Q.  With regard to these Zurich policies, did Mr. Swetnam ever

21    discuss what he had to do to go and negotiate the policy?

22    A.  To go and negotiate, he -- he would go to New York, and he

23    told me that he negotiated with several different insurance

24    companies to obtain the best deal we could get on purchasing

03:28    25    this excess liability coverage.

03:28    1    Q.  And when he told you that the policy he was giving you was

2    the best deal, did you trust Mr. Swetnam?

3    A.  Yes, sir.

4    Q.  When you were --

03:28    5         THE COURT:  Excuse me.

6             Was there ever any discussion between the health

7    facility and anybody at Smith-Reagan about the size of their

8    premiums?  Or was that something you simply didn't inquire

9    about?

03:29   10         THE WITNESS:  I can't remember any conversations.

11   We -- we trusted these guys to give us the best deal that we

12   could get.  We paid a total of seven or eight million dollars a

13   year in insurance, for all of it, for the whole program.

14   BY MR. COSTA:

03:29   15   Q.  And along the line of that question, I think you mentioned

16   earlier that some consultants came in around 2005.  Is that

17   correct?

18   A.  I can't remember the exact year.  The first consultants

19   came in around '05-'06.

03:29   20   Q.  And do you remember if those consultants had a view about

21   the hospital's insurance program?

22   A.  Yes, sir.

23   Q.  What was their view about the cost of it?

24   A.  I don't remember the -- what their estimate of the cost

03:30   25   was.  Their -- they just -- basically, the report they said --

03:30    1    they sent us was that they could have provided better coverage

2    and perhaps at a better cost.  I don't remember any specific

3    amounts.

4    Q.    Did you have any discussions with Mr. Swetnam in which he

03:30    5    had a reaction to these consultants who came in and reviewed

6    the insurance program?

7    A.    Yes, sir.

8    Q.    What was his opinion about that?

9    A.    Well, he wasn't very happy about it.

03:30   10    Q.    Did he say that -- did he defend the program he had helped

11    institute?

12    A.    I believe Mr. Swetnam wrote a rebuttal report about the

13    consultant report.

14    Q.    Going back to Government 4, is there any indication on this

03:31   15    document that this premium amount was changed from when Zurich

16    issued this document by Mr. Swetnam?

17    A.    Would you repeat that, please?

18    Q.    Sure.  Is there any indication on this document -- let me

19    ask you this.

03:31   20          Does Mr. Swetnam's name appear on this document?

21    A.    I don't see it.

22    Q.    Is there anything on this document that indicates to you

23    that after Zurich issued this declarations page that

24    Mr. Swetnam changed these premium numbers?  Is there

03:31   25    anything -- just from looking at that, would you think that

03:31  1  that had happened?

2  A.  No, sir.

3  Q.  Did Mr. Swetnam ever tell you that he was going to alter or

4  that he did alter the premium amount on this policy?

03:31  5  A.  No, sir.

6  Q.  Did he ever tell you that he was a managing general agent

7  for Zurich and could set the premiums he wanted, given that

8  role?

9  A.  No, sir.

03:31  10  Q.  And he told you, in fact, he had to go to New York to

11  negotiate that.  Is that right?

12  A.  Well, he did almost every year.  I can't remember if he did

13  on this specific one, but --

14  Q.  Fair enough.  But, generally, he told you that he often --

03:32  15  a lot of years, he had to go to New York --

16  A.  Yes, sir.

17  Q.  -- to negotiate?

18         Did you ever sign documents on Mr. Swetnam's

19  behalf?

03:32  20  A.  Yes, sir.

21  Q.  What types of documents were they?

22  A.  We set up a self-insurance program for physicians, employed

23  physicians.  And we -- any time we added a physician or deleted

24  a physician, we would have to sign an endorsement.  And

03:33  25  Swetnam -- from the inception of that program, Swetnam signed

03:33  1  it, the endorsements.

2  And then, after awhile, it became cumbersome

3  to -- as more and more doctors checked in that had to mail

4  those endorsements down to Mike to sign and mail back -- we

03:33  5  kept losing track of them.  And, so, I asked him if I could

6  just sign his name to those endorsements and save the hassle;

7  and he said, "Yeah, just sign my name."

8  Q.  So, you had a discussion with him about whether it would be

9  okay to sign his name?

03:33  10  A.  Yes.

11  Q.  And what would you do after signing his name?  Would he

12  ever see what you had signed?

13  A.  Oh, he required that I mail him a copy of it.

14  Q.  That was his request?

03:33  15  A.  I always mailed him a copy of it.

16  Q.  And at some point did you want to put this in writing, the

17  fact that he had told you it was okay to sign his name?

18  A.  Yes, sir.

19  Q.  I want to show you what is in evidence as Government's 19.

03:34  20  Do you recognize this, Mr. Cook?

21  A.  Yes, sir.

22  Q.  Is this the -- when you put it in writing, the fact that

23  Mr. Swetnam was fine with you signing his name to expedite this

24  process?

03:34  25  A.  Yes, sir.

03:34 | 1 | Q.   Who typed this out?

2 | A.   I did.

3 | Q.   And then did you present it to Mr. Swetnam?

4 | A.   Yes.

03:34 | 5 | Q.   And did he say, "Oh, forget about it.  We don't need to

6 | formalize this in writing"?

7 | A.   No.  He signed it.  He wrote a note on there that the

8 | certificates must be mailed to Mike Swetnam within three

9 | business days.

03:34 | 10 | Q.   So, that ink is Mr. Swetnam's additions?

11 | A.   Yes.

12 | Q.   He wanted to know within three days -- to have copies of

13 | what you are signing?

14 | A.   When I issued an endorsement.

03:34 | 15 | Q.   Then he signed this, correct?

16 | A.   That's right.

17 | Q.   Do you know what that date is?

18 | A.   Yes.

19 | Q.   What is it?

03:35 | 20 | A.   August 29th, '06.

21 | Q.   That date ring a bell for any other reason?

22 | A.   Yes, sir.

23 | Q.   Why is that?  What is the other reason?

24 | A.   That was the night that we drove to Mexico for dinner.

03:35 | 25 | Q.   The same -- was it the same evening that you gave him this

03:35   1    and had him sign it?

2    A.   Yes, sir.   It was just coincidental that I thought to do

3    this that particular day.   But I did it and -- we left for --

4    we left the hospital for dinner and I just brought it out and

03:35   5    handed it to him and he read it and signed it.

6    Q.   And did he say -- and that was the same night he gave you

7    those three cover notes?

8    A.   Yes, sir.

9    Q.   Did he say, "Wow, that's a coincidence.   I actually signed

03:35   10    for Mr. Thompson on two of those cover notes"?

11    A.   No, sir.

12    Q.   Did you ever have a discussion with Mr. Swetnam about the

13    commissions that he and the other agents were receiving off the

14    hospital program?

03:35   15    A.   One time I talked to Mike about -- he told me that he

16    was -- expressed the fact that he was upset that

17    Mr. Springfield and/or Mr. Vela asked him to show them how much

18    commission he was making off Valley Baptist's insurance

19    program.

03:36   20    Q.   And what was his reaction to that request from the hospital

21    executives?

22    A.   He was unhappy.   He said that it wasn't any of their

23    business.

24    Q.   And did you have a response?

03:36   25    A.   Yes, sir.   I said, "Well, Mike, it's -- it's between 10 and

03:36 1   15 percent, isn't it?"

2              And he said, "The average is under 15 percent."

3   Q.  Do you recall the approximate time period -- just a rough

4   guess as to -- your best guess as to when that discussion took

03:37 5   place?

6   A.  I really can't remember.

7   Q.  But you said the impetus for him mentioning it was that

8   Mr. Springfield and Mr. Vela had been asking him about it?

9   A.  Yes, sir.

03:37 10  Q.  I'm going to go back to Government 4, which shows -- it's

11  that Zurich policy showing a total premium of 2.3 million.  And

12  you said that you had no indication that Mr. -- that anyone had

13  altered this after it left Zurich, to increase the premium.

14              If you had known that the premium Zurich was

03:37 15  charging was approximately a million dollars less, what would

16  the hospital have done with that information?

17  A.  Well, we wouldn't have paid 2.3 for a policy that actually

18  the insurance company was going to charge 1.3 or whatever.

19  Q.  And when you were asking Mr. Swetnam about his commissions,

03:38 20  did he indicate that the agents were receiving about a million

21  dollars off the Zurich policy?

22  A.  No, sir.

23  Q.  And on those offshore hurricane policies, if you had been

24  told like that letter purports to tell the hospital back in '06

03:38 25  and then in early '08 that, in fact, these policies were not in

03:38  1  existence, what would the hospital have done?

2  A.  Wouldn't have purchased it.

3  Q.  And if you found out after the fact and you had already

4  paid the 936 --

03:38  5  A.  Well, I would have asked for a refund.

6  Q.  Did you think that some of that premium, $936,000, was

7  going to the insurance company to provide coverage?

8  A.  Yes, sir.

9       MR. COSTA:  Pass the witness, your Honor.

03:38  10       THE COURT:  All right.  Do you wish to inquire?

11       Yes, sir.

12  **CROSS-EXAMINATION**

13  BY MR. CYGANIEWICZ:

14  Q.  Good afternoon, Mr. Cook.

03:39  15  A.  Hi.

16  Q.  How are you?

17  A.  Great.

18  Q.  Enjoying the retirement?

19  A.  Well, I'm not doing great.

03:39  20  Q.  I don't think any of us are doing great.  But are you

21  enjoying the retirement?

22  A.  Yes, sir.

23  Q.  Do you know me, Mr. Cook?

24  A.  Well, I know you from seeing your face on television as the

03:39  25  mayor down there at Port Isabel, I believe.

03:39  1    Q.  Well, what I really meant, we haven't met before except for

2    this afternoon, correct?

3    A.  No, we've never met.

4    Q.  Well, I'm going to try to be as brief as possible and just

03:39  5    go over a few things that we think are important.

6                    I represent Mr. Carter.  You understand that,

7    correct?

8    A.  Yes, sir.

9    Q.  Let me first -- what did you review in preparation for your

03:39  10   testimony this afternoon?

11   A.  We reviewed all the documents that had been presented to me

12   by our -- the government attorney.

13   Q.  Did you --

14   A.  And I read -- I read a deposition I gave a year and a half,

03:40  15   two years ago and -- that's about it.

16   Q.  Now, that was my point.  I have your deposition.  So, if

17   I'm asking questions, I'm not trying to trick you.  I just want

18   to make sure what you said back then is the same way you feel

19   now.

03:40  20                   Did you notice any changes that come to mind

21   immediately or anything like that in your deposition?

22   A.  Not any major changes, I don't --

23   Q.  Did you -- I'm assuming you met with the prosecutors a

24   couple of times and -- to review the --

03:40  25   A.  Yes.

03:40  1    Q.  Okay.  You met with them, I think Mr. Costa said yesterday?

2    A.  Yes, sir.

3    Q.  And previously to that, also?

4    A.  About a week ago, made a dry run up here a week ago.

03:40  5    Q.  And those are the two meetings you've had with the

6    prosecutors?

7    A.  Yes.

8    Q.  No others?

9    A.  (No response).

03:40 10    Q.  Is that correct?  No others?

11    A.  That's correct.

12    Q.  I know Mr. Costa went through your background.  You started

13    as a claims man for the hospital in '89, correct?

14    A.  Yes, sir.

03:40 15    Q.  And then moved up to vice-president of, I would say, risk

16    management.  Is that correct?

17    A.  Yes.

18    Q.  In '97?

19    A.  Yes, sir.

03:41 20    Q.  Okay.  And when you were a -- in the private insurance

21    business, what type of licenses did you have?

22    A.  I had a Texas all lines insurance adjuster's license.

23    Q.  Did you ever have I guess what they call a surplus lines

24    license?

03:41 25    A.  No, sir.

03:41  1   Q.  This general or managing general agent license?

2   A.  No, sir.

3   Q.  Are you aware of what type of licenses Mr. Swetnam has?

4   A.  No, sir.

03:41  5   Q.  Mr. Carter?

6   A.  No, sir.

7   Q.  Would you agree with me that Mr. Carter is less experienced

8   in the insurance industry than Mr. Swetnam?

9   A.  Yes, sir.

03:41  10  Q.  Regarding the Valley Baptist -- that's a pretty big

11  operation, is it not?

12  A.  Yes, sir.

13  Q.  Do you know the amount of employees?

14  A.  I'm going to guess around 2500.

03:41  15  Q.  The amount of doctors?

16  A.  Probably 300.

17  Q.  And as risk management, are you familiar with, like, the

18  value of their assets and -- and their properties?

19  A.  Their properties?

03:42  20  Q.  Yes.

21  A.  Yes, sir.

22  Q.  Do you know how much that would be?

23  A.  Well, we insured the value; and we had over 500 million in

24  property.

03:42  25  Q.  And do you know how much generally the hospital would pay

03:42  1   in insurance premiums in just a typical year?

2   A.   For all --

3   Q.   Yes, sir.

4   A.   -- coverages?

03:42  5   Q.   Yes, sir.

6   A.   I think probably eight or nine million dollars.

7   Q.   Do you know how many policies generally existed?

8   A.   Maybe 15 or 20 maybe.

9   Q.   Can you briefly just outline some of the major ones -- we

03:42  10  may have heard this previously from another witness -- the

11  different types?

12  A.   Oh, well, we had malpractice excess liability insurance

13  that sat -- that coverage sat above our self-insurance trust.

14  We had, like, a $5 million deductible per claim on the med-mal.

03:43  15          Then we had many different property policies

16  through various insurance companies.  We had workers comp; we

17  had bonds; we had just -- just -- I just can't think off --

18  Q.   Automobiles?

19  A.   Automobile, yes, sir.

03:43  20  Q.   I think somebody mentioned a helicopter.  Some sort of

21  policy for a helipad?

22  A.   Helipad, aircraft.

23  Q.   And you oversaw that whole insurance business for the

24  hospital?

03:43  25  A.   Yes.  Yes, sir.

03:43    1    Q.  I know there's been discussion about the hospital being

2    non-profit; but there's parts of the hospital in that system

3    that makes a lot of money, does it not?

4    A.  I suppose so.

03:43    5    Q.  It's the same operation owns the golf course?

6    A.  (No response).

7    Q.  Do you know if they still own the golf course?

8    A.  I believe the System does, yes.

9    Q.  And how long did you retire, how long ago?

03:44    10    A.  Just October of '09.

11    Q.  And is there someone who has taken your place?

12    A.  No.

13    Q.  One of the -- I think something you may have mentioned was

14    the excessive loss program.  Are you familiar with that

03:44    15    program?

16    A.  Yes.

17    Q.  I think in your deposition you said you administered it and

18    paid some claims but you weren't there when it started.  Is

19    that correct?

03:44    20    A.  No.  I was there when it started.

21    Q.  You were.  Okay.

22          Tell us about -- just briefly how that program

23    works.

24    A.  That was back in the early 1990's, and physicians were

03:44    25    having a very difficult time purchasing insurance.  The

03:44   1   insurance med-mal companies were charging so much.  And the

2   hospital bylaws required each physician to provide $500,000

3   limit of med-mal.  The physicians were hurting.  They couldn't

4   buy it.

03:45   5           It -- so, we set up a self-insurance program,

6   called the excessive loss, to provide each physician with

7   $300,000 limit excess their primary 200 million.  So, they no

8   longer had to purchase 500.  All they had to do was purchase

9   200 million, and our XOL program provided the next $300,000

03:45  10   layer to satisfy the bylaws.

11   Q.  And, of course, that would have to be patients that were

12   treated at the Valley Baptist System, correct?

13   A.  I think so.

14   Q.  And were you ever -- did you ever become aware of an

03:45  15   attorney's opinion saying it may not be in compliance with

16   federal law and could be illegal?

17   A.  No, sir.

18   Q.  You still -- at this point in time have you heard about

19   that at all?

03:46  20   A.  I may have in connection with this case, but I'm not aware

21   of any opinions.

22   Q.  Is that program still in existence?

23   A.  No, sir.

24   Q.  If that lawyer's opinion was correct -- and I'm not trying

03:46  25   to blame you for anything -- but the hospital would basically

03:46　1　be doing something illegal without even knowing about it.

2　Would that be a fair statement?

3　A.　Could be.

4　Q.　Now, let me go to the area of how -- how does the hospital

03:46　5　decide on who they buy insurance from?　Who makes those type

6　decisions at the hospital?

7　A.　Well, we -- we were purchasing insurance from Smith-Reagan

8　agency when I went to work for the hospital.　And nobody ever

9　suggested that we should change; so, we just kept renewing it

03:46　10　through the same agency.

11　Q.　And that's a good point -- time to ask about Smith and

12　Reagan.　They've been around there for a long, long time?

13　A.　Yes.

14　Q.　They were always looked upon as being trustworthy and

03:47　15　reliable?

16　A.　Yes.

17　Q.　They've been described in this courtroom as "pillars of the

18　community."　Would you agree with all that?

19　A.　Yes, sir, I would.

03:47　20　Q.　They were there when you started in the hospital in 1989,

21　correct?

22　A.　Yes, sir.

23　Q.　And to this day -- or up until recently, they were still

24　the agency, correct?

03:47　25　A.　Yes.　Yes, sir.

03:47 1 Q. Would you ever get involved in selecting or going over

2 proposals for insurance to purchase --

3 A. Yes, sir.

4 Q. -- for the hospital?

03:47 5 A. Yes, sir.

6 Q. And who would you meet with about that?

7 A. I would meet with Mr. Vela and occasionally

8 Mr. Springfield; but usually those discussions, when we

9 discussed proposals, included Mr. Swetnam and/or Mr. Carter

03:47 10 and/or Mr. Smith.

11 Q. And did Mr. Vela or anybody at the hospital ever tell you

12 that they're way out of the market in their pricing?

13 A. No, sir.

14 Q. You wouldn't have paid it if you thought that was true?

03:48 15 A. Absolutely true.

16 Q. Would they be in the policy of getting quotes and proposals

17 back then? Or at some point during your tenure?

18 A. Well, we were talking earlier today about bringing in a

19 consultant a couple of times. I think that's what they were

03:48 20 for.

21 Q. And you would discuss the renewal programs with Manny and

22 some of the other people at the hospital?

23 A. Yes, sir.

24 Q. But, basically, it wasn't your decision on who to hire?

03:48 25 A. No, sir.

03:48 1   Q.  Do you know or are you aware -- because you've been in the

2   industry for a long time now --

3   A.  Uh-huh.

4   Q.  -- of any caps on commissions that legally cannot be

03:48 5   charged?

6   A.  I'm not familiar with the insurance laws.

7   Q.  You don't have any information that shows 10 percent is the

8   most you can ever charge for one particular policy?

9   A.  No, I don't know.

03:48 10   Q.  You had your own licenses still, insurance licenses, at

11   this point?

12   A.  My adjuster's license?

13   Q.  Yeah, or any type of insurance related licenses.

14   A.  No, sir.  That's just the -- only that one.

03:49 15   Q.  You're familiar with the surplus line insurance?

16   A.  I don't really know a definition for it.

17   Q.  I'll just pass on that, then.

18   A.  Okay.

19   Q.  How about your relationship with Smith and Reagan?  I guess

03:49 20   my point is I think in your deposition you said that your

21   primary contact, your number one contact was Mr. Swetnam.  Was

22   that correct?

23   A.  That's right.

24   Q.  And I think you said on -- sometimes Mr. Smith would be

03:49 25   involved.  Is that correct?

03:49  1    A.  Yes, sir.

2    Q.  And I think with Mr. Carter you used the word on -- "very

3    rarely or occasionally I would see Mr. Carter"?

4    A.  Yes.

03:49  5    Q.  Okay.  Is that true?

6    A.  Yes, sir.  I saw Mr. Carter quite a -- quite often, but we

7    didn't ever have any in-depth insurance discussions.  Most of

8    my technical discussions were with Mr. Swetnam.

9            THE COURT:  When you saw him, that was at the

03:49  10   hospital?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  You didn't have a social relationship with

13   him?

14           THE WITNESS:  None.

03:50  15   BY MR. CYGANIEWICZ:

16   Q.  I think it was you or someone said that he would stick his

17   head in and say hello.  Was that pretty much how that

18   relationship was?

19   A.  Exactly.

03:50  20   Q.  Mr. Swetnam was your number one contact with that agency?

21   A.  Yes, sir.

22   Q.  Mr. Carter, did he ever negotiate premiums with you or

23   discuss --

24   A.  No, sir.

03:50  25   Q.  But he would be -- I guess for lack of -- the delivery man?

03:50  1   On some of these papers, would he hand deliver you that binder?

2   A.   Yeah, some.

3   Q.   Okay.   And when I say "binder," we're talking about a

4   three-ring booklet, correct?

03:50  5   A.   Yes, sir.

6   Q.   Because a binder has also been used in this one page, which

7   is like a commitment for insurance?

8   A.   That's right.   Two different things.

9   Q.   So, Brent would hand you a package, basically,

03:50  10  occasionally?

11  A.   Occasionally.

12  Q.   Was that rare?

13  A.   Not rare.   We had a lot of correspondence going back and

14  forth; and he just delivered things, endorsements and that kind

03:50  15  of thing, invoices --

16  Q.   He was a delivery man?

17  A.   Occasionally, yeah, and -- from time to time.

18  Q.   But never negotiated premiums or talked in detail with you

19  about the policies or so forth?

03:51  20  A.   Never.

21  Q.   You knew Mr. Swetnam, I think you said, back from 1985.   Is

22  that correct?

23  A.   Something like that.

24  Q.   He worked with you at Trinity?

03:51  25  A.   No.

03:51 | 1
Q.   No.   He would file claims with you through Trinity or

2
something like that?

3
A.   Yes.

4
Q.   Okay.   And is he the one who suggested that -- to the

03:51 | 5
hospital that they hire you?

6
A.   Yes.

7
Q.   And when did you first meet Mr. Carter?

8
A.   I think about 19 -- about 2005, I believe.

9
Q.   You never knew him before that time?

03:51 | 10
A.   No, sir.

11
Q.   Do you know what his position was at Smith and Reagan?

12
A.   No, sir.

13
Q.   He wasn't an owner, was he?

14
A.   I don't know.

03:52 | 15
Q.   Are you familiar at all with the current insurance

16
situation at the hospital?

17
A.   Today?

18
Q.   Yes.

19
A.   No, sir.

03:52 | 20
Q.   Are you familiar with Lorraine Lewis?

21
A.   Oh, yes.

22
Q.   Is she -- what company is she with?

23
A.   Alliant.

24
Q.   Would it be fair to say -- I think you may have agreed with

03:52 | 25
this in the depo -- that she's the one who actually brought

03:52    1  forth these allegations that led to the lawsuit?  Is that true

         2  or not?

         3  A.   I believe she discovered some discrepancies.

         4  Q.   And at the time, she was a consultant?

03:52    5  A.   She was their agent.

         6  Q.   Okay.  So, she was first hired as a consultant; but ended

         7  up getting the hospital business.  Is that correct?

         8  A.   That's correct.

         9  Q.   And does she still have that business?

03:52   10  A.   As far as I know.

        11  Q.   Do you know how much, in millions of dollars, that she is

        12  making?

        13  A.   I can't recall.

        14  Q.   Were you ever told that she was sued for falsely accusing

03:52   15  someone of a crime?

        16  A.   That she was?

        17  Q.   Yeah.

        18  A.   No.

        19  Q.   She never told you that?

03:53   20  A.   No.

        21  Q.   And you don't know how much money she's making, what type

        22  of contract she has with the hospital currently?

        23  A.   No, I don't.

        24       THE COURT:  He said he doesn't know.

03:53   25  BY MR. CYGANIEWICZ:

03:53 1   Q.  Do you know the status of any claim from Hurricane Dolly

2   and what's going on with that claim at the hospital now?

3   A.  Damage to the hospital?

4   Q.  Yeah.  Did they file a claim for damage from Hurricane

03:53 5   Dolly's?

6   A.  Yes, sir, they did.

7   Q.  Okay.  Is that still pending?

8   A.  I don't know.

9   Q.  You don't know much about that claim at all?

03:53 10   A.  I don't know.  I think it was -- I think it ran 25 or 30

11   million dollars, but I'm just -- I can't give you an exact --

12   Q.  We heard a figure discussed in court about it was a seven

13   million-dollar deductible.  Is that --

14   A.  Yeah, I think that's correct.

03:53 15   Q.  Do you know how much money she's made on that policy?

16   A.  No, I don't.

17   Q.  Do you know if there's any type of litigation involved now

18   on that policy?

19   A.  No, I don't.

03:53 20   Q.  Or that claim?

21   A.  I don't know.

22   Q.  Your duties, then, with risk management -- I'm not trying

23   to simplify it, because, you know, you know a lot about

24   insurance.  You're still handling claims.  But you would

03:54 25   basically approve invoices and pay checks?

03:54　1　A.　That's about it.

2　Q.　You reviewed the checks that were involved in this case,

3　that I think Mr. Costa discussed with you?

4　A.　Yeah, the ones that he showed me.

03:54　5　Q.　And those checks involve four different policies: two

6　Zurich, two what I'll say windstorm policies?

7　A.　Yes, sir, I think.

8　Q.　Did Mr. Carter ever mail you an invoice?

9　A.　(No response).

03:54　10　Q.　I'm not talking about Swetnam or Swetnam Insurance.　I'm

11　talking about Mr. Brent Carter.　Did he ever send any invoices

12　to you?

13　A.　I never received any invoices with his name on them.

14　Q.　Okay.　That's my question.　Did you ever send him any

03:54　15　checks with his name on them?

16　A.　No, sir.

17　Q.　Who sent the invoices to you regarding these four policies?

18　A.　Swetnam.

19　Q.　Who did you send the checks to?

03:55　20　A.　Swetnam.

21　Q.　Do you have any idea what happened to those checks --

22　A.　No, sir.

23　Q.　-- afterwards?

24　　　　　Did Mr. Carter ever make you issue a check from

03:55　25　Valley Baptist?

03:55  1    A.  No, sir.

2    Q.  Did he ever cause you to issue a check from Valley Baptist?

3    A.  No, sir.

4    Q.  The next brief area is just the Mexico meeting.  You know

03:55  5    now that there's nothing unusual about going to Mexico on a --

6    to talk about a non-admitted captive situation?

7    A.  Well, I thought it sounded a little strange back at the

8    time.

9    Q.  Right.

03:55  10   A.  But I asked Mr. Swetnam if it was kosher, if it was legal

11   to do that; and he said it was.  So --

12         THE COURT:  I guess the question is do you have a

13   different understanding now.  Do you have -- I mean, do you

14   have a different understanding about --

03:55  15         THE WITNESS:  No.  Same understanding.

16         THE COURT:  Okay.  All right.

17   BY MR. CYGANIEWICZ:

18   Q.  Who contacted you to set up that meeting?

19   A.  Mike.

03:56  20   Q.  And was that through a phone call?

21   A.  Yes.

22   Q.  Did Mr. Carter ever call you about the meeting in Mexico?

23   A.  No, sir.

24   Q.  And when you went to Mexico, who handed you the papers?

03:56  25   A.  Mike.

03:56  1    Q.  Did Mr. Carter handed you anything?

      2    A.  No, sir.

      3    Q.  Did he discuss anything with you about insurance?

      4    A.  No, sir.

03:56  5    Q.  As a matter of fact, I think you've basically said that it

      6    was more of a social dinner than --

      7    A.  That's all it was.

      8    Q.  There was no discussion about insurance?

      9    A.  None.

03:56  10   Q.  Definitely not from Mr. Carter?

      11   A.  No, sir.

      12        THE COURT:  If you could wind up your questions.  If

      13   not, on this specific subject -- I mean, if not on the whole --

      14   on the witness in its entirety, then on this subject.

03:56  15        You-all still need to go at 4:00?

      16        THE JURORS:  (Indicating).

      17        THE COURT:  Yeah.

      18        MR. CYGANIEWICZ:  I can try to get done in five

      19   minutes, your Honor.

03:56  20        THE COURT:  Okay.  Let's just --

      21        MR. CYGANIEWICZ:  Let me --

      22   BY MR. CYGANIEWICZ:

      23   Q.  Do you know who prepared those documents that were handed

      24   to you in Mexico?

03:56  25   A.  I don't know.

03:57  1    Q.  Was it true that Mr. Smith was supposed to attend that

       2    meeting in Mexico?

       3    A.  I don't --

       4    Q.  You didn't know anything about that?

03:57  5    A.  I don't know.

       6    Q.  Did you ever talk to Mr. Smith about the meeting in Mexico?

       7    A.  I don't remember ever talking to him.

       8    Q.  Did -- when you left that meeting, did you talk to

       9    Mr. Smith about that particular policy on windstorm?

03:57 10    A.  I don't think so.

      11    Q.  So, there was no major discussion about insurance at that

      12    entire meeting?

      13    A.  None.

      14    Q.  And, of course, you talked about the civil suit and you

03:57 15    were deposed, correct?

      16    A.  Yes, sir.

      17    Q.  Smith and Reagan were not sued?

      18    A.  No.

      19    Q.  So, in conclusion, Mr. Cook, let me ask you, Mr. Carter

03:57 20    never mailed you anything and you never mailed anything to him,

      21    correct?

      22          THE COURT:  I think he's testified to that.

      23    A.  No, sir.

      24          THE COURT:  He's testified that he has not.

03:58 25    BY MR. CYGANIEWICZ:

03:58  1    Q.  Did you ever wire any money to Mr. Clark or back and forth?

       2    A.  No, sir.

       3            THE COURT:  "Mr. Clark"?

       4            MR. CYGANIEWICZ:  I'm sorry.  Mr. Carter.

03:58  5    A.  I didn't, to Clark nor Carter.

       6            MR. CYGANIEWICZ:  I just feel like I'm being rushed,

       7    your Honor.  I'm sorry.

       8    BY MR. CYGANIEWICZ:

       9    Q.  Do you know of -- do you have any evidence that Mr. Carter

03:58 10    changed any premium amounts?

      11    A.  No, sir.

      12    Q.  Altered any documents?

      13    A.  No, sir.

      14    Q.  Signed somebody's name?

03:58 15    A.  No, sir.

      16    Q.  Do you know if he even knew that the hurricane policies

      17    were not in effect?

      18    A.  No, sir.

      19            MR. CYGANIEWICZ:  That's all I have, your Honor.

03:58 20            THE COURT:  Okay.  I really hate to keep this witness

      21    over another day, but I don't think I have a choice.

      22            MR. CLARK:  I can make it surgical and see where we're

      23    at.

      24            THE COURT:  Well, there will probably be redirect.

03:58 25    I'm committed to these good people to turn them loose at 4:00.

03:58  1          MR. CLARK:  Sorry, Judge.

2          THE COURT:  I want to keep faith with all of you.

3   You've done so much for us.  I hope you planned your lunch, and

4   I hope you're finding each other good company.

03:59  5          We know this is hard, but this -- jury duty is

6   classically, classically an instance of short-term pain for

7   long-term gain.  It really is.

8          With our thanks, could everyone please rise?

9      *(Jury not present)*

03:59  10         THE COURT:  You may step down, sir.

11         We need to talk briefly about our timetable.  I'm

12  getting increasingly apprehensive about our ability to finish

13  by Friday.

14         How many more witnesses do you have?

04:00  15         MR. COSTA:  Mr. Cook, depending on Mr. Clark's cross,

16  will be done -- you know, Mr. Clark's cross in the morning --

17  and then we have two more witnesses, who should not be long.

18  We have someone from Landmark Insurance, who is going to be

19  very quick and say that that policy didn't re-insure the --

04:00  20         THE COURT:  Yeah, yeah.

21         MR. COSTA:  And then we have the individual from

22  Zurich.  He might be a little bit longer, but I don't think --

23  I'm hopeful we can --

24         THE COURT:  Then you'll rest?

04:00  25         MR. COSTA:  -- finish around lunch.

04:00    1          THE COURT:  Then you'll rest?

         2          MR. McCONNELL:  Then we'll rest, your Honor.

         3          THE COURT:  I know I can't hold you to this.  You

         4    don't know if you're going to call your own clients or not.

04:00    5    But do you have any idea, other than your own clients, how much

         6    testimony you're going to put on?

         7          MR. CHANEY:  Other than Mr. Carter, we have the

         8    possibility of one expert.  I can't imagine he would be more

         9    than an hour or two for everyone.

04:01   10              And, then, we've listed Mr. Hanslik; but we're

        11    not sure if we're going to call him at this point in time, your

        12    Honor.  So, our total time, I'm going to say, is a half day.

        13          THE COURT:  Oh, really?  Okay.  Well --

        14          MR. CLARK:  I think that sounds about right.  We've

04:01   15    got under subpoena Mr. Springfield, Mr. Eastham and

        16    Mr. Lieberenz.

        17          THE COURT:  Who is the last one?

        18          MR. CLARK:  The last one is another officer at the

        19    hospital.

04:01   20          THE COURT:  Oh, okay.

        21          MR. CLARK:  I don't believe we would call all three.

        22    Probably two of the three.  And I would imagine quite similar

        23    to what Mr. Chaney has represented.

        24          THE COURT:  Okay.  Well, if everybody is correct, that

04:01   25    means we finish by midday on Wednesday.

04:01    1         MR. CLARK: I think that's probably realistic.

2         THE COURT: Okay. All right. All right.

3         MR. COSTA: You're not calling your expert?

4         MR. CLARK: Well, I think that -- in all candor, it

04:01    5 may be redundant. So --

6         MR. COSTA: Based on their expert?

7         MR. CLARK: Based on their expert, we may just go

8 with --

9         MR. McCONNELL: Who is the expert they're calling? Is

04:01   10 it Mr. Beck?

11         MR. CLARK: Mr. Beck.

12         And we've been getting communication from the

13 clerk about the jury instructions. I think we're pretty close

14 on that. I think that there will be an issue that we're going

04:02   15 to raise about ambiguity with the Landmark policy. And, so, I

16 may put together an ambiguity instruction, your Honor, for

17 consideration.

18         THE COURT: Okay. If we do finish by Wednesday, my

19 normal practice, I stay as late as the jury wants to stay. But

04:02   20 Wednesday is an exception. I've got a speaking engagement I

21 committed to nine months ago, and I have got to go do that.

22 So, we can't stay late on Wednesday; but we'll stay late any

23 other night.

24         Normally I -- the way it works in our court is I

04:02   25 charge and then you guys argue. The default procedure in the

04:02  1  pattern jury instructions is you argue and then I charge.  You
       2  guys -- have you discussed that?  Do you have any consensus on
       3  that?
       4          MR. CLARK:  My preference?
04:02  5          MR. COSTA:  I prefer the charge first.
       6          MR. CLARK:  That's my preference.
       7          MR. McCONNELL:  I prefer the charge first.
       8          MR. CHANEY:  I think your way.  I like that way better
       9  than the default.
04:03 10          THE COURT:  The useful thing about it is I make a
      11  practice of giving copies of the instructions to the jurors.
      12  So, the lawyers can stand up and say, "As the instructions note
      13  on Page 3, 'beyond a reasonable doubt' means" -- whatever.
      14          MR. CLARK:  Fine.
04:03 15          THE COURT:  All right.  Thank you very much.  See you
      16  at 8:00.
      17          MR. CLARK:  Thank you.
      18          MR. COSTA:  Your Honor, we do have -- you said you
      19  would take up at the end of the day the matter with
04:03 20  Mr. Hanslik's subpoena.
      21          THE COURT:  Yeah.
      22          MR. COSTA:  He is -- I think he's right outside.  He
      23  didn't want to come in because of the rule.
      24          THE COURT:  Yes, Mr. Hanslik, if you would approach.
04:03 25          Okay.  The subpoena came from which defendant?

04:03  1          MR. CHANEY:  From Mr. Carter, your Honor.

2          THE COURT:  Okay.  And what are you hoping to prove

3    through his documents, then?

4          MR. CHANEY:  We wanted to see the e-mail traffic

04:03  5    between Mr. Hanslik and his firm and the government.  And

6    it's -- I mean, we served a subpoena on him.  It's clearly not

7    privileged.

8          THE COURT:  It's not privileged; but it's also not

9    Jencks, right?

04:04  10          MR. CHANEY:  I -- not having seen it, I don't know.  I

11    mean --

12          THE COURT:  Well, Jencks --

13          MR. COSTA:  We're not calling him.

14          THE COURT:  Yeah.  Jencks is something -- a statement

04:04  15    by a witness, and he's not going to be a witness for the

16    government.  So then the question is whether it's Brady or

17    Giglio.

18          Normally there has to be some showing that would

19    indicate there is a Brady or Giglio violation.  I don't -- all

04:04  20    we have here is what seems to be the irregularities in those

21    e-mails.

22          MR. CHANEY:  Government's witness said they were

23    transmitted, many of them, to him by Mr. Hanslik.  And, so, it

24    could very well be --

04:04  25          THE COURT:  I understand the documentary chain.  I'm

04:04  1      just trying to -- you know, my job is to see what category it

2  comes under, because we don't have wide-ranging discovery on

3  the criminal side the way we do on the civil.

4          MR. COSTA:  Your Honor, on the e-mails -- and

04:05  5  Mr. Hanslik -- they have the same production from Smith-Reagan.

6  They can check if they have something different, but they have

7  the same thing that Smith-Reagan produced.

8          THE COURT:  Well, I thought their concern was they had

9  something directly from Mr. Hanslik that --

04:05  10          MR. COSTA:  No.  We just passed along what

11  Smith-Reagan gave us.  It's really a non-issue.  Smith-Reagan

12  produced e-mails to Mr. Hanslik.  They have the same

13  Smith-Reagan production -- if there is an issue -- I don't

14  think there is -- with alterations.  It happened in

04:05  15  Smith-Reagan giving them to both -- I mean, they have the same

16  thing Mr. Hanslik has.

17          THE COURT:  So, any alterations are prior to

18  Mr. Hanslik coming into possession of them?

19          MR. COSTA:  Correct.  They should have whatever

04:05  20  Smith-Reagan produced.  I mean, if they don't -- we turned it

21  over.  Smith-Reagan, in the civil case, should have turned it

22  over.  I mean, Hanslik didn't give us anything from

23  Smith-Reagan that they don't have.

24          MR. HANSLIK:  If I might add, your Honor, what I

04:05  25  received from Smith-Reagan's attorneys were PDF copies of

04:05  1  e-mails that Mr. Swetnam's civil lawyer also received.  I gave
       2  over PDF's.  I didn't have some electronic version that I was
       3  able to manipulate or alter.  It was a PDF of a document.  I
       4  hit the print button, and that's -- I mean, that's it.

04:06  5          THE COURT:  You sent them hard copies or you sent them
       6  PDF?

       7          MR. HANSLIK:  I don't know if I sent a PDF or a hard
       8  copy, to be honest with you.  I don't know.  But it certainly
       9  wasn't --

04:06 10          THE COURT:  But it was whatever you got.

      11          MR. HANSLIK:  Whatever I got from Smith-Reagan, as I
      12  got it, they got it.  "They" being the government and "they"
      13  being Mr. Swetnam's civil attorney.

      14          THE COURT:  And would -- likewise, Mr. Carter's, too?

04:06 15          MR. HANSLIK:  Mr. Carter was not in the case at the
      16  time.  My understanding was that Mr. Swetnam's civil lawyer
      17  gave him access to all of the discovery, including deposition
      18  transcripts, because they were codefendants, once he was added.

      19          MR. CHANEY:  Mr. Carter doesn't have an attorney in
04:06 20  the civil case.  He's pro se.

      21              And now what we've learned from Mr. Vela is there
      22  was some -- what he said the other day was there was some
      23  discussion among -- between the hospital and Smith-Reagan's
      24  attorney, before the lawsuit, and some negotiation and
04:07 25  agreement to pay money and then the Smith-Reagan lawyer gives

04:07 1 documents to Mr. Hanslik.

2 I'm, frankly, not accusing Mr. Hanslik of

3 altering any documents. I just think that the e-mails back and

4 forth might give -- might shed some light on the -- on what

04:07 5 exactly was shared by the Smith-Reagan lawyers during the time

6 when they're apparently negotiating a settlement and coming up

7 with documents.

8 MR. HANSLIK: Let me be clear on the timeline. There

9 was no communication with any lawyer for Smith-Reagan until

04:07 10 after our lawsuit against Mr. Swetnam was filed.

11 Let me continue.

12 Mr. Swetnam's lawyer in the civil case served a

13 deposition on written question, under the State civil rules of

14 procedure, to Smith-Reagan. That's what prompted their

04:08 15 discovery. He beat me to it. Mr. Swetnam's lawyers beat me to

16 the punch to get Smith-Reagan's documents in discovery. And it

17 was in response to that deposition on written questions, where

18 Mr. Swetnam's lawyer and I believe Smith-Reagan's lawyer worked

19 out an agreement as to what would be produced, that we got

04:08 20 these documents.

21 THE COURT: I mean, so, are you saying you don't have

22 any documents that predate -- well, any documents that are post

23 the relevant time frame but pre-lawsuit, between -- between

24 Smith-Reagan and the government?

04:08 25 MR. HANSLIK: I --

04:08  1           THE COURT:  I mean, there's been production of

2      documents as to when the alleged misconduct was going on.

3           MR. HANSLIK:  Correct.

4           THE COURT:  But I think what Mr. Carter's attorneys

04:09  5      are asking for is whether there were documents after that

6      period but before a lawsuit was filed.

7                Is that it?

8           MR. CHANEY:  Your Honor, what we're trying to get is

9      traffic between this witness, e-mail traffic, and his firm and

04:09 10      the government.

11           THE COURT:  And I'm just trying to -- okay.  And the

12      government.

13                I'm trying to decide whether that's an empty

14      universe.  I don't know.

04:09 15                I mean, is there e-mail traffic between you and

16      the government?

17           MR. HANSLIK:  Yes.  There would be e-mails between

18      Mr. Costa and myself at some point.

19           THE COURT:  Were they more than transmittal?

04:09 20           MR. COSTA:  That's what I've already turned over after

21      lunch.

22           THE COURT:  Those are the ones you turned over?

23           MR. COSTA:  I turned over -- those are the

24      pre-indictment ones that I could find during the lunch break:

04:09 25      three.

04:09  1          But now he's going away from the e-mail issue.  I
       2  mean, he wants -- the government has no problem -- I think it's
       3  already been produced; but if Mr. Hanslik wants to turn over
       4  all the e-mails that he got in the civil case, from the
04:09  5  Smith-Reagan agency, in that Adobe file, I mean, Mr. --
       6          THE COURT:  But you're saying that's already been
       7  produced.  But you said --
       8          MR. COSTA:  Mr. Swetnam certainly already has them.
       9  Mr. Swetnam -- but I don't have any problem with that, one
04:10 10  Adobe being turned -- I mean, if that's the issue, Mr. Hanslik
      11  somehow -- from when they got from Smith-Reagan to Hanslik to
      12  us there was an alteration --
      13          THE COURT:  No.  I think he's now saying he didn't get
      14  what Mr. Swetnam got.
04:10 15          Is that the problem?
      16          MR. CHANEY:  No, I'm not saying that, your Honor.  I'm
      17  not saying that Mr. Carter didn't get it, and I'm not saying
      18  that the government didn't give us these mysterious e-mails
      19  that have big chunks out of them.
04:10 20          What I would like to see is the e-mail traffic
      21  that was sent from Mr. Hanslik or his law firm --
      22          THE COURT:  To the government.
      23          MR. CHANEY:  -- to the government, that would --
      24          THE COURT:  Well, Mr. Costa is saying he gave you that
04:10 25  as to the period pre-indictment.

04:10  1        MR. CHANEY:  But my subpoena doesn't just limit it to

    2  pre-indictment.  My subpoena --

    3        THE COURT:  Well, then, post-indictment it gets a lot

    4  trickier.  I mean, we're talking about work-product then, I

04:10  5  think.

    6        MR. COSTA:  Your Honor, what they're really trying to

    7  do is -- like I said earlier, I e-mailed Mr. Hanslik and said,

    8  "What do you know about their experts," since they were noticed

    9  in the civil case.  They're trying to get free discovery, but

04:11  10  it just doesn't have any relevance or -- as you said, it's not

    11  Jencks.  I just don't see -- I mean, that's not Brady, what --

    12  those discussions.  It's --

    13        MR. CHANEY:  At the very least, your Honor, since

    14  we've served a subpoena on -- I guess this is, in essence, a

04:11  15  motion to quash the subpoena that we served on Mr. Hanslik --

    16        THE COURT:  I think it is, yeah.

    17        MR. CHANEY:  -- which I -- I would suggest that he at

    18  least be ordered to provide the e-mails that are between he and

    19  his firm and the government, to you for an in camera inspection

04:11  20  so that, if nothing else, now --

    21        THE COURT:  How large a universe is that?  Are we

    22  talking about dozens of documents or five or --

    23        MR. HANSLIK:  Your Honor, I don't know.  I wouldn't

    24  think it would be, in all candor, too voluminous.  I haven't

04:11  25  looked.  I got this --

04:11    1        THE COURT:  Under what theory would you be entitled to

         2   those?

         3        MR. CHANEY:  To see how these -- these e-mails that

         4   have these issues, to see the manner in which they're

04:11    5   transmitted --

         6        THE COURT:  No.  But I'm just trying to understand

         7   what -- under what category these fall.  I mean, they're --

         8        MR. COSTA:  Well, the government doesn't have any

         9   problem -- if he wants -- if all he wants from Mr. Hanslik is

04:12   10   all the e-mails in which he discussed or related those -- the

        11   e-mails that are at issue, I mean, I don't have an issue with

        12   that.  It's probably one e-mail with an Adobe file attached.

        13        My concern is these other e-mails that may talk

        14   about litigation strategy and issues with their experts.  We

04:12   15   have given him the same Adobe that Mr. Hanslik gave us.  I

        16   mean, I just -- I mean, they have them.  I mean, I'm happy to

        17   turn it over again.  I just don't -- there is no issue --

        18        THE COURT:  No, that's not what he's asking.  That's

        19   not what he's asking for.

04:12   20        MR. COSTA:  There's really no issue here.  I can't

        21   tell if he wants -- if it's related to those e-mails from his

        22   clients -- he goes -- it's back and forth between that, which

        23   they have the same universe we got from Smith-Reagan through

        24   Mr. Hanslik --

04:12   25        THE COURT:  I understand that point.

04:12  1          MR. COSTA:  -- or if he wants everything.  I'm just

       2    not clear.

       3          THE COURT:  I think he's asking for what the nature of

       4    the communication was, post-indictment, which is between the

04:13  5    Boyer Miller firm and your office.  I think that's what is

       6    being sought.  But I just don't know under what theory that's

       7    producible.

       8          I mean, I really -- I'm just unwilling to accept

       9    the proposition that either the Boyer Miller firm or the US

04:13  10   Attorney for the Southern District altered documents.  I just

       11   think there's absolutely no suggestion of that.

       12         MR. CHANEY:  Right.  That's true, your Honor.

       13         THE COURT:  And, then, under what other theory would

       14   we produce these documents, then?

04:13  15         I mean, I need a rule book.  What -- why would I

       16   order that production?  I mean, what basis is there for

       17   ordering it?

       18         MR. CHANEY:  There may be, your Honor, in the

       19   transmittal of the -- of some of the documents, there might

04:13  20   be -- and I'm -- I agree with what you just said, Judge,

       21   that -- I'm not suggesting the United States Attorney's Office

       22   has altered any of these e-mails --

       23         THE COURT:  I didn't think you were.

       24         MR. CHANEY:  -- and neither am I suggesting it about

04:13  25   Mr. Hanslik or Boyer & Miller.

04:14   1          But there might be, for all I know, comments in

        2   some of these e-mails about why the -- the e-mails between the

        3   Boyer Miller firm and the government -- about why there are

        4   these other e-mails that the government has offered into

04:14   5   evidence.

        6          THE COURT:  And you think that's Brady material, then?

        7          MR. CHANEY:  I think that could be, yes.

        8          MR. COSTA:  I'll represent, if there are any e-mails

        9   of that nature, they will be disclosed by tomorrow.  I'm

04:14  10   thinking now there are absolutely none.

       11          But, you know, the other -- one thing about

       12   this -- and I understand that Mr. Carter does not -- he doesn't

       13   have to testify, but they have him as a resource.  I mean, he

       14   would know if there's e-mails missing better than any of us

04:14  15   would.  And I haven't heard anything from the attorneys --

       16          THE COURT:  You said "Mr. Carter" would.

       17          MR. COSTA:  Mr. Carter would.  I mean, he --

       18          MR. CHANEY:  The problem, your Honor, is Mr. Carter,

       19   when he left -- as we heard evidence that he left in the very

04:14  20   end of '07, first part of '08 -- he left his laptop with

       21   Smith-Reagan.  So, what happened is --

       22          THE COURT:  He doesn't have that institutional memory

       23   now.

       24          MR. CHANEY:  He has some memory, but he doesn't

04:15  25   have --

04:15    1              THE COURT:  But the -- I should have said the computer

         2    memory.

         3              MR. CHANEY:  Exactly, yes.  He does not have -- and

         4    that's why it's so important that no one --

04:15    5              THE COURT:  Well, I think Mr. Costa's offer is a

         6    grounds for proceeding.  Anything that speaks to alteration of

         7    documents, deletion of documents should be produced.

         8              MR. COSTA:  I'll -- I have no problem with that.

         9              THE COURT:  Okay.

04:15   10              MR. HANSLIK:  What am I supposed to do?

        11              THE COURT:  Thank you, gentlemen.  Thank you.

        12         *(Proceedings recessed for evening)*
                                     *  *  *  *  *

        13

        14                  COURT REPORTER'S CERTIFICATION

        15         I certify that the foregoing is a correct transcript from

        16            the record of proceedings in the above-entitled cause.

        17

        18    Date:   June 8, 2010

        19

        20                          /s/   Cheryll K. Barron

        21                          Cheryll K. Barron, CSR, CMR, FCRR
                                    Official Court Reporter

        22

        23

        24

        25