1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF TEXAS
2         HOUSTON DIVISION

3  UNITED STATES OF AMERICA    .
                               . H-09-CR-336
4        vs.                   . HOUSTON, TEXAS
                               . APRIL 27, 2010
5                              . 8:05 A.M.
   BRENT A. CARTER and         .
6  MICHAEL N. SWETNAM, JR.     .
   . . . . . . . . . . . . . . .
7

8              TRANSCRIPT OF JURY TRIAL
       BEFORE THE HONORABLE KEITH P. ELLISON
9          UNITED STATES DISTRICT JUDGE

10       TESTIMONY OF WARD COOK, VOL. 2 OF 2
           EXCERPTED FROM TRIAL DAY 6 OF 9
11

12  A P P E A R A N C E S:

13  FOR THE GOVERNMENT:

14       Gregg Costa
         Ryan McConnell
15       Assistant US Attorney
         PO Box 61129
16       Houston, Texas  77208-1129

17  FOR THE DEFENDANT BRENT A. CARTER:

18       Edmund K. Cyganiewicz
         Attorney at Law
19       1000 East Madison Street
         Brownsville, Texas 78520
20
         Norton A. Colvin, Jr.
21       Mitchell Chaney
         Colvin Chaney Saenz & Rodriguez
22       1201 East Van Buren Street
         Brownsville, Texas 78520
23

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
25                         - - - - -

```
 1   A P P E A R A N C E S:  (Continued)

 2   FOR THE DEFENDANT MICHAEL N. SWETNAM, JR.:

 3        Irvin Sheldon Weisfeld
          Attorney at Law
 4        855 East Harrison Street
          Brownsville, Texas 78520
 5
          Michael E. Clark
 6        Duane Morris, LLP
          3200 Southwest Freeway
 7        Suite 3150
          Houston, Texas 77027-7540
 8

 9   OFFICIAL COURT REPORTER:

10        Cheryll K. Barron, CSR, CM, FCRR
          U.S. District Court
11        515 Rusk Street
          Houston, Texas  77002
12
     ALSO PRESENT:
13
          Steve Goehring
14        Matthew Boyden
                              - - - - -
15

16

17

18

19

20

21

22

23

24

25
```

1        INDEX

2                                                    PAGE

3    GOVERNMENT'S WITNESS

4      Cross-Examination by Mr. Clark            4

5      Redirect Examination by Mr. Costa         22

6      Recross-Examination by Mr. Clark          26

7                    - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2       *(Jury present)*

3            THE COURT:  Good morning.  Please be seated.

4                 Welcome back, ladies and gentlemen.  Thank you

08:05   5   for your punctuality.

6                 We're hopeful we may finish the prosecution's

7   case today.  We'll keep marching.

8                 You may proceed.

9            MR. CLARK:  Thank you, your Honor.

08:06   10                Good morning.

11                      **CROSS-EXAMINATION**

12   BY MR. CLARK:

13   Q.  Good morning, Mr. Cook.  How are you?

14   A.  Hi.

08:06   15   Q.  I'm Michael Clark.  I represent Mr. Swetnam.  I'd like to

16   ask you some questions about your testimony if I could, please,

17   sir.

18                 If I'm understanding correctly, you had very

19   little interaction with Mr. Springfield, the CEO of the System.

08:06   20   Is that correct?

21   A.  Did you say "very little"?

22   Q.  "Very little."

23   A.  That would be true.

24   Q.  I believe in your deposition, when questioned about that,

08:06   25   your response was something to the effect that, "I might see

| | | |
|---|---|---|
| 08:06 | 1 | him once a month" or "talk to him once a month"? |
| | 2 | A.  That sounds right. |
| | 3 | Q.  Okay.  Now, prior to -- or before Mr. Springfield took over |
| | 4 | the hospital system, had there been an insurance committee? |
| 08:06 | 5 | A.  Yes, sir. |
| | 6 | Q.  And in light of your position, were you a part of that |
| | 7 | committee, sir? |
| | 8 | A.  Yes, sir. |
| | 9 | Q.  And were you consulted with about the decision to, |
| 08:07 | 10 | effectively, do away with the insurance committee or not? |
| | 11 | A.  No, sir. |
| | 12 | Q.  And among the documents that have been put into evidence |
| | 13 | for this jury are copies of some of the board of directors' |
| | 14 | minutes and minutes of the finance committee for Valley Baptist |
| 08:07 | 15 | Health System.  And I guess my question to you is I don't see |
| | 16 | your name showing up very often, if at all, as participating in |
| | 17 | the board or the finance committee discussions.  Is that the |
| | 18 | case, sir? |
| | 19 | A.  Yes, sir. |
| 08:07 | 20 | Q.  So, just again to make sure that it's clear, am I correct |
| | 21 | in understanding that you really never had an opportunity to |
| | 22 | interface with the finance committee formally, or with the |
| | 23 | board of directors.  Is that correct? |
| | 24 | A.  That's true. |
| 08:07 | 25 | Q.  So, your function and your title was -- you were senior |

08:08  1  vice-president at some point, were you not?

2  A.  Just a VP.

3  Q.  Just a VP.  VP in charge of insurance or just a VP in

4  general?

08:08  5  A.  It was called "resource administration."  It combined the

6  insurance program and all claims against the institution.  I

7  handled all those claims.

8  Q.  Now, the jury heard yesterday that before getting hired by

9  the Valley Baptist Health System that you had been involved in

08:08  10  the insurance industry, you had been an agent or broker.  Is

11  that correct?

12  A.  For one year, back in 1968.

13  Q.  And in addition to that, I'm sure that you would

14  periodically take advantage of continuing education specific to

08:08  15  insurance issues.  Is that correct?

16  A.  Claims.

17  Q.  "Claims"?

18  A.  Uh-huh.

19  Q.  If I understood your deposition testimony correctly, the

08:09  20  subsidiary of the American Hospital Association would

21  periodically have some courses that would be offered that you

22  would from time to time attend, correct?

23  A.  Yes, sir.

24  Q.  Which would be important to do because you want to stay

08:09  25  abreast of the issues in this field.  Is that correct?

08:09  1    A.   That's correct.

    2    Q.   And it's fair to say that this was a reasonably or fairly

    3    sophisticated insurance program that was in place for the

    4    Valley Baptist Health System.  Is that correct?

08:09  5    A.   I would say it was a pretty complex --

    6    Q.   And the Smith-Reagan Agency, as you've already testified,

    7    had had a very long-standing relationship with the System that,

    8    if I understood you correctly, actually preceded your arrival?

    9    A.   Yes, sir.

08:09  10   Q.   And from time to time, I'm assuming, you would interface

    11   with not only Brent Carter or my client, Mr. Swetnam, but you

    12   would also interface with David Smith or his partner Joel

    13   Reagan.  Is that correct, sir?

    14   A.   Yes.

08:10  15   Q.   All right.  How did you feel, I guess, about not being

    16   consulted with by the powers that be at the hospital about

    17   insurance coverage decisions?  Did it give you a sense of

    18   relief or did it give you a sense of frustration or what, sir?

    19   A.   At first I was a little bit frustrated about being taken

08:10  20   out of the loop, but it cut down on the stress.

    21   Q.   So, during the period of 2006 through 2007, which was the

    22   period in controversy here before this jury, would you have had

    23   more face-to-face or telephone-to-telephone discussions with my

    24   client, Mr. Swetnam, with Brent Carter, David Smith or Joel

08:11  25   Reagan?  How would you --

08:11  1   A.   Most of my contact was with Mike Swetnam.

     2   Q.   With Mike Swetnam?

     3   A.   Yes.

     4   Q.   And would these be calls that you or he would initiate or

08:11  5   roughly about 50-50?  How would you ballpark that?

     6   A.   I probably bugged him more than he called me.

     7   Q.   What types of questions would you be asking him about, sir?

     8   A.   Technical questions, insurance contractual questions,

     9   endorsement matters, changes in coverage, just routine

08:11  10  insurance --

     11  Q.   Okay.  Now, didn't there come a time around May of 2007

     12  that you were instructed from high above, Jim Springfield or

     13  perhaps his subordinate Mr. Eastham, not to directly contact

     14  Mr. Swetnam but, instead, to go through Mr. Smith or

08:12  15  Mr. Reagan?

     16  A.   No, sir.

     17  Q.   Okay.  Do you recall, Mr. Cook, if there were any written

     18  contracts -- agency contracts, if you would, broker contracts,

     19  agency contracts between the Valley Baptist Health System and

08:12  20  the Smith-Reagan Agency during that period of time?

     21  A.   I'm not aware of any contracts.

     22  Q.   Okay.  And I assume that would be the same answer to the

     23  question about whether there were any contracts between the

     24  System and Michael Swetnam?

08:12  25  A.   I'm not aware of any contracts.

08:13   1    Q.   That's different, however, later in the progression when

        2    Alliant came in, right?  Alliant, there was actually a written

        3    formalized broker contract with Alliant or some sort of

        4    contract?

08:13   5    A.   I've never been aware of any contract.

        6              MR. CLARK:   Judge, if I might approach the witness for

        7    just a second?

        8              THE COURT:   You may.

        9    BY MR. CLARK:

08:13  10    Q.   Do you recall giving this deposition on October the 15th of

       11    2008, in the civil litigation?

       12    A.   I gave a deposition.  I can't remember the date.

       13    Q.   I'll show it to you.

       14    A.   Okay.

08:13  15    Q.   I'm just trying to orient you to the time.

       16    A.   Okay.

       17    Q.   And at that time you were asked questions by Mr. Swetnam's

       18    civil lawyer Mr. Resendez.  Do you recall that?

       19    A.   Yes, sir.

08:14  20    Q.   And Mr. Hanslik, Chris Hanslik, of Boyer and Miller, I

       21    guess, was acting as representative of the hospital and there

       22    for you to consult with.  Is that correct?

       23    A.   Yes, sir.

       24    Q.   I want to see if I can -- first of all, does that sound

08:14  25    about right, that you were deposed on or about October the 15th

08:14   1   of 2008 --

2   A.  Yes, sir.

3   Q.  -- in that case?

4           Okay.  I'm trying to refresh your memory, quite

08:14   5   frankly.

6   A.  Okay.

7   Q.  To my last question -- and I'll just draw you down -- and

8   read this to yourself starting on Line 20, sir, and go through

9   Line 25.

08:14   10   A.  (Complies).

11   Q.  Let me know when you're finished reading that.

12   A.  Okay.

13   Q.  Going back to my last question, about whether or not there

14   was a contract between the System and Alliant, having now

08:15   15   refreshed your memory, is your answer the same, that you

16   weren't aware of any contract but you thought there might have

17   been?

18   A.  Yeah, that's what I said.  I didn't know.  I'm not sure if

19   there's a contract.  If there was, it probably would have been

08:15   20   with Alliant; but I was not aware of any.

21   Q.  Okay.  That's fair.  I understand, sir.

22           So, with that clarification, although you weren't

23   aware of any contract, if there had been a contract, it would

24   have been with Alliant?

08:15   25   A.  Yes, sir, the most recent --

*Clark Cross of Cook*

08:15  1    Q.  But certainly not -- and you're categorical about it --
       2    certainly not with Michael Swetnam or Swetnam Insurance
       3    Services?
       4    A.  That's correct.
08:15  5    Q.  In your experience, Mr. Cook, as an insurance professional,
       6    basically, and somebody who has been an agent and then helping
       7    to oversee the administration of a fairly complex and
       8    sophisticated insurance coverage, you are aware, are you not,
       9    that an insurance broker or agent does not represent the
08:16 10    client, the client is not -- there's not a fiduciary duty
      11    there.  You understand that, don't you?
      12    A.  I'm not sure what "fiduciary" is.
      13    Q.  Well, I understand.  That's a lawyer word.  I'm sorry.
      14            It's a relationship that imposes duties,
08:16 15    essentially.  Like a lawyer and a client, there is a duty to a
      16    client.
      17            Now, isn't it true that if there is any
      18    relationship it's between the agent and the insurance company
      19    but not between the agent and the customer?
08:16 20    A.  (No response).
      21    Q.  If you know.  If you don't know, just say you don't know.
      22    A.  I really don't -- it sounds okay, but I just don't know.
      23    Q.  You don't know.  And that's a fair answer, and I
      24    understand.
08:17 25            Getting back to how, physically, the various

08:17   1   documents were transmitted -- and by "documents" I mean, you

2   know, the insurance policies in question, the invoices in

3   question and so on and so forth.

4          It is my understanding that you don't really

08:17   5   specifically recall which ones may have been mailed and which

6   ones may have been hand delivered.  I know you've already

7   testified -- let me -- I'm sorry.  That's not a fair question.

8          I know you have said in your testimony that at

9   the dinner in Mexico -- and there was only one dinner in

08:17  10   Mexico -- that actually there were some documents handed to

11   you --

12   A.  Yes, sir.

13   Q.  -- at that dinner.

14          But other than that, do you have any specific

08:17  15   recall whether the -- for example the Zurich documents were

16   hand delivered or not?

17   A.  Well, you know, there were hundreds of documents --

18   Q.  I understand.

19   A.  -- back and forth every year.

08:18  20   Q.  I understand.

21   A.  That's been four years.

22   Q.  I understand.

23   A.  What I said in my deposition probably was more accurate

24   than what I can remember today.

08:18  25   Q.  That's human nature.  Being asked about a question that's

08:18　　1 closer in time, most people will remember things two years

　　　　2 after the event as opposed to four years after the event.

　　　　3 A.　Yes, sir.

　　　　4 Q.　And, generally, in your deposition -- if I -- again, if I

08:18　　5 paraphrase it incorrectly, please correct me.　But in your

　　　　6 deposition didn't you testify that you don't have a -- really a

　　　　7 specific recall of all these documents, whether they were

　　　　8 mailed or hand delivered, other than the one in Mexico we

　　　　9 talked about?

08:19　 10 A.　I believe that the first Zurich policy -- or invoice was

　　　 11 mailed, because I remember mailing a check to Mike.

　　　 12 Q.　Okay.　That would have been the 2006?

　　　 13 A.　Yes, sir.

　　　 14 Q.　Okay.　Now, the other line of question I want to ask you

08:19　15 about has to go to your signing -- and I think you testified on

　　　 16 this issue on direct -- your signing these various policies, if

　　　 17 you would, as Mike Swetnam.

　　　 18 A.　No, they weren't policies.

　　　 19 Q.　Binders?　What is the term?

08:19　20 A.　They were just simply endorsements --

　　　 21 Q.　Endorsements.

　　　 22 A.　-- onto the self-insurance plan, to add physicians.

　　　 23 Q.　Endorsements.　Okay.

　　　 24 　　　　And how long, Mr. Cook, had this been going on --

08:20　25 let me rephrase it.

08:20    1        Before this written document that you suggested

2   be created to memorialize your oral agreement with Mr. Swetnam

3   to do this, it's true, is it not, that this process had been

4   going on for several months, if not years?

08:20    5   A. Wasn't years, but maybe several weeks or months. And all

6   with his permission.

7   Q. And it would have been, at a minimum, seven or eight

8   months, at a minimum?

9   A. I can't remember.

08:20   10        MR. CLARK: May I approach, your Honor?

11        THE COURT: You may.

12   BY MR. CLARK:

13   Q. See if I can refresh your recollection. In evidence is

14   Exhibit Number 36, Mr. Cook. And I'll represent to you that

08:21   15   these may be documents that -- this is your signature, I

16   believe. And if you look at the -- at the date, is there not

17   at least five or six of them that go back to January of 2006,

18   sir?

19   A. Yes, sir. First two or three go back to January.

08:21   20   Q. Okay. Just going back to my question --

21   A. Yes, sir.

22   Q. -- it's fair to say, is it not, that at least seven months

23   before that written authorization was prepared and signed,

24   that -- that this agreement to allow you to sign as though you

08:21   25   were Mike Swetnam had been going on?

*Clark Cross of Cook*

08:21   1   A.  Yes.

     2   Q.  That's fair, isn't it?

     3   A.  Yes.

     4   Q.  You didn't see anything wrong with doing that, did you?

08:22   5   A.  No.  Actually, I could have signed those -- I could have

     6   signed my name on them.  But I thought that the physicians

     7   would probably be more impressed if the insurance agent signed

     8   them than me.

     9   Q.  All right.  Again, I understand.  And there was no intent

08:22  10   to deceive anybody, was there?

    11   A.  Not on my part.

    12   Q.  Well, that's kind of a pregnant answer, if you don't mind.

    13   Did you divine that there was some sinister reason for Michael

    14   Swetnam having you sign them on his part?

08:22  15   A.  Oh, absolutely not.

    16   Q.  Okay.  Okay.

    17        MR. CLARK:  Can I switch over here?

    18             Thank you.

    19   BY MR. CLARK:

08:22  20   Q.  The miracles of modern technology.  They call this an

    21   "Elmo."  I don't think it has to do with the big bird or

    22   anything like that, but it's a neat tool.

    23             Mr. Cook, what I would like to draw your

    24   attention to -- and, again, this is just a question.  There

08:23  25   really is no notation that would indicate to another reader

08:23  1  that you are signing by permission.  It just shows "Michael

2  Swetnam."  Sometimes you'll see people that will sign "Michael

3  Swetnam, Ward Cook by permission" --

4  A.  Sure.

08:23  5  Q.  -- or something like that.

6  This was the convention that you used and that

7  was used consistently, right?

8  A.  Yes,sir.

9  Q.  I'm going to show you a document that is Exhibit 21, and I

08:23  10  just really want to ask you if you have ever seen this document

11  or perhaps a Power Point that this appears to depict that would

12  have been prepared by Swetnam Insurance Services.  And if the

13  answer is "no," I understand.

14  A.  I don't remember ever seeing this before.

08:24  15  Q.  Okay.

16  A.  But it's been four years.  So --

17  Q.  And I understand, Mr. Cook.  I appreciate that.

18  Now, do you recall -- and you may not; but do you

19  recall in November of 2005, mid November, November the 14th or

08:24  20  thereabouts, that there had been a meeting which apparently you

21  had attended with others from the System and also with my

22  client and a few others, regarding setting up a captive

23  insurance company?

24  A.  I think I attended one or two meetings where that was the

08:25  25  subject, yes, sir.

08:25  1  Q.  I realize that you didn't have a whole lot of interfacing

2  with Mr. Springfield; but I guess my question would be to you

3  did you understand that Mr. Springfield was interested in

4  setting up a captive and that it was his idea, not Michael

08:25  5  Swetnam's idea, sir, to explore that route.

6  A.  Well, the subject of captives came up year after year --

7  Q.  Okay.

8  A.  -- way back, for a long time.  Mike had explored the

9  possibility of forming a captive probably 10, 15 years before;

08:25  10  and we just never did it.

11  Q.  Okay.  And in particular do you recall being asked by Manny

12  Vela, who was the general counsel of the System, to bring Bill

13  Boyer of that law firm up to speed on issues that might be

14  involved with the BVI captive insurance program?

08:26  15  A.  I don't believe I ever did that.

16  Q.  Is it possible that you would have been in such a

17  discussion but four years later that you just don't recall?

18  A.  I don't remember talking to Bill Boyer about anything.

19  Q.  Okay.  Do you recall being in a meeting in which Manny

08:26  20  Vela, you, Randy McLelland, who was -- what was Randy's

21  position?

22  A.  He was chief financial officer for awhile.

23  Q.  And he was later replaced by?

24  A.  (No response).

08:26  25  Q.  Would it be either Scott Lieberenz or Mr. Eastham?

08:27   1    A.   (No response).

2    Q.   If you don't know, that's fine, too, sir.

3    A.   I believe Mr. Eastham replaced him first.

4    Q.   But going back, do you remember being in a meeting with

08:27   5    Manny Vela, yourself, Randy McLelland, Bill Boyer, Brent Carter

6    and Michael Swetnam, where the topic of a captive insurance

7    company was discussed, where it might have been Michael Swetnam

8    bringing Mr. Boyer of Boyar & Miller up to speed on this issue

9    and what steps had been taken and how it was progressing?

08:27  10    A.   I cannot remember specifically being in that meeting.

11    Q.   Well, and, again, that's a fair answer; and I understand

12    that.

13              I'm going to show you what's in evidence --

14              MR. CLARK:   With the Court's permission, I'm

08:28  15    approaching.

16              THE COURT:   Yes, sir.

17    BY MR. CLARK:

18    Q.   This is in evidence as the defendants' Trial Exhibit

19    Number 4.   I'm sorry that the fonts are small.   I can put it on

08:28  20    the overhead and we can enlarge it if that's difficult to read.

21              Once you've had a chance to kind of skim through

22    it and familiarize yourself with it, Mr. Cook, I would like to

23    ask you some follow-up questions.

24    A.   I remember this.

08:28  25    Q.   Okay.   Good.   Specifically, do you recall that there --

08:28   1   there came a time, for whatever reason, that Michael Swetnam,

       2   my client, contacted you about having essentially broken away

       3   from the Smith-Reagan Insurance Agency?

       4   A.   This was my first knowledge of it, this memo.

08:29   5   Q.   Okay.  What we're looking at -- if I could, I'm going to go

       6   ahead and put it up so we can all look at it together.

       7   A.   Okay.

       8   Q.   What was the context that led to -- if you recall -- and if

       9   you don't, I understand -- that led to this happening?

08:29   10           And I guess -- I guess, in fairness, what I mean

     11   by that is did my client reach out to you and say, "Ward, I

     12   want you to know that I'm no longer associated with

     13   Smith-Reagan."  Or had you asked him, "What's going on" or "How

     14   did that happen?"

08:29   15   A.   I -- this was a total surprise to me, that he was

     16   leaving --

     17   Q.   Okay.

     18   A.   -- Smith-Reagan.

     19   Q.   Okay.  And, basically, what this exhibit reflects is that

08:30   20   he had sent you an e-mail, right?

     21   A.   Yes, sir, it looks like it was an e-mail.

     22   Q.   It looks like it was about, oh --

     23   A.   Yes.

     24   Q.   -- November the 23rd of 2007.

08:30   25           Would that comport with your memory, pretty well?

08:30    1    A.   I think so, yeah.

         2    Q.   And you responded that same afternoon -- he sent you the

         3    e-mail in the morning, and you responded to Mr. Cook in the

         4    afternoon.   You see where I have the paper clip here?

08:30    5    A.   Yes, sir.

         6    Q.   And basically -- we've seen this with other witnesses;

         7    before.   But true or not, my client represented in this

         8    communication to you that mid November he had terminated his

         9    employment with Smith-Reagan.   And did you have any reason to

08:30   10    doubt that?

      11    A.   No, sir.

      12    Q.   He went on to say, though, that -- I guess this was trying

      13    to -- trying to advise you and the hospital system about if

      14    there were any questions who to talk to about coverage issues,

08:31   15    right?

      16    A.   Yes, sir.

      17    Q.   That's the way you understood it?

      18    A.   I believe it was.

      19    Q.   And did you understand that although he had broken away

08:31   20    from the Smith-Reagan Insurance Agency that the company he had

      21    established, Swetnam Insurances Services, was still operational

      22    but that it would be operated by David Smith until April the

      23    1st, or April Fool's, of 2008?

      24            Just draw your attention to this first sentence

08:31   25    here, see if that refreshes your recollection.   Actually, it's

08:31   1    the second sentence.  "David Smith and I have agreed that David
        2    would operate Swetnam Insurance Services until April the 1st of
        3    2008."
        4    A.  Yes, sir, until April 1st, '08.
08:31   5    Q.  Yeah.  And, basically, that came as a real shock to you?
        6    A.  Yeah, it really did.
        7    Q.  Had you had an understanding that Mr. Swetnam was pretty
        8    knowledgeable about insurance law issues?
        9    A.  About insurance issues, yes.
08:32  10    Q.  Insurance issues.  I'm sorry.  That was not a well-phrased
       11    question.
       12         Did you -- did you consider him to be an expert
       13    in this area?
       14    A.  Yes, sir.
08:32  15    Q.  Were you aware of his reputation in this area, before this
       16    lawsuit and his indictment in this lawsuit, as an expert in
       17    insurance law -- or insurance services?
       18    A.  Yes, sir.
       19    Q.  And it's true, is it not, that he was widely regarded in
08:32  20    that part of the state as really a kind of go-to guy on
       21    complicated insurance issues?
       22    A.  Yes, sir, that's true.
       23         MR. CLARK:  Might I have just one second, your Honor?
       24    *(Discussion off the record)*
08:33  25         MR. CLARK:  Judge, I'll pass the witness.

*Costa Redirect of Cook*

08:33    1          THE COURT:  All right.

         2          MR. CLARK:  Thank you.

         3          THE COURT:  Yes, sir.

         4              Mr. Costa, do you want --

08:33    5          MR. COSTA:  Thank you, your Honor.

         6                    **REDIRECT EXAMINATION**

         7   BY MR. COSTA:

         8   Q.  Mr. Cook, do you recall the questions Mr. Clark just asked

         9   about the instances in which you signed Mr. Swetnam's name on

08:33   10   his behalf?

        11   A.  Yes, sir.

        12   Q.  And you discussed this yesterday; but before you had the

        13   written authorization from Mr. Swetnam, had he -- did he know

        14   you were doing that?

08:33   15   A.  Yes, sir.

        16   Q.  How did he know?

        17   A.  Well, I talked to him about it.  I would never have signed

        18   his name to a document without his permission.

        19   Q.  Whose idea was it that you would just go ahead and sign

08:34   20   these instead of sending them to him to get signed?

        21   A.  It was probably my idea, because I was tired of mailing

        22   these certificates down to him to sign and get back to me.

        23              Operating a self-insurance program requires that

        24   the records are kept meticulously.  So, when we added the

08:34   25   doctor, I needed to document that immediately.

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

*Costa Redirect of Cook*

08:34  1          And if I mailed those certificates to him,

2    sometimes it would be three or four days or a week or sometimes

3    I would have to call him and remind him to sign them and send

4    them back.

08:34  5          So, I asked him if I could sign his name on them.

6    He said, "Yeah, go ahead."

7    Q.   And then you would send him a copy of what you signed?

8    A.   Surely.   Absolutely.

9    Q.   And then, when you obtained that written authorization, he

08:35  10   insisted that you send him a copy within three business days?

11   A.   Yes.

12   Q.   Is that correct?

13   A.   Yes.

14   Q.   Because he wanted to be aware of whatever it was you were

08:35  15   signing.   Is that right?

16   A.   Yes.   But I always sent them the same day.

17   Q.   Did you receive over a million dollars for signing his

18   name?

19   A.   Pardon?

08:35  20   Q.   Did you -- when you were signing those documents for him,

21   did you receive any money?

22          MR. CYGANIEWICZ:   Objection, your Honor.   That's

23   argumentative.

24   A.   No, sir.

08:35  25          THE COURT:   Well, it is, slightly; but I'm going to

08:35  1  allow it.

2  BY MR. COSTA:

3  Q.  Did you receive any money for doing -- for signing his

4  name?

08:35  5  A.  No, sir, not a penny.

6  Q.  Yesterday afternoon Mr. Chaney asked some questions about

7  this excess loss program where the hospital, I think starting

8  in the early Nineties, was providing some insurance to

9  physicians.  Do you recall those questions?

08:35  10  A.  Yes, sir.

11  Q.  And he was asking whether the hospital knew that that may

12  have violated the law.  Do you recall those questions?

13  A.  Yes, sir.

14  Q.  Was Mr. Swetnam involved at all in that insurance program

08:36  15  that started back in the early Nineties?

16  A.  As far as I know, it was his brainchild to start it.

17  Q.  I want to show you Defense 4, which was the e-mail

18  Mr. Clark just showed you.  Do you recall, just looking at

19  this, this e-mail Friday, November 23rd, 2007, that Mr. Swetnam

08:36  20  wrote to you?

21  A.  Yes, sir.

22  Q.  Do you recall just looking at that?

23  A.  Yes.

24  Q.  And this is where Mr. -- let me focus for a second.

08:36  25          This is where Mr. Swetnam states that he's

08:36　　1　　leaving Smith-Reagan?

　　　　 2　　A.　Yes, sir.

　　　　 3　　Q.　And then he -- as Mr. Clark just pointed out, if you look

　　　　 4　　right there, "David Smith and I have agreed that David would

08:37　　5　　operate Swetnam Insurance Services" -- now it's focused --

　　　　 6　　"until April 1st, 2008"?

　　　　 7　　A.　Yes, sir.

　　　　 8　　Q.　Do you see that?

　　　　 9　　A.　Yes, sir.

08:37　 10　　Q.　So, according to this, even Swetnam Insurance Services at

　　　　11　　this point, it wasn't going to be Mr. Swetnam's operation

　　　　12　　anymore; is that your understanding from that e-mail?

　　　　13　　A.　Well, that's what he was saying.

　　　　14　　Q.　And that's November, 2007?

08:37　 15　　A.　Yes, sir.

　　　　16　　Q.　I want to look back at Government 13.　And we looked at

　　　　17　　this yesterday, Mr. Cook.　Do you remember looking at this

　　　　18　　letter dated -- supposedly dated March 10th, 2008, on Swetnam

　　　　19　　Insurance Services' letterhead?

08:37　 20　　A.　Yes, sir.

　　　　21　　Q.　Do you see that's the letterhead?

　　　　22　　　　　　And who is it supposedly from?

　　　　23　　A.　Michael Swetnam.

　　　　24　　Q.　And, so, this is -- March 2008 is some months after this

08:38　 25　　e-mail where he says that he's no longer running Swetnam

08:38    1    Insurance Services, right?

    2    A.   Yes, sir.

    3    Q.   And this is the letter where he claims to have told

    4    Mr. Springfield that RAC RE is still not licensed and then he

08:38    5    talks about reinsurance through Landmark.  Is that right?

    6    A.   Yes, sir.

    7            MR. COSTA:  Pass the witness, your Honor.

    8            THE COURT:  Anything further?

    9            MR. CYGANIEWICZ:  No, your Honor.

08:38   10            MR. CLARK:  May I follow up?

   11            THE COURT:  Okay.

   12                    **RECROSS-EXAMINATION**

   13    BY MR. CLARK:

   14    Q.   Mr. Costa had asked you about the excess of loss program

08:38   15    that had been put in place, and I think you characterized it --

   16    in answer to his question, as it being -- or you understood it

   17    to be Mr. Swetnam's brainchild?

   18    A.   I'm still thinking about that.  The -- the idea to figure

   19    out a way to help these physicians carry insurance, the first

08:39   20    that the subject was ever brought up, I believe, was by

   21    Mr. McKibbens, who was the CEO at the time.

   22    Q.   Preceded Springfield?

   23    A.   Yes, sir.

   24            And I believe he asked Mike and David to try to

08:39   25    come up with a plan that would keep these doctors insured at a

08:39   1   lower level and, you know, a plan to help the doctors purchase

2   insurance.

3   Q. Fair enough. And I'm assuming that at some point in time

4   the then outside counsel, a very fine firm, Fulbright &

08:39   5   Jaworski was consulted, were they not?

6   A. They did what?

7   Q. The firm of Fulbright & Jaworski?

8   A. Yes, sir.

9   Q. That had been the outside law firm that represented Valley

08:40   10   Baptist Health System during this period of time with

11   Mr. McKibbens, right?

12   A. They probably were one of several.

13   Q. Yeah. They were the primary go-to firm for health law

14   issues.

08:40   15        Tony Patterson of the Dallas office of Fulbright

16   & Jaworski, does that ring a bell?

17   A. Yes, sir.

18   Q. And you're aware, are you not, that because of the changes

19   to the Federal anti-kickback statute -- are you familiar with

08:40   20   the Federal anti-kickback statute?

21   A. Not really.

22   Q. Are you familiar with the Federal Stark Law?

23   A. Not really. I vaguely know what it is but --

24   Q. I mean, do you generally understand that the Federal and

08:40   25   the State governments have enacted civil and criminal laws that

08:40 1  prohibit giving things of value to physicians to try to control

2  the unnecessary provision of medical services because

3  physicians are in a position to make referrals and the concern

4  is that if they are being incentivized by being given something

08:41 5  of value by the hospital system that there may be a tendency to

6  basically steer business to the hospital.  You understand that

7  concept?

8  A.   Yes, sir, I do understand that.

9  Q.   And didn't it come to pass that there was a specific legal

08:41 10  memo that the law firm of Fulbright & Jaworski authored that

11  analyzed how this program would violate the Federal laws and

12  could subject the hospital to all sorts of bad things,

13  including perhaps criminal prosecution, perhaps violating the

14  Federal Stark law, perhaps violating the Federal anti-kickback

08:41 15  statute, perhaps implicating the Federal False Claims Act, and

16  could cost the hospital millions and millions and millions of

17  dollars?

18  A.   I never saw such a report or letter or anything from

19  Fulbright about -- on that subject.

08:42 20  Q.   And are you aware that Mr. Swetnam lobbied against

21  continuing this program because this would violate those laws,

22  that he thought you had to follow the advice of your outside

23  law firm?  Did he ever talk to you about that?

24  A.   He may have.  I remember discussions -- a couple of

08:42 25  discussions with him at the time that the program was being

08:42  1    shut down.

   2    Q.  Right.

   3    A.  But I don't remember specifically what we talked about.

   4    Q.  I'm going to show you -- just following up on one of the

08:42  5    other questions from Mr. Costa, I'm going to show you what is

   6    marked as Defense Trial Exhibit 38, which I don't believe is

   7    yet in evidence, and ask you to take a look.  It's a series,

   8    again, of documents that is collectively marked as Defendants'

   9    Trial Exhibit 38.  And I think it's similar to what you saw

08:43 10    previously.

  11            Can you identify that document, please?

  12    A.  Yes, sir.  This is a certificate of insurance in behalf of

  13    Dr. Eugene Deal, dated March 19th -- no -- February 19th, '08,

  14    as evidence of insurance coverage in the Harlingen Physician

08:43 15    Network self-insurance program.

  16    Q.  And wouldn't this also be consistent, Mr. Cook, with the

  17    type of documents that we saw with that last exhibit that you

  18    were signing Michael Swetnam's name by permission?

  19    A.  It's the same thing, yeah.

08:43 20            MR. CLARK:  Judge, I'm going to move at this time to

  21    introduce Defendant's Trial Exhibit 38 if I have not already.

  22            I have not already.  I move to introduce it.

  23            MR. COSTA:  No objection.

  24            THE COURT:  Admitted without objection.

08:44 25    BY MR. CLARK:

08:44  1    Q.  Let me show this on the overhead to everybody so we can all

      2    follow along.

      3              Now, what you have indicated by -- Mr. Cook, I'm

      4    sorry.  I'm going to go in and zoom in so we can all see part

08:44  5    of it.  Either my eyes are out or this is out --

      6    A.  Yeah, I think this is out.

      7    Q.  -- the focus.

      8    *(Discussion off the record)*

      9    BY MR. CLARK:

08:44  10   Q.  This is similar -- this is actually your signature, right?

      11   A.  I believe it is.

      12   Q.  Okay.

      13   A.  I can sign pretty close to Michael Swetnam's signature.

      14   Q.  Yeah, I can see.

08:45  15             And, Mr. Cook, up on the right-hand corner, this

      16   is February the 18th of 2008, sir?

      17   A.  Yes, sir.

      18   Q.  Okay.  And you'll notice that that one changed a little

      19   bit.  I wanted to follow up and ask you a question about the

08:45  20   second one in the series.

      21             "Valley Baptist Health System, care of Ward

      22   Cook"?

      23   A.  Yes, sir.

      24   Q.  Okay.  This is the same type of a document, except -- let's

08:45  25   see.  The date here, February the 22nd, of 2008, sir?

08:45    1    A.   Yes, sir.

2    Q.   Now, down here in the right-hand corner, it changed a

3    little bit, did it not?

4          You're not actually signing it here. It looks

08:45    5    like it's a facsimile signature of David Smith.

6    A.   Yes, sir, looks like.

7          Could I see the top of that again?

8    Q.   Absolutely.

9    A.   I'm not sure if that's the same thing or not.

08:46    10    Q.   Well, absolutely. I want you to be comfortable with what

11    you're looking at; so, let me put it back in front of you. And

12    just let me know when you're ready, and I'll ask questions.

13    A.   I just want to see at the top what it is.

14    Q.   (Indicating).

08:46    15    A.   Yeah, it's a certificate like the other one.

16    Q.   Okay. And I guess my follow-up question to you is that, at

17    least by February of 2008, the convention that you were

18    following, looks like it changed -- this is February the 18th,

19    and you've identified down below that is your signature?

08:46    20    A.   Uh-huh.

21    Q.   But looks like four days later, the 22nd, sir, that it

22    changed to what I am calling a "facsimile signature" or a

23    stamp, or whatever it was, of "David Smith" in the bottom

24    right-hand corner.

08:47    25          You didn't have a rubber stamp to do that, did

08:47  1  you?

2  A.  Oh, no.

3  Q.  So, apparently, at some point in time, when David Smith

4  took over operating the -- operating the Swetnam Insurance

08:47  5  Services part of the business, it changed and stamps started

6  being put on these documents.

7        And I can show you others that are just like this

8  if that would help.

9        Now, do you have any recall of how or why the

08:47  10  process changed, instead of you signing now David Cook is --

11  A.  David "Smith."

12  Q.  Or David -- I'm sorry, Mr. Cook.  I didn't mean to --

13  A.  It's all right.  He's a nice guy.

14  Q.  Well, you are, too, from what I can tell.

08:47  15        But there are other documents I believe -- maybe

16  not.  Maybe those are the only documents like that that -- no.

17  Here's another one, for example, same date, same way.

18        I'm just trying to drill down how do you recall

19  this happened, that it went from you signing to David Smith or

08:48  20  somebody at his office stamping it.

21  A.  I don't really remember, but I think -- I think I was out

22  of town or on vacation or something and, for some reason, I

23  couldn't issue that certificate the way --

24  Q.  Okay.  And wouldn't that be consistent also with the -- the

08:48  25  point that Mr. Swetnam was making about he was transitioning

08:48    1  out of Swetnam Insurance Services and that this would be

2  operated by David Smith up through April the 1st of 2008, sir?

3  A.  Well, yes, sir, it makes sense.

4  Q.  Thank you, Mr. Cook.

08:48    5        MR. CLARK:  Pass the witness.

6        MR. COSTA:  Nothing, your Honor.

7        THE COURT:  Okay.  You may step down.  You're free to

8  go.  Thank you for your time.  Safe travels, sir.

9        *(End of requested proceedings)*
                        * * * * *

10

11            COURT REPORTER'S CERTIFICATION

12     I certify that the foregoing is a correct transcript from

13      the record of proceedings in the above-entitled cause.

14

15  Date:  June 8, 2010

16

17                  /s/   Cheryll K. Barron

18            Cheryll K. Barron, CSR, CMR, FCRR
             Official Court Reporter

19

20

21

22

23

24

25