1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3    UNITED STATES OF AMERICA      .
                                   . H-09-CR-336
4          vs.                     . HOUSTON, TEXAS
                                   . APRIL 23, 2010
5                                  . 3:10 P.M.
     BRENT A. CARTER and           .
6    MICHAEL N. SWETNAM, JR.       .
     . . . . . . . . . . . . . . .
7

8                     TRANSCRIPT OF JURY TRIAL
               BEFORE THE HONORABLE KEITH P. ELLISON
9                   UNITED STATES DISTRICT JUDGE

10         TESTIMONY OF MATTHEW SCOTT BOYDEN, VOL. 4
                 EXCERPTED FROM TRIAL DAY 4 OF 9
11

12   A P P E A R A N C E S:

13   FOR THE GOVERNMENT:

14        Gregg Costa
          Ryan McConnell
15        Assistant US Attorney
          PO Box 61129
16        Houston, Texas   77208-1129

17   FOR THE DEFENDANT BRENT A. CARTER:

18        Edmund K. Cyganiewicz
          Attorney at Law
19        1000 East Madison Street
          Brownsville, Texas 78520
20
          Norton A. Colvin, Jr.
21        Mitchell Chaney
          Colvin Chaney Saenz & Rodriguez
22        1201 East Van Buren Street
          Brownsville, Texas 78520
23

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
25

```
 1   A P P E A R A N C E S:  (Continued)

 2   FOR THE DEFENDANT MICHAEL N. SWETNAM, JR.:

 3        Irvin Sheldon Weisfeld
          Attorney at Law
 4        855 East Harrison Street
          Brownsville, Texas 78520
 5
          Michael E. Clark
 6        Duane Morris, LLP
          3200 Southwest Freeway
 7        Suite 3150
          Houston, Texas 77027-7540
 8

 9   OFFICIAL COURT REPORTER:

10        Cheryll K. Barron, CSR, CM, FCRR
          U.S. District Court
11        515 Rusk Street
          Houston, Texas  77002
12

13   ALSO PRESENT:

14        Steve Goehring
                                - - - - -
15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2                                                              PAGE

3     GOVERNMENT'S WITNESS

4        Continued Direct Examination by Mr. McConnell          4

5                              - - - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2     *(Jury present)*

3          THE COURT:  Members of the jury, please be seated.

4          Okay.  You may resume your inquiry.

5          **CONTINUED DIRECT EXAMINATION**

6     BY MR. McCONNELL:

7     Q.  Inspector Boyden, if you recall yesterday, we left off

8     talking about the Zurich umbrella policy from 2006 and 2007.

9     A.  Yes.

10    Q.  And we had gone through the cashier's checks that the

11    defendants had received --

12    A.  Correct.

13    Q.  -- from those policies.

14         And were all the defendants paid the same amount

15    of money from the sale of the policies -- those policies?

16    A.  Yes.

17    Q.  How much did each defendant receive?

18    A.  250,000.

19    Q.  The cashier's checks yesterday, one was for 150,000 and

20    there were three for 250,000.  Can you explain why that is?

21    A.  That's because the Valley Baptist check was deposited into

22    Mr. Swetnam's account and then he purchased the subsequent

23    cashier's checks, 250,000 for each of the other three, 150,000

24    for himself and the other $100,000 he just left in his account.

25    Q.  And do you remember, if I can use the overhead,

01:21    1    Government's Exhibit 2B we talked about yesterday, which was

         2    this e-mail that was sent on September 1st, 2006?

         3    A.   Yes.

         4    Q.   Do you recall going through the premium amounts and the

01:22    5    documents attached to the e-mails?

         6    A.   I do.

         7    Q.   And do you recall what the total was for those premiums?

         8    A.   Yes.

         9    Q.   Was it about $1.4 million?

01:22   10    A.   Correct.

        11    Q.   I would like you to take a look at Government's Exhibit 2A.

        12    Do you recognize Government's Exhibit 2A?

        13    A.   I do.

        14    Q.   How did you come to possess Government's Exhibit 2A?

01:22   15    A.   2A was provided by the hospital.

        16         MR. McCONNELL:  The United States moves to admit 2A.

        17         MR. CHANEY:  Your Honor, it's hearsay as to the

        18    Government.

        19         MR. McCONNELL:  Your Honor, we're not offering it for

01:23   20    the truth.  We're offering it to show the misrepresentation to

        21    the hospital.

        22         THE COURT:  Why is this hearsay?

        23         MR. CHANEY:  I just don't think that he's

        24    authenticated it --

01:23   25         THE COURT:  Well, that's a different issue.

01:23    1   Authentication?

2            You can lead him through authentication.  It's

3   not hearsay.

4   BY MR. McCONNELL:

01:23    5   Q.  Inspector Boyden, how did you come to possess Government's

6   Exhibit 2A?

7   A.  During the course of my investigation, I asked the hospital

8   to provide records and documents in furtherance of our case.

9   Q.  Is Government's Exhibit 2A signed?

01:23   10   A.  It is.

11   Q.  Who signed Government's Exhibit 2A?

12   A.  Mr. Swetnam.

13   Q.  Have you also interviewed witnesses during the course of

14   your investigation, who identified Government's Exhibit 2A?

01:24   15   A.  Yes.

16   Q.  And what is Government's Exhibit 2A?

17   A.  It's the interim insurance binder and premium billing.

18   It's a sheet that was provided to the hospital, that has the

19   premium and policy fees and surplus lines tax as well as

01:24   20   stamping taxes.

21   Q.  Are the numbers listed in Government's 2A, with respect to

22   the premiums, are those the same numbers that are in that

23   policy that we looked at, the Zurich policy that was presented

24   to the hospital with the November 30th, 2006, date?

01:24   25   A.  Right.  These are documents that continue to reflect the

01:24    1    inflated premiums.

2    MR. McCONNELL: Your Honor, the United States moves to

3    admit 2A.

4    MR. CHANEY: I thought it was just admitted, wasn't

01:24    5    it?

6    THE COURT: No. We -- you had an objection to its

7    authenticity, and I asked him to prove it up. Do you still

8    have an objection?

9    MR. CHANEY: Yes, I still object, your Honor.

01:25    10    THE COURT: Okay. Admitted over objection.

11    BY MR. McCONNELL:

12    Q. So, this e-mail with the Zurich binders with the premiums

13    was sent on what day?

14    A. 9-1 of '06.

01:25    15    Q. When is this document dated?

16    A. 9-5 of '06.

17    Q. And whose signature is attached to the bottom?

18    A. Mr. Swetnam.

19    Q. Do you see someone's initials next to Mr. Swetnam's

01:25    20    signature?

21    A. Ward Cook's.

22    Q. And what's the date of those initials?

23    A. 9-7th of '06.

24    Q. Is this a document that was presented to the hospital by

01:26    25    Mr. Swetnam?

*McConnell Direct of Boyden*

01:26    1    A.   Yes.

2    Q.   And what's the premium that's reflected in this document?

3    A.   2.185 million.

4    Q.   And is the policy fee listed in this document?

01:26    5    A.   81,949.

6    Q.   What's the surplus line fee?

7    A.   109,962.

8    Q.   How about the stamping office fee?

9    A.   3400 and some change.

01:26    10    Q.   And for the total premium?

11    A.   The 2.380 premium.

12    Q.   And have we seen that number before in the case?

13    A.   Yes. That's the amount that the hospital was charged.

14    Q.   Is that the amount that Zurich provided to Mr. Swetnam in

01:27    15    the binders that we just went over?

16    A.   No.

17    Q.   Now I'm showing you Government's Exhibit 4. What is

18    Government's Exhibit 4?

19    A.   That's the Zurich declarations page.

01:28    20    Q.   And what's the date on Government's Exhibit 4?

21    A.   The date with Mr. Hamlin's signature is November 30th,

22    2006.

23    Q.   And is the total premium on Government's Exhibit 4 the same

24    total premium listed on Government's Exhibit 2A?

01:28    25    A.   Yes.

*McConnell Direct of Boyden*

01:28    1    Q.  Do you also see some of these other fees listed in

         2    Government's Exhibit 4 reflected in Government's Exhibit 2A?

         3    A.  Yes.

         4    Q.  Are the fees the same?

01:28    5    A.  (No response).

         6    Q.  Do you want to take a look at the two documents?

         7    A.  Do you have -- well, I've got 4.  Do you have an extra copy

         8    of the 2A?

         9    Q.  You can look at this one.

01:29   10    A.  There's some minor differences.  The premium is the same;

        11    but there's some minor discrepancies between the other policy

        12    fee, surplus lines tax, and stamping office tax.

        13    Q.  And whose signature is at the bottom of Government's

        14    Exhibit 4?

01:29   15    A.  Mr. Hamlin.

        16    Q.  And what company's logo is embossed on Government's Exhibit

        17    4?

        18    A.  Zurich.

        19    Q.  Do you remember during -- earlier during the trial -- I

01:29   20    believe Mr. Clark mentioned during opening the ability to sign

        21    on someone else's behalf?

        22    A.  I've heard that.

        23    Q.  And the authority to sign on someone else's behalf?

        24    A.  Yes.

01:29   25    Q.  Did you obtain any documents during the course of your

| | |
|---|---|
| 01:30 | 1 |

01:30   1   investigation, which showed that Mr. Swetnam gave someone

2   authority to sign on his behalf?

3   A.   Yes.

4   Q.   And, specifically, which individual did Mr. Swetnam give

01:30   5   authority to sign on his behalf?

6   A.   Mr. Cook.

7   Q.   I'm handing you Government's Exhibit 19.   Whose signature

8   is on Government's Exhibit 19?

9   A.   Mr. Swetnam.

01:30   10   Q.   And when is it dated?

11   A.   8-something of '06.

12   Q.   How did Government's Exhibit 19 come into your possession?

13   A.   Provided by the hospital.

14   Q.   And what is Government's Exhibit 19?

01:30   15   A.   It's an authorization for Mr. Cook to sign Mr. Swetnam's

16   name.

17          MR. McCONNELL:   United States moves to admit

18   Government's Exhibit 19.

19          MR. CLARK:   No objection.

01:31   20          MR. CHANEY:   No objection, your Honor.

21          THE COURT:   Admitted without objection.

22   BY MR. McCONNELL:

23   Q.   Can you read Government's Exhibit 19?

24   A.   It's a statement of authorization, "I, Michael Swetnam,

01:31   25   hereby authorize Ward Cook to execute in my name and signature

01:31   1   all certificates of insurance for physicians insured under the

2   Harlingen Physicians Network self-insurance plan.  Copies of

3   all such certificates must be mailed to Michael Swetnam within

4   three business days," signed Michael Swetnam.

01:31   5   Q.  And that "within three business days," does that look like

6   it was typed in there or did someone look -- does it look like

7   someone hand wrote --

8   A.  It's handwritten.

9   Q.  -- that information?

01:31  10              Does the handwriting look familiar?

11   A.  It appears to me to be Mr. Swetnam's.

12   Q.  So, it appears that someone -- could be Mr. Swetnam --

13   wrote in there after this document was typed "within three

14   business days"?

01:32  15   A.  Correct.

16   Q.  Applying the limitation?

17   A.  Yes.

18   Q.  Did you find any document authorizing -- during the course

19   of your investigation, authorizing Mr. Swetnam to sign on

01:32  20   behalf of Mr. Hamlin?

21   A.  No.

22   Q.  Did you find any document authorizing Mr. Swetnam to sign

23   on behalf of Mr. Thompson?

24   A.  No.

01:32  25   Q.  Did you find a document authorizing Mr. Swetnam to sign on

01:32   1   any -- any of the witnesses that the Government has called in

        2   this case?

        3   A.   No.

        4   Q.   Do you recall yesterday we ended on talking about the wire,

01:33   5   which is Count 9.   Do you remember when that occurred?

        6   A.   Was it the first or second wire?   The one in February?

        7   Q.   Yes.   February of 2007?

        8   A.   Correct.

        9   Q.   I would like to talk now about April 2007 and go back to

01:33  10   those e-mails.   So, if you could, could you turn to Page 11-7

       11   in your exhibit book?

       12   A.   I'm there.

       13   Q.   Does this e-mail say something about the "four horsemen"?

       14   A.   Yes.

01:34  15   Q.   Who are the four horsemen?

       16   A.   Smith, Swetnam, Reagan and Carter.

       17   Q.   Is a meeting that's going to occur at Valley Baptist

       18   discussed in this e-mail?

       19   A.   Yes.

01:34  20   Q.   If you look at the third paragraph.

       21   A.   Yes.

       22   Q.   And what's to be discussed at this meeting?

       23   A.   Windstorm.

       24   Q.   And who is going to attend the meeting?

01:34  25   A.   (No response).

*McConnell Direct of Boyden*

01:34    1    Q.  If you look at the third paragraph.

         2    A.  Mike and Brent.

         3    Q.  When is that meeting supposed to occur?

         4    A.  The -- it says "next Wednesday."

01:35    5    Q.  So, if this is April 30th, would that be Wednesday,

         6    May 9th?

         7    A.  Yes.  Or it could be -- if this was on a Monday, it could

         8    have been two days away; but it appears to be a week.

         9    Q.  It says the 9th?

01:35   10    A.  Oh, the 9th, correct.

        11    Q.  Right.  At 1:00 o'clock?

        12    A.  Correct.

        13    Q.  Is this an e-mail sent by Mr. Carter?

        14    A.  Yes.

01:35   15    Q.  And when was this e-mail sent?

        16    A.  May the 9th, 2007, at 10:21 p.m.

        17    Q.  Does Mr. Carter appear to be giving individuals at

        18    Smith-Reagan some instructions on how to deal with Valley

        19    Baptist?

01:36   20    A.  Yes, he does.

        21    Q.  What does he say Mike should do, Mike Swetnam?

        22    A.  He said, "Mike, we must focus on a laymen's mentality as we

        23    gather information regarding Marsh and make certain that all

        24    our presentation is easily understood.  These folks fancy

01:36   25    themselves as businessmen.  Manny is the only one who admits

*McConnell Direct of Boyden*

01:36  1   any semblance of ignorance and is the only one who defers to

2   our knowledge.  Don't tell them anything about TDI, taxes or

3   anything negative about Marsh at this first meeting.  Trust me,

4   they all believe they got objective counseling from the big

01:36  5   broker.  Any challenge will make them timid about letting us in

6   front of their finance committee, and we have to get there."

7   Q.  What's the best formula for dealing with Valley Baptist,

8   according to Mr. Carter?

9   A.  "The best formula is the one that has guided the past three

01:37  10   renewals.  Give me info and let me explain it to them.  They

11   trust me completely, as evidenced by their encouragement of

12   this process.  And we will handle this program unless we do

13   something stupid."

14   Q.  So, this e-mail was sent May 9th, 2007, at 10:21 p.m.?

01:37  15   A.  Yes.

16   Q.  And that meeting was to occur at 1:00 o'clock this day?

17   A.  Correct.

18   Q.  So, it was sent after the meeting?

19   A.  Correct.

01:37  20   Q.  Can you read this last -- last part of the e-mail?

21   A.  Which part?

22   Q.  Where it says, "I know the above to be accurate."

23   A.  "I know the above to be accurate because it came from Jim

24   himself today.  Drop all egos at the door and help me do what I

01:37  25   do best.  Relax.  I can handle this one.  BC."

01:37  1    Q.  According to this e-mail, does Mr. Carter meet with Jim

2    Springfield this day?

3    A.  Yes.

4    Q.  And they're talking about the meeting that was referenced

01:38  5    in the last e-mail?

6    A.  Correct.

7    Q.  And this e-mail was sent May 9th, 2007?

8    A.  Yes.

9    Q.  Can you turn in your book to United States Exhibit 6?

01:38  10   A.  (Complies).

11   Q.  Do you recognize United States Exhibit 6?

12   A.  I do.

13   Q.  What's United States Exhibit 6?

14   A.  A confirmation of insurance assurance binder purportedly in

01:39  15   the name of RAC RE Ltd.  This would be the second windstorm

16   policy.

17   Q.  What's the total premium?

18   A.  The total premium is $884,000.

19   Q.  Is this the amount that's referenced in the guaranty letter

01:39  20   that was supposedly given to the hospital in September of 2006?

21   A.  Correct.

22   Q.  When is -- whose signature is on the bottom of this?

23   A.  Harry Thompson.

24   Q.  Does this signature look a little bit different than when

01:39  25   we saw Mr. Thompson's signature --

01:39  1    A.  Yes, it does.

       2    Q.  -- in United States Exhibit 1?

       3    A.  Yes.

       4    Q.  Did Mr. Swetnam say who signed this document, in his

01:40  5    deposition?

       6    A.  He did.

       7    Q.  And what's the date down there at the bottom?

       8    A.  Looks like 31 May 2007.

       9    Q.  So, the date on it was the same month as this meeting they

01:40  10   had with the hospital, on May 9th, 2007?

       11   A.  Yes.

       12   Q.  And what's the policy period on this document, the

       13   effective date, if you look up at the top right-hand side?

       14   A.  June 1st of '07 through June 1st of '08.

01:40  15   Q.  And the name of the assurance company?

       16   A.  RAC RE Ltd.

       17   Q.  Not "insurance," "assurance"?

       18   A.  Correct.

       19   Q.  And do you recall what "assurance" stands for?

01:41  20   A.  I believe Mr. Thompson characterized it as more of an

       21   assurance because of -- a sure thing is coming, as in you're

       22   going to die, versus insurance, which is an event that may not

       23   occur.

       24   Q.  And the premium charged in this policy is how much?

01:41  25   A.  884 is the total premium.  The premium charge is listed as

McConnell Direct of Boyden

01:41    1    $850,000.

2    Q.    Did any of this money ever go to purchase insurance?

3    A.    No.

4    Q.    Who did this money go to?

01:41    5    A.    It went to Brent Carter, Mr. Swetnam and Mr. Smith.

6    Q.    They each get about $294,000?

7    A.    I believe that's the right number.

8    Q.    And it says -- what does it say Mr. Thompson is, a -- is

9    the attorney in fact for what company?

01:42   10    A.    RAC Holdings, Ltd.

11    Q.    Did you ever identify a RAC Holdings or RAC RE in the

12    course of your investigation?

13    A.    They don't exist.

14    Q.    Did you ever conclude whether this provided any insurance

01:42   15    coverage for the hospital?

16    A.    It did not.

17    Q.    I would like you to look at Government's Exhibit 5.  Do you

18    recognize Government's Exhibit 5?

19    A.    I do.

01:42   20    Q.    What is Government's Exhibit 5?

21    A.    That was an invoice mailed to the hospital for a payment of

22    the $884,000 for that second windstorm policy.

23    Q.    And who is Government's Exhibit 5 from and who is it to?

24    A.    It's from Swetnam Insurance Services to Valley Baptist

01:43   25    Medical Center.

*McConnell Direct of Boyden*

01:43  1   Q.  How did Government's Exhibit 5 come into your possession?
       2   A.  Provided to me by the hospital.
       3           MR. McCONNELL:  United States moves to admit
       4   Government's Exhibit 5.
01:43  5           MR. CHANEY:  No objection, your Honor.
       6           MR. CLARK:  No objection.
       7           THE COURT:  Admitted without objection.
       8   BY MR. McCONNELL:
       9   Q.  What's this premium for, listed on Government's Exhibit 5?
01:43 10   A.  It says "named storm only."
      11   Q.  When is it dated?
      12   A.  June 4th of '07.
      13   Q.  Date right here?
      14   A.  Correct.
01:43 15   Q.  So, about a month after they had that meeting, close to a
      16   month -- the meeting was on May 9th -- the hospital gets
      17   invoiced with this June 4, 2007, invoice?
      18   A.  Correct.
      19   Q.  Does this appear it had been mailed to the hospital?
01:43 20   A.  Yes.
      21   Q.  And the amount of the premium is for the $884,000 policy
      22   you said didn't exist?
      23   A.  Correct.
      24   Q.  I would like you to turn now to Government's Exhibit 5A.
01:44 25   Do you recognize Government's Exhibit 5A?

*McConnell Direct of Boyden*

01:44  1    A.   I do.

     2    Q.   What is Government's Exhibit 5A?

     3    A.   It's an accounts payable disbursing authority form from the

     4    accounting department at the hospital.

01:44  5    Q.   Does it have somebody's name on it?

     6    A.   It says, "Make check payable to Swetnam Insurance

     7    Services."

     8    Q.   How did United States Exhibit 5A come into your possession?

     9    A.   Provided by the hospital.

01:44 10         MR. McCONNELL:   United States moves to admit

    11    Government's Exhibit 5A.

    12         MR. CLARK:   No objection.

    13         MR. CHANEY:   No objection.

    14         THE COURT:   Admitted without objection.

01:45 15    BY MR. McCONNELL:

    16    Q.   What is Government's Exhibit 5A?

    17    A.   In layman's terms, it's an approved directive from Ward

    18    Cook to -- telling the accounting department at the hospital to

    19    pay the bill to Swetnam Insurance Services.

01:45 20    Q.   And when is it dated?

    21    A.   6-5 of '07.

    22    Q.   Do you recall when that invoice -- the date of the invoice?

    23    June 4th.

    24    A.   Yes.

01:45 25    Q.   So, the next day?

01:45  1    A.   Correct.

2    Q.   And how much is Mr. Cook instructing the hospital to pay

3    Swetnam Insurance Services?

4    A.   $884,000.

01:45  5    Q.   And what is the payment for?

6    A.   The -- it says here the purpose was the property insurance,

7    fourth layer, RAC RE Ltd.

8    Q.   Was any of this $884,000 ever used to purchase insurance?

9    A.   No.

01:46  10   Q.   I would like you to turn now to Government's Exhibit 6A.

11   A.   (Complies).

12   Q.   Are these some of the bank records that you obtained during

13   your investigation?

14   A.   Yes.

01:46  15        MR. McCONNELL:  The United States moves to admit 6A.

16        MR. CHANEY:  No objection, your Honor.

17        MR. CLARK:  No objection.

18        THE COURT:  Admitted without objection.

19   BY MR. McCONNELL:

01:46  20   Q.   Do you see the $884,000 notated on this exhibit?

21   A.   I do.

22   Q.   And this is a check, in total, for how much?

23   A.   A little over 2.7 million.

24   Q.   And when is the check dated?

01:47  25   A.   6-7 of '07.

01:47   1   Q.  And it's a check written on whose behalf?

2   A.  On behalf of Valley Baptist to Swetnam Insurance Services.

3   Q.  And what's the total of the check, again?

4   A.  2.7 million, a little over that.

01:47   5   Q.  And according to this document, was part of that

6   2.7 million this $884,000 payment for the windstorm coverage?

7   A.  Yes.

8   Q.  When the hospital wrote this check, did they have windstorm

9   coverage?

01:47  10   A.  Not with this company.

11   Q.  Did they have windstorm coverage with RAC RE?

12   A.  No.

13   Q.  Can you look at Government's Exhibit 6B?

14   A.  (Complies).

01:48  15   Q.  Are these more bank records you obtained during the course

16   of your investigation?

17   A.  Yes.

18   Q.  Whose bank records are these?

19   A.  Mr. Swetnam's.

01:48  20         MR. McCONNELL:  United States moves to admit 9B.

21         MR. CLARK:  No objection.

22         MR. CHANEY:  No objection.

23         THE COURT:  Admitted without objection.

24   BY MR. McCONNELL:

01:48  25   Q.  Looking at first page of United States Exhibit 6B, do you

01:48    1    see a counter deposit for $2.7 million?

2    A.   I do.

3    Q.   And the date of that counter deposit?

4    A.   6-7-2007.

01:49    5    Q.   So, almost immediately after the hospital was invoiced --

6    A.   Correct.

7    Q.   -- the check is deposited?

8    A.   Yes.

9    Q.   In fact, it's deposited on the same day that the check was

01:49    10    written?

11    A.   Correct.

12    Q.   Can you look at United States 6C, 6D and 6E?

13    A.   I am.

14    Q.   Do you have those in front of you?

01:50    15    A.   6D and E?   Or 6C and D?

16    Q.   6C, D and E.

17    A.   Yes.

18    Q.   What are Exhibits 6C and 6D?

19    A.   Copies of cashier's checks.

01:50    20    Q.   Who are they payable to?

21    A.   One is payable to Brent Carter.   The other is payable to

22    Mr. Smith.

23    Q.   Is 6C the one that's payable to Mr. Carter?

24    A.   Yes.

01:50    25    Q.   6D the one that's payable to Mr. Smith?

01:50   1    A.   Yes.

        2    Q.   And what amounts are they in?

        3    A.   $290,242.12.

        4    Q.   Are these checks you obtained during the course of your

01:50   5    investigation?

        6    A.   Yes.

        7         MR. McCONNELL:   United States moves to admit Exhibit

        8    6C and 6D.

        9         MR. CHANEY:   No objection, your Honor.

01:50  10         THE COURT:   On this line of documents, I'm just going

       11    to admit them all unless we hear specific objections.

       12         MR. McCONNELL:   Your Honor, is that for all the bank

       13    records?

       14         THE COURT:   Yes.

01:51  15    BY MR. McCONNELL:

       16    Q.   I'll put on the overhead United States Exhibit 6C.   Who

       17    endorsed the back of 6C?

       18    A.   Brent Carter.

       19    Q.   And when is that cashier's check dated?

01:51  20    A.   June 7th of '07.

       21    Q.   And remind us again when the check from the hospital was

       22    written.

       23    A.   The same day.

       24    Q.   So, the check from the hospital is written, it's deposited

01:51  25    and cashier's checks are immediately purchased for Mr. Carter

01:51  1  and then here's the one for Mr. Smith?

2  A.   Correct.   The check is written, deposited to Mr. Swetnam's

3  account; he purchases cashier's checks.   They're then

4  subsequently deposited all on the same day by Mr. Carter.   And

01:51  5  the other one went to Mr. Smith.

6  Q.   And 6E, which the Court has admitted, I'm showing you

7  Page 6E-2.   Mr. Swetnam also get a share of that windstorm

8  policy?

9  A.   He did.

01:52  10  Q.   Is that his share, $290,000?

11  A.   Yes.

12  Q.   Did any of these gentlemen use any of this money to

13  purchase insurance for the hospital?

14  A.   No.

01:52  15  Q.   And this all happened in June of 2007?

16  A.   Yes.

17  Q.   I want to go back to these e-mails.   And the other e-mail

18  that I skipped over but one that's been talked about in some

19  detail, was this May 27, 2007, e-mail.   This was sent before --

01:53  20  do you recognize this?   This is 11-9.

21  A.   Okay.

22  Q.   We don't need to go over it again.   I just want to note

23  that there was that e-mail between -- in Government's Exhibit

24  11, between the one I'm going to show you next, which is 11-10.

01:53  25                  Who is this e-mail from?

*McConnell Direct of Boyden*

01:53    1    A.  Brent Carter.

      2    Q.  And who is it to?

      3    A.  Mr. Reagan, Smith and Mr. Swetnam.

      4    Q.  When was it sent?

01:54    5    A.  July 28th of '07.

      6    Q.  And what is Mr. Carter telling Mr. Reagan, Mr. Smith and

      7    Mr. Swetnam?

      8    A.  Where do you want me to start?

      9    Q.  Well, in general, what's he talking about?

01:54   10    A.  He advised them that he's leaving on a trip with

    11    Mr. Springfield, going out to California.  He says that Dave

    12    Smith mentioned that he should handle all the social stuff for

    13    the agency while he's gone.  I mean, there's a myriad of things

    14    that are discussed here.

01:54   15    Q.  Can you read the paragraph -- it's the third one down --

    16    where it begins, "When you have volatile personalities"?

    17    A.  It says, "When you have volatile personalities like Jim's

    18    and mine, flare-ups occur, people get yelled at and feelings

    19    get hurt.  I have taken volumes of grief over the past three

01:54   20    years and protected you from it all.  The welding goggles jump

    21    to mind, followed closely by the accidental implications they

    22    sought to commit a crime over their trusts.  I get paid

    23    handsomely to take it, right?  So, do you.  Welcome to my

    24    world."

01:55   25    Q.  Now, we've heard a lot of talk during the trial about the

*McConnell Direct of Boyden*

01:55   1   social relationship between Mr. Carter and Mr. Springfield.
        2   Can you read this second paragraph where it begins, "David
        3   mentioned"?
        4   A.   "David mentioned that I should handle all the social stuff
01:55   5   for the agency while I am gone.  My inference is that he will
        6   continue to handle the actual important work of the account.  I
        7   appreciate that and will do my part to contribute.  The social
        8   stuff is the reason we kept the account three years ago, have
        9   it today and the reason Mr. Springfield didn't throw us out two
01:55  10   months ago.  The social stuff is the reason it will move
       11   someday.  No one questions our ability to buy insurance for the
       12   facility.  Hey, we are in a social business, and I am Jim
       13   Springfield's best friend.  This fact could matter later."
       14            THE COURT:  Do you have any understanding of what some
01:56  15   of these references are about?
       16            THE WITNESS:  Which ones, your Honor?
       17            THE COURT:  The goggles?
       18            THE WITNESS:  No, sir.
       19   BY MR. McCONNELL:
01:56  20   Q.   The paragraph you just read, "throw us out two months ago,"
       21   does that appear to refer to some sort of encounter that
       22   occurred a couple of months ago?
       23   A.   That could be the May meeting.
       24   Q.   And can you read this last -- or I guess it's the fourth
01:56  25   paragraph, "My relationship with JGS is fine"?

*McConnell Direct of Boyden*

01:56  1   A.  "My relationship with JGS is fine and back to normal, yet I
       2   am still catching little irresponsible, stinging remarks from
       3   my own team.  The time spent obsessing on this account needs to
       4   be directed toward streamlining production to replace the
01:56  5   income loss when it moves.  The financial reckoning cometh."
       6   Q.  Now, just to give that some context, how much money had
       7   Mr. Carter, Mr. Smith and Mr. Reagan and Mr. Swetnam made off
       8   of these policies that we've been discussing during this trial,
       9   at the time this e-mail was sent?
01:57  10  A.  I believe both of the windstorm and at least one Zurich
       11  policy.
       12  Q.  So, a million for the Zurich and then 936,000 -- and I
       13  promised you I wouldn't ask you to do math again.  A million
       14  for the windstorm --
01:57  15  A.  A little bit less than 3 million.
       16  Q.  A little bit less than 3 million.  But there's still one
       17  more policy to come?
       18  A.  Correct.
       19  Q.  And what policy is that?
01:57  20  A.  The '07-08 Zurich policy.
       21  Q.  Now, the -- you said it was almost $3 million?
       22  A.  Yes.
       23  Q.  How much money in actual -- how much of that money was
       24  actually used to purchase any insurance for the hospital?
01:58  25  A.  Well, I would term the 3 million the illgotten gain.  I

01:58  1   mean, there was still payments that equaled more that included

2   the true premium for the Zurich policy.  Only one policy was

3   legitimate -- or actually bought anything, and that was the

4   wind -- or not the windstorm, but the Zurich policy.

01:58  5   Q.  So, out of that -- out of the 3 million, how much

6   actually -- how much of the premiums that the hospital paid to

7   Smith-Reagan, Mr. Carter and Mr. Swetnam, how much of that

8   was -- actually went to any kind of insurance?

9   A.  Well, none of that.

01:58  10  Q.  That's just money that they received?

11  A.  Correct.

12  Q.  How much out of the total the hospital paid on all those

13  policies went to insurance?

14  A.  Well, again, I mean, the two windstorm policies were

01:59  15  fictitious; so, they kept all that money.  With the

16  overcharging on the Zurich policies the additional $2 million,

17  they kept that.

18          But they had actually billed closer to 4 million;

19  so, they went ahead and paid the other million to Zurich each

01:59  20  year.

21  Q.  So, the entire three -- nearly $3 million that they got,

22  none of that was used to purchase insurance; and they had used

23  roughly a million dollars to purchase some insurance for the

24  hospital --

01:59  25  A.  Right.  I mean, they --

01:59  1  Q.  -- in addition to the 3 million they had received?

2  A.  They had received a little over 4 million that -- that

3  included the true premium on the Zurich and they -- they

4  pocketed 3 million for themselves.

01:59  5  Q.  So, Zurich gets 1 million; the defendants and their

6  co-conspirators, they get 3 million?

7  A.  Correct.

8  Q.  I would like to go now to August 2007.  And I'm at 11-11.

9  Who is this e-mail from?

02:00  10  A.  Brent Carter.

11  Q.  And who is it to?

12  A.  Dave Smith.

13  Q.  And is there an e-mail, if you scroll down, that was sent

14  earlier?

02:00  15  A.  Yes.

16  Q.  I would like you to read the e-mail from Mr. Smith to

17  Mr. Carter.  It starts, "I will talk to Mike."

18  A.  It says, "Brent, I will talk to Mike.  I suspect your

19  mortgage is about paid off but understand your concept and

02:01  20  thinking."

21  Q.  And what does Brent write back, Mr. Carter?

22  A.  He writes, "Be that as it may, we did a good job pricing it

23  last year at a level I suspect was higher than you would have

24  placed it.  The concept of pricing it down has no logic since

02:01  25  it will not lead to any consideration in the future.  As soon

02:01  1    as VAC is capable, it will write the excess if for no other

2    reason than to justify its existence.  Trust me on matters of

3    cash and be more profitable.  You can always give it back via

4    Children's Gala, etcetera.  I am really serious here, BC."

02:01  5    Q.  So, that first sentence, "We did a good job pricing it last

6    year," how much had Zurich received out of last year, the

7    monies that the hospital paid out for insurance?

8    A.  A million, a little over a million for the policy.

9    Q.  And, then, how much did the Smith-Reagan Agency receive?

02:02  10   A.  The four defendants had received about 3 million.

11   Q.  And we still have one policy, the Zurich policy, left that

12   we haven't talked about?

13   A.  Yes.

14   Q.  What does Mr. Carter say?  Trust who on matters of cash?

02:02  15   A.  Trust him, Mr. Carter.

16   Q.  And what will happen?

17   A.  "You'll be more profitable."

18   Q.  Is this e-mail -- you can see, kind of here at the bottom

19   of this page, there's another -- you see where it says, "Gents,

02:02  20   just got back from meeting with Ward Cook"?

21   A.  Yes.

22   Q.  If we turn the page to Exhibit 11A, is this the earlier

23   e-mail that's incorporated in that dialogue?

24   A.  Yes.

02:03  25   Q.  And who is this e-mail from and who is it to?

*McConnell Direct of Boyden*

02:03  1    A.   It's from Brent Carter to Mr. Swetnam, Smith and Reagan.

2    Q.   And when is it dated?  Same day?

3    A.   August 28th of '07.

4    Q.   And what's -- in general, what's Mr. Carter discussing in

02:03  5    this e-mail?

6    A.   He's relating information that he gleaned during a meeting

7    he had with Ward Cook and, it says, Dave Smith.

8    Q.   What does he say at the bottom in this e-mail, before "Have

9    a nice day"?

02:03  10   A.   "Do not focus on any legacy issues.  Focus on my mortgage."

11   Q.   What does he say above that sentence?

12   A.   "In summary, this business is leaving as soon as they can

13   move it.  I suggest all commissions and fees be fully earned

14   and we plan on losing it next renewal.  That does two things,

02:04  15   allows us to plan for the future and removes any guilt about

16   this year's income."

17   Q.   So, August 28th, 2007, and there's one more policy to do,

18   correct?

19   A.   Correct.

02:04  20   Q.   And what does Mr. Carter say about this business?

21   A.   I believe he's saying that they're going to lose the

22   hospital's business; so, he suggests a course of action.

23   Q.   What does he tell them not to focus on?

24   A.   "Legacy issues," that he wants them to focus on his

02:04  25   mortgage.

02:04  1    Q.   Can you look at United States Exhibit 7B?

2    A.   (Complies).

3    Q.   What is United States Exhibit 7B?

4    A.   That's the e-mail to Mr. Swetnam from Zurich, that

02:05  5    contained the attached binder.

6    Q.   When was this sent?

7    A.   8-31 of '07.

8    Q.   Who is it sent to?

9    A.   Mr. Swetnam.

02:05  10   Q.   So, three days after this e-mail?

11   A.   Yes.

12   Q.   How did this United States Exhibit 7B come into your

13   possession?

14   A.   I received it from the hospital as well as Zurich, TDI.

02:05  15        MR. McCONNELL:   United States moves to admit

16   Government's Exhibit 7B.

17        MR. CHANEY:   No objection.

18        MR. CLARK:   No objection.

19        THE COURT:   Admitted without objection.

02:05  20   BY MR. McCONNELL:

21   Q.   I would like you to turn to 7B-2.

22   A.   (Complies).

23   Q.   What's the annual premium listed here on the document that

24   was e-mailed from Zurich to Mr. Swetnam?

02:06  25   A.   A little over 1.2 million.

*McConnell Direct of Boyden*

02:06    1    Q.   Does it list out some coverages?

2    A.   It does.

3    Q.   And when is the effective period for the policy?

4    A.   September 1st, '07, through September 1st of '08.

02:06    5    Q.   And who is it insuring?

6    A.   Valley Baptist Health System.

7    Q.   What's 10 percent commission of a million two?

8    A.   1.2, or 120,000.

9    Q.   120,000 --

02:06    10    A.   If --

11    Q.   -- approximately.

12    A.   Correct.

13    Q.   Last time, I promise.

14         So, that was sent August 31st, 2007?

02:07    15    A.   Correct.

16    Q.   Okay.  Inspector Boyden, I'm handing you Government's

17    Exhibit 8I.

18    A.   Yes.

19    Q.   Let me show it to the defense attorneys.

02:08    20         Do you recognize Government's Exhibit 8I?

21    A.   I do.

22    Q.   When is it dated?

23    A.   8-31 of '07.

24    Q.   Same day of that Zurich e-mail?

02:08    25    A.   Correct.

McConnell Direct of Boyden

02:08    1    Q.   What is Government's Exhibit 8I?

2    A.   It's called an insurance -- or interim insurance binder and

3    premium billing.

4    Q.   How did it come into your possession?

02:08    5    A.   It came from the hospital.

6         MR. McCONNELL:   The Government moves to admitted 8I.

7         MR. CHANEY:   No objection, your Honor.

8         MR. CLARK:   No objection.

9         THE COURT:   Admitted without objection.

02:08    10    BY MR. McCONNELL:

11    Q.   May I have that back, Inspector Boyden?

12    A.   (Complies).

13    Q.   So, this document is dated the same day that e-mail is

14    sent.   Is that your testimony?

02:08    15    A.   Correct.

16    Q.   Who signed it?

17    A.   Mr. Swetnam.

18    Q.   Are the numbers here the same as the numbers we saw in that

19    e-mail?

02:09    20    A.   No.   These are the inflated numbers.

21    Q.   So, the premium that we saw in the Zurich e-mail was

22    $1.2 million?

23    A.   Correct.

24    Q.   What's the premium listed here on this document?

02:09    25    A.   2.3 million.

*McConnell Direct of Boyden*

| | | |
|---|---|---|
| 02:09 | 1 | Q.  And where was this document sent? |
| | 2 | A.  To the hospital. |
| | 3 | Q.  You received this document from the hospital? |
| | 4 | A.  Correct. |
| 02:09 | 5 | Q.  Are there some additional fees listed on this policy -- |
| | 6 | A.  There are. |
| | 7 | Q.  -- or this document? |
| | 8 | What are the additional fees? |
| | 9 | A.  The policy fee, the surplus lines tax and the stamping |
| 02:09 | 10 | office fee. |
| | 11 | Q.  Inspector Boyden, I would like you to turn now to United |
| | 12 | States Exhibit 8B. |
| | 13 | A.  (Complies). |
| | 14 | Q.  Do you recognize Government's Exhibit 8B, as in "boy"? |
| 02:10 | 15 | A.  Yes. |
| | 16 | Q.  What is Government's Exhibit 8B? |
| | 17 | A.  Another invoice sent to the hospital. |
| | 18 | Q.  How did 8B come into your possession? |
| | 19 | A.  Provided by the hospital. |
| 02:10 | 20 | MR. McCONNELL:  The Government moves to admitted 8B. |
| | 21 | MR. CHANEY:  No objection. |
| | 22 | THE COURT:  Admitted without objection. |
| | 23 | BY MR. McCONNELL: |
| | 24 | Q.  Does this have the same date of the e-mail that was sent by |
| 02:10 | 25 | Zurich and the interim insurance binder that was signed by |

*Cheryll K. Barron, CSR, CM, FCRR*            *713.250.5585*

*McConnell Direct of Boyden*

02:10   1    Mr. Swetnam that we just looked at?

2    A.  Yes.

3    Q.  And what is Government's Exhibit 8B?

4    A.  It's the invoice sent by Mr. Swetnam to the hospital.

02:10   5    Q.  Was this mailed to the hospital?

6    A.  Yes.

7    Q.  What's the policy period?

8    A.  9-1 of '07 through 9-1 of '08.

9    Q.  And is this for that Zurich umbrella liability coverage?

02:11  10    A.  Correct.

11    Q.  All sent on the same day?

12    A.  Correct.

13    Q.  I would like you to look now at Government's Exhibit 8C.

14        MR. McCONNELL:  And this is a bank document; so, I'm

02:11  15  assuming it's admitted.

16        THE COURT:  Okay.

17  BY MR. McCONNELL:

18    Q.  Government's Exhibit -- what is Government's Exhibit 8C?

19    A.  It's a check dated 9-4 of '07, from the hospital to Swetnam

02:11  20  Insurance for the $2.5 million invoice.

21    Q.  Four days after the invoice and the inflated premium were

22  sent to the hospital?

23    A.  Correct.

24    Q.  What's the check -- what's the check amount listed?

02:12  25    A.  The 2.5 million.

*McConnell Direct of Boyden*

02:12   1    Q.  And who was the check made payable to?

        2    A.  Swetnam Insurance Services.

        3    Q.  And who is the payee?  I'm sorry.  The payor?

        4    A.  Valley Baptist.

02:12   5    Q.  Is that check endorsed by Mr. Swetnam?

        6    A.  Yes.

        7    Q.  And if you look at Government's Exhibit 8D, which the Court

        8    has admitted, do you see a counter deposit of that amount in

        9    Mr. Swetnam's bank records?

02:12  10    A.  I do.

       11    Q.  And the check was dated 9-4, 2007.  The counter deposit

       12    occurred when?

       13    A.  The next day.

       14    Q.  9-5?

02:12  15    A.  Yes, sir.

       16    Q.  And I would like you to look at Government's Exhibit 8E,

       17    which the Court has admitted.

       18    A.  (Complies).

       19    Q.  And 8E is what?

02:13  20    A.  It's a cashier's check dated September 5th, '07, payable to

       21    Brent Carter for $274,000.

       22    Q.  What's the date?

       23    A.  It's 9-5 of '07.

       24    Q.  Did mr. Carter endorse it?

02:13  25    A.  Yes.

*McConnell Direct of Boyden*

02:13  1    Q.  I would like you to look at what's been admitted as

2    Government's Exhibit 8F.

3    A.  (Complies).

4    Q.  What is Government's Exhibit 8F?

02:13  5    A.  A cashier's check to Mr. Reagan.

6    Q.  For how much?

7    A.  $274,000.

8    Q.  Same day?

9    A.  Same day.

02:13  10   Q.  Endorsed?

11   A.  Yeah -- yes.

12   Q.  8G?

13   A.  It's another cashier's check, the same date, for the same

14   amount, payable to Mr. Smith.

02:14  15   Q.  Endorsed?

16   A.  Yes.

17   Q.  And, then, what's been admitted as Government's Exhibit 8H,

18   does this show a counter deposit into Mr. Swetnam's account on

19   the same day?

02:14  20   A.  Yes.

21   Q.  Same amount?

22   A.  Yes.

23   Q.  Everyone get the same amount of money?

24   A.  They did.

02:14  25   Q.  So, in total, they got a little bit over a million bucks?

02:14   1   A.  Correct.

        2   Q.  I want you to look at Government's Exhibit 10 --

        3         MR. McCONNELL:  John, I assume there's no objection to

        4   the wire.

02:15   5         MR. CHANEY:  No objection.

        6         THE COURT:  Admitted without objection.

        7   BY MR. McCONNELL:

        8   Q.  Is this the money going back to Zurich?

        9   A.  It is.

02:15  10   Q.  Is 10 percent taken out of this -- about $129,000 taken out

       11   of this money for the 10 percent premium?

       12   A.  Yes.

       13   Q.  So, they got 129,000 for the 10 percent premium plus a

       14   little bit over a million for the difference?

02:15  15   A.  Correct.

       16   Q.  So, how much in total did they get?  274 times --

       17   A.  They got the little bit over a million from the hospital

       18   and then were also paid 10 percent by Zurich for the actual

       19   premium price.

02:16  20   Q.  So, more or less than the amount of money they -- if you

       21   look on Exhibit 9 -- or I'm sorry -- if you look on Exhibit 10,

       22   the $1.1 million sent back to Zurich.

       23   A.  I believe the math would be very close.

       24         Are you suggesting did they make as much as they

02:16  25   had to pay Zurich for the actual policy?

02:16   1   Q.   Or did they make more?

   2   A.   It's going to be very close.  I'm trying to avoid math, but

   3   274 times 4 plus the -- another 120,000.

   4   Q.   And how much did Zurich get?

02:16   5   A.   1.1 million.

   6   Q.   And the defendants got the million dollars in addition to

   7   the 10 percent?

   8   A.   Sure.

   9   Q.   So, if 1.1 million went back to Zurich and they kept

02:16   10   roughly over a million, did they almost get a hundred percent

   11   of the premium --

   12   A.   Yes.

   13   Q.   -- going back to Zurich?

   14            Plus another 10 percent?

02:17   15   A.   Correct.

   16   Q.   So, almost 110 percent?

   17   A.   Correct.

   18   Q.   And, then, this wire was sent from who to who?

   19   A.   It was sent from Mr. Swetnam to Zurich.

02:17   20   Q.   And, so, Mr. Swetnam is down in Texas and Zurich is in New

   21   York?

   22   A.   Correct.

   23   Q.   Is this wire a charged count in the indictment?

   24   A.   It is.

02:17   25   Q.   Is it Count 9?

02:17  1    A.   I believe you if you say it's 9.

       2    Q.   It is a wire fraud count.

       3    A.   Correct.  There are two wire fraud counts.  I know it's one

       4    of them.

02:17  5    Q.   There's three wire fraud counts.

       6    A.   There's two wire fraud counts for the monies from Swetnam

       7    to Zurich; and there's a third count, that involves an e-mail.

       8    Q.   Let's quickly talk about -- since you brought it up, those

       9    are the two wire fraud counts.  And then we have another wire

02:17 10    fraud count in connection with the windstorm policies?

      11    A.   Correct.

      12    Q.   Is that an August 22nd e-mail sent by Mr. Swetnam?

      13    A.   It's Exhibit --

      14    Q.   Exhibit 1D-26?

02:18 15    A.   Yes.

      16    Q.   That e-mail is also charged as a count of wire fraud?

      17    A.   That's correct.

      18    Q.   And I would like you to look at Government's Exhibit 8A,

      19    which I believe has already been admitted.

02:19 20         MR. CHANEY:  I think it has.

      21    BY MR. McCONNELL:

      22    Q.   After that -- and I didn't ask you the date of that wire.

      23    Do you recall it, or would you like to look at the document?

      24    A.   I'll look.  It was 10 -- the second wire?

02:19 25    Q.   Yes.

02:19  1    A.  I believe 9-24 of 2007.

2    Q.  So, September 2007, September 24, 2007, that money is wired

3    back to Zurich.  Did Zurich later send the policy, the binder,

4    to Mr. Swetnam?

02:19  5    A.  Correct.

6    Q.  And how did they send that to Mr. Swetnam?

7    A.  They mailed them down to him.

8    Q.  So, is this the document that Zurich mailed down to

9    Mr. Swetnam?

02:19  10   A.  Yes.

11   Q.  And whose signature is on this document?

12   A.  Mr. Hamlin.

13   Q.  And, then, what's the date of the document?

14   A.  November 28th of '07.

02:20  15   Q.  And is this that $1.2 million?

16   A.  It's the real premium.

17   Q.  And, then, Zurich got the premium less the 10 percent

18   commission?

19   A.  Correct.

02:20  20   Q.  And all of the other information stayed the same as that --

21   as that e-mail that they sent down in August, August 31st

22   e-mail?

23   A.  Correct.

24   Q.  So, is this basically confirming something the hospital had

02:20  25   purchased?

02:20    1    A.  Yes.

2    Q.  And the hospital had already been invoiced more than this?

3    A.  Yes.  They had already paid more.  They had already paid

4    for it.  This is -- again, if you think of it as initially

02:20    5    getting your car, at the outset of your automobile policy, and

6    then subsequently get detailed policy documents. [sic]

7    Q.  In fact, if you look at Government's Exhibit -- what's been

8    admitted as Government's Exhibit 8, the hospital had already

9    paid part of this $2.3 million premium?

02:21    10    A.  Yeah, they already paid that a couple of months prior to

11    this.

12    Q.  So, they had already paid an amount that's roughly a

13    million dollars more than the true policy?

14    A.  Sure.

02:21    15          MR. CLARK:  Judge, I'm going to object.  This is

16    cumulative at this point.  We've kind of re-plodded this ground

17    three, four, five times now.

18          MR. McCONNELL:  I disagree, your Honor.  We're

19    explaining that they later actually got the policy in the mail

02:21    20    from the hospital.

21          THE COURT:  I'm going to allow it.  I'm going to allow

22    it.

23    BY MR. McCONNELL:

24    Q.  And was this document, Government's Exhibit 8, provided to

02:21    25    the hospital?

*McConnell Direct of Boyden*

02:21  1    A.   Yes.

       2    Q.   And you'll notice the -- in addition to the premium, you

       3    see that number on there twice, the premium, the $2.3 million?

       4             What's -- where else do you see it besides the

02:22  5    premium for the policy period?

       6    A.   In the "Minimum Earned Premium"?

       7    Q.   So, what's the "Minimum Earned Premium"?

       8    A.   I believe that's the amount that you can be refunded when

       9    you cancel -- or if you cancel the policy.

02:22  10   Q.   So, if the hospital canceled the next day after they paid

       11   the $2.3 million, how much would they get back?

       12   A.   They would get nothing back.

       13   Q.   And this document that was sent to the hospital,

       14   Government's Exhibit 8, does it note on here that it's been

02:22  15   altered at all by Mr. Swetnam or anyone else?

       16   A.   No.  No.

       17   Q.   Who does it purport to be from?

       18   A.   Zurich.

       19   Q.   And whose signature is affixed to it?

02:22  20   A.   Mr. Hamlin's.

       21   Q.   Is the Zurich logo affixed to this document?

       22   A.   Yes.

       23   Q.   I want to go to January 2008, back to the e-mails.  And if

       24   you could, look at Government's Exhibit 11-13.

02:23  25   A.   (Complies).

02:23  1    Q.  So, we saw that document was dated the end of November,

       2    2007.  Is this e-mail roughly two months later?

       3    A.  Yes.

       4    Q.  What's being discussed in this e-mail?  This "e-mail chain"

02:24  5    I should say.

       6    A.  Well, on this page, it starts down -- with an e-mail from

       7    Mr. Carter to Mr. Smith.

       8              Where in the string do you want me to start?

       9    Q.  Just, in general, what's this string discussing?

02:24 10    A.  (No response).

      11    Q.  Does it appear as though they're arguing about the

      12    business?

      13    A.  Oh, yes.

      14    Q.  And what does Mr. Carter say in response to this argument?

02:24 15    A.  "Don't give me any of that good ol' boy rhetoric about just

      16    trying to help.  You're culpable in this one as well.  You're

      17    just lucky I am as greedy as you."

      18    Q.  What's the date on this e-mail?

      19    A.  January 16th of '08.

02:25 20    Q.  I would like you to turn to Government's Exhibit 11-14B.

      21    Is this an e-mail sent by Mr. Carter roughly a week after the

      22    earlier e-mail?

      23    A.  11-what?

      24    Q.  14B.  You can look -- it should be on the screen.

02:25 25    A.  I apologize.  I kind of have a hard time reading it from

02:25    1    there.

         2                Okay.  Yes, it's from Mr. Carter.

         3    Q.  And when is this e-mail he sent?

         4    A.  January 23rd of '08.

02:25    5    Q.  Is this more discussions about the disagreement they're

         6    having in the business?

         7    A.  Yes.

         8    Q.  I would like you to turn to the second page.  Can you start

         9    reading here, "When God closes a door" and then finish the

02:26   10    e-mail?

        11    A.  It says, "When God closes a door, he always opens another,

        12    but it can be hell in the hallway.  Wise young insurance guy.

        13    There is always a reckoning.  Wise old insurance guy."

        14    Q.  Keep going.

02:26   15    A.  "Make no mistake, I am on Mike's side as he is my partner.

        16    However, it doesn't take an objective mind to admit who drove

        17    the income side of the old agency.  Mike.  Show him the respect

        18    and love he deserves for all he's done for you, because it

        19    makes sense, not because the above two statements will come

02:26   20    home to roost.  Do the right thing."

        21    Q.  Then the last e-mail we have, 11-25, Mr. Vela already

        22    talked about.  You said you gathered quite a few bank records

        23    during the course of your investigation?

        24    A.  Yes.

02:27   25    Q.  Do you recall during opening statements how Mr. Carter's

02:27  1   attorney said that some of the money had been tithed to the

       2   church?

       3   A.  I do.

       4   Q.  Did you do an analysis of those bank records?

02:27  5   A.  Yes.

       6   Q.  Did you, in fact, chart how all of the money was spent from

       7   the proceeds, you or the postal service?

       8   A.  It was charted.

       9   Q.  I'm going to show you Exhibit 14, Government's Exhibit 14.

02:28 10   Do you have Government's Exhibit 14 in your book?

      11   A.  Yes, sir.  Do you need my copy?

      12   Q.  Yes.

      13           Is Government's Exhibit 14 a summary of some of

      14   the analysis that you did?

02:28 15   A.  Yes.

      16   Q.  And that analysis was based on a review of the bank

      17   records --

      18   A.  Correct.

      19   Q.  -- that you got through your subpoenas?

02:28 20   A.  Correct.

      21           MR. McCONNELL:  The Government moves to admit 14.

      22           THE COURT:  Admitted.

      23           MR. CHANEY:  I just need to -- I would like to make

      24   sure -- is it the same 14 that we've been provided?  Nothing

02:28 25   has been changed?

*McConnell Direct of Boyden*

02:28  1                    No objection, your Honor.

2    BY MR. McCONNELL:

3    Q.  The first page of 14, does that list out the amount of

4    monies received by Mr. Swetnam?

02:29  5    A.  Yes, it does.

6    Q.  So, here, out of this -- out of the sale of these two sets

7    of policies -- four policies, how much did Mr. Swetnam receive?

8    A.  $1.2 million.

9    Q.  And, then, I'm looking at 14-2.  Is this the same thing for

02:29  10   Mr. Carter?

11   A.  Yes, he also got $1.2 million.

12   Q.  In this column, it shows where the funds were deposited?

13   A.  Correct.

14   Q.  So, some of the policies were deposited at this Frost

02:29  15   National Bank and some were deposited at McAllen National Bank?

16   A.  Right.  That just tells where the funds were initially

17   deposited.

18   Q.  So, two different banks?

19   A.  Correct.

02:29  20   Q.  All right.  And the same thing for Mr. Swetnam; we have

21   McAllen Bank as the first bank, and then we have this Frost

22   National Bank is the second bank?

23   A.  Correct.

24   Q.  Okay.  And then you did the same thing for Mr. Smith.  Is

02:30  25   that right?

02:30  1  A.  Correct.

2  Q.  And it looks like two of the deposits were into two

3  different banks.

4  And then there's a question mark here.  Does that

02:30  5  mean you couldn't figure out where the final deposit went?

6  A.  I suspect at the time that this was done that it was not

7  legible.

8  Q.  Okay.  And the same thing for Mr. Reagan?

9  A.  Correct.

02:30  10  Q.  And there's a question mark by Wells Fargo, and a question

11  mark by "Account."  Does this mean you couldn't figure out the

12  account number, it wasn't real legible?

13  A.  At the time this was created, yes.

14  Q.  And Wells Fargo, same thing with the question mark?

02:30  15  A.  Correct.

16  Q.  There aren't any question marks, though, with Mr. Swetnam

17  and Mr. Carter.

18  A.  Well, there aren't any now.  I was able to identify and

19  locate and review the records for all of the deposits.  Just at

02:31  20  the time this was created it hadn't been determined yet.

21  Q.  Were you more focused on discerning where the money went

22  for Carter's and Swetnam's account because there's some

23  forfeiture language in the indictment?

24  A.  Well, no.  I think I'm equally focused but -- just,

02:31  25  literally, at the time when this particular Excel chart was

02:31　　1　created -- it's just a work in progress -- it just hadn't been

　　　　2　determined yet.

　　　　3　Q.　What is "forfeiture"?

　　　　4　A.　"Forfeiture" is an attempt to make a victim whole through

02:31　　5　the recovery of assets or seizing things, to recover money.

　　　　6　Q.　Was some money seized as a result of these charges against

　　　　7　the defendants?

　　　　8　A.　Yes.

　　　　9　Q.　And were certain documents filed with respect to certain

02:32　　10　properties they had?

　　　　11　A.　Sure.

　　　　12　Q.　Can you talk about, with respect to the forfeiture, what

　　　　13　monies were seized and what property was -- I guess we

　　　　14　noticed -- or a lis pendens notice was filed.  Can you discuss

02:32　　15　that?

　　　　16　A.　In the most general terms, a forfeiture, an asset

　　　　17　forfeiture investigation is very specific.  It has to be

　　　　18　directly attributable to the proceeds of the scheme.

　　　　19　　　　　　　In this particular case, by the time we were able

02:32　　20　to trace all of the funds, a large amount of the assets that

　　　　21　had been purchased had already changed hands.  I did seize some

　　　　22　funds in an account of Mr. Carter's.

　　　　23　Q.　Did you look -- I understand -- did you look at how the

　　　　24　defendants spent those monies?

02:32　　25　A.　Sure.

02:32   1   Q.  What sort of things did -- you know, aside from the

2   forfeiture, what sort of things were purchased with the funds?

3   A.  Cars, motorcycles, jewelry, pay off credit cards, just --

4   just -- I can provide great detail, to the penny, of where it

02:33   5   was spent; but those are some of the larger categories.

6   Q.  Did you discover any funds that were donated back to the

7   church?

8   A.  Oh, yes.

9   Q.  How much money --

02:33   10         THE COURT:  To the church or the hospital?

11         MR. McCONNELL:  The church.

12         THE COURT:  Okay.

13   BY MR. McCONNELL:

14   Q.  The church?

02:33   15   A.  Correct, the church.

16   Q.  Was it donated or how was the money spent?

17   A.  Well, it's somewhat like on a check when you see "Memo" and

18   things, it will say things like "tithe"; but, yeah, there was

19   money given to the church.

02:33   20   Q.  What sort of -- other than the church tithing, what sort of

21   other things were the funds spent on?

22   A.  I believe I saw a -- for Mr. Carter's account, a $26,000

23   jewelry purchase, vehicles, motorcycle, an exorbitant amount to

24   credit card companies.  I mean, there -- if you want --

02:34   25   Q.  How much was spent on jewelry, cars, and -- I guess

02:34  1  fungible goods, as opposed to given back to the church, if you

2  know?

3  A.  I'm a little embarrassed to say.  They give more to the

4  church than I can.

02:34  5        Significant amounts, in sometimes $10,000

6  increments.

7  Q.  Do you have some records that can refresh your recollection

8  on how much was given back to the church?

9  A.  Sure.

02:34  10  Q.  Would you like to review those?

11  A.  Sure.  Mr. Carter, there was a $26,300 payment to the

12  Jewelry Connection; there were counter withdrawals in

13  increments of $15,000, $32,500, $25,000; there were significant

14  transfers to subsequent accounts that he controlled; there's a

02:35  15  almost $40,000 payment to his credit card at MBNA, which is now

16  Bank of America; there's a $10,000 payment to the church.

17        He approximately spent looks like $5,000 for a

18  sprinkler system; 13 and a half thousand dollars for a boat;

19  6,000 for furniture; $10,000 for a Chase credit card.  He

02:35  20  donated $6,000, it says, for a CCS library construction, the

21  Harlingen Country Club.

22     MR. CLARK:  Judge, I would like to make an objection,

23  a housekeeping matter, if we could approach the bench.

24     THE COURT:  Okay.

02:36  25     *(At the bench with all counsel)*

*McConnell Direct of Boyden*

02:36  1    MR. CLARK:  Forfeiture proceedings are typically
      2    bifurcated, your Honor.  And I don't know the continued
      3    relevancy of going into the life style, spending part, because
      4    I've never seen it done this way.  It's always after there's a
02:36  5    verdict then you go into this type of testimony.  It's not
      6    particularly relevant right now.
      7        MR. McCONNELL:  Your Honor, they opened the door in
      8    the beginning of the trial by saying the money was tithed back
      9    to the church.  We're just trying to say that, you know, more
02:36  10   money was spent on toys than was given back to the church.  So,
      11   we're just trying to rebut that.
      12       MR. CLARK:  I certainly never opened the door.
      13       MR. McCONNELL:  Mr. Carter did.
      14       MR. CLARK:  And, quite frankly, you know, it's
02:37  15   confusing.  But it's also erroneous to be doing what should be
      16   a bifurcated proceeding if and when they're --
      17       THE COURT:  Well, I don't know that I hear this as
      18   being forfeiture.  A lot of that stuff is --
      19       MR. McCONNELL:  We're not forfeiting the jewelry
02:37  20   and --
      21       THE COURT:  -- the jewelry or credit card payments.
      22   But I did think there was reference made early on to
      23   Mr. Carter's tithing.
      24       MR. CHANEY:  There was, your Honor.
02:37  25       MR. CLARK:  There were.

*McConnell Direct of Boyden*

02:37   1          THE COURT:  How does this implicate your clients?

        2          MR. CLARK:  It -- you know, again, it's just -- to me,

        3   it's not particularly relevant at this point.  I mean, it

        4   doesn't affect my client; but it's a waste of time as I see it,

02:37   5   Judge.

        6          MR. COSTA:  No, no.  They're talking about the

        7   hospital salaries and salaries --

        8          THE COURT:  Yeah.  I think we've opened the door to

        9   all sorts of issues as to how money was earned and how it was

02:37  10   spent.

       11          MR. CLARK:  Sure.

       12          THE COURT:  I'm going to allow it.

       13          MR. CLARK:  Okay.  Fair enough.

       14          THE COURT:  I'm going to allow it.

02:38  15      *(In open court)*

       16   BY MR. McCONNELL:

       17   Q.  So, can you quantify for us, Inspector Boyden, how much was

       18   spent on donations to the church versus purchases such as

       19   jewelry, cars, and that sort of thing, credit card payments?

02:38  20   A.  Well, I would say, with the cumulative gain to Mr. Carter

       21   of approximately 1.2 million, I believe it was less than

       22   100,000 that went to the church.

       23   Q.  About 10 percent?

       24   A.  And everything else was spent.  There was a -- I believe I

02:38  25   seized around -- or up to $44,000 from one bank account that I

| | |
|---|---|
| 02:38 | 1 |

was able to find that I froze up.

Q.  What about Mr. Swetnam's purchases?

A.  Do I have one other folder right there at the end, against the wall?

Q.  Yes.

A.  Could I look at that, please?

Q.  (Indicating)

A.  Again, it's significant as it pertains to Mr. Swetnam. And, again, significant counter withdrawals or cash withdrawals, 25,000; a $6,300 payment to a car company; a $15,000 cash withdrawal; 1600, air conditioning; another 10,000 to a church.  It looks like he bought a Jeep for 22,000; $11,000 to American Express; 8,000 to MBNA.

Q.  And these are all funds you were able to trace back to the policies?

A.  Directly.  I mean, this is a very specific analysis of the funds coming into the accounts.  I go through the records and follow every penny, where it goes.

MR. McCONNELL:  Your Honor, I pass the witness.

THE COURT:  All right.

Inquiry?

MR. CHANEY:  Thank you, your Honor.  It's going to take me just a moment to set up.

THE COURT:  Anybody want a break?

Okay.  All rise for the jury.

02:40  1       *(Jury not present)*

2          MR. CHANEY:  Can I ask a scheduling question, your

3  Honor?

4          THE COURT:  Yes, sir.

02:41  5          MR. CHANEY:  Because I was told they had a witness

6  that they were going to call out of order.  And if that -- if

7  you need -- is that still the case?

8          MR. McCONNELL:  Your Honor, we do have a witness here

9  from the British Virgin Islands, Elton Lettsome.  He's going

02:41 10  back tomorrow.

11          MR. CLARK:  That's fine.

12          MR. McCONNELL:  We were going to try to get him on

13  today.

14          THE COURT:  That's fine with me.

02:41 15          MR. CLARK:  It's fine with me, makes more sense to do

16  now.

17          MR. CYGANIEWICZ:  I think the point is, would it be

18  appropriate to put him on before the cross.

19          THE COURT:  No, I understand that.  But the jury wants

02:41 20  to go by 4:00.  Can you do it?

21          MR. CLARK:  Otherwise, we're going to break the cross.

22          MR. COSTA:  He should be a very brief witness.  I say

23  that.  You never know.

24          THE COURT:  Let's try it.  Let's try it.

02:41 25      *(Recess was taken from 2:41 to 2:56 p.m.)*

02:56    1          THE COURT:  Ladies and gentlemen, the Government has

         2    one more witness from out of the country.  So, rather than

         3    proceed with Inspector Boyden's cross-examination, we're going

         4    to allow the Government to call their other witness.  We think

02:56    5    we can get done with him this afternoon.  We'll resume with

         6    Inspector Boyden on Monday.

         7          *(End of requested proceedings)*

         8                        *  *  *  *  *

         9                  COURT REPORTER'S CERTIFICATION

        10          I certify that the foregoing is a correct transcript from
              the record of proceedings in the above-entitled cause.

        11

        12    Date:  November 18, 2010

        13

        14                    /s/   Cheryll K. Barron

        15                    Cheryll K. Barron, CSR, CMR, FCRR
                              Official Court Reporter

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25